UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| State of North Dakota,<br>Industrial Commission of North Dakota,<br>Lignite Energy Council,<br>Basin Electric Power Cooperative,<br>The North American Coal Corporation,<br>Great Northern Properties Limited<br>Partnership, Missouri River Basin<br>Municipal Power Agency d/b/a Missouri<br>River Energy Services, Minnkota Power<br>Cooperative, Inc., | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No.: |
| | ) | |
| Plaintiffs, | ) | **COMPLAINT FOR** |
| v. | )<br>) | **DECLARATORY AND**<br>**INJUNCTIVE RELIEF** |
| Lori Swanson, Attorney General of the<br>State of Minnesota,<br>Ellen Anderson, Commissioner and<br>Chair, Minnesota Public Utilities<br>Commission,<br>David C. Boyd, Commissioner,<br>Minnesota Public Utilities Commission,<br>Phyllis Reha, Commissioner and Vice<br>Chair, Minnesota Public Utilities<br>Commission,<br>J. Dennis O'Brien, Commissioner,<br>Minnesota Public Utilities Commission,<br>Betsy Wergin, Commissioner, Minnesota<br>Public Utilities Commission,<br>Mike Rothman, Commissioner,<br>Minnesota Department of Commerce,<br>each in his or her official and individual<br>capacities, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Demand for Jury Trial** |
| | ) | |
| Defendants. | )<br>)<br>) | |

Come now Plaintiffs State of North Dakota, Industrial Commission of North

Dakota, the Lignite Energy Council, Basin Electric Power Cooperative, The North

American Coal Corporation, Great Northern Properties Limited Partnership, Missouri River Basin Municipal Power Agency d/b/a Missouri River Energy Services, and Minnkota Power Cooperative, by and through their attorneys, and for their Complaint against Defendants Lori Swanson, Attorney General of the State of Minnesota; Ellen Anderson, Commissioner and Chair, Minnesota Public Utilities Commission; David C. Boyd, Commissioner, Minnesota Public Utilities Commission; Phyllis Reha, Commissioner and Vice Chair, Minnesota Public Utilities  Commission; J. Dennis O'Brien, Commissioner, Minnesota Public Utilities Commission; Betsy Wergin, Commissioner, Minnesota Public Utilities Commission; and Mike Rothman, Commissioner, Minnesota Department of Commerce; each in his or her official and individual capacities, state as follows:

## INTRODUCTION

1.      Over the past several decades, the State of North Dakota has become a leader in energy production and supply.  Drawing on its vast lignite coal deposits, North Dakota has become a leading source of lignite-generated electricity, which it has supplied at low cost to consumers, farms, and businesses in North Dakota and its neighboring states, including Minnesota.  North Dakota is also a significant source of oil, natural gas, biomass, and wind energy.

2.      North Dakota stands as a model for the United States in the development of innovative, long-term energy resources to meet the Nation's growing demand for energy in a clean and environmentally responsible manner.  In particular, North Dakota's lignite-powered electric industry is recognized as a leader in installing and operating emissions

2

control technologies, including electrostatic precipitators, scrubbers, spray dryers and baghouses to reduce particulates and other emissions.  North Dakota has also taken the lead in developing and implementing carbon capture and sequestration technologies. North Dakota is home to the largest carbon sequestration project in the world, in which Basin Electric's for-profit subsidiary, Dakota Gasification Company, operates the Great Plains Synfuels Plant and exports captured carbon dioxide through a 205-mile pipeline to Saskatchewan, Canada, where it is used for enhanced oil recovery.

3.     North Dakota's Public Service Commission has numerous statutory responsibilities with respect to the regulation of utilities in North Dakota, including regulating rates, terms, and conditions of retail electric service provided by investor owned utilities; siting power plant and transmission line facilities; and prescription and enforcement of safety requirements for electric service.

4.     In recent years, North Dakota has become a vital and essential source of electricity for consumers in Minnesota.  Power stations in Minnesota generate approximately fifty-five percent of their electricity from coal, all of which is imported. North Dakota's power plants export the vast majority of the electricity they produce to consumers in other states, including Minnesota.   In this way, North Dakota and Minnesota have collaborated to develop a mutually beneficial energy and economic partnership.

5.     However, the State of Minnesota has recently adopted a law that, on its face and as applied, unconstitutionally interferes with North Dakota's energy production in violation of, inter alia, the Commerce Clause of the United States Constitution.  The Next

Generation Energy Act of 2007, Minn. Stat. §§ 216H.01, *et seq.* ("NGEA"), is a law purportedly relating to "global warming" and "Greenhouse Gas Emissions." The NGEA is premised on the proposition that there is a causal relationship between anthropogenic carbon dioxide emissions and global warming. *See id.* §§ 216H.01; 216H.02; 216H.10, subd. 5. Based upon this presumption, the NGEA imposes restrictions on carbon dioxide emissions from out-of-state energy sources as a purely symbolic gesture that could only have negligible impact toward actually achieving the purpose of reducing greenhouse gases on a global scale.

6.     Pursuant to the NGEA, effective August 1, 2009, Minnesota's climate change laws (1) prohibit the importation into Minnesota of power from any "new large energy facility" that "would contribute to statewide power sector carbon dioxide emissions," and (2) prohibit any person from entering into "a new long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions." Minn. Stat. § 216H.03, subd. 3. The NGEA defines "statewide power sector carbon dioxide emissions" to include carbon dioxide emitted from the generation of electricity imported from outside of Minnesota and consumed in Minnesota. *Id.* subd. 2. The NGEA also defines a "new large energy facility" as "any electric power generating plant or combination of plants at a single site with a combined capacity of 50,000 kilowatts or more and transmission lines directly associated with the plant that are necessary to interconnect the plant to the transmission system" that was not in operation as of January 1, 2007, but does not include a facility that (1) uses natural gas as a primary fuel, (2) is designed to provide peaking, intermediate, emergency backup, or contingency

services, (3) uses a simple cycle or combined cycle turbine technology, and (4) is capable of achieving full load operations within 45 minutes of startup for a simple cycle facility, or is capable of achieving minimum load operations within 185 minutes of startup for a combined cycle facility. *Id.* subd. 1; *see also* Minn. Stat. § 216B.2421, subd. 2(1). In practical effect, a "new large energy facility" includes only coal-powered facilities.

7.     These prohibitions on the importation of power from new large energy facilities from outside Minnesota and new long-term power purchase agreements for power generated outside of Minnesota imposed by the NGEA are facially discriminatory and have been discriminatory as applied. Through these prohibitions, Defendants improperly seek to control and regulate new energy facilities, as well as the expansion and refurbishment of existing energy facilities, located in North Dakota and other states. In practical effect, through the implementation and application of these statutes, Defendants have subjected energy projects located outside of Minnesota and/or in which Minnesota-based entities have no interests to onerous regulatory burdens. Because North Dakota is home to significant lignite reserves and lignite-powered energy plants, Defendants' implementation of the NGEA reduces demand for North Dakota lignite and thereby harms North Dakota, its lignite industry and its citizens, as well as the coal-powered electric industry outside of Minnesota.

