UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| State of North Dakota, et al., | Civil File No. 11-3232 SRN/SER |
| Plaintiffs, | **DEFENDANTS' MEMORANDUM** |
| vs. | **OF LAW IN SUPPORT OF** |
| | **MOTION FOR PARTIAL** |
| Lori Swanson, Attorney General | **JUDGMENT ON THE PLEADINGS** |
| of the State of Minnesota, et al., | |
| Defendants. | |

## INTRODUCTION

In 2007, the Minnesota legislature established new energy and environmental policies for the State of Minnesota when it passed the Next Generation Energy Act ("NGEA"). 2007 Minn. Laws ch. 136. The NGEA includes provisions encouraging increased use of renewable energy and energy conservation. *Id.*, arts. 1-2, 4. The NGEA also addresses climate change and greenhouse gas emissions. *Id.*, art. 5 (codified at Minn. Stat. ch. 216H).

Plaintiffs, who represent various interests in the use of coal to generate electricity, challenge the portion of the NGEA that regulates carbon dioxide emissions. Defendants bring this motion for judgment on the pleadings on all of Plaintiffs' claims except one, and on that remaining claim, Defendants will seek summary judgment at a later time. Defendants also move to dismiss the Attorney General as a defendant under the Eleventh Amendment of the United States Constitution.

# BACKGROUND

## I.    THE PARTIES

Plaintiffs are the State of North Dakota, the Industrial Commission of North Dakota, a North Dakota trade association, two coal companies, and three electric utilities. Plaintiffs sue the members of the Minnesota Public Utilities Commission, the Commissioner of the Minnesota Department of Commerce, and the Minnesota Attorney General in their official capacities.

## II.    SECTION 216H.03 OF THE NGEA

The pertinent part of the NGEA, Minn. Stat. § 216H.03, implements the Minnesota legislature's decision to limit increases in carbon dioxide emissions resulting from Minnesotans' use of electric power.  Under the statute, a "new large energy facility" cannot be built in Minnesota if it would increase "statewide power sector carbon dioxide emissions." Minn. Stat. § 216H.03, subd. 3(1) (2010).[1]  The increased carbon dioxide emissions must be offset by corresponding reductions in carbon dioxide emissions at an existing facility or by purchasing carbon dioxide emissions allowances from an established "cap and trade" system.  *Id.*, subd. 4.  Similarly, no Minnesota utility may import power into the state from a "new large energy facility" built after 2007 unless the

---

[1] The statute defines "statewide power sector carbon dioxide emissions" as "the total annual emissions of carbon dioxide from the generation of electricity within the state and all emissions of carbon dioxide from the generation of electricity imported from outside the state and consumed in Minnesota."  Minn. Stat. § 216H.03, subd. 2.

utility offsets any increase in Minnesota's "statewide power sector carbon dioxide emissions." *Id.*, subds. 3(2), 4.[2]

## III.    PLAINTIFFS' CLAIMS

Plaintiffs' Amended Complaint, filed on December 1, 2011, purports to challenge the NGEA as a whole, but the actual focus of Plaintiffs' Amended Complaint is on Section 216H.03.  *See* Am. Compl. ¶¶ 85-143 and Prayer for Relief (requesting relief *only* as to Section 216H.03) (Docket # 9).   Plaintiffs allege six claims.  In Count I, Plaintiffs assert that Section 216H.03 violates the Commerce Clause of the United States Constitution.  *Id.* ¶¶ 85-98.  In Counts II and III, Plaintiffs claim that Section 216H.03 violates the Supremacy Clause of the United States Constitution because Section 216H.03 is preempted by two federal statutes, the Clean Air Act and the Federal Power Act.  *Id.* ¶¶ 99-118.[3]  In Count IV,  Plaintiffs allege that Section 216H.03 violates the Privileges and Immunities Clause of the United States Constitution.  *Id.* ¶¶ 119-127. In Count V, Plaintiffs reframe their Federal Power Act preemption claim as a claim for declaratory judgment.  *Id.* ¶¶ 128-133.  Finally, in Count VI, Plaintiffs claim that Section 216H.03 violates the Minnesota Constitution's prohibition against special legislation,

---

[2] The statute also prohibits Minnesota utilities from entering into new long-term power purchase agreements that would increase Minnesota's "statewide power sector carbon dioxide emissions" unless those increased emissions are offset.  Minn. Stat. § 216H.03. subds. 3(3), 4.

[3] Plaintiffs' preemption claims cannot be asserted under 42 U.S.C. § 1983.  *See Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107-08 (1989) (holding that the Supremacy Clause does not create a right enforceable under Section 1983).  The Court does, however, have jurisdiction to decide these claims pursuant to 28 U.S.C. § 1331.

casting this as a claim under the due process clause of the Fourteenth Amendment of the United States Constitution. *Id.* ¶¶ 134-143.

Defendants move the Court for judgment on the pleadings as to Counts II through VI of Plaintiffs' Amended Complaint. *See* Defendants' Motion for Partial Judgment on the Pleadings (Docket # 11). Defendants also move the Court to dismiss the Attorney General as a party. *Id.*

## STANDARD OF REVIEW

A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) is governed by the same standard as a motion to dismiss under Fed. R. Civ. P. 12(b). *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). In addition, a motion to dismiss must be granted where the complaint does not allege "enough facts to state a claim to relief that is plausible on its face" rather than merely "conceivable." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Whether a complaint states a cause of action is a question of law. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986).

A federal court must also dismiss a claim if it lacks subject matter jurisdiction over the claim. Fed. R. Civ. P. 12(b)(1), 12(h)(3). The existence of subject matter jurisdiction is a question of law. *Keene Corp. v. Cass*, 908 F.2d 293, 296 (8th Cir. 1990).

