UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| State of North Dakota, | ) | No.: 11-CV-3232 (SRN/SER) |
| Industrial Commission of North Dakota, | ) | |
| Lignite Energy Council, | ) | |
| Basin Electric Power Cooperative, | ) | |
| The North American Coal Corporation, | ) | |
| Great Northern Properties Limited | ) | |
| Partnership, Missouri Basin Municipal | ) | |
| Power Agency d/b/a Missouri River | ) | |
| Energy Services, Minnkota Power | ) | |
| Cooperative, Inc., | ) | |
| | ) | |
| Plaintiffs, | ) | **PLAINTIFFS' MEMORANDUM** |
| v. | ) | **OF LAW IN OPPOSITION TO** |
| | ) | **DEFENDANTS' MOTION FOR** |
| Lori Swanson, Attorney General of the | ) | **PARTIAL JUDGMENT ON THE** |
| State of Minnesota, | ) | **PLEADINGS** |
| Ellen Anderson, Commissioner and | ) | |
| Chair, Minnesota Public Utilities | ) | |
| Commission, | ) | |
| David C. Boyd, Commissioner, | ) | |
| Minnesota Public Utilities Commission, | ) | |
| Phyllis Reha, Commissioner and Vice | ) | |
| Chair, Minnesota Public Utilities | ) | |
| Commission, | ) | |
| J. Dennis O'Brien, Commissioner, | ) | |
| Minnesota Public Utilities Commission, | ) | |
| Betsy Wergin, Commissioner, Minnesota | ) | |
| Public Utilities Commission, and | ) | |
| Mike Rothman, Commissioner, | ) | |
| Minnesota Department of Commerce, | ) | |
| each in his or her official capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**INTRODUCTION**

In enacting the Next Generation Energy Act of 2007, Minn. Stat. §§216H.01, *et seq.* ("NGEA"), the Minnesota Legislature could not have more clearly expressed its intention to impose Minnesota's policies and exert Minnesota's control over transactions involving the generation, transmission, and sale at wholesale of electricity that originates outside of Minnesota. The plain terms of the NGEA go beyond Minnesota's "traditional" authority of regulating the use of its own resources, the oversight of generation facilities actually located within the State, and the rates charged for the retail consumption of electricity by Minnesota consumers. The statute regulates not just emissions that occur in the State from the generation of electricity in Minnesota, but the NGEA also regulates those emissions that occur in the generation of electricity outside of the State where Minnesota has absolutely no right or authority to regulate such activities.

The NGEA plainly states its scope is necessarily extraterritorial in nature, as its goal is to address "***global warming***" which it defines as transcending local or statewide matters to cover the "observed and predicted increase in the temperature of the atmosphere near the earth's surface and the oceans." Minn. Stat. §216H.10, subd. 5; s*ee also id.* subd., 3, 6, 7.[1]

The NGEA could not be more far-reaching, as it states that "***no person shall***" engage in the proscribed transactions unless they agree to certain carbon offsets requirements. Minn. Stat. §216H.03, subds. 3&4 (emphasis added). Thus, the NGEA

---

[1]     Defining terms for Minn. Stat. §§216H.10-216H.13.

imposes its restrictions on all persons involved in the generation, transmission, and/or sale at wholesale of electricity that is eventually consumed in Minnesota.

The NGEA applies to transactions that, by definition, involve the generation, transmission, and sale at wholesale of electricity.  Specifically, the NGEA imposes restrictions on transactions in which any "person" would "***import or commit to import from outside the state power from a new large energy facility*** that would contribute to statewide power sector carbon dioxide emissions."  Minn. Stat. §216H.03, subds. 3(2)&4 (emphasis added).  Such activities and transactions necessarily relate directly to the generation, transmission, and/or sale at wholesale of electricity—not the retail distribution of that electricity to Minnesota consumers.  This is reinforced by the fact that the Minnesota Legislature expressly incorporated the statutory definition for "large energy facilities," *id.* subd. 1, which are statutorily described as "any electric generating plant or combination of plants at a single site with a combined capacity of 50,000KW or more ***and transmission lines directly associated with the plant that are necessary to interconnect the plant to the transmission system***."  *Id.* §216B.2421, subd. 2, cl. (1)(emphasis added).

Likewise, the NGEA imposes restrictions on transactions in which any "person" would "enter into a ***long-term power purchase agreement*** that would contribute to statewide power sector carbon dioxide emissions."  Minn. Stat. §216H.03, subds. 3(3)&4 (emphasis added).  The NGEA defines a "long-term power purchase agreement" as "an agreement to purchase 50MW of capacity or more for a term exceeding five years," *id.*,

which obviously constitutes the sale at wholesale of electricity—not the retail distribution of that electricity to Minnesota consumers.

The United States has exclusive jurisdiction over the transmission and sale at wholesale of electricity.   In particular, through its enactments, amendments, and expansion of the Federal Power Act ("FPA"), Congress has empowered and authorized the Federal Energy Regulatory Commission ("FERC") to regulate and facilitate transmission and competition in the wholesale power markets for electricity flowing through interstate commerce.   Congress has also enacted and expanded the Clean Air Act, and empowered the Environmental Protection Agency ("EPA") to address regional or national regulation regarding air quality.   Plaintiffs and similarly-situated "persons" are entitled to rely upon the federal government's exclusive authority and jurisdiction over such activities for the long-term planning, development, and delivery of efficient and reliable energy, and should not have to be exposed to the vagaries and vicissitudes of Minnesota and potentially 49 other states imposing a patchwork of competing, evolving, and conflicting regulations.   Giving its terms their plain meaning, the NGEA is a clear intrusion into federal authority under the Federal Power Act and the Clean Air Act.

The NGEA's extraterritorial restrictions and regulation of "upstream" activities and transactions involving the generation, transmission, and sale at wholesale of electricity that originates from outside of Minnesota plainly exceed Minnesota's "traditional" authority to regulate retail consumption of that electricity.   Minnesota has no authority to regulate the generation and transmission of electricity in other states,

regardless of whether that electricity may subsequently be transmitted to or consumed in Minnesota, nor does it have the authority to regulate the sale of that electricity at wholesale. Minnesota cannot impose its views regarding national and global issues on other states and out-of-state interests through an embargo on electricity that is and/or otherwise would be generated and transmitted outside of Minnesota and sold at wholesale.

Plaintiffs respectfully request the Court deny the Defendants' Motion for Partial Judgment on the Pleadings because Minnesota Statutes Sections 216H.03, subdivisions 3(2), 3(3), and 4 are preempted by federal law and otherwise invalid and unenforceable under the United States Constitution.

## GENERAL BACKGROUND

The NGEA imposes terms and conditions on transactions involving the transmission and sale at wholesale of electricity that is generated elsewhere. As noted, the NGEA's plain terms require that *"no person shall"*—including those "persons" that generate electricity in other states, "persons" who transmit that electricity, and "persons" who transact for the sale and purchase of that electricity at wholesale—*"import or commit to import from outside the state power from a new large energy facility"* or *"enter into a new long-term power purchase agreement"*—which are fundamentally and by definition transactions that involve the transmission and sale at wholesale of electricity, as opposed to retail sale and distribution to Minnesota customers—if the electricity that is the subject of those activities and transactions would, according to Minnesota's definitions, "contribute to statewide power sector carbon dioxide

4

emissions"—which by the NGEA's own definitions includes carbon dioxide emissions from the generation of electricity that actually occur "**outside the State**." Minn. Stat. §§216H.01, subd. 2 & 216H.03, subd. 2, 3, 4.

By imposing these barriers and conditions on all "persons" who seek to supply electricity from out-of-state sources through interstate commerce for consumption in Minnesota, the NGEA clearly regulates the generation, transmission, and sale at wholesale of electricity originating from outside of its borders based on emissions that occur entirely outside of Minnesota.

The NGEA harms Plaintiffs and similarly-situated "persons"[2] by, *inter alia*, improperly burdening and chilling plans for the development and construction of new large energy facilities in other states and interfering with persons who would enter into new long-term power purchase agreements; interfering with the demand for lignite that would otherwise be used to responsibly generate low-cost electricity; and preventing the delivery of electricity to cooperatives and municipalities located in Minnesota.

## A.    The NGEA Harms North Dakota, North American Coal, And Great Northern By Reducing The Demand For Lignite.

By prohibiting or, alternatively, imposing conditions on the importation and purchase of coal-generated electricity transmitted from other states, and the sale at wholesale of that electricity, the NGEA will cause less coal to be mined to the detriment

---

[2]    The Lignite Energy Council's membership includes lignite mining companies, lignite resource owners and users of lignite and lignite byproducts, utilities that generate electricity from lignite, and businesses that provide services to the lignite industry.  Am. Compl. ¶14; Answer ¶13.

of North Dakota and its citizens, The North American Coal Corporation ("North American Coal"), and Great Northern Properties Limited Partnership ("Great Northern Properties").