8.     Additionally, the NGEA further provides that Defendant Commissioners of the Minnesota Public Utilities Commission "shall establish an estimate of the likely range of costs of future carbon dioxide regulation on electricity generation. The estimate . . . must be used in all electricity generation resource acquisition proceedings." Minn. Stat.

§ 216H.06.  Pursuant to this provision, Defendant MPUC Commissioners have set the range of likely costs of carbon dioxide regulation at between $9 and $34 per ton of emitted carbon dioxide.  As these estimates "must" be used in "all electricity generation resource acquisition proceedings," they function as a de facto tax on coal resources.

9.      Furthermore, because the exemptions contained in the NGEA discriminate in favor of Minnesota-based interests, implementation of this statute has an adverse effect on whether new energy facilities are constructed in North Dakota or other states outside of Minnesota and whether existing power plants in North Dakota or other states will expand their facilities and capacity—particularly facilities and plants that utilize coal.

10.     Thus, Defendants regulate beyond the borders of the State of Minnesota, and interfere with the free flow of goods and services, in clear violation of the Commerce Clause of the United States Constitution.

11.     Plaintiffs have commenced this action seeking declaratory relief to have the unconstitutional provisions of the NGEA struck down and invalidated as null and void, and injunctive relief to prevent the unconstitutional enforcement of these laws.

**PARTIES**

12.     Plaintiff State of North Dakota is a sovereign state which, inter alia, serves its citizens through the responsible regulation and promotion of the energy industry and assesses coal severance taxes and a tax for the Lignite Research Fund on lignite severed for sale or industrial purposes.  North Dakota also assesses a coal conversion tax on electrical generating plants which generate coal-powered energy.

13. Plaintiff Industrial Commission of North Dakota was created by the North Dakota Legislature in 1919 to conduct and manage certain utilities, industries, enterprises, and business projects established by state law. N.D. Cent. Code §§ 54-17-01-39 (2009). The Industrial Commission is comprised of three members, namely the Governor, Attorney General, and Agriculture Commissioner of the State of North Dakota. *Id.*

14. Plaintiff Lignite Energy Council is a trade association based in North Dakota whose mission is to protect, maintain and enhance development of lignite resources in North Dakota. Its members include lignite mining companies, lignite resource owners and users of lignite and lignite byproducts, utilities that generate electricity from lignite, and businesses that provide services to the lignite industry.

15. Plaintiff Basin Electric Power Cooperative ("Basin Electric") is a North Dakota nonprofit cooperative association whose core business is generating and transmitting wholesale bulk electric power to customers, principally its 135 member rural electric systems located in Minnesota, North Dakota, Montana, Wyoming, Colorado, New Mexico, Nebraska, South Dakota and Iowa. By 2012, approximately 59% of Basin Electric's generating capacity will be coal-based.

16. Plaintiff The North American Coal Corporation ("North American Coal") is a Delaware corporation and is the largest lignite coal producer in the United States. North American Coal operates the Freedom Mine in Beulah, North Dakota through The Coteau Properties Company, a wholly-owned subsidiary of North American Coal which supplies lignite to Basin Electric. North American Coal also operates the Falkirk Mine in

Underwood, North Dakota through The Falkirk Mining Company, a wholly-owned subsidiary of North American Coal which supplies lignite to Great River Energy.

17.     Plaintiff Great Northern Properties Limited Partnership ("Great Northern Properties") is a privately held Delaware limited partnership.   Within the State of North Dakota, Great Northern Properties owns over 958,000 mineral acres under which lie in excess of 2 billion tons of developable and surface mineable lignite.  A portion of these reserves are currently under development by an affiliate of Great Northern Properties for the generation of low carbon electricity using state-of-the-art low emission coal gasification technologies.

18.     Plaintiff Missouri River Basin Municipal Power Agency d/b/a Missouri River Energy Services ("MRES") is a body corporate and politic organized under Chapter 28E of the Code of Iowa and a public agency existing under the intergovernmental cooperation laws of the States of Iowa, Minnesota, North Dakota and South Dakota.  MRES membership is comprised of sixty-one municipalities.  Twenty-four of its member municipalities are located in Minnesota.  The balance of its members are located in Iowa, South Dakota and North Dakota.

19.     Plaintiff Minnkota Power Cooperative, Inc. is a nonprofit Minnesota cooperative corporation providing wholesale power on an all requirements basis to eleven member-owned distribution cooperatives located in eastern North Dakota and northwestern Minnesota.

20.     Defendant Lori Swanson is the Attorney General of the State of Minnesota. She is charged with enforcing relevant provisions of the NGEA against any person who is violating or about to violate them.  Minn. Stat. § 216H.03, subd. 8.

21.     Defendant Commissioners of the Minnesota Public Utilities Commission Ellen Anderson, David C. Boyd, Phyllis Reha, J. Dennis O'Brien, and Betsy Wergin are charged with the regulation of electric, natural gas, and telephone utilities doing business in the State of Minnesota. Under the NGEA, Defendant Commissioners are required to establish an estimate of the likely range of costs of future carbon dioxide regulation on electricity generation, which estimate must be used in all electricity resource acquisition proceedings.  *Id.* § 216H.06.  Further, whenever the Commissioners determine that any person is violating or about to violate the NGEA, they may refer the matter to Defendant Attorney General of Minnesota Lori Swanson. *Id.* § 216H.03, subd. 8.

22.     Defendant Mike Rothman is the Commissioner of the Minnesota Department of Commerce, which includes the Minnesota Division of Energy Resources, which advocates for the public's interest before Defendant Commissioners of the Minnesota Public Utilities Commission.  Whenever Defendant Rothman determines that any person is violating or about to violate the NGEA, he may refer the matter to Defendant Attorney General of Minnesota Lori Swanson. *Id.*

### JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. §§ 1331.  Plaintiffs assert claims under 42 U.S.C. § 1983 and the Constitution and laws of the United States.

24.     This Court has jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367.     Plaintiffs assert state law claims under Article XII, Section 1 of the Minnesota Constitution.

25.     This Court has personal jurisdiction over Defendants because all Defendants are residents of Minnesota and regularly conduct business in Minnesota.

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants reside in Minnesota and a substantial part of the events or omissions giving rise to this claim have occurred in Minnesota.

## STATEMENT OF FACTS

**I.      Coal is a significant natural resource in North Dakota, and the coal industry is a significant part of the North Dakota economy.**

27.     North Dakota is home to the largest single deposit of lignite coal in the world, which fuels seven power plant stations within the State.   Coal is among the least expensive fuels for producing electricity on an industrial scale.