## SUMMARY OF THE ARGUMENT

This Court should dismiss Counts II through VI of Plaintiffs' Amended Complaint because each of these claims fails as a matter of law. Counts III and V, the Federal

Power Act preemption claims, fail because Section 216H.03 regulates generation resources, not the transmission of electricity in interstate commerce or transmission facilities as Plaintiffs erroneously contend. Count II, the Clean Air Act preemption claim, is without merit because Congress expressly preserved broad state authority to regulate air emissions, including carbon dioxide emissions from electric generating facilities. Count IV, the Privileges and Immunities Clause claim, fails because the statute does not discriminate against North Dakota residents with regard to employment in Minnesota. Count VI, the due process claim, is barred by the Eleventh Amendment under the *Pennhurst* doctrine because Plaintiffs' claim is based on an alleged violation of state law. In addition, the Court should dismiss the Attorney General as a defendant because she is not a proper party under the Eleventh Amendment.

## ARGUMENT

### I.    SECTION 216H.03 IS NOT PREEMPTED BY THE FEDERAL POWER ACT.

Section 216H.03, the only provision of the NGEA at issue in this case, is not preempted by the Federal Power Act. It is a lawful exercise of the Minnesota legislature's traditional state authority to regulate electric utility service and protect the environment.

#### A.    The Presumption Against Preemption Applies To Plaintiffs' Preemption Claims.

"[B]ecause the States are independent sovereigns in our federal system," the Supreme Court has "long presumed that Congress does not cavalierly pre-empt" state law. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). "In areas of traditional state

regulation, [the Court] assume[s] that a federal statute has not supplanted state law unless Congress has made such an intention 'clear and manifest.'" *Bates v. Dow Agrosciences LLC.*, 544 U.S. 431, 449 (2005) (citations omitted); *see also Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009) (same).

The regulation of electric generation sources and utilities is an area of traditional state regulation. *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 205 (1983); *Southern Union Co. v. Missouri Pub. Serv. Comm'n*, 289 F.3d 503, 508-09 (8th Cir. 2002). Likewise, "[e]nvironmental regulation traditionally has been a matter of state authority." *Exxon Mobile Corp. v. EPA*, 217 F.3d 1246, 1255 (9th Cir. 2000) (also noting that "[a]ir pollution prevention falls under the broad police powers of the state"). Because the NGEA regulates electric generation resources and air emissions, areas of traditional state authority, the presumption against preemption applies with full force to Section 216H.03. *Bates*, 544 U.S. at 449.

    **B.**    **Section 216H.03 Is Not Preempted By The Federal Power Act Because It Regulates Electric Generation Resources Used In Minnesota, Not Transmission Or Transmission Facilities.**

        **1.**    **The Federal Power Act does not preempt state authority over electric generation resource decisions.**

Both the state and federal governments play important roles in the regulation of electric service. The Federal Power Act grants the federal government authority over "transmission of electricity in interstate commerce" and "wholesale" sales of electricity. 16 U.S.C. §§ 824(a),(b)(1). States, however, generally retain authority to determine whether and where transmission lines should be constructed in a state, with limited

exceptions relating to "national interest electric transmission corridors." *See* 16 U.S.C. § 824p(b) (setting forth the Federal Energy Regulatory Commission's ("FERC's") authority to issue permits for the construction of transmission facilities in "national interest electric transmission corridors" in specified circumstances); *Piedmont Envtl. Council v. FERC*, 558 F.3d 304, 310 (4th Cir. 2009) (recognizing state authority over construction of new transmission facilities subject to the limits in 16 U.S.C. § 824p).[4]

States also retain authority over generation and distribution facilities. 16 U.S.C. § 824(b)(1) (stating that FERC "shall not have jurisdiction . . . over *facilities used for the generation of electric energy* or *over facilities used in local distribution*" with limited exceptions) (emphasis added). Likewise, States retain authority over retail sales. *Id.* (providing that the Federal Power Act applies to wholesale sales but "shall not apply to any other sale of electricity" except as specifically provided). The States' retained authority over generation facilities and retail sales includes their traditional authority to regulate the type of electric generation resources used by retail customers in the state.

FERC, as well as the United States Supreme Court, recognize that the States retain this core regulatory function. In FERC Order 888, which was adopted pursuant to FERC's authority under the Federal Power Act, FERC specifically stated that its order:

> *will not affect or encroach upon state authority in such traditional areas* as … administration of *integrated resource planning* and *utility buy-side and*

---

[4] *See also* Minn. Stat. §§ 216B.243, 216E.03 (2010) (longstanding Minnesota laws giving the Minnesota Public Utilities Commission authority to make decisions about the need for and location of new transmission facilities, as well as decisions regarding new generation facilities); N.D. Cent. Code, ch. 49-22 (2009) (North Dakota Energy Conversion and Transmission Facility Siting Act).

> *demand-side decisions,* including DSM [demand-side management];
> *authority over utility generation and resource portfolios …*

FERC Order 888, 61 FR 21540, 21626, n.544 (emphasis added).[5]  Each of these areas of

traditional state regulation — integrated resource planning, utility buy-side decisions, and

utility generation and resource portfolios — involve regulation of the type of generation

resources that are used in the state.  Thus, FERC has confirmed that the States retain

authority to make generation resource decisions.

The Supreme Court has also recognized that the States retain this important state

energy policy decision-making authority.  In *New York v. FERC*, 535 U.S. 1, 24 (2002),

the Court cited the language in FERC Order 888, which preserves state authority over

generation resources.  *See also Pacific Gas*, 461 U.S. at 205 (recognizing that "States

retain their traditional responsibility in the field of regulating electric utilities for

determining questions of need, reliability, cost and other related state concerns" even

though Congress, through the passage of the Atomic Energy Act, regulates radiological

aspects of nuclear power plants).  Thus, the Federal Power Act does not preempt state

regulation of generation facilities or the type of generation resources used in a state.

---

[5] Integrated resource planning is a process by which a utility identifies a set of resource options that the utility could use to meet the service needs of its customers over a defined planning period.  *See, e.g.*, Minn. R. 7843.0100, subp. 9 (2011).  In considering whether to approve a resource plan, the Minnesota Public Utilities Commission is required to consider a number of factors including reliability of utility service, cost, socioeconomic and environmental impacts, and risk.  Minn. R. 7843.0500, subp. 3 (2011).