**1.      North Dakota.**

North Dakota's legislative assembly has declared as a matter of North Dakota public policy "it is an essential governmental function and public purpose to assist with the development and wise use of North Dakota's vast lignite resources."  N.D. Cent. Code. §54-17.5-01; *see also id.* §54-17.5-01.   Lignite-based power in North Dakota plants have made and continue to make substantial investments in technology to control emissions.  Am. Compl. ¶33-34.  Moreover, each power plant in North Dakota that uses lignite complies with all state and federal ambient air quality standards.  *Id.*  These facilities have supplied lignite-generated electricity to consumers, farms, and businesses in North Dakota and its neighboring states, including Minnesota.  Am. Compl. ¶1; Answer ¶2.

The Industrial Commission of North Dakota assists the "development and wise use" of North Dakota's lignite resources, N.D. Cent. Code §54-17.5-02, and makes grants or loans and executes contracts for research, development, and marketing projects related to lignite and products derived from lignite.  *Id.* §§54-17.5-01&54-17.5-04.

North Dakota collects a severance tax of 37.5¢ per ton of lignite mined in North Dakota.  N.D. Cent. Code §57-61-01.  These monies are credited to the state's Coal Development Fund and appropriated by the state's legislative assembly.  *Id.* §57-61-10.

6

North Dakota also collects 2¢ per ton of lignite mined in North Dakota for the Lignite Research Fund. *Id.* §57-61-01.5.

Additionally, North Dakota collects a coal conversion tax from electrical generating plants for the privilege of producing electricity from coal within the State of North Dakota. *Id.* §57-60-02. Its revenues are then shared by the state and coal-producing counties, cities, and school districts. *Id.* §§57-60-14&15.

As a result of the chilling effects of the NGEA, fewer energy facilities that qualify as "new large energy facilities" will be developed and there will be fewer "new long-term power purchase agreements." Am. Compl. ¶79. Correspondingly, less coal will be mined in North Dakota to the detriment of North Dakota and its citizens, and North Dakota will collect less in revenues from its coal severance tax and coal conversion tax than it would otherwise collect. *Id.*

### 2. North American Coal.

North American Coal's wholly-owned subsidiary, The Coteau Properties Company, operates the Freedom Mine near Beulah, North Dakota. Am. Compl. ¶49. The Freedom Mine is the largest lignite mine in the United States in terms of deliveries and produces up to 16,000,000 tons of lignite annually. *Id.* Lignite from the Freedom Mine supplies Basin Electric Power Cooperative's ("Basin Electric") Leland Olds and Antelope Valley Stations. *Id.*

North American Coal's wholly-owned subsidiary, The Falkirk Mining Company, operates the Falkirk Mine in Underwood, North Dakota. Am. Compl. ¶50. The Falkirk Mine delivers more than 7,000,000 tons of lignite annually. *Id.* Lignite from the Falkirk

Mine fuels Great River Energy's ("GRE") Coal Creek Station in North Dakota and will fuel Great River Energy's Spiritwood Station. *Id.*

As a result of the chilling effects of implementation of the NGEA, fewer energy facilities that qualify as "new large energy facilities" will be developed and there will be fewer "new long-term power purchase agreements," and as a result less coal will be mined in North Dakota and other states, to the detriment of North American Coal. Am. Compl. ¶79.

### 3.    Great Northern Properties.

Great Northern Properties has over 20 different developable lignite deposits scattered around central and western North Dakota. Am. Compl. ¶51. Since 2001, it has been proactive in the development of its lignite reserves, predominately focused on electrical generation using state-of-the-art "clean coal" technologies such as coal gasification. *Id.* Great Northern Properties and its affiliates continue to source and sponsor development of new technologies that will enable the use of lignite as a cheap, abundant energy resource and in compliance with stringent statutory environmental requirements. *Id.*

The NGEA is now negatively impacting and will continue to negatively impact Great Northern Properties and its affiliates in the development of its owned resources by curtailing opportunities to utilize the products derived from such lignite within Minnesota. Am. Compl. ¶52. A case in point is the South Heart Project being developed by an affiliate of Great Northern Properties. *Id.* The South Heart Project will generate 175MW of low-carbon electricity whose potential customers could include utilities and

8

co-ops that could export to Minnesota. *Id.* Because of NGEA, it is likely that potential Minnesota customers will be unwilling to commit to power purchase or other types of participation agreements relative to the South Heart Project. *Id.* This will be detrimental to the development and use of Great Northern Properties' coal resources as well as the development of the South Heart Project. *Id.* ¶¶52&79.

### B. The NGEA Harms Entities That Generate And/Or Transmit Electricity Outside Of Minnesota For Distribution To Their Member Cooperatives And/Or Municipalities In Minnesota.

By seeking to unconstitutionally regulate beyond its borders and control the generation, transmission, and sale at wholesale of electricity from other states, the NGEA harms entities that generate and/or transmit electricity outside of Minnesota by unlawfully preventing them from being able to distribute that electricity to their member cooperatives and municipalities located in Minnesota.

#### 1. Basin Electric.

Basin Electric is a North Dakota nonprofit cooperative association whose core business is generating and transmitting wholesale bulk electric power to customers, principally its 135-member rural electric systems located in Minnesota, North Dakota, Montana, Wyoming, Colorado, New Mexico, Nebraska, South Dakota and Iowa. Am. Compl. ¶15; Answer ¶14. Basin Electric has entered into power purchase agreements for coal-based generation resources in the past. Am. Compl. ¶48; Answer ¶36. By 2012, approximately 59% of Basin Electric's generating capacity will be coal-based. Am. Compl. ¶15.

9

Basin Electric operates two lignite-fueled power stations in North Dakota:  Leland Olds Station, near Stanton, and Antelope Valley Station, near Beulah.  Am. Compl. ¶41; Answer ¶29.  Further, Basin Electric operates and is a 42.27% owner of the Laramie River Station, located east of Wheatland, Wyoming.  *Id.*  Unit 1 of the Leland Olds Station has been in commercial operation since 1966, and Unit 2 has been in operation since 1975.  Am. Compl. ¶42; Answer ¶30.  In addition to its lignite-fueled power stations, Basin Electric operates other generation facilities, including its Dry Fork Station near Gillette, Wyoming.  Am. Compl. ¶43; Answer ¶31.

Basin Electric provides supplemental wholesale power directly to four distribution cooperatives serving in Minnesota and to nine distribution cooperatives via contracts with intermediary Generation and Transmission Cooperatives.  Am. Compl. ¶44; Answer ¶32.  In 2010, Basin Electric provided approximately 1,035,272MWH or about 4.59% of its total sales to its Minnesota customers.  Am. Compl. ¶44.  Since Basin Electric is the supplemental power supplier, it is obligated to serve the load growth of these cooperatives and will have to construct new generating resources as needed to serve this load.  *Id.*

There are three major alternating current power grids in North America, the Western Interconnection, the Eastern Interconnection, and the Texas ERCOT Interconnection.  Am. Compl. ¶45; Answer ¶33.  These grids operate electrically separate from each other.  *Id.*  Basin Electric provides electric service to its members on both the Eastern Interconnection and the Western Interconnection, and operates generating facilities on each system to accomplish this.  *Id.*  Through ownership of contract rights in

AC/DC/AC tie facilities, Basin Electric has the ability to move a limited amount of power between the two systems.  Am. Compl. ¶45.

In northwestern North Dakota, Basin Electric has experienced an increase in electrical load largely attributable to booming oil and gas exploration and development activities.  Am. Compl. ¶46.  To help service this load, during the start-up and testing of the Dry Fork Station, Basin Electric has moved up to 130MW of power from the Dry Fork Station into the Eastern Interconnection.  *Id.*  Once Dry Fork Station is in commercial operation, it is expected that these load transfers into the Eastern Interconnection will continue.  *Id.*

The NGEA could be interpreted to condition or prohibit the above-described transfers of power into the Eastern Interconnection, necessary to service Basin Electric's North Dakota customers, because such transfers result in sub-bituminous coal-generated power being potentially imported into Minnesota through the Eastern Interconnection. Am. Compl. ¶47.  Basin Electric faces a reasonable apprehension of adverse action by the State of Minnesota and its agencies based on the NGEA.  *Id.*

The NGEA also adversely affects Basin Electric's ability to plan for future operations necessary to support expected demand growth.  Basin Electric has entered into power purchase agreements from coal-based resources in both the short- and long-term duration throughout its 55-year existence.  Am. Compl. ¶48.  Basin Electric faces uncertainty about the application of the NGEA with respect to certain power purchase agreements and the NGEA thus has interfered with Basin Electric's long-term planning efforts.  *Id.*

## 2. MRES.

Missouri Basin Municipal Power Agency d/b/a Missouri River Energy Services ("MRES") is a body corporate and politic organized under Chapter 28E of the Code of Iowa and a public agency existing under the intergovernmental cooperation laws of the States of Iowa, Minnesota, North Dakota and South Dakota. Am. Compl. ¶18; Answer ¶16. MRES membership is comprised of 61 municipalities. *Id.* Twenty-four of its member municipalities are located in Minnesota. *Id.* The balance of its members are located in Iowa, South Dakota and North Dakota. *Id.*

MRES supplies its members with market purchases of power and energy. Am. Compl. ¶53; Answer ¶40. MRES is contractually obligated to supply power and energy sufficient to meet its members' demand, both within and without Minnesota. Am. Compl. ¶53. MRES currently supplies its members with power and energy from an integrated mix of coal, natural gas, oil, and wind generation. *Id.* MRES has contractual rights for transmission of power and energy into Minnesota, and transmits power and energy into Minnesota daily. Am. Compl. ¶53; Answer ¶40. MRES has indicated to the Minnesota Public Utilities Commission ("MPUC") that it expects that its members' power and energy requirements will increase with time. Am. Compl. ¶54; Answer ¶41. MRES has contracted for coal-based generation resources in the past. Amend. Compl. ¶55; Answer ¶41.