28.     North Dakota's legislative assembly has found and declared as a matter of North Dakota public policy that:

> [I]t is an essential governmental function and public purpose to assist with the development and wise use of North Dakota's vast lignite resources by supporting a lignite research, development, and marketing program that promotes economic, efficient, and clean uses of lignite and products derived from lignite in order to maintain and enhance development of North Dakota lignite and its products; support educational activities relating to the lignite industry; preserve and create jobs involved in the production and utilization of North Dakota lignite; ensure economic stability, growth, and opportunity in the lignite industry; and maintain a stable and competitive tax base for our state's lignite industry for the general welfare of North Dakota. The legislative assembly further finds and declares that development of North Dakota's lignite resources must be conducted in an

environmentally sound manner that protects our state's air, water, and soil resources as specified by applicable federal and state law.

N.D. Cent. Code. § 54-17.5-01.

29.     In support of state-sponsored research and development in the North Dakota lignite industry, North Dakota's legislative assembly found and declared as of 2009 that the North Dakota lignite industry:

- Produces approximately thirty million tons of lignite annually;

- Generates electricity for more than two million people;

- Produces synthetic natural gas to heat three hundred thousand homes and businesses;

- Generates nearly three billion dollars in annual business volume;

- Generates more than one hundred million dollars in annual tax revenue; and

- Generates 28,000 direct and indirect jobs.

*Id.*

30.     North Dakota collects a severance tax of 37.5 cents per ton of lignite mined in North Dakota. N.D. Cent. Code § 57-61-01. These monies are credited to the state's Coal Development Fund in order to be appropriated by the state's legislative assembly. *Id.* § 57-61-10.

31.     North Dakota also collects two cents per ton of lignite mined in North Dakota for the Lignite Research Fund *Id.* § 57-61-01.5.

32.     North Dakota also collects a coal conversion tax from electrical generating plants for the privilege of producing electricity from coal within the State of North

Dakota. *Id.* § 57-60-02. The coal conversion tax is assessed against North Dakota power plants depending on their capacity to produce energy and their actual production. Its revenues are then shared by the state and coal-producing counties, cities and school districts. *Id.* §§ 57-60-14, 15. Over the past decade, North Dakota has collected approximately $273 million from the coal conversion tax.

33.    Lignite-based power plants have invested more than one billion dollars in technology to control emissions, and utilities with plants in North Dakota are continuing to invest millions of dollars in additional emissions control technologies.

34.    North Dakota's lignite-powered electric industry has become a recognized leader in the industry for installing and operating emissions control technologies, including electrostatic precipitators, scrubbers, spray dryers and baghouses to reduce particulates and other emissions. Moreover, each power plant in North Dakota that uses lignite complies with all state and federal ambient air quality standards. North Dakota and its industries have also pioneered the development and implementation of carbon capture and sequestration technologies.

35.    The development cycle for new large energy facilities ranges approximately from five to seven years in length requiring planning for compliance with state and federal regulatory requirements, development of project financing, engineering and construction.

36.    To assist with the "development and wise use" of North Dakota's lignite resources, the Industrial Commission is required to consult with the Lignite Research Council in matters of policy affecting the administration of North Dakota's Lignite

Research Fund.    N.D. Cent. Code § 54-17.5-02.    In this regard, the Industrial Commission is authorized to make grants or loans for research, development, and marketing projects related to lignite and products derived from lignite, and to make and execute contracts in support of research, development, and marketing that promotes North Dakota lignite. *Id.* §§ 54-17.5-04, 54-17.5-01.

37.    One of the Industrial Commission's initiatives is the allocation of $10 million to the Lignite Vision 21 Program, which seeks to develop "the finest coal-fueled plants in the world, employing the latest clean-coal technology."    In addition to the Industrial Commission's investment, the State of North Dakota has provided tax incentives for new coal projects. The Lignite Vision 21 Program is currently invested in three projects.

38.    The first project is the investment of two million dollars in Great River Energy's ("GRE's") Spiritwood Station power plant—a 99 megawatt ("MW") combined heat and power plant which will be ready for commercial operation in 2012.

39.    The second project is an investment of $1.7 million for American Lignite Energy's prospective coal-to-liquids plant which would use 11.5 million tons of lignite per year to produce 30,000 barrels of gasoline per day, 100 MW of electricity for export, and other chemicals and fuels.

40.    The third project is the South Heart Energy LLC project (the "South Heart Project") being developed by Great Northern Project Development LP, an affiliated company of Great Northern Properties. The South Heart Project is a planned coal-to-hydrogen plant that will generate 175 MW of low carbon electricity from 2.4 million tons

of lignite per year, the majority of which will come from the reserves of Great Northern Properties. While construction on the South Heart Project is scheduled to begin in 2015, current mine permitting is underway and being pursued through the North Dakota Public Service Commission.

41.     Basin Electric operates two lignite-fueled power stations in North Dakota: Leland Olds Station near Stanton, North Dakota, and Antelope Valley Station, near Beulah, North Dakota.  Further, Basin Electric operates and is a 42.27% owner of the Laramie River Station, located east of Wheatland, Wyoming.

42.     Unit 1 of the Leland Olds Station has been in commercial operation since 1966, and Unit 2 has been in operation since 1975.  In 2007 Basin Electric began construction on a wet limestone scrubber in order to remove sulfur dioxide from the plant's flue gasses.  The project is expected to cost $410 million.

43.     In addition to its lignite-fueled power stations, Basin Electric operates other generation facilities, including its Dry Fork Station near Gillette, Wyoming, which began operating in the summer of 2011 and is expected to go into commercial operation on November 1, 2011.  This station generates 385 MW of electricity using sub-bituminous coal from the Dry Fork Mine in Wyoming.  The Dry Fork Station has cost more than one billion dollars to construct.

44.     Basin Electric provides supplemental wholesale power directly to four distribution cooperatives serving in Minnesota and to nine distribution cooperatives via contracts with intermediary Generation and Transmission Cooperatives.  In 2010, Basin Electric provided approximately 1,035,272 mwh or about 4.59% of its total sales to its

Minnesota customers. Since Basin Electric is the supplemental power supplier, it is obligated to serve the load growth of these cooperatives and will have to construct new generating resources as needed to serve this load.

45.     There are three major alternating current power grids in North America, the Western Interconnection, the Eastern Interconnection, and the Texas ERCOT Interconnection. These grids operate electrically separate from each other. Basin Electric provides electric service to its members on both the Eastern Interconnection and the Western Interconnection, and operates generating facilities on each system to accomplish this. Through ownership of contract rights in AC/DC/AC tie facilities, Basin Electric has the ability to move a limited amount of power between the two systems.

46.     In northwestern North Dakota, Basin Electric has experienced an increase in electrical load largely attributable to booming oil and gas exploration and development activities. To help service this load, during the start-up and testing of the Dry Fork Station, Basin Electric has moved up to 130 MW of power from the Dry Fork Station into the Eastern Interconnection. Once Dry Fork Station is in commercial operation, it is expected that these load transfers into the Eastern Interconnection will continue.