**2.    Section 216H.03 regulates the type of generation used in Minnesota, not the transmission of electricity.**

Section 216H.03 is concerned with new generation resources used in Minnesota that contribute to "statewide power sector carbon dioxide emissions." To address this concern, Section 216H.03 prohibits construction within Minnesota of "new large energy facilit[ies]" that would contribute to "statewide power sector carbon dioxide emissions" unless the emissions are offset. Minn. Stat. § 216H.03, subds. 3(1), 4. The statute also prohibits the importation of power used (i.e., consumed) in Minnesota from a "new large energy facility" located outside the state that would contribute to "statewide power sector carbon dioxide emissions" unless the emissions are offset. *Id.*, subds. 3(2), 4.

Section 216H.03 in no way regulates the actual transmission of electricity. The "transmission" of electricity is the delivery of electricity from the generation facility to the local distribution system. *See* 16 U.S.C. § 824(b)(1) (differentiating between generation, transmission and local distribution); *PPL Corp. v. Commissioner of IRS*, 135 T.C. 176, 178 (2010) (stating that "[t]ransmission is the process of moving high voltage electricity from power plants to distribution substations"); *United States Energy Information Administration Glossary*, http://205.254.135.7/tools/glossary/ (follow link to the definition of "transmission"). Regulation of transmission involves the terms and conditions of the transmission itself, not the type of generation delivered over the transmission lines. *See, e.g.*, FERC Order No. 888, 61 FR 21540, 21541 (May 10, 1996) (requiring tariffs setting forth terms and conditions of non-discriminatory access to transmission lines). Nothing in Section 216H.03 establishes terms or conditions for the

actual transmission, i.e., the *process* of moving the electricity. Indeed, transmission of electricity imported into Minnesota from a "new large energy facility" remains fully subject to federal transmission rates, terms and conditions.

Nevertheless, Plaintiffs erroneously assert that Section 216H.03, subdivision 3(2) regulates the transmission of electricity in interstate commerce. Am. Compl. ¶¶ 109, 133. This provision only requires an offset of the carbon dioxide emissions resulting from Minnesotans' *use* of power from the "new large energy facility." Minn. Stat. § 216H.03, subds. 3(2), 4. Otherwise, power from that "new large electric facility" cannot be used in Minnesota. *Id.*[6] This is a generation resource choice clearly within the State's legal authority. *See, e.g.*, FERC Order No. 888, 61 FR at 21626, n. 544 (May 10, 1996) (noting that the States retain authority over integrated resource planning and buy-side decisions).

A number of states have enacted legislation that also affects the type of generation resources used in the regulating state. For example, in 2006, California enacted a law that prohibits retail utilities in California from entering into "long-term financial commitment[s]" for "baseload generation" unless that generation source meets a "greenhouse gas emissions performance standard established by the [California public utilities] commission." Cal. Pub. Util. Code § 8341 (West 1994 & Supp. 2012). This California law applies to both in-state and out-of-state generation sources. *Id.*

---

[6] The statute contains a few exemptions for facilities that were planned at the time that the NGEA was enacted in 2007. Minn. Stat. § 216H.03, subds. 5-7.

In addition, most states have renewable portfolio standards ("RPSs"). RPSs generally require utilities in the state to generate or procure a certain amount of renewable energy for their retail electricity sales or, alternatively, to obtain renewable energy credits. *See Database of State Incentives for Renewable and Efficiency*, United States Department of Energy, http://www.dsireusa.org/summarytables/rrpre.cfm (table showing states with RPSs, including links to applicable state statutes), http://www.dsireusa.org/glossary (definition of "Renewable Portfolio Standards" under "Rules, Regulations, and Policies") (last visited February 28, 2012); Minn. Stat. § 216B.1691, subd. 2a (2010) (setting forth Minnesota's RPS) (enacted in 2007 Minn. Laws ch. 3).

Section 216H.03 is a similar exercise of the States' traditional and continuing authority to determine the type of energy used in the state. Because Section 216H.03, subdivision 3(2) regulates the type of power used in Minnesota, not the actual transmission of the power, Plaintiffs' assertion that this Minnesota statute impermissibly regulates transmission of electricity fails as a matter of law.

### 3.    Section 216H.03 does not regulate transmission lines.

Likewise, Plaintiffs' assertion that Section 216H.03 regulates transmission lines fails as a matter of law. Am. Compl. ¶ 132. As discussed above, Section 216H.03 regulates the type of generation used in the state and the associated carbon dioxide emissions. It does not regulate transmission lines.

Plaintiffs' erroneous assertion relies *solely* on a cross-reference in the definition of "new large energy facility" in Section 216H.03, subdivision 1. *Id.* The cross-reference is

to the definition of "large energy facility" in Section 216B.2421, subdivision 2(1).  *Id.*
Plaintiffs' reliance on this cross-reference to argue that Section 216H.03 regulates
transmission lines fails for several reasons.

First, reading Section 216H.03 as a whole, it is clear that the reference to
"transmission lines directly associated with the plant" in Section 216B.2421, subdivision
2(1) is irrelevant for purposes of the substantive requirements of Section 216H.03.  *See
Dunham v. Portfolio Recovery Assocs.*, 663 F.3d 997, 1001 (8th Cir. 2011) (stating that
courts "examine the text of the statute as a whole by considering its context, object, and
policy") (internal citations omitted); *State v. Randolph*, 800 N.W.2d 150, 154 (Minn.
2011) (providing that a "statute is read as a whole and each section is interpreted in light
of surrounding sections") (internal citations omitted).

As discussed above, the operative regulatory provisions of Section 216H.03 are
found in Subdivisions 3 and 4 of the statute.  Subdivision 3, entitled "Long-term
increased emissions from power plants prohibited," limits increased emissions from "new
large energy facilit[ies]."  Minn. Stat. § 216H.03, subd. 3.  Subdivision 4 allows energy
from a such facility to be used in the state if the increased carbon dioxide emissions from
the energy's generation are offset.  *Id.*, subd. 4.