MRES anticipates that its members' future power and energy requirements will exceed MRES's present capacity to meet contractual obligations to its members. Am. Compl. ¶54. Because MRES is obligated to supply the load growth of its members, it

will have to construct or acquire new sources of power and energy as demand increases. *Id.* The NGEA could be applied to condition or prohibit importation of coal-generated power and energy into Minnesota to serve Minnesota members' increased demand. *Id.*

MRES has contracted to purchase power and energy produced by coal-based generating resources for more than 35 years. Am. Compl. ¶55. Since the enactment of the NGEA, MRES has negotiated for acquisition of additional coal-generated power and energy. *Id.* In analyzing the acquisition of such coal-generated power and energy, MRES has, of necessity, been faced with tailoring its business plan to avoid violation of the NGEA. *Id.* The NGEA thus adversely affects MRES's ability to plan for future operations necessary to support expected demand. *Id.*

MRES has a reasonable apprehension of adverse action by the State of Minnesota and its agencies based on the NGEA. Am. Compl. ¶56. Uncertainty regarding the application of the NGEA with respect to certain coal-based power and energy purchases interferes with MRES's long-term planning and opportunities to acquire economical supplies of power and energy to serve its contractual obligations to its members. *Id.*

### 3. MPC.

Minnkota Power Cooperative, Inc. ("MPC") is a nonprofit Minnesota cooperative corporation providing wholesale power on an all-requirements basis to 11 member-owned distribution cooperatives located in eastern North Dakota and northwestern Minnesota. Am. Compl. ¶19; Answer ¶16. Uncertainty regarding the application of the NGEA with respect to certain coal-based power and energy purchases interferes with

MPC's long-term planning and opportunities to acquire economical supplies of power and energy to serve its contractual obligations to its members.

### C.    GRE's Experience With The NGEA.

Great River Energy is a nonprofit electrical transmission and generation cooperative based in Minnesota, which is owned by 28 rural electric cooperatives.  GRE recently constructed the Spiritwood Station in Jamestown, North Dakota, which has the capacity to generate up to 99MW of electricity for the regional energy market.  When operational, the Spiritwood Station's fuel source will be lignite, and state-of-the-art technologies will make it one of the cleanest coal-based power plants in the world.

On July 1, 2008, GRE filed its 2008 Resource Plan with the MPUC pursuant to Minn. Stat. §216B.2422, subd. 2 and Minn. R. 7843.0100-7843.0600.  Am. Compl. ¶71; Answer ¶53.  GRE's plans with respect to its Spiritwood Station in North Dakota were mentioned on only four out of the more than 200 pages of GRE's 2008 Resource Plan filing.  Am. Compl. ¶72.  However, the MPUC proceedings regarding this Resource Plan devolved over the course of three years into a referendum on the applicability of NGEA requirements to Spiritwood Station, in which several environmental organizations succeeded in persuading the MPUC to commence a contested case hearing on the issue. *Id.*  This occurred notwithstanding the fact that the Spiritwood Station is located *outside of Minnesota*, the generation of the electricity would take place entirely *outside of Minnesota*, any emissions resulting from the generation of the electricity would occur entirely *outside of Minnesota*, and the transmission and wholesale distribution of the electricity generated at the Spiritwood Station is regulated by FERC.

14

In late 2010, the MPUC finally approved GRE's 2008 Resource Plan, but opened a new docket to consider Spiritwood Station's compliance with the NGEA. Am. Compl. ¶73. On this new docket, approval of energy imports from Spiritwood Station continued to meet with objection from numerous environmental organizations that advocated for contested proceedings, which the MPUC granted. *Id.* Moreover, the environmental organizations argued that the MPUC should not allow GRE to claim as carbon offsets projects that it had voluntarily undertaken to reduce carbon dioxide emissions, simply because GRE's projects were not directly undertaken to comply with NGEA offsetting requirements, as purportedly required by the NGEA's "would not have otherwise occurred" requirement for offsets. *Id.*[3]

Through the aforementioned MPUC proceedings, the Spiritwood Station project was still tied up in hearings before Minnesota's Office of Administrative Hearings when, on May 28, 2011, the Minnesota Legislature enacted an exemption for Spiritwood from the NGEA, benefitting Minnesota-based GRE. *See Laws of Minnesota 2011*, Ch. 97. Without this exemption, GRE would have been required by the NGEA to offset the Spiritwood emissions, which would have cost tens of millions of dollars over the life of that plant.

---

[3]     The NGEA's requirement is squarely at odds with North Dakota's longstanding statutory policy that "development of North Dakota's lignite resources must be conducted in an environmentally sound manner that protects [North Dakota's] air, water, and soil resources." N.D. Cent. Code. §54-17.5-01. Entities that have complied with and even exceeded North Dakota's environmental requirements are now subject to new, onerous burdens established by the NGEA. Am. Compl. ¶74.

The MPUC's handling of GRE's Spiritwood project, including the MPUC's opening of a new docket and the Commissioners' referral to an administrative law judge to consider Spiritwood Station's compliance with the NGEA, demonstrates the problematic and unworkable nature of the restrictions imposed by the statute. Further, the indefinite delays and uncertainty imposed on the Spiritwood Station reflect that the process imposed by the NGEA constitutes as much harm as the statutory restrictions themselves. Defendants must not be permitted to enforce the NGEA and its improper regulation of the generation, transmission, and sale at wholesale of electric energy from other states.

## ARGUMENT

The Next Generation Energy Act far exceeds Minnesota's "traditional" authority to regulate the use of its own natural resources, the generation of electricity in Minnesota, and the retail delivery of electricity to Minnesota consumers.

The NGEA attempts to control the terms and conditions of the generation, transmission, and sale at wholesale of electricity originating from new large energy facilities located outside Minnesota and long-term power purchase agreements for power generated outside of Minnesota by requiring that *"no person shall"* engage in any such actions if the electricity in question "would increase statewide power sector carbon dioxide emissions" unless the proponents of those transactions and projects provide for carbon dioxide emission offsets.

Minnesota simply does not have the authority to regulate "electric generation resources" located outside of Minnesota and carbon emissions associated with the

generation of electricity in other states, and Minnesota does not have the authority to regulate and/or impose terms and conditions with respect to the generation, transmission, and sale at wholesale of that electricity. These actions clearly intrude upon the jurisdiction and authority of those other states to regulate activities that occur within their own respective borders, and the federal government's authority to regulate the transmission of electricity and sale at wholesale, and the regional air emissions that may occur as the result of the generation and transmission of that electricity.

## I.      THE FEDERAL POWER ACT PREEMPTS THE NGEA.

Under the Supremacy Clause of the Constitution, Art. IV, cl. 2, state law will be preempted when it conflicts with or frustrates federal law. *N. Natural Gas Co. v. Iowa Utils. Bd.*, 377 F.3d 817, 820-21 (8th Cir. 2004)(citing *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993)). State law is preempted in one of three ways. First, state law is preempted where Congress has expressly stated that it intends to prohibit state regulation in an area. *Id.* (citing *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001)). Second, Congress may implicitly preempt state regulation, through occupation of a field, where the federal regulatory scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947)). Finally, even if Congress has not completely precluded the ability of states to regulate in a field, state regulations are preempted to the extent they conflict with federal law. *Id.* (citing *Silkwood v. Kerr McGee Corp.*, 464 U.S. 238 (1984)).

Congress enacted the original version of the Federal Power Act in 1920, and since then it has further enacted, amended, and expanded the FPA on several occasions, 16 U.S.C. §§791a-828c, through which the United States expressly and exclusively regulates the transmission of electric energy in interstate commerce and the sale of such energy at wholesale. 16 U.S.C. §§824(a), 824(b)(1); *see United States v. Pub. Util. Comm'n of Cal.*, 345 U.S. 295, 299-300 (1953); *Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 371 (1988)("*MP&L*"). Congress expressly decreed that this authority shall be exercised through the FERC. Congress has tasked the FERC—not the State of Minnesota—with ensuring that entire region have access to efficient, cost-effective, and reliable energy.