47.     The NGEA could be interpreted to condition or prohibit the above described transfers of power into the Eastern Interconnection necessary to service Basin Electric's North Dakota customers because such transfers result in sub-bituminous coal generated power being potentially imported into Minnesota through the Eastern Interconnection. Basin Electric faces a reasonable apprehension of adverse action by the State of Minnesota and its agencies based on the NGEA.

48. The NGEA also adversely affects Basin Electric's ability to plan for future operations necessary to support expected demand. Basin Electric has entered into power purchase agreements from coal based resources in both the short and long term duration throughout its fifty year existence. Basin Electric faces uncertainty about the application of the NGEA with respect to certain power purchase agreements and the NGEA thus has interfered with Basin Electric's long term planning efforts.

49. North American Coal's wholly-owned subsidiary The Coteau Properties Company operates the Freedom Mine near Beulah, North Dakota. The Freedom Mine is the largest lignite mine in the Unites States in terms of deliveries and produces up to 16 million tons of lignite annually. Lignite from the Freedom Mine supplies Basin Electric's Leland Olds and Antelope Valley Stations.

50. North American Coal's wholly-owned subsidiary The Falkirk Mining Company operates the Falkirk Mine in Underwood, North Dakota. The Falkirk Mine delivers more than seven million tons of lignite annually. Lignite from the Falkirk Mine fuels Great River Energy's Coal Creek Station in North Dakota and will fuel Great River Energy's Spiritwood Station.

51. Great Northern Properties has over 20 different developable lignite deposits scattered around central and western North Dakota. Since 2001, Great Northern Properties has been proactive in the development of its lignite reserves, predominately focused on electrical generation using state-of-the-art "clean coal" technologies such as coal gasification. Great Northern Properties and its affiliates continue to source and sponsor development of new technologies that will enable the use of lignite as a cheap,

abundant energy resource and in compliance with stringent statutory environmental requirements.

52. The NGEA is now and will continue to negatively impact Great Northern Properties and its affiliates in the development of its owned resources by curtailing opportunities to utilize the products derived from such lignite within the State of Minnesota. A case in point is the South Heart Project being developed by an affiliate of Great Northern Properties. The South Heart Project will generate 175 MW of low carbon electricity whose potential customers could include utilities and co-ops that could export to Minnesota. Because of NGEA, it is likely that potential Minnesota customers will be unwilling to commit to power purchase or other types of participation agreements relative to the South Heart Project. This would be detrimental to the development and use of Great Northern Properties' coal resources as well as the development of the South Heart Project.

53. MRES is contractually obligated to supply power and energy sufficient to meet its member's demand, both within and without Minnesota. MRES currently supplies its members with power and energy from an integrated mix of coal, natural gas, oil and wind generation. MRES also supplies its members with market purchases of power and energy. MRES has contractual rights for transmission of power and energy into Minnesota, and transmits power and energy into Minnesota daily.

54. MRES anticipates that its members' power and energy requirements will increase with time, exceeding its present capacity to meet contractual obligations to its members. Because MRES is obligated to supply the load growth of its members, it will

have to construct or acquire new sources of power and energy as demand increases. The NGEA could be applied to condition or prohibit importation of coal generated power and energy into Minnesota to serve Minnesota members' increased demand.

55.     MRES has contracted to purchase power and energy produced by coal based generating resources for more than thirty-five years. Since the enactment of the NGEA, MRES has negotiated for acquisition of additional coal generated power and energy. In analyzing the acquisition of such coal generated power and energy, MRES has, of necessity, been faced with tailoring its business plan to avoid violation of the NGEA. The NGEA thus adversely affects MRES's ability to plan for future operations necessary to support expected demand.

56.     MRES has a reasonable apprehension of adverse action by the State of Minnesota and its agencies based on the NGEA. Uncertainty regarding the application of the NGEA with respect to certain coal based power and energy purchases interferes with MRES's long term planning and opportunities to acquire economical supplies of power and energy to serve its contractual obligations to its members.

**II.     Minnesota's Next Generation Energy Act harms the coal industry.**

57.     The NGEA was introduced in the 2007 Minnesota legislature as Senate File 145. Article 5 of the NGEA provides broad provisions addressing so-called "greenhouse gas emissions" that have been codified in Chapter 216H of Minnesota Statutes. The NGEA was signed into law on May 25, 2007.

58. The professed objective of the NGEA is to reduce "global warming." However, the NGEA is, at best, a purely symbolic gesture and will not have any meaningful effect on global warming.

59. Instead, the NGEA has the effect of regulating and controlling the development of new large energy facilities located outside of Minnesota, as well as chilling the potential expansion or refurbishing of existing power plants located outside of Minnesota.

60. Defendants have interfered with the development of new energy facilities and new power agreements through the implementation of the NGEA, which provides that, effective August 1, 2009, "[u]nless preempted by federal law" or "until a comprehensive and enforceable state law or rule pertaining to greenhouse gases that directly limits and substantially reduces, over time, statewide power sector carbon dioxide emissions is enacted and in effect," no person shall:

(1) construct within the state a new large energy facility that would contribute to statewide power sector carbon dioxide emissions;

(2) import or commit to import from outside the state power from a new large energy facility that would contribute to statewide power sector carbon dioxide emissions; or

(3) enter into a new long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions. For purposes of this section, a long-term power purchase agreement means an agreement to purchase 50 megawatts of capacity or more for a term exceeding five years.

Minn. Stat. § 216H.03, subd. 3.

61.     The NGEA defines "statewide power sector carbon dioxide emissions" to include carbon dioxide emitted from the generation of electricity imported from outside of Minnesota and consumed in Minnesota. *Id.* subd. 2.

62.     As implemented, the NGEA has had and will continue to have a chilling effect on the development of new large energy facilities and the expansion or refurbishing of existing power plants located outside of Minnesota, as well as such facilities that would utilize lignite supplied from North Dakota.

63.     Although Minn. Stat. § 216H.03 purports to provide exemptions for new large energy facilities that offset carbon dioxide emissions, it prohibits the Minnesota Public Utilities Commission from granting such an exemption unless the proposed offsets "would not have otherwise occurred"—that is, unless the proposed offsets were caused by the necessity to comply with the NGEA. *Id.* subd. 4. Moreover, the MPUC has a statutory obligation to "maximize benefits to Minnesota citizens." Minn. Stat. § 216B.1691, subd. 9.

64.     The NGEA initially provided four tailored exemptions from the prohibitions found in Minn. Stat. § 216H.03, subd. 3. *Id.* subds. 5-7. All of these exemptions favor Minnesota projects or businesses.