Second, the transmission lines referenced in Section 216B.2421, subdivision 2(1)
are relevant to a different statute, Minn. Stat. § 216B.243.[7]  Under Section 216B.243, the
Minnesota Public Utilities Commission determines whether there is a need to construct

---

[7] Section 216B.243 predates Section 216H.03.  It was enacted in 1974, the same year that
Section 216B.2421 was enacted.  1974 Minn. Laws ch. 307, sec. 13 (enacting Minn. Stat.
§ 216B.243).

new "large energy facilit[ies]" in the state.  *Id.*, subd. 2.[8]  This statute applies to "large energy facilit[ies]" as defined in Section 216B.2421, subdivision 2(1)-(9), including new electric power plants and any directly associated transmission lines.   Minn. Stat. § 216B.243, subds. 1-2.  Thus, the transmission lines referenced in Section 216B.2421, subdivision 2(1) have consequence for purposes of Section 216B.243, but not for purposes of Section 216H.03.

Third, a close examination of the definition of "new large energy facility" in Section 216H.03 confirms that the statute is only concerned with the "electric power generating plant[s]" referred to in Section 216B.2421, subdivision 2(1), not the "transmission lines directly associated with the plant" referenced in that same provision. The definition of "new large energy facility" in Section 216H.03 expressly excludes certain natural gas plants, but not the transmission lines directly associated with those plants.  Minn. Stat. § 216H.03, subd. 1.  If the term "new large energy facility" included both, the legislature would have also excluded the associated transmission lines when it excluded certain natural gas plants.   Similarly, the legislature's decision to cross-reference *only* clause (1) of Section 216B.2421, subdivision 2 in the definition of "new large energy facility" but not clauses (2) and (3), which explicitly cover high voltage transmission lines, also shows that the legislature never intended to regulate transmission lines under Section 216H.03.   The legislature only intended to regulate generation resources.

---

[8] Such regulations are entirely within the States' retained authority to determine whether new transmission and generation facilities should be built in the state.  *See Piedmont Envtl. Council v. FERC*, 558 F.3d 304, 310 (4th Cir. 2009); 16 U.S.C. § 824(b)(1).

Fourth, it would be illogical for the legislature to regulate transmission lines under Section 216H.03 because transmission lines do not create carbon dioxide. Fossil-fueled electric generation facilities do, and accordingly, Section 216H.03 regulates the generation resource, not the transmission lines. Plaintiffs' illogical interpretation of Section 216H.03 should be rejected by the Court. *See* Minn. Stat. § 645.17 (2010) (providing that Minnesota laws are to be interpreted to avoid "a result that is absurd, impossible of execution, or unreasonable"); *Gershman v. American Cas. Co.*, 251 F.3d 1159, 1162 (8th Cir. 2001) (recognizing that in interpreting a state statute, federal courts are bound by the state's rules of statutory construction).

Finally, not only is Plaintiffs' interpretation of Section 216H.03 inconsistent with the language of the statute as a whole and illogical, it is contrary to the well-established rule of statutory construction that statutes are to be interpreted to avoid a constitutional issue. *See Hince v. O'Keefe*, 632 N.W.2d 577, 582 (Minn. 2001) (stating that Minnesota statutes must be interpreted to avoid constitutional defects); *Martin v. City of Rochester*, 642 N.W.2d 1, 17 (Minn. 2002) (providing that Minnesota statutes are therefore to be interpreted to avoid preemption where feasible), *cert. denied*, 539 U.S. 957 (2003). Plaintiffs' illogical interpretation of Section 216H.03 as regulating "transmission lines" creates an unnecessary constitutional question that the Court should avoid.

For all the above reasons, Plaintiffs' argument that Section 216H.03 regulates transmission facilities in violation of the Federal Power Act fails as a matter of law.

4.      **Section 216H.03 does not conflict with FERC's authority to regulate transmission.**

Plaintiffs erroneously allege that the NGEA conflicts with FERC's authority to regulate transmission and Regional Transmission Organizations. In order for conflict preemption to be found, there must be an actual conflict between state law and federal law. *Dalton v. Little Rock Family Planning Servs.*, 516 U.S. 474, 476 (1996). "The existence of a hypothetical or potential conflict is insufficient to warrant preemption of the state statute." *Rice v. Norman Williams Co.*, 548 U.S. 654, 659 (1982). Further, "pre-emption is not to be lightly presumed." *California Fed. Sav. & Loan v. Guerra*, 479 U.S. 272, 281 (1987). Here, there is no basis for finding preemption because there is no actual conflict between Section 216H.03, the only provision of the NGEA at issue, and FERC's authority over transmission and Regional Transmission Organizations.

a.      **There is no conflict between Section 216H.03 and FERC's authority under 16 U.S.C. § 824j.**

Contrary to Plaintiffs' assertion, Am. Compl. ¶ 110, there is no conflict between Section 216H.03 and the authority granted to FERC under 16 U.S.C. § 824j to regulate interstate transmission. This provision of the Federal Power Act authorizes FERC to order transmission-owning utilities to provide transmission services to unaffiliated wholesale generators on a case-by-case basis. 16 U.S.C. § 824j; *New York*, 535 U.S. at 9. Section 216H.03 does not interfere with or conflict with FERC's authority under 16 U.S.C. § 824j because Section 216H.03 does not regulate transmission providers or transmission service.

Instead, as discussed above, Section 216H.03 regulates the type of power used by retail customers in Minnesota. *See* Minn. Stat § 216H.03, subds. 3-4. The Minnesota law requires the Minnesota utility, not the transmission provider, to offset an increase in "statewide power sector carbon dioxide emissions." *Id.* The Minnesota law in no way precludes a transmission owner from providing transmission service to an unaffiliated wholesale provider. Thus, there is no conflict between Section 216H.03 and FERC's authority under 16 U.S.C. § 824j.