Minnesota's prohibition on importation of electric energy and long-term power purchase agreements for electric energy based on carbon emissions (unless the parties to those transactions agree to certain offsets) is preempted by the Federal Power Act. The NGEA usurps FERC's authority, and interferes with the interstate transmission and sales at wholesale of electricity within the regional grid over which FERC has exclusive jurisdiction, by restricting the manner in which coal-generated electrical energy can be transmitted into Minnesota. The NGEA unlawfully interferes with FERC's broad jurisdiction and authority by imposing terms and conditions on the interstate transmission and sale at wholesale of a certain type of electricity, namely coal-fired electricity, and thus limits the energy available to satisfy the needs of all interconnected states.

For the sound reasons set forth herein, the Federal Power Act preempts the NGEA.

18

**A.     The Presumption Against Preemption Does Not Apply To The NGEA.**

Defendants claim there is a presumption against preemption that applies to the NGEA.   Defendants' Memorandum of Law ("Defs.' Mem.") 5.   Not so.   The presumption against preemption generally only applies where the state regulation or law predates and is being "displaced" by federal regulation.   *See New York v. FERC*, 535 U.S. 1, 17-18 (2002)(no presumption against preemption when considering jurisdictional line between retail and wholesale activities under FPA).   The cases cited by Defendants for the presumption against preemption all involved pre-existing state law.   Def.'s Mem. 5-6.   The NGEA was passed in 2007—several decades after the relevant provisions of the FPA were enacted.   Indeed, the MPUC did not have the authority to regulate electric utilities until 1974, while the FPA was originally enacted in 1920.   *See* Laws of Minnesota 1974, Ch. 429.   Thus, the presumption against preemption does not apply here.

Moreover, even Defendants' own cases held that the presumption only applies where Congress has "legislated in a field which the States have traditionally occupied." *Medtronic*, 518 U.S. at 485.   States have not "traditionally" regulated the use of resources, the generation of energy, air emissions, or the transmission of electricity when those resources are located and used in other states, and where those activities are occurring in other states.   The NGEA's extraterritorial scope goes well beyond areas traditionally occupied by states, and therefore it is not entitled to the presumption against preemption.

**B.     The Federal Power Act Regulates Interstate Transmission And Sales At Wholesale Of Electric Energy And Therefore Preempts The NGEA.**

The NGEA attempts to regulate interstate transmission of electric energy and impose terms and conditions on sales at wholesale.  Congress has vested FERC with exclusive jurisdiction and authority over the interstate transmission and sales at wholesale of electricity—there is no place for state regulation of these activities.  Thus, the Federal Power Act clearly preempts the NGEA on field preemption grounds.  Defendants wholly fail to address field preemption in their motion.

Under the FPA, 16 U.S.C. §§791a-828c, the federal government exclusively regulates "the *transmission of electric energy in interstate commerce* and the *sale of such energy at wholesale in interstate commerce*."  16 U.S.C. §824(a), (b)(1)(emphasis added).  The original legislative purpose of the FPA was to address the increasing transmission of electric power between states and the need to coordinate facilities to ensure efficiency and reliability of the national power supply, which could not reasonably or constitutionally be accomplished by individual states.  *Jersey Cent. Power & Light Co. v. Fed. Power Comm'n,* 319 U.S. 61, 68 n.7 (1943)(recognizing "[t]he necessity for Federal leadership in securing planned coordination of the facilities of the industry which alone can produce an abundance of electricity at the lowest possible cost…")(quoting S. Rep. No. 621, 7th Cong., 1st Sess., p.17)).

Congress subsequently passed the Energy Policy Act of 1992, which amended the FPA to provide FERC with even broader federal authority over interstate transmission and wholesale sales of electricity.  *See* 16 U.S.C. §824(b).  FERC has "*exclusive*

authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce, without regard to the source of production." *New England Power Co. v. New Hampshire,* 455 U.S. 331, 340 (1982)(emphasis added).  Congress broadly empowered FERC to regulate, *inter alia*, financial transactions involving public utilities, wholesale electricity rates, transactions involving transmission of unbundled retail electricity, interconnection and wheeling of wholesale electricity, and ensure adequate and reliable service on the regional and national grids.  16 U.S.C. §§824a-824o.

FERC has developed a cohesive, efficient, and competitive wholesale electricity and transmission grid in the United States through the enablement of Regional Transmission Organizations ("RTOs").  FERC has promulgated numerous orders that have established a complex regulatory scheme with the intention of promoting competitiveness in the national electricity market.

FERC issued Order No. 888 "to remove impediments to competition in the wholesale bulk power marketplace and to bring more efficient, lower-cost power to the Nation's electricity consumers," *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, 61 Fed. Reg. 21,540 (May 10, 1996), FERC Stats. & Regs. ¶31,036, at p. 31,632 (1996), et al. ("Order No. 888"), and was designed to encourage the creation of electric transmission organizations that, *inter alia*, operate independently of market participants; provide open access to the transmission system; maintain the reliability of the transmission grid; and control the operation of all transmission facilities within the region.  *Id.*

In Order No. 2000, FERC supported the establishment of RTOs with the overall objective of further ensuring non-discriminatory access by all market participants to the transmission grid while maximizing the efficiency of operations by eliminating multiple actors and thereby "promote efficiency in wholesale electricity markets and to ensure that electricity consumers pay the lowest price possible for reliable service." Order No. 2000 set out seven major functions for RTOs, including tariff administration and design; congestion management; management of parallel path flows; provision of last resort for ancillary services; development of an open access same-time information system; market monitoring; and responsibility for planning and expanding facilities under its control.

Midwest Independent Transmission System Operator, Inc. ("MISO") is a FERC-regulated RTO responsible for electricity transmission in Minnesota and North Dakota. MISO covers all or part of North Dakota, South Dakota, Minnesota, Iowa, Wisconsin, Illinois, Indiana, Michigan and parts of Montana, Missouri, Kentucky, and Ohio. Am. Compl. ¶114; Answer ¶72. Of the electricity transmitted through the MISO grid, 51% is generated by coal and 23% is generated by gas. Am. Compl. ¶115. FERC regulates MISO by reviewing and, when appropriate, approving changes or additions to MISO's tariff. MISO's current tariff, effective as of July 28, 2010, is over 3,000 pages long. Am. Compl. ¶116. Thus, Congress has clearly, expressly, and conclusively evidenced its intent to occupy the field of efficient, reliable, and cost-effective interstate electrical power transmission and sale at wholesale. *See* 16 U.S.C. §§824(a)&(b)(1).

The United States Supreme Court has repeatedly found that state efforts to regulate interstate electricity transmission and sales at wholesale are preempted by the

FPA.  *See, e.g., MP&L*, 487 U.S. at 370-371 (preemption of Mississippi Public Service Commission prudence inquiry relating to power allocations from a nuclear plant); *Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 970 (1986)(preemption of North Carolina order which precluded power company from recovering costs incurred pursuant to their payment of just and reasonable FERC-set rates).  In *Federal Power Commission v. Southern California Edison Co.,* 376 U.S. 205 (1964), the Supreme Court recognized that, in passing the Federal Power Act, "***Congress meant to draw a bright line easily ascertained between state and federal jurisdiction***...by making FPC jurisdiction *plenary* and extending it to ***all wholesale sales in interstate commerce*** except those which Congress has made explicitly subject to regulation by the States."  *Id.* at 215-16 (emphasis added).

Similarly, in *MP&L*, the Supreme Court again noted that "***Congress has drawn a bright line between state and federal authority*** in the setting of wholesale rates and in the regulation of ***agreements that affect wholesale rates***.  States may not regulate in areas where FERC has properly exercised its jurisdiction to determine just and reasonable wholesale rates or to insure that agreements affecting wholesale rates are reasonable." *MP&L,* 487 U.S. at 374 (emphasis added).  Ultimately, under the Federal Power Act, as enacted, amended, and expanded over the years, the only area left for state regulation is "sale at local retail rates to ultimate consumers" and any other exceptions which Congress has explicitly made subject to regulation by the states.  *Fed. Power Comm'n,*

376 U.S. at 214, 216 (quoting *Ill. Natural Gas Co. v. Cent. Ill. Pub. Serv. Co.,* 314 U.S. 498, 504 (1942)).[4]

The NGEA expressly states its intention to regulate emissions that occur not only "within the state" but also "from the generation of electricity imported from outside the state and consumed in Minnesota."   Minn. Stat. §216H.01, subd. 2.   The NGEA's requirement that ***"no person shall…import or commit to import from outside the state power from a new large energy facility*** that would increase statewide power sector carbon dioxide emissions" necessarily constitutes the regulation of interstate transmission and sale at wholesale of electricity, *id.* §216H.03, subd. 3(2)(emphasis added), as does the NGEA's prohibition that ***"no person shall…enter into a new long-term power purchase agreement*** that would increase statewide power sector carbon dioxide emissions," *id.* §216H.03, subd. 3(3)(emphasis added).   Likewise, the NGEA's exception for facilities that offset emissions necessarily imposes terms on the transmission and sale at wholesale of electricity.   *Id.* §216H.03, subd. 4.   In doing all of these things, Minnesota effectively impacts wholesale rates and agreements which are regulated by FERC for the