65.     Subdivision 5 of the NGEA expressly exempts "a new steel production project located in a taconite relief area that has filed an application for an air quality permit from the Pollution Control Agency prior to January 1, 2007" from the carbon dioxide emission prohibitions of subdivision 3. *Id.* § 216H.03, subd. 5. On information and belief, this steel production project is a steel production plant located near Nashwauk,

Minnesota commenced by Minnesota Steel Industries, LLC, which company was bought in 2007 by Essar Global.

66.     Subdivision 6 of the NGEA expressly exempts "an iron nugget production facility that began construction prior to January 31, 2007" and "associated mining activities and beneficiation facilities with a concentrate capacity of up to three million tons annually" from the carbon dioxide emission prohibitions of subdivision 3.   *Id.* subd. 6.   On information and belief this iron nugget production facility is popularly known as the Mesabi Nugget facility, located in Hoyt Lakes, Minnesota, run by Mesabi Mining LLC, a wholly-owned subsidiary of Steel Dynamics, Inc.

67.     Subdivision 7 of the NGEA expressly exempts from the carbon dioxide emission prohibitions of subdivision 3 "[a] new large energy facility under consideration by the Public Utilities Commission pursuant to proposals or applications filed with the Public Utilities Commission before April 1, 2007, or to any power purchase agreement related to a facility described in this clause."   *Id.* subd. 7(1).   On information and belief this exemption is for Excelsior Energy Inc.'s Mesaba Energy Project, having a proposed location near Taconite, Minnesota with a proposed alternate site near Hoyt Lakes, Minnesota.

68.     Subdivision 7 of the NGEA also expressly exempts from the carbon dioxide emission prohibitions of subdivision 3 "[a] contract not subject to commission approval that was entered into prior to April 1, 2007, to purchase power from a new large energy facility that was approved by a comparable authority in another state prior to that date, for which municipal or public power district bonds have been issued, and on which

construction has begun." *Id.* subd. 7(2).  On information and belief, this exemption was for the Big Stone II power plant project in South Dakota, whose lead developer was Otter Tail Power Company, a Minnesota corporation.

69.     On May 27, 2011, Minnesota Governor Mark Dayton signed into law Laws of Minnesota 2011, Chapter 97, which, inter alia, amended subdivision 7 of Minn. Stat. § 216H.03 to expressly exempt GRE's Spiritwood Station from the NGEA.  ("Minnesota Statutes 2010, section 216H.03, subdivision 7, is amended to read: . . . The prohibitions in subdivision 3 do not apply to: . . . (4) a new large energy facility with a combined electric generating capacity of less than 100 megawatts, which did not require a Minnesota certificate of need, which received an air pollution control permit to construct from an adjoining state before January 1, 2008, and on which construction began before July 1, 2008 . . .").  This provision became effective the day following final enactment. GRE is a Minnesota corporation.

70.     The mere existence and number of these exemptions to the NGEA's restrictions are evidence of the incoherence and arbitrariness of the underlying policy aims of the NGEA itself.  As these exemptions from the NGEA's strictures become the norm, they vitiate the purported policy goals of the NGEA.  Furthermore, to the degree that the exemptions demonstrate any coherent policy, it is a policy that uniformly favors new large energy projects in Minnesota and/or Minnesota-based businesses with new large energy projects, to the detriment of North Dakota and other out-of-state interests and entities.

III.    **The chilling effects of the NGEA restrictions in North Dakota have been illustrated by Defendants' treatment of Spiritwood Station.**

71.    On July 1, 2008, GRE filed its 2008 Resource Plan with the MPUC pursuant to Minn. Stat. § 216B.2422, subd. 2 and Minn. R. 7843.0100 – 7843.0600.

72.    While GRE's plans with respect to Spiritwood Station were mentioned on only four out of the more than 200 pages of GRE's 2008 Resource Plan filing, MPUC proceedings regarding this Resource Plan devolved over the course of three years into a referendum on the applicability of NGEA requirements to Spiritwood Station, in which several environmental organizations succeeded in persuading the MPUC to commence a contested case hearing on the issue.

73.    In late 2010, the MPUC finally approved GRE's 2008 Resource Plan and opened a new docket in order to consider Spiritwood Station's compliance with the NGEA.   On this new docket, approval of energy imports from Spiritwood Station continued to meet with stringent objection from numerous environmental organizations that strenuously advocated for contested proceedings, which the MPUC granted. Moreover, the environmental organizations steadfastly argued that the MPUC should not allow GRE to claim as carbon offsets projects that it had voluntarily undertaken to reduce carbon dioxide emissions, simply because GRE's projects were not directly undertaken to comply with NGEA offsetting requirements, as purportedly required by the NGEA's "would not have otherwise occurred" requirement for offsets.

74.    The NGEA's "would not have otherwise occurred" limitation for claiming carbon offsets allegedly establishes that proponents of energy imports from out-of-state

new large energy facilities must prove that carbon offsets would not have occurred but for compliance with the NGEA offset requirements.   Minn. Stat. § 216H.03, subd. 4. This NGEA requirement is squarely at odds with North Dakota's longstanding statutory policy that "development of North Dakota's lignite resources must be conducted in an environmentally sound manner that protects [North Dakota's] air, water, and soil resources."  N.D. Cent. Code. § 54-17.5-01.   Entities that have long worked in North Dakota's lignite industry and complied with and even exceeded North Dakota's environmental requirements are now subject to new, onerous burdens established by the NGEA.

75.   Through the aforementioned MPUC proceedings, the NGEA requirements had a materially adverse impact on the operations of Spiritwood Station in North Dakota and GRE's ability to sell energy from Spiritwood Station into Minnesota.   Indeed, the Spiritwood project was firmly tied up in hearings before Minnesota's Office of Administrative Hearings until May 28, 2011, when Minnesota enacted an exemption for Spiritwood from the strictures of the NGEA, benefitting Minnesota-based GRE.   *See* Laws of Minnesota 2011, Chapter 97.

76.   As evidenced by the MPUC proceedings regarding Spiritwood Station, implementation of the NGEA is having an industry-wide chilling effect on new coal-based large energy projects located outside of Minnesota, to the detriment of, among others, North Dakota, its citizens, and stakeholders in the lignite coal industry.

77.   The two other Lignite Vision 21 Programs, i.e., the American Lignite Energy coal-to-liquids plant and the South Heart Project coal-to-hydrogen plant, each

will generate more than 50 MW of electricity, and therefore each is considered a "new large energy facility" under the NGEA. Minn. Stat. §§ 216H.03, subd. 1; 216B.2421, subd. 2. Consequently, both of these projects remain subject to the threat and uncertainty that regulatory review in Minnesota may be imposed under the NGEA should any proponent of either of these projects seek to sell electricity generated at these plants into Minnesota.