> **b.    There is no conflict between Section 216H.03 and any FERC Order.**

Plaintiffs' assertion that Section 216H.03 conflicts with FERC's regulation of transmission under Orders 888, 889, and 2000 also fails as a matter of law. *See* Am. Compl. ¶¶ 112-118. Through these orders, FERC regulates transmission, transmission providers, and Regional Transmission Organizations, not the type of generation used by retail customers or the associated carbon dioxide emissions.

FERC Order 888 was issued in response to FERC's findings that electric utilities were discriminating against independent power producers. *New York*, 535 U.S. at 11. To address the issue, FERC required all public utilities "that own, control, or operate facilities used for transmitting electric energy in interstate commerce" to file with FERC "open access non-discriminatory transmission tariffs that contain minimum terms and conditions of non-discriminatory service." FERC Order No. 888, 61 FR 21540, 21541 (May 10, 1996). FERC Order 888 does not conflict with Section 216H.03 because, as

discussed above, Section 216H.03 does not regulate the terms or conditions of transmission. *See* Minn. Stat. § 216H.03, subds. 3-4.

In Order 889, FERC added rules requiring an electronic clearinghouse for transmission services by requiring each public utility "that owns, controls or operates facilities used for the transmission of electric energy in interstate commerce . . . to create or participate in an [Open Access Same-time Information System] . . . ."  FERC Order 889, 61 FR 21737 (May 10, 1996) (summary).  Just as with FERC Order 888, there is no conflict between FERC Order 889 and any provision of Section 216H.03 because FERC Order 889 and Section 216H.03 regulate completely different matters.

Finally, there is no conflict between Section 216H.03 and FERC Order 2000.  In Order 2000, FERC strongly encouraged all public utilities to become part of a Regional Transmission Organization ("RTO"), which would operate the transmission facilities of its utility members on an independent basis.  89 FERC ¶ 61285, 1999 WL 33505505 at *3 (Dec. 20, 1999).  In this order, FERC also set forth minimum characteristics of an RTO, one of which is to "plan and coordinate necessary *transmission* additions and upgrades."  *Id.* at *131 (emphasis added); *see also id.* at *199 (stating that the RTO has the "ultimate responsibility for both *transmission* planning and expansion within its region") (emphasis added).  The RTO planning role contemplated by FERC Order 2000 is limited to "transmission" planning and expansion.  Nothing in Order 2000 gives RTOs authority to engage in *generation* resource planning in place of the States or otherwise intrudes upon the States' traditional authority to decide what type of generation resources

will be used in the state and to address associated environmental concerns. Thus, there is no conflict between Order 2000 and Section 216H.03.

Plaintiffs' erroneous allegations to the contrary are completely unsupported and speculative. They assert that the "NGEA stands as an obstacle to the accomplishment of the full purposes and objectives of Congress because, among other things, it directly interferes with and frustrates FERC's empowerment and control of RTOs." Am. Compl. ¶ 117. Plaintiffs, however, fail to cite a single provision of FERC Order 2000 or any other FERC order to support their assertion. *Id.* Likewise, Plaintiffs do not allege that FERC *itself* has found that Section 216H.03 or similar state laws conflict with FERC's empowerment and control of RTOs. *Id.* The absence of such an allegation further confirms that there is no actual conflict between Section 216H.03 and FERC's authority to regulate transmission or RTOs.

Finally, Plaintiffs erroneously allege that Section 216H.03's "restriction on importation of power generated from coal frustrates MISO's [the Midwest Independent Transmission System Operator's] purpose because it precludes MISO from effectively planning for power supply on a regional basis (i.e., across state lines) as it is required to do." Am. Compl. ¶ 118; *see also id.* ¶ 114 (describing MISO). Plaintiffs fail to provide any legal basis for this assertion. *Id.* Because they have failed to identify any FERC order that "requires" MISO to do regional generation resource planning, Plaintiffs have failed to allege an actual conflict between Section 216H.03 and any FERC order. *See Qwest v. Scott*, 380 F.3d 367, 374 (8th Cir. 2004) (declining to find preemption based on

an FCC order "given the absence of persuasive evidence of preemptive intent by the FCC").[9]

Plaintiffs' allegation that Section 216H.03 somehow "precludes MISO from effectively planning for power supply on a regional basis" also fails because it is speculative. Plaintiffs do *not* allege that MISO *itself* has determined that Section 216H.03 interferes with MISO's operations or MISO's ability to plan effectively. Am. Compl. ¶¶ 117-118. The absence of any such allegation is not surprising because MISO, as a transmission operator, does not have any reason to prefer one type of generation over another. Thus, Plaintiffs' assertion that Section 216H.03 "precludes MISO from effectively planning for power supply on a regional basis" fails to allege an actual conflict with any FERC order or provision of the Federal Power Act. *See Dalton*, 516 U.S. at 476 (requiring an actual conflict in order to find conflict preemption).

For these reasons, Plaintiffs' claim that Section 216H.03 is preempted by the Federal Power Act fails as a matter of law.

## II.    SECTION 216H.03 IS NOT PREEMPTED BY THE CLEAN AIR ACT BECAUSE CONGRESS EXPRESSLY PRESERVED STATE AUTHORITY TO REGULATE AIR EMISSIONS.

Plaintiffs' claim that Section 216H.03 is preempted by the Clean Air Act fails as a matter of law because Congress has not occupied the field of air emissions regulation as Plaintiffs erroneously assert. Courts look to congressional intent as the "ultimate

---

[9] Even if Plaintiffs had identified a FERC order that required regional generation resource planning, they also would have needed to show that the requirements of Section 216H.03 actually conflict with the requirements of the FERC order. Plaintiffs would not be able to make such a showing because no such conflict exists, as discussed above.

touchstone" in determining whether Congress exercised its power under the Supremacy Clause to preempt state law.   *Medtronic*, 518 U.S. at 485.   In addition, a strong presumption against preemption applies to Plaintiffs' claim of field preemption under the Clean Air Act because air emissions regulation is an area of traditional state authority. *Bates*, 544 U.S. at 449; *see supra* at 5-6.   In order for field preemption to be found, Congress' intent to preempt must be "clear and manifest."   *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).   Here, no such congressional intent to preempt exists.