---

[4] Caselaw on the Natural Gas Act ("NGA") is instructive, as the federal authority under both the NGA and FPA has been broadly interpreted and applied.   *See Fed. Power Comm'n,* 376 U.S. at 211.   NGA caselaw establishes that state regulations requiring particular action or inaction in relation to interstate transmission are preempted.   *See, e.g., Maryland v. Louisiana,* 451 U.S. 725, 732, 748-49 (1981)(Supreme Court struck down state tax imposed on natural gas imported into Louisiana); *N. Natural Gas Co. v. State Corp. Comm'n,* 372 U.S. 84, 90-92 (1963)(Supreme Court struck down state orders which required interstate pipeline company to purchase gas ratably from all wells connecting with its pipeline system in each gas field within state); *Ill. Natural Gas Co. v. Cent. Ill. Pub. Serv. Co.,* 314 U.S. 498 (1942)(rejecting state order requiring natural gas distributor to supply gas to another local distributor).

purpose of maintaining efficiency, competitiveness, and reliability of the regional electric grid to which Minnesota is attached. Thus, the NGEA plainly interferes with the FERC's "plenary" authority to set wholesale rates and regulate all agreements which might affect wholesale rates, *see MP&L,* 487 U.S. at 374, and is at odds with FERC's efforts "to remove impediments to competition in the wholesale bulk power marketplace and to bring more efficient, lower-cost power to the Nation's electricity consumers" and "promote efficiency in wholesale electricity markets and to ensure that electricity consumers pay the lowest price possible for reliable service," (*See* Order Nos. 888 and 2000, *supra*.).

The NGEA also directly interferes with and frustrates FERC's empowerment and control of RTOs. By way of example, the NGEA's restriction on importation of power generated from coal frustrates MISO's purpose because it hinders MISO from effectively planning for power supply on a regional basis (i.e., across state lines) as it is required to do. Fifty-one percent of the electricity in the MISO grid is generated by coal. If a state were able to unilaterally impose limitations upon the source of electricity in the MISO grid, it would effectively give that state veto power over MISO's decisions to the detriment of other states within the MISO grid. The NGEA nonetheless attempts to regulate "new large energy facility[ies]," Minn. Stat. §216H.03, subd. 1, which are defined to include "transmission lines," *id*. §216B.2421, subd. 2(1), despite the United States' exclusive jurisdiction over such transmission lines under the Federal Power Act. 16 U.S.C. §§824(a), 824(b)(1). The NGEA also impermissibly restricts the importation of power from a new large energy facility into the State of Minnesota, Minn. Stat.

§216H.03, subd. 3(2), which importation can only occur through transmission in interstate commerce, notwithstanding the United States exclusive jurisdiction over such transmission under the Federal Power Act. 16 U.S.C. §§824(a), 824(b)(1).

In short, the Federal Power Act preempts the NGEA's attempts to regulate transmission of electric energy and the sale of such energy at wholesale, both of which are fields reserved exclusively to the federal government. The Legislature itself perceived the constitutional vulnerabilities of its provisions when it originally passed the NGEA. By its express terms, the NGEA provides that its restrictions on coal-sourced imports and long-term power purchase agreements for electricity shall not be effective if "preempted by federal law." Minn. Stat. §216H.03, subd. 3. Accordingly, the Court should deny Defendants' Motion for Partial Judgment on the Pleadings and hold that sections 216H.03, subdivisions 3(2) and 3(3), are unenforceable as a matter of law because they are preempted by federal law.

### C.   Minnesota Has Not And Cannot Establish That The NGEA Falls Within The Permissible Boundaries of State Regulation.

Defendants acknowledge that the Federal Power Act grants the federal government authority over "transmission of electricity in interstate commerce" and "wholesale" sales of electricity. Defs.' Mem. 6. But, Defendants argue the individual states "generally retain authority to determine whether and where a transmission line should be constructed in a state;" "States also retain authority over generation and distribution facilities;" and "States retain authority over retail sales." Defs.' Mem. 6-7. While this may be true, such limited authority to regulate electricity that is generated

within Minnesota does not translate into authority to regulate the generation, transmission, and sale at wholesale of electricity from other states. *See* Defs.' Mem. 7. Defendants have overstated Minnesota's "traditional" regulatory authority over "electric generation resources," electrical generation utilities, and the distribution of electricity to retail consumers. Minnesota *has not traditionally exercised authority*—and *does not have the authority over*—resources that are located in another state or the use of those resources to generate electricity outside of Minnesota.

While Defendants identify certain statutes and rules to illustrate Minnesota's traditional authority, they fail to acknowledge that such traditional regulation relates exclusively to generation and retail regulation within the state. For example, Defendants reference Minnesota Statutes §§216B.243 and 216E.03 as "longstanding" Minnesota laws authorizing the State to make decisions about the need for and location of new transmission facilities. Defs.' Mem. 7 n.4. However, these statutes explicitly regulate energy facilities that will "be *sited or constructed in Minnesota*." Minn. Stat. §216B.243, subd. 2 (emphasis added). Defendants also cite Minnesota Rules 7843.0100 and 7843.0500 as illustrating Minnesota's authority in resource planning. Defs.' Mem. 8 n.5. But these rules specifically regulate utilities which are "selling *at retail* electricity in Minnesota." Minn. R. 7843.0100, subp. 5 (emphasis added); *see also* Minn. Stat. §§216B.02 (defining "public utility" as entity "now or hereafter operating, maintaining, or controlling *in this state* equipment or facilities for *furnishing at retail* natural, manufactured, or mixed gas or electric service to or for the public or engaged in the production and retail sale thereof….")(emphasis added); 216B.2422, subd. 1(b)(defining

27

"utility" as an entity...serving, either directly or indirectly, the needs of 10,000 **retail customers** in Minnesota")(emphasis added).

Minnesota has not traditionally exercised authority—nor does it have such authority—over the approval, construction, or operation of large energy facilities located in other states. Indeed, given that Minnesota itself claims the right to regulate these very same activities when they occur within its own borders, it certainly cannot deny that its sister states have the very same right to regulate these same activities when they occur within the borders of those other states. It simply is not for Minnesota to impose its policies and requirements on energy generation and transmission activities that occur entirely in other states.

Nor does Minnesota have the "traditional" authority to regulate the sale at wholesale of electricity originating from other states. Defendants' conspicuous failure to acknowledge the limited "local" nature of their "traditional" authority to regulate the distribution of electricity at the retail level is highlighted by their selective quoting of FERC Order 888. Defs.' Mem. 7-8. The complete language states this Order "will not affect or encroach upon state authority in such traditional areas as **the authority over local service issues, including reliability of local service;** administration of integrated resource planning and utility buy side and demand side decision, including DSM; authority over utility generation and resource portfolios...." 61 FR at 21626 n.544 (emphasis reflecting language omitted by Defendants). Defendants also neglected to mention that this was a footnote to a sentence that clarified that the Order related "only to the bulk power market and not **traditional state regulation of the retail market.**" 61 FR

at 21626 (emphasis added).  When FERC Order 888 is read as a whole, it is quite clear that FERC acknowledges the authority of the individual states in traditional areas regarding *local service* issues and the *retail market*; but such acknowledgement is not as a concession by FERC that states have the authority to impose terms and conditions on the transmission of electricity from another state.

Defendants argue that the "transmission of electricity imported into Minnesota from a 'new large energy facility' remains fully subject to federal transmission rates, terms and conditions."  Defs.' Mem. 10.  This is true enough, but it misses the point.  Minnesota does not have the authority to impose, and is preempted from adding, its own restrictions, terms, and conditions on the transmission and sale at wholesale of electricity that has been generated in other states.  This is simply not allowed under the plain language of the FPA.

Defendants' citation to California Public Utility Code section 8341 is ineffective for several reasons.  Defs.' Mem. 10.  First, the California statute is narrowly applicable to "retail utilities" as opposed to the NGEA which broadly asserts "no person shall" engage in certain transmission activities which would apply to out-of-state generators and entities engaged in interstate transmission and sales at wholesale.  Second, this California statute expressly provides for uniform "performance standards" as contrasted to the NGEA.  Third, the fact that California passed this statute does not make it constitutional, and does not mean it is immune from a preemption challenge.

Defendants' reliance on so-called renewable portfolio standards is similarly misplaced.  Defs.' Mem. 11.  Defendants fail to note that Minnesota's renewable

29

portfolio standards are explicitly limited to retail customers.  *See* Minn. Stat. §216B.1691 (setting renewable standards for provision of power to "***retail*** customers" and "***retail*** consumers")(emphasis added).  Renewable portfolio standards requiring a certain mix of generation sources to retail consumers are one thing.  It is altogether different to require a mix of generation sources and then specifically dictate the terms and conditions upon which the electricity from those sources can be delivered through interstate transmission or procured from sales at wholesale.  While the former is arguably within the realm of state regulation, the latter most certainly is not.