78.     Moreover, the manner in which the MPUC proceedings devolved to contested proceedings with the Spiritwood Station illustrates the difficulty of applying NGEA requirements and offsets exceptions to new large energy projects, and demonstrates how the NGEA has created the absurd situation in which proponents of new large energy facilities are now motivated to *avoid* undertaking voluntary measures to reduce carbon dioxide emissions so that such measures can instead be delayed and only undertaken later for the purpose of complying with the NGEA offsets exemption. This turns the purported policy objective of the NGEA on its head, and demonstrates that the practical effect of implementing the NGEA is actually counter to its goals.

79.     Finally, as a result of the chilling effects of implementation of the NGEA, less coal will be mined in North Dakota and other states, to the detriment of North American Coal, Great Northern Properties, and North Dakota and its citizens. North Dakota will collect less in revenues from its coal severance tax, Lignite Research Fund tax, and conversion tax than it would otherwise collect. As a result, North American Coal, Great Northern Properties, and North Dakota and its citizens will be harmed by the NGEA.

IV.   **The Minnesota Legislature has recognized the NGEA is poor public policy and has sought to eliminate the moratorium on the construction of new large coal-powered energy facilities.**

80.     As GRE's Spiritwood Station illustrates, there is a great deal of uncertainty as to how the NGEA is actually applied in practice.  Further, it has become evident that the coal moratorium law, both in form and in substance, is at odds with an economical and reliable electric energy policy.

81.     During the 2010 legislative session, bipartisan groups in both houses of the Minnesota Legislature introduced legislation, i.e., House File 3158 and Senate File 2868, to repeal the provisions in the NGEA that prohibited the importation of power from new, coal-fired power plants located outside of the State of Minnesota.

82.     During the 2011 legislative session, the Minnesota Legislature actually passed legislation with bipartisan support in both the House of Representatives and the Senate to substantially curtail the prohibition on the construction of new large energy facilities that had been imposed by the NGEA.  Specifically, Chapter 96, Senate File 86 amended and expanded the exemptions provided for under the NGEA to include, "1,500 megawatts of electric generating capacity, in aggregate, from new large energy facilities or power purchase agreements with those new large energy facilities that:  (i)  are fueled by feedstock coal; and  (ii)  began construction after April 1, 2007."  Chapter 96, Senate File 86, amending Minnesota Statutes 2010, section 216H.03, subd. 7.

83.     Notwithstanding the clear bipartisan support for the 2011 amendment to the NGEA, Governor Dayton vetoed Chapter 96, Senate File 86 in a May 27, 2011 letter to the Hon. Michelle Fischbach, President of the Minnesota Senate.

84.    These recent actions by the Minnesota Legislature demonstrate that the State's policymakers have recognized the serious practical, as well as constitutional, infirmities of the NGEA.

## COUNT I
## (VIOLATION OF THE COMMERCE CLAUSE OF THE U.S. CONSTITUTION)

85.    Plaintiffs reallege paragraphs 1 through 84 of this Complaint as if fully set forth herein.

86.    The United States Constitution provides that Congress shall have the power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3.

87.    A state law that discriminates against interstate commerce is invalid as unconstitutional.

88.    The NGEA facially discriminates against the Plaintiffs because it prohibits the importation into Minnesota of power from "a new large energy facility that would contribute to statewide power sector carbon dioxide emissions," Minn. Stat. § 216H.03, subd. 3(2), and it prohibits any person from "enter[ing] into a new long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions," *id*. subd. 3(3), where "statewide power sector carbon dioxide emissions" include "all emissions of carbon dioxide from the generation of electricity imported from outside the state and consumed in Minnesota," *id*. subd. 2.

89.    The NGEA also facially discriminates against interstate commerce because it exempts new large energy facilities located in Minnesota and new large energy facilities owned by Minnesota-based entities. *Id*. subds. 5-7.

90.   The NGEA unduly burdens interstate commerce by prohibiting the importation into Minnesota of power from "a new large energy facility that would contribute to statewide power sector carbon dioxide emissions," *id*. subd. 3(2), and it prohibits any person from "enter[ing] into a new long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions," *id*. subd. 3(3), where "statewide power sector carbon dioxide emissions" include "all emissions of carbon dioxide from the generation of electricity imported from outside the state and consumed in Minnesota," *id*. subd. 2.

91.   The NGEA further unduly burdens interstate commerce because the only exception to the above prohibitions, *id*. subd. 4, is governed by the MPUC which is statutorily required to "maximize benefits to Minnesota citizens," *id*. § 216B.1691, subd. 9.

92.   The purported local benefits of the NGEA are insignificant and illusory because it exempts at least five new large energy facilities located in Minnesota and/or owned by Minnesota-based entities. *Id*. § 216H.03, subds. 5-7.   Further, by its own terms, the NGEA prohibition on carbon dioxide emissions are effective only until "a comprehensive and enforceable state law or rule . . . is enacted and in effect." *Id*. subd. 3.

93.   As a practical matter, the NGEA will have no appreciable effect in meeting or advancing the NGEA's stated goal of "reduc[ing] statewide greenhouse gas emissions across all sectors . . . to a level at least 15 percent below 2005 levels by 2015, to a level at

least 30 percent below 2005 levels by 2025, and to a level at least 80 percent below 2005 levels by 2050." *See id.* § 216H.02, subd. 1.

94.     Thus, the NGEA is not justified by valid public welfare, consumer protection, or procompetitive purpose unrelated to economic protectionism.

95.     Minnesota is not a market participant in any field related to the NGEA.

96.     The NGEA provisions prohibiting the purchase of power from new large energy facilities are not severable from the balance of the NGEA legislation.

97.     Plaintiffs have been injured by the NGEA provisions prohibiting the purchase of power from new large energy facilities and new power purchase agreements with such facilities.

98.     This unconstitutional legislation, as enacted and as applied, should be stricken as unconstitutional and/or its enforcement should be enjoined as it threatens Plaintiffs with irreparable injury for which there is no adequate remedy at law.

**COUNT II**
**(VIOLATION OF THE SUPREMACY CLAUSE OF THE U.S. CONSTITUTION)**

99.     Plaintiffs reallege paragraphs 1 through 98 of this Complaint as if fully set forth herein.

100.     The United States Constitution provides, "This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the

Constitution or laws of any State to the contrary notwithstanding." U.S. Const. art. VI, cl. 2.

101.    The United States Constitution provides that Congress shall have the power to "provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1.

102.    Pursuant to the Clean Air Act, 42 U.S.C. §§ 7410-7671q, there exists "a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *see also Massachusetts v. Environmental Protection Agency*, 529 U.S. 497, 528-530 (2007).

103.    The NGEA conflicts with the Clean Air Act because it purports to regulate emissions of carbon dioxide, a field that is regulated by Congress. The NGEA should therefore be stricken as unconstitutional.

## COUNT III
## (VIOLATION OF THE SUPREMACY CLAUSE OF THE U.S. CONSTITUTION)

104.    Plaintiffs reallege paragraphs 1 through 103 of this Complaint as if fully set forth herein.

105.    The United States Constitution provides, "This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the

Constitution or laws of any State to the contrary notwithstanding." U.S. Const. art. VI, cl. 2.