**A.     Congress Has Not Occupied The Field Of Air Emissions Regulation.**

In Section 116 of the Clean Air Act, Congress specifically preserved the States' authority to regulate air emissions.   42 U.S.C. § 7416.   Section 116, which is entitled "Retention of State Authority," provides:

> Except as otherwise provided in sections 1857c-10(c), (e), and (f) (as in effect before August 7, 1977), 7543, 7545(c)(4), and 7573 of this title (preempting certain State regulation of moving sources) *nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution*; except that if an emission standard or limitation is in effect under an applicable implementation plan or under section 7411 or section 7412 of this title, such State or political subdivision may not adopt or enforce any emission standard or limitation which is less stringent than the standard or limitation under such plan or section.

42 U.S.C. § 7416 (emphasis added).

The plain language of Section 116 broadly and expressly preserves state authority to adopt "*any* standard or limitation respecting emissions of air pollutants" and "*any* requirement respecting control or abatement of air pollution."   *Id.*   (emphasis added). The only limits on state authority apply to certain state regulations regarding new motor

vehicles, fuel and fuel additives, and aircraft. *Id.*; 42 U.S.C. § 7543 (relating to motor vehicles); 42 U.S.C. § 7545(c)(4) (relating to fuel and fuel additives); 42 U.S.C. § 7573 (relating to aircraft). The inclusion of the savings clause in Section 116 of the Clean Air Act precludes a finding of field preemption. *See California Sav. & Loan*, 479 U.S. at 281 (finding no field preemption based on Congress' inclusion of savings clauses); *Lockwood v. Conagra Foods*, 597 F. Supp.2d 1028, 1032 (N.D. Cal. 2009) (recognizing that the presence of a savings clause is fundamentally incompatible with a claim of field preemption).

Congress' intent to preserve state authority to regulate air emissions is also expressed in Section 101 of the Clean Air Act. This section, which is entitled "Congressional Findings and Declaration of Purpose," provides that "States and local governments" have primary responsibility for "air pollution prevention . . . and air pollution control at its source." 42 U.S.C. § 7401(a)(3). Taken together, Sections 101 and 116 unequivocally demonstrate that Congress intended to allow supplemental state regulation of air emissions and air pollution.

**B.    The Courts Have Recognized That Congress Expressly Preserved State Authority To Regulate Air Emissions.**

Case law confirms that Congress has not occupied the field of air regulation. As the United States Supreme Court has recognized, the Clean Air Act made "the States and the Federal Government partners in the struggle against air pollution." *General Motors Corp. v. United States*, 496 U.S. 532, 532 (1990). Likewise, the Ninth Circuit has found that the "text of the Clean Air Act, in a number of different sections, explicitly protects

the authority of the states to regulate air pollution." *Exxon Mobil Corp.*, 217 F.3d at 1254.

In a more recent case, the Ninth Circuit again affirmed that Congress has not occupied the field of air emissions regulation. *Jensen Family Farms v. Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d 934, 938 (9th Cir. 2011). In *Jensen Family Farms*, the Ninth Circuit upheld a California regional air district regulation that set emissions limits for stationary diesel engines within the region. *Id.* at 938, 941-42. The Ninth Circuit found the California regional air regulation was not preempted because Section 116 of the Clean Air Act preserves state and local authority to limit air emissions from stationary sources. *Id.*

### C.   Section 216H.03 Is Not Preempted By The Clean Air Act.

Because Congress has expressly preserved state law authority to regulate air emissions and to control air pollution from stationary sources, there is no legal basis for Plaintiffs' field preemption claim under the Clean Air Act. Section 216H.03, the only state law at issue here, limits increases to "statewide power sector carbon dioxide emissions" from certain "new large energy facilit[ies]." Minn. Stat. § 216H.03, subds. 3-4.[10] The phrase "new large energy facility" is limited to electric generating facilities.

---

[10] The only portion of Section 216H.03 that imposes any actual limits on emissions from electric power plants is subdivision 3, clause (1). This clause prohibits the construction of a "new large energy facility" in Minnesota unless any increase to "statewide power sector carbon dioxide emissions" is offset. *See* Minn. Stat. § 216H.03, subds. 3(1), 4. The "import" provision in Section 216H.03, subdivision 3, clause (2), on the other hand, does not limit carbon dioxide emissions at the out-of-state electric power plants referenced in that subdivision. Electric power plants in other states can continue to be built and can emit any amount of carbon dioxide. The statute simply requires the

*Id.*, subd. 1; *see also supra* at 11-14.  Under Section 116 of the Clean Air Act, Minnesota

retains authority to regulate air emissions from these stationary sources.  *See* 42 U.S.C.

§ 7416.  The only exclusions of state authority in Section 116 relate to mobile sources.

*Id.*    Thus, Minnesota's regulation of its "statewide power sector carbon dioxide

emissions" in Section 216H.03 falls squarely within the authority retained by the States

under the Clean Air Act.

Furthermore, Plaintiffs' citation to the Supreme Court's decision in *Massachusetts

v. EPA*, 549 U.S. 497, 528-530 (2007) to support its field preemption claim is misplaced.

*See* Am. Compl. ¶ 102.  In the portion of the *Massachusetts* decision cited by Plaintiffs,

the Supreme Court concluded that carbon dioxide is an "air pollutant" within the meaning

of the Clean Air Act.  529 U.S. at 528-530.  The Supreme Court did not conclude that the

federal government has exclusive authority to regulate carbon dioxide emissions.  *Id.*  In

fact, the *Massachusetts* case did not address preemption.  Instead, it examined, in relevant

part, whether the EPA has authority to regulate greenhouse gas emissions from new

motor vehicles pursuant to the Clean Air Act.  *Id.* at 528-32.  Thus, the *Massachusetts*

case in no way supports Plaintiffs' claim of preemption.