Defendants struggle mightily—but futilely—to explain away the NGEA's incorporation of the statutory definition for a "large energy facility" which means "any electric power generating plant or combination of plants at a single site with a combined capacity of 50,000KW or more ***and transmission lines directly associated with a plant that are necessary to interconnect the plant to the transmission system.***"  Defs.' Mem. 11-14 (referencing Minn. Stat. §216H.03, subd. 1, which expressly incorporates Minn. Stat. §216B.2421, subd. 2(1))(emphasis added). The Legislature presumably intended to incorporate the entire definition when it actually did just that, i.e., expressly incorporated the entire preexisting statutory definition as part of the NGEA, rather than adopting the edited version the Defendants now propose.  Moreover, the Minnesota Legislature expressly provided in the NGEA that "statewide power sector carbon dioxide emissions" would be defined to include "[e]missions of carbon dioxide associated with transmission and distribution line losses," Minn. Stat. §216H.03, subd. 2, which obviously conflicts with Defendants' argument that "it would be illogical for the legislature to regulate

transmission lines under Section 216H.03 because transmission lines do not create carbon dioxide." Defs.' Mem. 14. The NGEA plainly and unambiguously includes "transmission lines" as part of a "large energy facility" and therefore it plainly and unambiguously regulates transmission lines. Indeed, for the NGEA regulatory scheme to succeed, it must regulate transmission lines, as well as the sale at wholesale.

Ultimately, it is simply inescapable that the NGEA's restrictions on the transmission and sale at wholesale of electricity based on the "type of generation" used to generate that electricity are preempted. As FERC has recognized:

> …the Commission's authority to set the rates, terms and conditions of transmission arrangements is, according to these court decisions, ***exclusive, nondelegable and may not be disclaimed***,…. If we were to assert jurisdiction over some "terms and conditions" of transmission arrangements and to suggest state commissions might assert jurisdiction over others, we would almost certainly create the type of overlap, confusion, and potential for conflict between state and federal regulation that the Federal Power Act sought to avoid.

*Fla. Power & Light Co.,* 85. P.U.R. 4th, 40 F.E.R.C. P 61045, 61121 (1987)(emphasis added).

### D. Defendants Have Only Addressed Conflict Preemption While Neglecting To Directly Address The More Relevant Theory Of Field Preemption.

Defendants have completely ignored field preemption, basing their motion to dismiss entirely on "conflict preemption." Defs.' Mem. 15-19. However, Defendants have presented no case where the question of preemption as to the federal government's authority under the Federal Power Act, or the scope of FERC's exercise of its broad regulatory authority, was analyzed under the conflict preemption theory. Indeed,

Defendants' focus on conflict preemption is simply misplaced given the plain language of the Federal Power Act and Congress's clear intent to occupy the field of interstate transmission and sale at wholesale of electricity. Of course, if there was a direct conflict between the NGEA and a specific FERC regulation or order, this would further support preemption. However, an actual conflict need not be shown to find preemption.

Further, whether or not the NGEA actually conflicts with the specific orders of FERC identified by Plaintiffs in the Complaint (each of which is hundreds of pages long) or any other FERC Orders cannot reasonably be determined on the pleadings alone. Accordingly, Defendants' contentions as to conflict preemption cannot be borne out on the pleadings. For example, the degree to which the NGEA precludes or negatively impacts the Midwest Independent Transmission System Operator from effectively planning for power supply on a regional basis, as alleged by Plaintiffs, will likely require development of a fact record. While Defendants refer to Plaintiffs' MISO argument as "speculative," Plaintiffs obviously are not required to present evidence to conclusively support its allegations at this stage of the proceedings.

Defendants argue that the NGEA does not "conflict" with FERC's authority to regulate transmission and, therefore, there is no preemption. Defs.' Mem. 15-19. As noted above, however, the NGEA directly and explicitly burdens transactions for the transmission and sale at wholesale of electrical power with carbon dioxide emission offset costs, and thereby interferes with the wholesale rates and agreements which are regulated by FERC for the purpose of maintaining efficiency, competitiveness, and reliability of the regional electric grid to which Minnesota is attached. *See* Order

Nos. 888 and 2000, *supra*.   The NGEA also directly interferes with and frustrates FERC's empowerment and control of RTOs because the NGEA's restriction on importation of power generated from coal frustrates MISO's purpose by precluding MISO from effectively planning for power supply on a regional basis.

Minnesota simply does not have the authority to regulate "electric generation resources" and related air emissions where the electricity is generated in a different State, and Minnesota does not have the authority to regulate or impose terms and conditions with respect to the transmission or the sale at wholesale of that electricity.   Minnesota's authority to do so is clearly preempted by the Federal Power Act, as enacted, amended and supplemented by Congress, and FERC as the federal authority that Congress has empowered and entrusted with those regulatory responsibilities.   The Court should therefore deny the Defendants' Motion for Partial Judgment on the Pleadings with respect to Plaintiffs' claim of preemption under the Federal Power Act.

## II.      THE CLEAN AIR ACT PREEMPTS THE NGEA.

Plaintiffs recognize the federal government and the states are partners in addressing air quality issues.   However, that federal-state partnership exists with respect to air quality issues in which the individual state is the source of the emissions; this partnership does not deputize the individual states to exercise the federal government's authority to address emissions on a regional or national (or, as is the case with the NGEA, a "global") level.   Any interstate regulation of air pollution emissions is for the exclusive authority and jurisdiction of the federal government, and shall not be imposed by an individual state.

33

Field preemption exists "where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," and conflict preemption exists "where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). "Where Congress has chosen to grant states an extensive role in the Clean Air Act's regulatory regime through [state implementation plans] and permitting process, field and conflict preemption principles caution at a minimum against according states a wholly different role." *N.C. ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 303 (4th Cir. 2010).

### A.  Congress Has Preempted the Field of Interstate Air Pollution Abatement.

The Clean Air Act expressly provides for interstate air pollution abatement. 42 U.S.C. §§7426, 7410(a)(2)(D).  Under these statutes, states are required "to provide written notice to all nearby States the air pollution levels of which may be affected by" each major proposed new or modified source "which may significantly contribute to levels of air pollution in excess of the national ambient air quality standards in any air quality control region outside the State in which such source intends to locate."  *Id.* §7426(a).  In addition, each state's implementation plan for national primary and secondary ambient air quality standards must contain adequate provisions prohibiting any source or other type of emissions activity within the state from emitting any air pollutant in amounts which will contribute significantly to nonattainment or interfere with

34

maintenance by any other state with respect to such standards.  *Id*. §7410(a)(2)(D).  Thus, Congress has established how the states are to work together cooperatively to address air pollution, and the NGEA does not operate within the strictures of these statutes.  *Cooper*, 615 F.3d at 306 ("[T]he [Clean Air Act] 'carefully defines the role of both the source and affected States, and specifically provides for a process whereby their interests will be considered and balanced by the source State and the EPA.'")(quoting *Int'l Paper Co. v. Ouellete*, 479 U.S. 481, 497 (1987)).  Minnesota is preempted from freelancing by enacting laws like the NGEA with extraterritorial regulatory effects.  Under the federal system, if Minnesota has concerns and perceives problems with other states' emissions, then its recourse is to express those concerns under section 7426(b).  *Id*. at 300 ("[A]ny state that believes that it is being subjected to interstate emissions may file what is known as a section 126 petition.")

Congress has found that federal leadership "is essential for the development of cooperative Federal, State, regional, and local programs to prevent and control air pollution."  42 U.S.C. §7401(a)(4).  While Congress also acknowledges that air pollution prevention and control ***"at its source"*** is the primary responsibility of state and local governments, *id*. §7401(a)(3)(emphasis added), as illustrated above, Congress has also mandated that the EPA "shall encourage cooperative activities by the States and local

governments for the prevention and control of air pollution," *id*. §7402(a).[5]   The NGEA certainly does not comport with these aims.

The Clean Air Act also delegates to the EPA the establishment of standards of performance for new stationary sources of air pollutants.   *Id*. §7411(b).   Each State may then develop and submit to the EPA "a procedure *for implementing and enforcing standards of performance* for new sources *located in such state*."   *Id*. §7411(c)(emphases added).   However, the EPA retains authority to enforce its standards, *id*. §7411(c)(2)&(d)(2), to require recordkeeping and inspection of records, *id*. §7414, and broad power to impose administrative penalties and commence civil actions.   *Id*. §7413; c*f*. *Am. Elec. Power Co. v. Conn.*, 563 U.S. ---, No. 10-174, slip op. at 11 (2011). Indeed, Federal criminal penalties can attach to violations of the Clean Air Act.   42 U.S.C. §7413(c).