106.  The United States Constitution provides that Congress shall have the power "[t]o regulate Commerce . . . among the several States . . ." U.S. Const. art. I, § 8, cl. 3.

107.  Pursuant to the Federal Power Act, 16 U.S.C. §§ 791a-828c, duly enacted by Congress, the United States expressly and exclusively regulates the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce.  16 U.S.C. §§ 824(a), 824(b)(1); *see United States v. Pub. Util. Comm'n of California*, 345 U.S. 295, 299-300 (1953); *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 371 (1988).

108.  Under the Federal Power Act, states generally, and Minnesota specifically, are only allowed to regulate such things as siting of transmission lines.  The Federal Power Act has always reserved to Congress the power to regulate interstate transmission and sale at wholesale of electricity.

109.  The NGEA explicitly broadens Minnesota's regulation into the area of transmission of electricity in interstate commerce by impermissibly restricting the importation of power from a new large energy facility into the State of Minnesota, Minn. Stat. § 216H.03, subd. 3(2), which importation can only occur through transmission in interstate commerce. The NGEA thus violates the exclusive jurisdiction of the United States over interstate transmission under the Federal Power Act.  16 U.S.C. §§ 824(a), 824(b)(1).  The NGEA should therefore be stricken as unconstitutional.

110.   The NGEA also conflicts with the Federal Power Act because it impermissibly impinges upon the authority given by Congress to the Federal Energy Regulatory Commission ("FERC") under the Energy Policy Act of 1992. Pursuant to the Energy Policy Act of 1992, duly enacted by Congress, FERC was given the authority to regulate interstate transmission and wholesale sales of electricity. *See* 16 U.S.C. §824j. Congress also gave FERC the authority to order utilities to provide transmission services to requesting wholesale electricity generators. This landmark legislation was intended, among other things, to promote competition and reliability in the wholesale electricity market.

111.   Under the authority granted by Congress, FERC issued orders which created a complex regulatory scheme controlling electricity generators and transmission facilities. FERC's ultimate objective is to develop a smoother, more efficient, and competitive wholesale electricity and transmission grid in the United States through the enablement of Regional Transmission Organizations ("RTO").

112.   Among other things, FERC issued Orders 888 (75 F.E.R.C. ¶ 61,080 (1996)) and 889 (75 F.E.R.C. ¶ 61,078 (1996)) which were designed to create electricity transmission organizations that could: (1) operate independently of market participants, (2) provide open access to the transmission system, (3) administer a single region-wide tariff that eliminates rate pancaking; (4) maintain the reliability of the transmission grid; and (5) control the operation of all transmission facilities within the region.

113.   FERC also issued Order 2000 (89 F.E.R.C. ¶ 61,285 (1999)) which had an overall objective of further ensuring non-discriminatory access by all market participants

to the transmission grid while maximizing the efficiency of operations by eliminating multiple actors. Additionally, Order 2000 set out seven major functions for RTO's including: (1) tariff administration and design; (2) congestion management; (3) management of parallel path flows; (4) provision of last resort for ancillary services; (5) development of an open access same-time information system (OASIS); (6) market monitoring; and (7) responsibility for planning and expanding facilities under its control.

114.    Midwest Independent Transmission System Operator, Inc. ("MISO") is a FERC regulated RTO responsible for electricity transmission in Minnesota and North Dakota. MISO covers all or most of North Dakota, South Dakota, Nebraska, Minnesota, Iowa, Wisconsin, Illinois, Indiana, Michigan and parts of Montana, Missouri, Kentucky, and Ohio.

115.    Of the electricity transmitted through the MISO grid, 51% is generated by coal and 23% is generated by gas.

116.    FERC's regulation of electricity transmission pursuant to its authority under the Energy Policy Act of 1992 is comprehensive and complex. To illustrate the scope of regulation, FERC Orders 888, 889 and 2000 are all hundreds of pages long. With respect to MISO in particular, FERC regulates MISO by reviewing and, when appropriate, approving changes or additions to MISO's tariff. MISO's current tariff, effective as of July 28, 2010, is over three thousand pages long.

117.    Through the Energy Policy Act of 1992 and empowerment of FERC, Congress has shown an intent to occupy the field of efficient, reliable and cost effective interstate electrical power transmission. Indeed, Congressional authority in this area is

express.  *See* 16 U.S.C. §§ 824(a), (b)(1).   The NGEA stands as an obstacle to the accomplishments of the full purposes and objectives of Congress because, among other things, it directly interferes with and frustrates FERC's empowerment and control of RTO's.

118.   By way of example, the NGEA's restriction on importation of power generated from coal frustrates MISO's purpose because it precludes MISO from effectively planning for power supply on a regional basis (i.e. across state lines) as it is required to do.  Fifty-one percent (51%) of the electricity in the MISO grid is generated by coal.  If a state were able to unilaterally impose limitations upon the source of electricity in the MISO grid, it would effectively give that state veto power over MISO's decisions to the detriment of other states within the MISO grid.  The NGEA should therefore be stricken as unconstitutional.

## COUNT IV
## (VIOLATION OF THE PRIVILEGES AND IMMUNITIES CLAUSE OF ARTICLE 4 OF THE U.S. CONSTITUTION)

119.   Plaintiffs reallege paragraphs 1 through 118 of this Complaint as if fully set forth herein.

120.   Plaintiff State of North Dakota brings this count *parens patriae* to vindicate its interest and that of its citizens in the economic well-being of North Dakota and its citizens and in not being discriminately denied their rightful status within the federal system.

121.    The United States Constitution provides, "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, §2, cl. 1.

122.    A state law which unfairly discriminates against or imposes an unreasonable burden on citizens of other states in, *inter alia,* their pursuit of employment is unconstitutional.

123.    The NGEA violates Article IV of the constitution because, *inter alia,* it imposes an unreasonable burden on the citizens of the State of North Dakota employed in the lignite industry and the coal-powered electric industry. The preferential treatment given to Minnesota citizens and entities in competing industries will negatively impact meaningful employment opportunities for North Dakota citizens.

124.    The NGEA violates Article IV of the constitution because, *inter alia,* it deprives the State of North Dakota and its citizens of the benefits that are to flow from participation in the federal system.

125.    The State of Minnesota does not have a substantial reason for the discriminatory practices embodied in the NGEA.

126.    The discriminatory practices embodied in the NGEA do not bear a substantial relationship to the State of Minnesota's stated objectives for the NGEA; indeed, the preferential treatment given to Minnesota citizens and entities directly undermines the stated objectives of the NGEA.