To the contrary, the Supreme Court's determination that carbon dioxide is an "air

pollutant" within the meaning of the Clean Air Act actually supports the dismissal of

Plaintiffs' Clean Air Act claim.  As discussed above, Section 116 of the Act specifically

preserves the States' authority to "adopt or enforce (1) *any standard or limitation*

---

Minnesota utility to offset any increase in statewide power sector carbon dioxide
emissions or refrain from importing the power.  *Id.*, subds. 3(2), 4.

respecting emissions of *air pollutants*" from non-mobile sources.  42 U.S.C. § 7416 (emphasis added).  Because the Supreme Court has found that carbon dioxide is an "air pollutant" within the meaning of the Clean Air Act, state regulation of carbon dioxide emissions from stationary sources such as "new large energy facilities" is expressly permitted by Section 116 of the Act.  *Id.*

For these reasons, Plaintiffs' preemption claim under the Clean Air Act fails as a matter of law.

### III.    SECTION 216H.03 DOES NOT VIOLATE THE PRIVILEGES AND IMMUNITIES CLAUSE BECAUSE IT DOES NOT DISCRIMINATE AGAINST NORTH DAKOTA RESIDENTS WITH RESPECT TO EMPLOYMENT IN MINNESOTA.

Count IV of Plaintiffs' Amended Complaint asserts that Section 216H.03 violates the Privileges and Immunities Clause of the United States Constitution.  This claim is brought by North Dakota *parens patriae* on behalf of its citizens' interest in employment opportunities.  Am. Compl. ¶¶ 120, 122.[11]  North Dakota alleges that Section 216H.03 violates the Privileges and Immunities Clause because it reduces employment opportunities for North Dakotans in their state's lignite and coal-powered electric industries.  *Id.* ¶ 123.  This challenge to Section 216H.03 fails from the outset because the statute does not discriminate against North Dakota residents in obtaining employment within Minnesota.

The Privileges and Immunities Clause provides that the "Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."  U.S.

---

[11] The other Plaintiffs cannot assert this claim because corporations cannot invoke the Privileges and Immunities Clause.  *Western & Southern Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 656 (1981).

Const. art. IV, § 2, cl. 1.  It "was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy." *Toomer v. Witsell*, 334 U.S. 385, 395 (1948).  The Clause affords "protections for nonresidents who enter a State . . . to obtain employment" and "'bar[s] discrimination against [them] where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States.'"  *Saenz v. Roe*, 526 U.S. 489, 502 (1999) (quoting *Toomer*, 334 U.S. at 396).[12]

Thus, with respect to employment, the Privileges and Immunities Clause is aimed at preventing a state from discriminating against nonresidents in their pursuit of jobs within the state.  *See, e.g., Hicklin v. Orbeck*, 437 U.S. 518, 523-31 (1978) (invalidating Alaska statute that created an Alaska-resident hiring preference for oil and gas jobs in the state); *Piper*, 470 U.S. 274 (striking down New Hampshire rule that allowed only New Hampshire residents to be admitted to the practice of law in the state).  The Clause is not implicated, and the inquiry ends, if the challenged state law does not discriminate against nonresidents in obtaining work within the state.  *See, e.g., United Bldg. & Constr. Trades Council v. Mayor & Council of Camden*, 465 U.S. 208, 218-23 (1984) (reiterating that a state must justify a statute under the Privileges and Immunities Clause only if the statute discriminates against out-of-state residents with regard to the pursuit of employment or another privilege or immunity protected by the Clause).

---

[12] The terms "citizen" and "resident" are interchangeable in the context of the Privileges and Immunities Clause.  *Supreme Court of New Hampshire v. Piper*, 480 U.S. 274, 279 n.6 (1985).

Section 216H.03 plainly does not discriminate against North Dakota residents in obtaining employment within Minnesota. Indeed, North Dakota does not allege otherwise. North Dakotans have the same opportunities as Minnesotans to work in power industries in Minnesota. (Nor, for that matter, does the statute favor Minnesota residents over North Dakotans in obtaining jobs within North Dakota). In short, Section 216H.03 treats residents of Minnesota and North Dakota equally with respect to employment in Minnesota and, therefore, cannot be said to violate the Privileges and Immunities Clause.

## IV. THE ELEVENTH AMENDMENT BARS PLAINTIFFS' CLAIM THAT SECTION 216H.03 VIOLATES THE MINNESOTA CONSTITUTION.

Count VI of Plaintiffs' original complaint asserted that Section 216H.03 violates the Minnesota Constitution's prohibition against special legislation, Minn. Const. art XII, § 1. Compl. ¶¶ 134-138 (Docket # 1). The Eleventh Amendment plainly bars such a claim from being brought in federal court. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984) (holding that Eleventh Amendment bars federal court from deciding a claim that state officials are violating state law, even if the claim is pendent to federal claims); *see also Minnesota Chamber of Commerce & Indus. v. Hatch*, 672 F. Supp. 393, 399-400 (D. Minn. 1987) (recognizing that in federal court lawsuit against state officials, *Pennhurst* precludes a claim that a state statute violates the state constitution).

After being advised of Defendants' position regarding *Pennhurst* and its import, Plaintiffs amended their complaint to revise Count VI. Plaintiffs now seek to circumvent *Pennhurst* by recasting their state law claim as a purported federal due process claim. The revised Count VI asserts that Section 216H.03 violates federal due process because it

violates the Minnesota Constitution's prohibition against special legislation. Am. Compl. ¶¶ 139-40. Since Plaintiffs' claim is still predicated on finding that Section 216H.03 violates the Minnesota Constitution, this claim remains barred by the Eleventh Amendment under *Pennhurst*.