The EPA's regulation of greenhouse gasses from stationary sources such as electric utility steam generating units is being extensively litigated, and the EPA's standards are forthcoming.   *See, e.g.*, 75 Fed. Reg. 82392 (referencing cases and settlement agreements establishing deadlines by which the EPA must take action to establish standards of performance for emissions of greenhouse gasses by electric utility

---

[5]     Field preemption has been found even in fields traditionally regulated by the states.   *See, e.g., City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 638 (1973)("Control of noise is of course deep-seated in the police power of the States.   Yet the pervasive control vested in EPA and in FAA under the 1972 Act seems to us to leave no room for local curfews or other local controls."); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)("Congress legislated here in the field which the States have traditionally occupied.").

steam generating units).  The Supreme Court has acknowledged that carbon dioxide is air pollution subject to regulation under the Clean Air Act, *Am. Elec. Power*, slip op. at 10, and "Congress delegated to EPA the decision whether and how to regulate carbon-dioxide emissions from power plants." *Id*. at 12.[6]

When issued, the EPA's standards of performance will be governed by 42 U.S.C. §7411, under the terms of which Minnesota "may develop and submit to the Administrator a procedure for implementing and enforcing standards of performance for new sources ***located in such State***.  If the Administrator finds the State procedure is adequate, [s]he shall delegate to such State any authority [s]he has under this chapter to implement and enforce such standards." *Id*. §7411(c)(emphasis added).  Minnesota's ability to regulate greenhouse gasses under this statute is therefore conditioned on the approval of the EPA, and then Minnesota only has the authority to implement and enforce such standards as to new sources located in Minnesota.  The NGEA clearly does not constitute such a "procedure for implementing and enforcing standards of performance" for "new sources located in [Minnesota]" and does not meet the narrow requirements of the authority delegated to states under section 7411(c).  Consequently, this statute does not save the NGEA from preemption.

The limitation of each state's authority to regulate only within its borders permeates the Clean Air Act.  *See, e.g.*, 42 U.S.C. §7407(a)("Each State shall have the primary responsibility for assuring air quality ***within the entire geographic area***

---

[6]    Plaintiffs do not here proffer opinions on whether EPA's regulation of stationary source emissions of greenhouse gasses is proper under the Clean Air Act.

*comprising such State* by submitting an implementation plan *for such State* which will specify the manner in which national primary and secondary ambient air quality standards will be achieved and maintained within each air quality control region *in such State*."); §7411(c)(1) ("Each State may develop and submit to the Administrator a procedure for implementing and enforcing standards of performance for new sources located *in such State*."); §7410(a)(1)("Each State shall…adopt and submit to the Administrator…a plan which provides for implementation, maintenance, and enforcement of such primary standards in each air quality control region (or portion thereof) *within such State*.") §7410(a)(2)(D)(i)("any source or other type of emissions activity *within the State*"); §7420(a)(1)(B)(i)("Each State may develop and submit to the Administrator a plan for carrying out this section *in such State*.")(emphases added).  The EPA retains authority to designate interstate and even major intrastate air quality control regions.  *Id*. §7407(c).  State plans for "implementation, maintenance, and enforcement" of national primary ambient air quality standards are narrowly circumscribed and clearly subject to federal authority.  *See id*. §§7410, 7409.

Defendants' reliance on the general savings statute under the Clean Air Act, 42 U.S.C. §7416, as justification for the NGEA is misplaced.  Defs.' Mem. 20.  Section 7416 of the Clean Air Act reserves to the states the rights to "adopt or enforce (1) any *standard or limitation* respecting emissions of air pollutants or (2) any requirement respecting *control or abatement* of air pollution…."  (Emphasis added.) Defendants point to the word "any" in these clauses to justify the NGEA while ignoring the remaining language in the section.  Defs.' Mem. 20-21.  In the first clause, the word

"any" modifies "standard or limitation."  In the second clause, the word "any" modifies "control or abatement."  The NGEA is neither an emissions "standard" nor an emissions "limitation," nor does it speak to pollution "controls" or "abatements" of emissions.  The NGEA is instead an interstate trade restraint prohibiting certain power imports.  *See, e.g.*, Minn. Stat. §216H.03, subd. 3(2).  The NGEA imposes an embargo on certain out-of-state electricity unless the "persons" involved in the generation, transmission, and sale at wholesale of that electricity agree to purchase carbon offsets.  *Id.* §216H.03, subds. 3(2), 3(3), & 4.[7]

In sum, the Clean Air Act as enacted by Congress, interpreted by the courts, and implemented by the EPA, expressly provides for interstate pollution abatement and has spawned a "scheme of federal regulation [that] is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it."  *Gade*, 505 U.S. at 98.  Consequently, it preempts the NGEA.

## B.    The NGEA Conflicts With the Clean Air Act and is Therefore Preempted.

The NGEA is also preempted because it conflicts with the Clean Air Act.  There are two types of conflict preemption.  In the first type, it may be impossible for an entity to comply with both federal and state regulations.  *Gade*, 505 U.S. at 98.  A state law is also preempted "where state law stands as an obstacle to the accomplishment and

---

[7]    Defendants' argument that Congress' inclusion of a savings clause in the Clean Air Act precludes a finding of field preemption is contrary to the Supreme Court holdings.  *Ouellete*, 479 U.S. at 493-97 ("The savings clause, then, does not preclude pre-emption of the law of an affected State."); *see also Pac. Gas & Elec. Co. v. State Energy Res. Conservation Dev. Comm'n*, 461 US 190, 212-13 (1983).

execution of the full purposes and objectives of Congress." *Id.* "Even where federal and state statutes have a common goal, a state law will be preempted if it interferes with the *methods* by which the federal statute was designed to reach this goal." *Clean Air Mkts. Grp. v. Pataki*, 338 F.3d 82, 87 (2d Cir. 2003)(internal quotes omitted, emphasis in original). "[A]n actual conflict exists when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting federal legislation." *Id.* (internal quotes omitted).

As noted above, sections 7426 and 7410(a)(2)(D) of the Clean Air Act provide a particular method for the interstate abatement of air pollution. Further, under section 7411 of the Clean Air Act pertaining to standards of performance for new stationary sources (the very category of emitters addressed by the NGEA), the authority given to the states is narrow, limited to "implementing" and "enforcing" the standards of performance established by the EPA "for new sources *located in such State.*" 42 U.S.C. §7411(c)(1)(emphasis added). The authority granted to the states under these statutes is specific and limited. The NGEA exceeds these grants of authority and conflicts with the Clean Air Act because the NGEA expressly attempts to regulate new large energy facilities extraterritorially. Minn. Stat. §216H.03, subd. 3(2). Because the NGEA directly conflicts with the Clean Air Act, it is preempted.

Further, the scope of a savings clause is highly relevant to the preemption analysis. *Cf. Lindsey v. Caterpillar, Inc.*, 480 F.3d 202, 206 (3d Cir. 2007). As noted above, section 7416 of the Clean Air Act reserves to the states the rights to "adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any

requirement respecting control or abatement of air pollution…." However, as the Court held in *Clean Air Markets Group*, "[n]othing in the language of 42 U.S.C. §7416 permits" a state "to control emissions in another state." 338 F.3d at 89 (internal quotation omitted). Moreover, as argued above, the salient provisions of the NGEA are not emissions standards, limitations, controls, or abatements. They are instead interstate trade restraints on power that regulate beyond Minnesota's borders. It is improper for the Defendants to seek refuge in the authority of the Clean Air Act to justify a statute that clearly oversteps what little authority is granted to the state by that Act.

Because the Clean Air Act preempts the NGEA on both field preemption and conflict preemption grounds, the Court should deny Defendants' motion for partial judgment against Plaintiffs' claim asserting preemption under the Clean Air Act.

## III. THE NGEA VIOLATES THE PRIVILEGES AND IMMUNITIES CLAUSE.

The Privileges and Immunities Clause "prevents a State from discriminating against citizens of other States in favor of its own." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 511 (1939). The Supreme Court has stated that there is an overlap between the dormant commerce clause and the privileges and immunities clause. *Hicklin v. Orbeck*, 437 U.S. 518, 531 (1978). "[S]tatutes that burden the ability of non-residents 'to ply their trade, practice their occupation, or pursue a common calling within the State,' *id.*, repeatedly have been held to come within the purview of the Clause." *Salem Blue Collars Workers Ass'n v. City of Salem*, 832 F.Supp. 852, 857 (D.N.J. 1993). A state law which imposes an unreasonable burden on citizens of other states in, *inter alia*, their pursuit of employment is unconstitutional. State laws that effectively impose restrictions

on private employers have an adverse impact on commerce and free trade between the states.  *Id.*

North Dakota has alleged that the NGEA effectively limits employment opportunities for residents of North Dakota by engaging in protectionist measures that favor Minnesota, and consequently the NGEA constitutes an unconstitutional restraint on the right of North Dakota residents to "pursue a common calling."  Am. Compl. ¶¶123-125 (NGEA imposes unreasonable burdens on citizens of North Dakota employed in coal-powered electric industries; preferential treatment given to Minnesota citizens and entities in competing industries will negatively impact meaningful employment opportunities for North Dakota citizens; and deprives North Dakota and its citizens of benefits that should flow from participation in the federal system).  The discriminatory practices embodied in the NGEA do not bear a substantial relationship to Minnesota's stated objectives; indeed, the preferential treatment given to Minnesota citizens and entities directly undermines the stated objectives of the NGEA.  Am. Compl. ¶126.