127.    The NGEA should therefore be stricken as unconstitutional.

## COUNT V
## (DELCARATORY JUDGMENT RELIEF)

128.   Plaintiffs reallege paragraphs 1 through 127 of this Complaint as if fully set forth herein.

129.   "In a case of actual controversy . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

130.   By its express terms, the NGEA provisions prohibiting coal-sourced imports of electricity into Minnesota are effective "[u]nless preempted by federal law." Minn. Stat. § 216H.03, subd. 3.

131.   Pursuant to the Federal Power Act, 16 U.S.C. §§ 791a-828c, duly enacted by Congress, the United States expressly and exclusively regulates the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce.   16 U.S.C. §§ 824(a), 824(b)(1); *see United States v. Pub. Util. Comm'n of California*, 345 U.S. 295, 299-300 (1953); *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 371 (1988).

132.   The NGEA is preempted by the Federal Power Act because it attempts to regulate "new large energy facility[ies]," Minn. Stat. § 216H.03, subd. 1, which are defined to include "transmission lines," *id.* § 216B.2421, subd. 2(1), in violation of the United States' exclusive jurisdiction over such transmission lines under the Federal Power Act. 16 U.S.C. §§ 824(a), 824(b)(1). The provisions of the NGEA restricting the

construction of new large energy facilities, importing power from such facilities, or entering into new long-term power purchase agreements that would increase statewide power sector carbon dioxide emissions are therefore preempted by federal law, and the Court should declare that such provisions of the NGEA have no force or effect.

133.   The NGEA is further preempted by the Federal Power Act because it impermissibly restricts the importation of power from a new large energy facility into the State of Minnesota, Minn. Stat. § 216H.03, subd. 3(2), which importation can only occur through transmission in interstate commerce, in violation of the United States exclusive jurisdiction over such transmission under the Federal Power Act.  16 U.S.C. §§ 824(a), 824(b)(1).  The provisions of the NGEA restricting the construction of new large energy facilities, importing power from such facilities, or entering into new long-term power purchase agreements that would increase statewide power sector carbon dioxide emissions are therefore preempted by federal law, and the Court should declare that such provisions of the NGEA have no force or effect.

### COUNT VI
### (VIOLATION OF THE PROHIBITION OF SPECIAL LEGISLATION PROVISION OF THE MINNESOTA CONSTITUTION)

134.   Plaintiffs reallege paragraphs 1 through 133 of this Complaint as if fully set forth herein.

135.   The Minnesota Constitution provides in part that, "The legislature shall pass no local or special law . . . granting to any private corporation, association, or individual any special or exclusive privilege, immunity or franchise whatever."  Minn. Const. art. XII, § 1.

136. Subdivisions 5-7 of the NGEA, Minn. Stat. § 216H.03 violate the Minnesota Constitution's prohibition on special legislation, as these subdivisions grant special privileges and immunities to several private corporations, including, without limitation, Essar Global, Steel Dynamics, Inc., Excelsior Energy Inc., Otter Tail Power Company, and Great River Energy by exempting them from the requirements of Minn. Stat. § 216H.03, subd. 3.

137. Other private companies involved in other new large energy facilities are prejudiced by the special treatment afforded to these private corporations by the Minnesota Legislature.

138. Minn. Stat. § 216H.03, subds. 5-7 is therefore unconstitutional under Article XII, section 1 of the Minnesota Constitution.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs hereby respectfully request the Court for the following relief:

1. An order declaring and adjudicating that Minn. Stat. § 216H.03, subd. 3, does not apply or, alternatively, is unconstitutional, and therefore invalid and unenforceable, to the extent it prohibits the importation into Minnesota of power from "a new large energy facility that would contribute to statewide power sector carbon dioxide emissions," *id*. subd. 3(2), and it prohibits any person from "enter[ing] into a new long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions." *Id*. subd. 3(3).

2.      An order enjoining Defendants from enforcing Minn. Stat. § 216H.03, subd. 3.

3.      An order awarding Plaintiffs' the costs and expenses incurred in the instant litigation, including their reasonable attorneys' fees pursuant to 42 U.S.C. § 1988(b).

4.      An order for such other and further relief as may be just and appropriate under the circumstances.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial as to all issues so triable.

Dated:  November 2, 2011                    Respectfully Submitted,



Wayne Stenehjem
    Attorney General of North Dakota
    Pro Hac Vice
John A. Knapp
    Special Assistant Attorney General
    Minnesota Bar No. 56789
Thomas H. Boyd
    Special Assistant Attorney General
    Minnesota Bar No. 200517
Daniel J. Kelly
    Special Assistant Attorney General
    Minnesota Bar No. 351386
Brent A. Lorentz
    Special Assistant Attorney General
    Minnesota Bar No. 386865
Suite 3500
225 South Sixth Street
Minneapolis, MN 55402-4629
612-604-6400

*Counsel of Record for Plaintiffs State of
North Dakota and Industrial
Commission of North Dakota.*

WINTHROP & WEINSTINE, P.A.



John A. Knapp
    Minnesota Bar No. 56789
Thomas H. Boyd
    Minnesota Bar No. 200517
Daniel J. Kelly
    Minnesota Bar No. 351386
Brent A. Lorentz
    Minnesota Bar No. 386865
Suite 3500
225 South Sixth Street
Minneapolis, MN 55402-4629
612-604-6400

*Counsel of Record for Plaintiffs Lignite
Energy Council, Basin Electric Power
Cooperative, The North American Coal
Corporation, Great Northern Properties
Limited Partnership, Missouri River
Basin Municipal Power Agency d/b/a
Missouri River Energy Services,
Minnkota Power Cooperative, Inc.*


Claire M. Olson
Casey Jacobson
Basin Electric Power Cooperative
Office of General Counsel
1717 East Interstate Avenue
Bismarck, ND 58503-0564
Phone:  (701) 557-5317

*Attorneys for Basin Electric Power
Cooperative*

John Neumann
Thomas Koza
The North American Coal Corporation
5340 Legacy Drive, Building 1, Suite
300
Plano, TX 75024
Phone:  (972) 448-5400

*Attorneys for The North American Coal Corporation*

Sandi Tabor
Lignite Energy Council
1016 East Owens Avenue
PO Box 2277
Bismarck, ND 58502
Phone:  (701) 258-7117

*Attorney for The Lignite Energy Council*

William Taylor
Woods, Fuller, Shultz and Smith
300 S. Phillips Ave., Suite 300
P.O. Box 5027
Sioux Falls, SD 57117-5027
Phone:  (605) 336-3890

*Attorneys for Missouri River Basin Municipal Power Agency d/b/a Missouri River Energy Services*

David Sogard
Minnkota Power Cooperative, Inc.
P.O. Box 13200
Grand Forks, ND 58208-3200
Phone:  (701) 795-4210

*Attorney for Minnkota Power Cooperative, Inc.*

Wyatt Hogan
Great Northern Properties L.P.
601 Jefferson Street
Suite 3600
Houston, TX 77002
Phone:  (713) 751-7500

*Attorney for Great Northern Properties
Limited Partnership*

5048644v24