*Pennhurst* ruled that the *Ex parte Young* exception to Eleventh Amendment immunity does not apply to any claim based on an alleged violation of state law. *Pennhurst*, 465 U.S. at 106 (explaining that *Ex parte Young* is inapplicable "when a plaintiff alleges that a state official has violated *state* law") (emphasis in original). Accordingly, *Pennhurst* established that a federal court cannot award declaratory or injunctive relief against state officials "on the basis of state law." *Id.* at 91, 117.[13]

Courts have properly rejected plaintiffs' attempts to circumvent *Pennhurst* by recasting a claimed violation of state law as a federal due process claim. *See, e.g., Massey v. Coon*, No. 87-3768, 1989 WL 884, at *2 (9th Cir. Jan. 3, 1989) (recognizing *Pennhurst* barred purported federal due process claim that was "based on the failure of defendant[] [state officials] to conform to state law"); *Envirotech Sanitary Sys., Inc. v. Shoener*, 745 F. Supp. 271, 278 (M.D. Pa. 1990) (recognizing *Pennhurst* barred claim that "by allegedly violating state procedural provisions" defendant state officials "in turn deprived [plaintiff] of its federal right to due process"). Indeed, to allow such claims to

---

[13] *Pennhurst* does not prevent a federal court from interpreting a state law to determine whether it creates a property interest protected by federal due process, but that is different than deciding whether a state law has been violated. *See, e.g., Shakopee Mdewakanton Sioux (Dakota) Community v. Hatch*, No. 01-1737, 2002 WL 1364113, at *5, 7 (D. Minn. June 20, 2002) (determining whether state law created a protected property interest but recognizing that Eleventh Amendment prevented federal court from deciding whether state officials were violating state law).

proceed would make the Eleventh Amendment's jurisdictional bar "a nullity," as "a plaintiff would need only to claim a denial of rights protected or provided by [state law] in order to override sovereign immunity." *Pennhurst*, 465 U.S. at 112.

Thus, Plaintiffs' purported due process claim must be dismissed for lack of subject matter jurisdiction because, under *Pennhurst*, the Eleventh Amendment prevents the Court from deciding whether Section 216H.03 violates the Minnesota Constitution.

## V.    THE MINNESOTA ATTORNEY GENERAL IS NOT A PROPER PARTY UNDER THE ELEVENTH AMENDMENT.

Under the *Ex parte Young* exception to state Eleventh Amendment immunity, a federal lawsuit to prevent enforcement of an allegedly unconstitutional state statute can include the Attorney General as a defendant only if two conditions are met: (1) she "must have some connection with the enforcement" of the challenged statute; and (2) she must "threaten and [be] about to commence proceedings" to enforce the statute.  *Ex parte Young*, 209 U.S. 123, 156-57 (1908).  Neither of these conditions is met here.

Plaintiffs' asserted basis for including the Attorney General as a defendant is subdivision 8 of Section 216H.03. Am. Compl. ¶ 20.  That provision authorizes the Attorney General to take legal action to enforce Section 216H.03 only if the Public Utilities Commission or the Department of Commerce first "determines that [a] person is violating or about to violate [the] section" and "refer[s] the matter to the attorney general."  Minn. Stat. § 216H.03, subd. 8.

This conditional authority to enforce the statute is insufficient to satisfy *Ex parte Young*'s first prong.  *See Reproductive Health Servs. v. Nixon*, 428 F.3d 1139, 1145-46

(8th Cir. 2005) (holding that Missouri Attorney General was not a proper defendant where his authority to enforce the challenged statute was dependent on a request being made by the Governor or a trial court and no request had been made); *Minnesota Citizens Concerned for Life, Inc. v. Swanson*, No. 10-2938, 2011 WL 797462, at *3-4 (D. Minn. Mar. 1, 2011) (dismissing Minnesota Attorney General as a defendant in a challenge to a campaign finance statute because her authority to enforce the statute was dependent on a request being made by the Governor).

Moreover, Plaintiffs make no allegation that the Attorney General is threatening to enforce section 216H.03 against them. *See* Amended Complaint; *see also* Answer (Docket # 10) ¶¶ 18-19 (affirmatively asserting that neither the Public Utilities Commissioner nor the Department of Commerce has ever requested the Attorney General to bring an action to enforce Section 216H.03). Thus, *Ex parte Young*'s second prong is also not satisfied. *See Advanced Auto Transport, Inc. v. Pawlenty*, No. 10-159, 2010 WL 2265159, at *3 (D. Minn. June 2, 2010) (dismissing Minnesota Attorney General as a defendant where the plaintiff company did not allege that she had threatened a suit or was about to commence proceedings to enforce the challenged statute against the company).[14]

Accordingly, because both prongs of *Ex parte Young* are not met, the Eleventh Amendment prevents Plaintiffs from including the Attorney General as a defendant. Suing the Attorney General in such circumstances "is merely making [her] a party as a representative of the state, and thereby attempting to make the state a party," which the

_____

[14] Naming the Attorney General as a defendant is also contrary to Fed. R. Civ. P. 5.1, which requires litigants to notify her of lawsuits challenging the constitutionality of a Minnesota statute but leaves it to her discretion whether to intervene.

Eleventh Amendment forbids. *Ex parte Young*, 209 U.S. at 157; *see also Virginia Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632, 1640 (2011) (reiterating that incorrect denial of Eleventh Amendment immunity "offends the dignity of a State"); *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 268 (1997) (recognizing that Eleventh Amendment immunity is designed to protect "the dignity and respect afforded a State").

## CONCLUSION

Based on the foregoing, Defendants respectfully request that the Court grant their motion for partial judgment on the pleadings. The Court should dismiss Counts II through VI of Plaintiffs' Amended Complaint and the Attorney General as a defendant.

Dated: March 1, 2012

Respectfully Submitted,

OFFICE OF THE ATTORNEY GENERAL
State of Minnesota

s/**Jeanne M. Cochran**
Jeanne M. Cochran
Assistant Attorney General
Atty. Reg. No. 0246116
jeanne.cochran@ag.state.mn.us

John S. Garry
Assistant Attorney General
Atty. Reg. No. 0208899
john.garry@ag.state.mn.us

445 Minnesota Street, Suite 1100
St. Paul, MN 55101-2128
Telephone: (651) 757-1217

ATTORNEYS FOR DEFENDANTS