The Supreme Court has set forth a three-prong test to determine if state action violates the Privileges and Immunities Clause.  *Lee v. Minner*, 458 F.3d 194, 197 (3d. Cir. 2006).  A court must "(1) determine whether the policy at issue burdens a right protected by the Privileges and Immunities Clause; (2) consider whether the state has a 'substantial reason' for the discriminatory practice; and (3) evaluate whether the practice bears a substantial relationship to the state's objectives."  *Id.*

The Court in *Lee* held that the first prong of the test was met by showing that a Delaware law burdened Lee's right to pursue a "common calling"—a right protected by

the Privileges and Immunities Clause. *Id.* at 198. In this case, North Dakota citizens can allege a similarly-restricted right.

In seeking to achieve a substantial purpose for a discriminatory practice, i.e., the second prong of the test, "the means the state employs must be precisely drawn in light of the acknowledged purpose." *Id.* at 201 (citing *Sugarman v. Dougall*, 413 U.S. 634, 643 (1973)). In *Sugarman*, the Court explained that "in seeking to achieve this substantial purpose…the means the State employs must be precisely drawn in light of the acknowledged purpose." *Sugarman*, 413 U.S. at 643. The Court concluded that the law in question was unconstitutional because it excluded some individuals from employment and was thus not narrowly confined nor precise in its application. *Id.* The means used by Minnesota in the NGEA arguably are not narrowly confined in application because of the broad sweep of the legislation, the numerous ambiguities in the language of the law, and the way in which it restricts the employment opportunities of North Dakota residents.

The last prong of the test, whether the practice bears a substantial relationship to the state's objectives, requires a nexus between the purported objective and the practice. *Lee*, 458 F.3d at 201. In *Lee*, the Court did not find a nexus between the stated objective of defining the state's political community and the practice of discriminating between citizens and noncitizens in the ability to obtain information from public records. *Id.* In this case, it would appear that Minnesota's purported objectives in enacting the NGEA (to curb global warming and greenhouse gases) have nothing to do with the facially discriminatory practice of restricting the employment opportunities of North Dakota

43

residents.  Thus, North Dakota has clearly pleaded and alleged a colorable claim that NGEA violates the Privileges and Immunities Clause of Art. IV of the U.S. Constitution.

## IV.  THE NGEA VIOLATES THE FEDERAL DUE PROCESS CLAUSE.

Plaintiffs have asserted a federal procedural due process constitutional claim. Specifically, Plaintiffs assert that the passage of the NGEA in violation of the Minnesota Constitution's prohibition on special legislation violates the procedural due process guarantees of the Fourteenth Amendment in the United States Constitution.  Am. Compl. ¶¶134-143.

Defendants contend that Plaintiffs' federal procedural due process claim is barred by the Eleventh Amendment because it is "predicated on finding that Section 216H.03 violates the Minnesota Constitution."  Defs.' Mem. 26-27.  In making this argument, Defendants—either intentionally or unintentionally—have missed the point.  While the State clearly and obviously has the authority to establish its own legislative process, the State's legislative process must conform to the State's established constitutional rules and requirements in order to satisfy federal due process requirements.  *Richardson v. Town of Eastover*, 922 F.2d 1152, 1158 (4th Cir. 1991)("Fairness (or due process) in legislation is satisfied when legislation is enacted in accordance with the procedures established in the state constitution and statutes for the enactment of legislation.")

"[A]n individual claiming a ***defect in the legislative process*** might have a claim for due process violations…if plaintiff could show that the legislation here was arbitrary or irrational, or that the ***legislative process was defective***, she would have a triable issue of fact as to whether she had been denied due process."  *Rea v. Matteucci*, 121 F.3d 483,

485 (9th Cir. 1997)(citing *Atkins v. Parker*, 472 U.S. 115, 130 (1985)(emphasis added));

*see also Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 969 (9th Cir.

2003)("Generally, if the action complained of is legislative in nature, due process is

satisfied when the legislative body performs its responsibilities in the ***normal manner***

***prescribed by law***.")(emphasis added); *Gattis v. Gravett,* 806 F.2d 778, 780 (8th Cir.

1986)("The Court in *Atkins* held that absent some identified ***defect in the legislative***

***process***, a legislature has the power to modify or rescind property interest previously

conferred.")(emphasis added).

      Thus, there is ample caselaw establishing the proposition that an asserted defect in

the legislative process may provide grounds for a federal procedural due process claim,

and that when legislation is passed in violation of a state constitution, a procedural due

process claim may arise for a plaintiff harmed by the legislation.   Accordingly,

Defendants are not entitled to partial judgment on the pleadings as to Plaintiffs' federal

procedural due process claim.

      Alternatively, should the Court decide to dismiss this claim, such dismissal should

be *without prejudice*.   *See, e.g.*, *Minn. Chamber of Commerce & Indus. v. Hatch*, 672

F.Supp. 393, 400 (D. Minn. 1987)(citing *Pennhurst State Sch. & Hosp. v. Halderman*,

465 U.S. 89, 122 (1984)).

## V.  ATTORNEY GENERAL HAS SPECIFIC STATUTORY AUTHORITY AND RESPONSIBILITY FOR THE ENFORCEMENT OF THE NGEA.

      Defendant Attorney General incorrectly contends she has no authority to enforce

the NGEA unless she is requested to do so by the MPUC or the Minnesota Department of

Commerce ("MDOC").  Defs.' Mem. 28-30.  This erroneous argument is based on a selective reading of only the first sentence of Minnesota Statute section 216H.03, subdivision 8, and ignores the second sentence of subdivision 8 in which the Legislature provided her with independent, unconditional authority, stating:  "This section may be enforced by the attorney general on the same basis as a law listed in section 8.31, subd. 1,…"  Thus, subdivision 8 clarifies that the Attorney General's authority to enforce the NGEA is not conditional on whether she is asked to do so by either the MPUC or the MDOC.  Minn. Stat. 8.31, subd. 1.  Consequently, there is no requirement that Plaintiffs allege a threat of prosecution in order to retain the Attorney General as a party.

## CONCLUSION

Plaintiffs respectfully request the Court to deny Defendants' Motion for Partial Judgment on the Pleadings because the provisions of Minnesota Statutes section 216H.03, subdivisions 3 and 4, are preempted, unconstitutional, and otherwise unenforceable restrictions on the generation, transmission, and sale at wholesale of electricity.

Dated:  March 22, 2012

s/Thomas H. Boyd
Wayne Stenehjem
Attorney General of North Dakota
     Pro Hac Vice
John A. Knapp
    Special Assistant Attorney General
    Minnesota Bar No. 56789
Thomas H. Boyd
    Special Assistant Attorney General
    Minnesota Bar No. 200517
Daniel J. Kelly
    Special Assistant Attorney General
    Minnesota Bar No. 351386
Brent A. Lorentz
    Special Assistant Attorney General
    Minnesota Bar No. 386865
Suite 3500
225 South Sixth Street
Minneapolis, MN 55402-4629
612-604-6400

*Counsel of Record for Plaintiffs State of
North Dakota and Industrial
Commission of North Dakota.*

WINTHROP & WEINSTINE, P.A.


s/Thomas H. Boyd
John A. Knapp
   Minnesota Bar No. 56789
Thomas H. Boyd
   Minnesota Bar No. 200517
Daniel J. Kelly
   Minnesota Bar No. 351386
Brent A. Lorentz
   Minnesota Bar No. 386865
Suite 3500
225 South Sixth Street
Minneapolis, MN 55402-4629
612-604-6400

*Counsel of Record for Plaintiffs Lignite Energy Council, Basin Electric Power Cooperative, The North American Coal Corporation, Great Northern Properties Limited Partnership, Missouri Basin Municipal Power Agency d/b/a Missouri River Energy Services, Minnkota Power Cooperative, Inc.*



Claire M. Olson
Casey Jacobson
Basin Electric Power Cooperative
Office of General Counsel
1717 East Interstate Avenue
Bismarck, ND 58503-0564
Phone:  (701) 557-5317

*Attorneys for Basin Electric Power Cooperative*

48

John Neumann
Thomas Koza
The North American Coal Corporation
5340 Legacy Drive, Building 1, Suite 300
Plano, TX 75024
Phone:  (972) 448-5400

*Attorneys for The North American Coal Corporation*


Sandi Tabor
Lignite Energy Council
1016 East Owens Avenue
PO Box 2277
Bismarck, ND 58502
Phone:  (701) 258-7117

*Attorney for The Lignite Energy Council*


William Taylor
Woods, Fuller, Shultz and Smith
300 S. Phillips Ave., Suite 300
P.O. Box 5027
Sioux Falls, SD 57117-5027
Phone:  (605) 336-3890

*Attorneys for Missouri Basin Municipal Power Agency d/b/a Missouri River Energy Services*

David Sogard
Minnkota Power Cooperative, Inc.
P.O. Box 13200
Grand Forks, ND 58208-3200
Phone:  (701) 795-4210

*Attorney for Minnkota Power Cooperative, Inc.*

Wyatt Hogan
Great Northern Properties L.P.
601 Jefferson Street
Suite 3600
Houston, TX 77002
Phone:  (713) 751-7500

*Attorney for Great Northern Properties Limited Partnership*

6741679v9