## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

State of North Dakota, et al.,

                 Plaintiffs,                         Civil No. 11-3232 (SRN/SER)

     v.

Lori Swanson, Attorney General              **MEMORANDUM OPINION**
of the State of Minnesota, et al.,               **AND ORDER**

                 Defendants.

---

John A. Knapp, Thomas H. Boyd, Daniel J. Kelly, and Brent A. Lorentz, Winthrop & Weinstein, P.A., 225 South Sixth Street, Suite 3500, Minneapolis, MN 55402-4629; Casey Jacobson and Claire M. Olson, Basin Electric Power Cooperative, Office of General Counsel, 1717 East Interstate Avenue, Bismarck, ND 58503-0564;  David Sogard, Minnkota Power Cooperative, Inc., PO Box 13200, Grand Forks, ND 58208; Wayne K. Stenehjem, Office of the Attorney General, State of North Dakota, 600 East Boulevard, 1st Floor, Bismarck, ND 58505-0040; Sandra Tabor, The Lignite Energy Council, 1016 East Owens Avenue PO Box 2277, Bismarck, ND 58502; and William Taylor, Woods Fuller Schultz & Smith, 300 South Phillips Avenue Suite 300, P.O. Box 5027, Sioux Falls, SD 57117-5027, for Plaintiffs.

Lisa A. Crum and John S. Garry, Office of the Attorney General, State of Minnesota, 445 Minnesota Street, Suite 1100, St. Paul, MN 55101-2128, for Defendants.

---

SUSAN RICHARD NELSON, United States District Court Judge

Pending before the Court is Defendants' Motion for Partial Judgment on the Pleadings.  (Doc. No. 11.)  For the reasons set forth below, the motion is granted in part and denied in part.

I.      **BACKGROUND**

A.      **Minnesota's Next Generation Energy Act**

The Minnesota legislature passed the Next Generation Energy Act ("NGEA") in

2007, establishing energy and environmental standards related to carbon dioxide

emissions.  2007 Minn. Laws Ch. 136, art. 5, § 3.  Minn. Stat. § 216H.03, subd. 3 seeks

to limit increases in "statewide power sector carbon dioxide emissions."  The statute

provides that "[u]nless preempted by federal law" or "until a comprehensive and

enforceable state law or rule pertaining to greenhouse gases that directly limits and

substantially reduces, over time, statewide power sector carbon dioxide emissions is

enacted and in effect," no person shall:

> (1) construct within the state a new large energy facility that would
> contribute to statewide power sector carbon dioxide emissions;
>
> (2) import or commit to import from outside the state power from a new
> large energy facility that would contribute to statewide power sector carbon
> dioxide emissions; or
>
> (3) enter into a new long-term power purchase agreement that would
> increase statewide power sector carbon dioxide emissions.  For purposes of
> this section, a long-term power purchase agreement means an agreement to
> purchase 50 megawatts of capacity or more for a term exceeding five years.

Id.  "Statewide power sector carbon dioxide emissions" are defined in the statute as "the

total annual emissions of carbon dioxide from the generation of electricity within the

state and all emissions of carbon dioxide from the generation of electricity imported from

outside the state and consumed in Minnesota."  Id. subd. 2.  A "new large energy facility"

is defined as "any electric power generating plant or combination of plants at a single site

with a combined capacity of 50,000 kilowatts or more and transmission lines directly

associated with the plant that are necessary to interconnect the plant to the transmission system."  Minn. Stat. § 216B. 2421, subd. 2(1).[1]

Certain persons are exempt from the prohibitions contained in Minn. Stat. § 216H.03, subd. 3.  Minn. Stat. § 216H.03, subd. 4 provides that "[t]he prohibitions in subdivision 3 do not apply if the project proponent demonstrates to the Public Utilities Commission's satisfaction that it will offset the new contribution to statewide power sector carbon dioxide emissions with a carbon dioxide reduction project."  The carbon dioxide reduction project must:

> offset in an amount equal to or greater than the proposed new contribution to statewide power sector carbon dioxide emissions in either, or a combination of both, of the following ways:
>
> > (1) by reducing an existing facility's contribution to statewide power sector carbon dioxide emissions; or
> >
> > (2) by purchasing carbon dioxide allowances from a state or group of states that has a carbon dioxide cap and trade system in place that produces verifiable emissions reductions.

---

[1]   Minn. Stat. § 216H.03, subd. 1 specifically provides that the following are not considered a "new large energy facility" under the law:

> a facility that (1) uses natural gas as a primary fuel, (2) is designed to provide peaking, intermediate, emergency backup, or contingency services, (3) uses a simple cycle or combined cycle turbine technology, and (4) is capable of achieving full load operations within 45 minutes of startup for a simple cycle facility, or is capable of achieving minimum load operations within 185 minutes of startup for a combined cycle facility.

Minn. Stat. § 216H.03, subd. 1.

Minn. Stat. 216H.03, subd. 4(b).  The Minnesota Public Utilities Commission ("MPUC") must ensure that proposed carbon dioxide reduction projects are "permanent, quantifiable, verifiable, enforceable, and would not have otherwise occurred."  Id. subd. 4(c).

The NGEA may be enforced by either the MPUC or the Minnesota Department of Commerce ("MDOC") if either entity "determines that any person is violating or about to violate this section."  Id., subd. 8.  The MPUC or MDOC may "refer the matter to the attorney general who shall take appropriate legal action."  Id.  The NGEA may also "be enforced by the attorney general."  Id.

### B.   This Lawsuit

Plaintiffs are the State of North Dakota; the Industrial Commission of North Dakota; the Lignite Energy Council, a North Dakota trade association; Basin Electric Power Cooperative, a non-profit whose core business is generating and transmitting wholesale electric bulk power to customers; the North American Coal Corporation, the largest lignite coal producer in the United States; Great Northern Properties Limited Partnership, an owner of land in North Dakota containing surface mineral lignite; Missouri Basin Municipal Power Agency d/b/a Missouri River Energy Services, an electric utility; and Minnkota Power Cooperative, Inc., a nonprofit Minnesota cooperative wholesale power provider to member owned distributors and cooperatives.  (Am. Compl., Doc. No. 9, ¶¶ 12–19.)  Defendants are the Commissioners of the MPUC, the Commissioner of the MDOC, and the Minnesota Attorney General, each in their official capacities.  (Id. ¶¶ 20–22.)

4

Plaintiffs sued Defendants on November 2, 2011 and filed an amended complaint on December 1, 2011.  (Doc. Nos. 1, 9.)  In Count I, Plaintiffs assert that Minn. Stat. § 216H.03, subd. 3(2)–(3) violates the Commerce Clause of the United States Constitution.  (Id. ¶¶ 85–98.)  In Counts II and III, Plaintiffs claim that Minn. Stat. § 216H.03, subd. 3(2)–(3) violates the Supremacy Clause of the United States Constitution because the statute is preempted by the Clean Air Act, 42 U.S.C. §§ 7410 et seq. ("CAA") and the Federal Power Act, 16 U.S.C. §§ 791a et seq. ("FPA").  (Id. ¶¶ 99–118.)  In Count IV, Plaintiffs allege that Minn. Stat. § 216H.03, subdivision 3(2)–(3) violates the Privileges and Immunities Clause of the United States Constitution.  (Id. ¶¶ 119-127.)  In Count V, Plaintiffs seek a declaratory judgment that the FPA preempts Minn. Stat. § 216H.03, subd. 3(2)–(3).  (Id. ¶¶ 128–133.)  In Count VI, Plaintiffs allege that Minn. Stat. § 216H.03, subd. 3(2)–(3) violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution.  (Id. ¶¶ 134-143.)

Plaintiffs further request a declaratory judgment adjudicating that Minn. Stat. § 216H.03, subd. 3(2)–(3) is unconstitutional and injunctive relief enjoining its enforcement.  (Id. at pp. 39–40.)  Plaintiffs also request an award of costs and expenses incurred in the litigation, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988(b).  (Id.)

On December 7, 2011, the Defendants moved for Judgment on the Pleadings on Counts II through VI of Plaintiffs' Amended Complaint.  (Doc. No. 11.)  Defendants also moved to dismiss the Attorney General as a party to this action.  (Id.)  Oral argument was held on April 12, 2012.  (Doc. No. 20.)  The Court then requested supplemental briefing

addressing the role of various entities related to the generation, transmission, and distribution of electric power in the electrical utility sector to enable the Court to assess the impact of this statute on the delivery of electric power in this state.  (Doc. Nos. 24.)

On August 21, 2012, the Court <u>sua sponte</u> ordered the parties to submit supplemental briefing on whether the action should be stayed under the doctrine of primary jurisdiction so that the parties could petition the Federal Energy Regulatory Commission ("FERC") on the issue of whether Minn. Stat. § 216H.03, subd. 3(2)–(3) is preempted by the FPA.  (Doc. No. 27.)  The Court also requested that the parties address whether the entire action should be stayed or only the FPA preemption claim if the Court were to grant primary jurisdiction to FERC.  (<u>Id.</u>)  The parties filed supplemental briefs addressing those questions on August 31, 2012.  (Doc. Nos. 28–29.)

## II.    DISCUSSION

### A.    Standard of Review

A court should grant judgment on the pleadings only if the moving party clearly establishes that there are no material issues of fact and that it is entitled to judgment as a matter of law.  <u>Porous Media Corp. v. Pall Corp.</u>, 186 F.3d 1077, 1079 (8th Cir. 1999).  A court evaluates a motion for judgment on the pleadings brought under Rule 12(c) of the Federal Rules of Civil Procedure under the same standard as a motion brought under Rule 12(b)(6).  <u>See</u> <u>Westcott v. City of Omaha</u>, 901 F.2d 1486, 1488 (8th Cir. 1990).

In deciding a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must accept the facts alleged in the complaint as true and grant all reasonable inferences in favor of the plaintiff.  <u>Crooks</u>

v. Lynch, 557 F.3d 846, 848 (8th Cir. 2009).  Although a complaint is not required to contain detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).

 "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).  A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6).  Porous Media, 186 F.3d at 1079.

## B.   Federal Preemption

The Defendants first move to dismiss Counts II, III, and V of Plaintiffs' Amended Complaint, which allege that the FPA and CAA preempt Minn. Stat. § 216H.03, subd. 3(2)–(3), arguing that this Court should find no preemption as a matter of law.

Federal preemption doctrine derives from the Constitution's Supremacy Clause, which states that laws of the United States made pursuant to the Constitution are the "supreme Law of the Land."  U.S. Const. Art. VI, cl. 2.  "[S]tate laws that interfere with, or are contrary to the laws of congress, made in pursuance of the constitution' are invalid," or preempted.  Wis. Pub. Intervenor v. Mortier, 501 U.S. 597, 604 (1991)

(citation and quotation omitted).  "Whether a particular federal statute preempts state law

depends upon congressional purpose."  <u>In re Aurora Dairy Corp. Organic Milk Mktg. &</u>

<u>Sales Practices Litig.</u>, 621 F.3d 781, 791 (8th Cir. 2010).

In analyzing the issue of preemption, the Supreme Court is highly deferential to

state law in areas traditionally regulated by the states.  <u>N.Y. State Conf. of Blue Cross &</u>

<u>Blue Shield Plans v. Travelers Ins. Co.</u>, 514 U.S. 645, 654–55 (1995).  In <u>Travelers</u>, the

Court held:

> we have never assumed lightly that Congress has derogated state
> regulation, but instead have addressed claims of pre-emption with the
> starting presumption that Congress does not intend to supplant state law . . .
> Indeed, in cases like this one, where federal law is said to bar state action in
> fields of traditional state regulation . . . we have worked on the assumption
> that the historic police powers of the States were not to be superseded by
> the Federal Act unless that was the clear and manifest purpose of Congress.

<u>Id.</u> (citations and quotations omitted).

The Eighth Circuit has stated that "there are three primary ways that federal law

may preempt state law."  <u>N. Natural Gas Co. v. Iowa Utils. Bd.</u>, 377 F.3d 817, 821 (8th

Cir. 2004).  First, federal law may preempt state law where Congress has expressly stated

that it intends to prohibit state regulation in a particular area.  <u>Id.</u> (citing <u>Lorillard</u>

<u>Tobacco Co. v. Reilly</u>, 533 U.S. 525, 541 (2001)).  Second, federal law may preempt

state law where Congress has implicitly preempted state regulation by the "occupation of

a field."  <u>Id.</u>  A field is occupied when the federal regulatory scheme is "so pervasive as

to make reasonable the inference that Congress left no room for the States to supplement

it."  <u>Id.</u> (citing <u>Rice v. Santa Fe Elevator Corp.</u>, 331 U.S. 218, 230 (1947)).  Finally, even

if Congress has not completely precluded the ability of states to regulate in a field, state

regulations are preempted if they conflict with federal law.  Id. (citing Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 248 (1984)).  Such a conflict exists "when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress."  Id.  To determine Congressional intent, courts "may consider the statute itself and any regulations enacted pursuant to the statute's authority."  Aurora Dairy, 621 F.3d at 792.

C.      The FPA Preemption Claim

Defendants move for judgment on the pleadings on Counts III and V of Plaintiffs' Amended Complaint, which allege that the FPA preempts certain provisions of the NGEA.  For the reasons discussed below, the Court determines that at this stage of the proceedings, Plaintiffs have adequately pled FPA preemption such that this Court cannot, as a matter of law, enter judgment on Counts III and V of Plaintiffs' Amended Complaint.

1.      The United States Electric Utility Sector

The United States electric utility[2] sector is "economically immense and vast in geographic scope."  The Regulatory Assistance Project, Electricity Regulation in the US: A Guide 9 (2011).  It includes over 3,000 public, private, and cooperative utilities, more than 1,000 independent power generators, three regional synchronized power grids, and approximately 150 control-area operators and land-use regulatory authorities.  See id.

---

[2]      A "utility" is a company that "provides a commodity or service that is considered vital to the general public such as power, water, or natural gas."  U.S. Dep't of Energy, No. PNNL-13906, A Primer on Electric Utilities, Deregulation, and Restructuring of U.S. Electricity Markets 2.1 (2002).

Given the electric utility sector's complexity, it is important to understand the context in which Plaintiffs' claims arise and the structure and purpose of the FPA.

The electric utility industry is comprised of entities engaged in three basic activities: generation, transmission, and distribution of electrical power.  (Pls.' Suppl. Submission Relating to Defs.' Mot. for Partial J. on the Pleadings, Doc. No. 25, ("Pls.' Suppl. Br."), p. 2.)  Generating plants produce electricity using fuels such as coal, natural gas, and biomass, or non-combustible energy sources such as wind, solar energy, and nuclear power.  Stan Mark Kaplan, Cong. Research Servs., Electric Power Transmission: Background and Policy Issues 2 (2009) (hereinafter "Kaplan, Electric Power Transmissions").  Carbon emissions typically occur when energy is generated.  (Pls.' Suppl. Br. at p. 2.); (Defs.' Response to Pls.' Suppl. Submission Relating to Defs.' Mot. for Partial J. on the Pleadings, Doc. No. 26 ("Defs.' Response to Pls.' Suppl. Submission"), at p. 2 n.1).  Transmission lines carry electricity from the power plant to distribution centers.  Kaplan, Electric Power Transmissions, at p. 2.  Once the electricity arrives at distribution centers, the energy is processed for distribution to wholesale or retail customers.  Id.

Three categories of utilities typically provide electrical energy to consumers. (Pls.' Suppl. Br. at p. 4.)  Investor-Owned Utilities ("IOUs") are for-profit enterprises that are owned by stockholders.  (Id.)  They can be privately-owned or publicly-traded.  (Id.) Cooperative Electric Utilities ("co-ops") are owned by the members they serve and operate on a non-profit basis in rural or semi-rural areas.  (Id. at pp. 4–5.)  Municipal Electric Utilities ("Munis") are government owned utilities that function similarly to co-

ops.  (Id. at pp. 5–6.)  Munis receive their generation and transmission services from non-

profit agencies in the states where the agency's members reside.  (Id.)  Each of these

utilities can generate, transmit, and distribute electrical power.  (Id. at p. 4.)

Power is distributed over a transmission grid, New York v. FERC, 535 U.S. 1, 7

(2002), which includes three major "interconnections"—the Eastern, Western, and the

Electric Reliability Council of Texas ("ERCOT").  Kaplan, Electrical Power

Transmission, at p. 3.  The grid allows utilities to transmit electric energy over long

distances at a low cost.  New York, 535 U.S. at 7–8.  Once electricity is generated and

injected into the power grid, it is a fungible commodity and there are "no qualitative

differences based on the source from, or method by, which the electricity has been

generated."  (Pls.' Suppl. Br. at p. 2); see also New York, 535 U.S. at 7 ("[A]ny

electricity that enters the grid immediately becomes a part of a vast pool of energy that is

constantly moving in interstate commerce.").

Other entities are also involved in the generation, transmission, and distribution of

electricity.  (Pls.' Suppl. Br. at p. 6.)  Federal regulation of the power industry is

exercised by FERC, an independent agency within the Department of Energy.  Kaplan,

Electric Power Transmission, at p. 6.  FERC regulates wholesale electricity rates,[3]

approves transmission line projects, and sets transmission rates.  Id.; see also 16 U.S.C.

§ 824(a) (granting FERC the responsibilities of regulating "the transmission of electric

---

[3]    Wholesale electricity sales are transactions between a generator and a reseller of
power, or between two resellers.  Kaplan, Electric Power Transmission, at p. 6 n.8.  A
retail transaction is a sale to the final end user, such as a homeowner.  Id.

11

energy in interstate commerce and the sale of such energy at wholesale in interstate commerce").

FERC issued an order in 1999 encouraging the creation of regional transmission organizations ("RTOs").  Regional Transmission Organizations, 89 FERC ¶ 61,285 (FERC Dec. 20, 1999) (hereinafter "FERC Order 2000").  RTOs coordinate the minute-to-minute transmission of energy on the grid in a region or large state.  Id.[4]  RTOs ensure open access to the grid, coordinate transmission planning, and establish procedures to pay for new transmission lines.  Kaplan, Electric Power Transmission, at p. 7.  RTOs also oversee the safety and reliability of the regional electric system.  FERC Order 2000 at p. 3.  Their purpose is to ensure that the transmission grid is operated in a non-discriminatory fashion to benefit consumers.  Id.

The Midwest Independent Transmission System Operator ("MISO") is an RTO that operates and controls transmission facilities in the Midwest, including Minnesota and North Dakota, but does not otherwise generate or distribute power.  (Pls.' Suppl. Br. at 6–7.)  MISO also operates short-term energy markets where utilities can purchase energy at wholesale rates.  (Id.); (Defs.' Resp. to Pls.' Suppl. Submission at p. 5.)  "Using a sophisticated system of gathering information from utilities regarding demand and

---

[4]      The term independent system operator ("ISO") is often used interchangeably with RTO.  Kaplan, Electric Power Transmission, at p. 7 n.15.  Strictly speaking, an organization is an RTO only if it has been so designated by FERC, but RTOs and ISOs operate identically.  Id.

generation, MISO establishes prices for energy that is on the MISO grid." (Pls.' Suppl.

Br. at p. 7.)

### 2.        The FPA: Its Structure and Purpose

When the FPA became law in 1935, most electricity was sold by "utilities that had

constructed their own power plants, transmission lines, and local delivery systems." New

York, 535 U.S. at 5. Although there were some interconnections among utilities, "most

operated as separate, local monopolies subject to state or local regulation." Id. States

had broad authority to regulate public utilities, but the Supreme Court limited that power

in Pub. Util. Comm'n of R.I. v. Attleboro Steam & Elec. Co., 273 U.S. 83, 89 (1927)

(hereinafter "Attleboro"). Id. at 5–6. There, the Court held that a state could not regulate

rates for electricity sold to other states because it is a "direct burden on interstate

commerce." Id.

As a "direct result" of the Court's decision in Attleboro, Congress passed the FPA

to "fill the gap" and establish exclusive federal jurisdiction over the interstate sale of

electricity. New Eng. Power Co. v. N.H., 455 U.S. 331, 340 (1982) (citations and

quotations omitted); see also Jersey Cent. Power & Light Co. v. Fed. Power Comm'n,

319 U.S. 61, 68 n.7 (1943) (providing that the FPA's goal was to address the increasing

transmission of electric power between states and coordinate facilities to ensure

reliability of the national power supply). The FPA's primary purpose is to regulate

utilities for the benefit of consumers. See Pa. Water & Power Co. v. Fed. Power

Comm'n, 343 U.S. 414, 418 (1952) ("A major purpose of the whole [FPA] is to protect

power consumers against excessive prices."); Cal. ex rel. Lockyer v. FERC, 383 F.3d 1006, 1017 (9th Cir. 2004) ("protecting consumers" is the FPA's "primary purpose").

The FPA charged FERC with "provid[ing] effective federal regulation of the expanding business of transmitting and selling electric power in interstate commerce." New York, 535 U.S. at 6 (citing Gulf States Util. Co. v. FPC, 411 U.S. 747, 758 (1973)); see also 16 U.S.C. § 824(a) (granting FERC the responsibilities of regulating "the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce").[5]  The FPA grants FERC plenary jurisdiction over wholesale sales in interstate commerce.  N. States Power Co. v. Minn. Pub. Utils. Comm'n, 344 N.W.2d 374, 378 (Minn. 1984); see also FERC v. Miss., 456 U.S. 742, 757 (1982) ("[I]t is difficult to conceive of a more basic element of interstate commerce than electric energy, a product used in virtually every home and every commercial manufacturing facility.").  FERC is responsible for the economic regulation of the electric utility industry, including financial transactions, wholesale rate regulation, transactions involving transmission of retail electricity, and ensuring adequate and reliable service. Kaplan, Electric Power Transmission, at pp. 6–7.

FERC's authority to regulate interstate transmission derives primarily from §§ 205 and 206 of the FPA.  While the FPA authorizes FERC to regulate wholesale electricity rates, it does not grant FERC the authority to regulate retail rates charged to consumers by local utilities.  Pub. Util. Dist. No. 1 v. FERC, 471 F.3d 1053, 1058 (9th Cir. 2006)

---

[5]    The FPA originally delegated authority to the Federal Power Commission, the FERC's predecessor, to administer the FPA.

(citing 16 U.S.C. § 824(a), (b)(1)) aff'd in part and rev'd in part sub nom. Morgan

Stanley Capital Grp., Inc. v. Pub. Util. Dist. No. 1, 554 U.S. 527 (2008).  "The protection

the FPA accords consumers is therefore indirect: By assuring that wholesale purveyors of

electric power charge fair rates to retailers, the FPA protects against the need to pass

excessive rates on to consumers."  Id.

Section 205 of the FPA provides that all transmission rates for electric energy are

subject to FERC's jurisdiction.  It also requires that the rules and regulations affecting

those rates must be "just and reasonable" and that no public utility's rates "unduly

discriminat[e]" against customers.  Occidental Chem. Corp. v. La. Pub. Serv. Comm'n,

494 F. Supp. 2d 401, 413 (M.D. La. 2007) (citing 18 U.S.C. §§ 813, 824d(a), 824(d),

824e(a)).  Section 206 of the FPA clarifies FERC's authority:

> Whenever [FERC], after a hearing held upon its own motion or upon
> complaint, shall find that any rate, charge, or classification, demanded,
> observed, charged, or collected by any public utility for any transmission or
> sale subject to the jurisdiction of [FERC], or that any rule, regulation,
> practice, or contract affecting such rate, charge, or classification is unjust,
> unreasonable, unduly discriminatory or preferential, [FERC] shall
> determine the just and reasonable rate, charge, classification, rule,
> regulation, practice, or contract to be thereafter observed and in force, and
> shall fix the same by order.

16 U.S.C. § 824e(a).  Section 206 thus permits FERC to make changes to existing utility

rates, including transmission charges, either on its own initiative or at the request of an

interested party.  See id.  To make such changes, FERC must: (1) find that the existing

rates or practices are "unjust, unreasonable, unduly discriminatory, or preferential," and

(2) "show that its proposed changes are just and reasonable."  Atlantic City Elec. Co. v.

FERC, 295 F.3d 1, 10 (D.C. Cir. 2002) (citations omitted).

15

FERC clarified its role in the regulation of interstate transmission and wholesale transactions in FERC Order 888.  <u>Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities</u>, 61 Fed. Reg. 21,540, 21,541 (May 10, 1996) (hereinafter "FERC Order 888").  FERC stated, in that Order, that it operated under an "Open Access Rule," which requires all public utilities "that own, control, or operate facilities used for transmitting electric energy in interstate commerce" to file with FERC "open access non-discriminatory transmission tariffs that contain minimum terms and conditions of non-discriminatory service."  <u>Id.</u> at 21540–41.  Order 888 also required transmission owners to make available, at cost-based or market-based fees, transmission capacity to any generator or power buyer that is or can be connected to the system.  Kaplan, Electric Power Transmissions, at p. 7.

### 3.        State Authority Under the FPA

As to the allocation of authority under the FPA, the Supreme Court has stated that "Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction."  <u>Fed. Power Comm'n v. S. Cal. Edison Co.</u>, 376 U.S. 205, 215–16 (1964). Under the FPA, the federal government regulates "the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce . . . such Federal regulation, however, . . . extend[s] only to those matters which are not subject to regulation by the States."  16 U.S.C. § 824(a).  More specifically, the FPA provides that the law

> shall apply to the transmission of electric energy in interstate commerce
> and to the sale of electric energy at wholesale in interstate commerce, but
> . . . shall not apply to any other sale of electric energy . . . . [FERC] shall
> have jurisdiction over all facilities for such transmission or sale of electric
> energy, but shall not have jurisdiction . . . over facilities used for the
> generation of electric energy or over facilities used in local distribution or
> only for the transmission of electric energy in intrastate commerce, or over
> facilities for the transmission of electric energy consumed wholly by the
> transmitter.

16 U.S.C. § 824(b)(1).

States thus retain limited authority to regulate electrical energy under the FPA.  In

<u>Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development

Commission</u>, for example, the Supreme Court stated that "[s]tates retain their traditional

responsibility in the field of regulating electrical utilities for determining questions of

need, reliability, cost and other related state concerns."  461 U.S. 190, 205 (1983).

Additionally, a state retains the authority to determine which generation resources are

used within its borders.  <u>See</u> <u>id.</u>  FERC's authority does "not affect or encroach upon state

authority in such traditional areas as . . . administration of integrated resource planning

and utility buy-side and demand-side decisions, including DSM [demand-side

management]; [and] authority over utility generation and resource portfolios . . . ."  FERC

Order 888 at 21,626 n.544; <u>see also</u> 16 U.S.C. § 824(b)(1) (stating that FERC "shall not

have jurisdiction . . . over facilities used for the generation of electric energy or over

facilities used in local distribution").  States also retain authority over retail sales of

electric energy.  16 U.S.C. § 824(b)(1) (providing that the FPA applies to wholesale sales

but "shall not apply to any other sale of electric energy" except as specifically provided).

### 4.  Application of The Doctrine of Primary Jurisdiction

The doctrine of primary jurisdiction coordinates judicial and administrative

decision-making.  See Red Lake Band of Chippewa Indians v. Barlow, 846 F.2d 474, 476

(8th Cir. 1988).  The doctrine allows a district court to refer a matter to the appropriate

administrative agency for a ruling in the first instance, even when the matter is initially

cognizable by the district court.  Access Telecomms. v. S.W. Bell Tel. Co., 137 F.3d 605,

608 (8th Cir. 1998).  When primary jurisdiction is granted to an agency, the action may

be dismissed or stayed at the district court pending the agency's resolution of it.  Jackson

v. Swift Eckrich, Inc., 53 F.3d 1452, 1456 (8th Cir. 1995).  Courts may invoke the

doctrine even where the controversy involves constitutional or statutory challenges.

Peoria v. Gen. Elec. Cablevision Corp., 690 F.2d 116, 121 (7th Cir. 1982) ("It is

immaterial that the validity of the rule is challenged on constitutional as well as statutory

grounds.") (citation omitted).  The doctrine is to be "invoked sparingly, as it often results

in added expense and delay."  Barlow, 846 F.3d at 476 (citation and quotation omitted).

On August 21, 2012, the Court, sua sponte, ordered the parties to submit

supplemental briefing on whether it should exercise its discretion to stay the action under

the doctrine of primary jurisdiction and require the parties to submit a petition to FERC

on whether the FPA preempts certain provisions of the NGEA.  (Doc. No. 27 at p. 7).  On

August 31, 2012, both parties responded to the Court's Order.  (Pls.' Mem. of Law in

Response to the Court's Order, Doc. No. 28; Defs. Suppl. Mem. Br. Regarding Primary

Jurisdiction, Doc. No. 29).  Plaintiffs argued that the Court should not grant primary

jurisdiction to FERC because the issue of preemption is a question of law that the

18

Court—and not FERC—should decide.  (Pls.' Mem. of Law in Response to the Court's

Order, Doc. No. 28, at pp. 2–8).  Defendants asserted that granting primary jurisdiction to

FERC on the limited question of whether certain provisions of the NGEA are preempted

by FERC Orders 888, 889, or 2000 is appropriate.  (Defs.' Supplemental Br. Regarding

Primary Jurisdiction, Doc No. 29, at pp. 1–6.)  After careful consideration of the parties'

supplemental briefs, and mindful that the doctrine is to be invoked sparingly, the Court

has determined at this juncture that it will not invoke the doctrine of primary jurisdiction.

### 5.        Adequacy of Plaintiffs' Claim of FPA Preemption

Accepting the facts alleged in the Amended Complaint as true and granting all

reasonable inferences in favor of Plaintiffs, the Court determines that Plaintiffs have

plausibly stated a claim that the FPA preempts certain provisions of the NGEA.  In PPL

Energyplus, LLC v. Solomon, several energy companies sued officials of the New Jersey

Board of Public Utilities, alleging that the FPA preempted a New Jersey law that had

been enacted to "foster new electric generation."  No. 11-745, 2011 WL 5007972, at *1

(D.N.J. Oct. 20, 2011).  The plaintiffs claimed that the New Jersey law (1) "intrude[d] on

FERC's exclusive jurisdiction to regulate wholesale electricity transactions," and (2)

"erect[ed] obstacles to the FERC's achievement of its regulatory goals in the wholesale

electricity markets."  Id. at *4.  The defendants moved to dismiss the FPA preemption

claim and the court denied the motion, determining that the plaintiffs had successfully

pled both a field and conflict preemption claim.  Id. at *5.  The court recognized that the

plaintiffs had made numerous, particularized claims stating that the New Jersey law

intruded on FERC's exclusive authority.  Id.  Further, the plaintiffs had alleged that "even

if the Act does not intrude on FERC's exclusive authority, the Act impedes [on] FERC's policy of establishing a market-based approach to setting wholesale energy rates." Id. (citation omitted).  The plaintiffs' claims withstood a motion to dismiss and went forward "to determine the scope, context, and record of the challenged state and federal laws." Id.

Plaintiffs here similarly pled sufficient factual allegations to withstand Defendants' motion for judgment on the pleadings on Counts III and V.  Plaintiffs allege that certain provisions of the NGEA intrude on a field that Congress intended to be regulated by FERC.  (Am. Compl., Doc. No. 9, ¶ 109.)  Plaintiffs also allege that because "[t]he NGEA explicitly broadens Minnesota's regulation into the area of transmission of electricity in interstate commerce" the law intrudes on FERC's exclusive jurisdiction under the FPA.  (Id.)  Since Congress delegated exclusive jurisdiction to FERC to regulate the transmission and sale of electric energy at wholesale in interstate commerce, Plaintiffs' allegations plausibly demonstrate that certain provisions of the NGEA may invade the field of transmission of electricity or the sale of electricity at wholesale in interstate commerce.

Plaintiffs have also sufficiently pled that certain provisions of the NGEA directly conflict with the FPA.  In their Amended Complaint, Plaintiffs state that FERC's "ultimate objective is to develop a smoother, more efficient, and competitive wholesale electricity and transmission grid in the United States," (id. ¶ 111), referencing FERC Orders 888 and 2000.  (Id. ¶¶ 112–13.)  FERC Order 888 requires all utilities "that own, control, or operate transmission facilities used in interstate commerce" to file with FERC "open access non-discriminatory transmission tariffs that contain minimum terms and

conditions of non-discriminatory service." FERC Order 888 at 21,540–41. This order

was meant to "remove impediments to competition in the wholesale bulk power

marketplace and to bring more efficient, lower cost power to the Nation's electricity

consumers." Id. at 21,540. FERC Order 2000 encouraged the creation of RTOs to

ensure open access to the grid and coordinate transmission planning. RTOs were "to

ensure that electricity consumers pay the lowest price possible for reliable service" by

promoting "efficiency in wholesale electricity markets." FERC Order 2000 at ¶ 61,896.

Plaintiffs have plausibly alleged that the "NGEA stands as an obstacle to the

accomplishments of the full purposes and objectives of Congress because . . . it directly

interferes with and frustrates FERC's empowerment and control of RTO's." (Am.

Compl., Doc. No. 9, ¶ 117.) Specifically, Plaintiffs allege that the NGEA's restrictions

"frustrates MISO's purpose because it precludes MISO from effectively planning for

power supply on a regional basis (i.e. across state lines) as it is required to do." (Id. ¶

118.) Plaintiffs have plausibly stated that if a generator in another state contributes to

Minnesota's power sector carbon dioxide emissions, but chooses not to purchase

offsets—which it must do under Minn. Stat. § 216H.03, subd. 3(2) and (4) if a Minnesota

utility wants to "import or commit to import" energy for sale in the state from that

generator—then MISO may need to reconfigure the transmission grid to ensure that

power from that generator does not enter Minnesota. This may well conflict with FERC

Orders 888 and 2000, which require FERC to ensure nondiscriminatory access to the grid

and to provide consumers with the most efficient, low cost energy sources through

transmission planning.

Plaintiffs have also plausibly pled that certain provisions of the NGEA may interfere with FERC's authority to set wholesale rates and regulate agreements, which may affect "the sale of . . . energy at wholesale in interstate commerce," (Am. Compl., Doc. No. 9, ¶ 107), citing to FERC's "authority to regulate . . . wholesale sales of electricity." (Id. ¶ 110.) Minn. Stat. § 216H.03, subd. 3(3) prohibits "enter[ing] into a new long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions," unless the facility agrees to "offset in an amount equal to or greater than the proposed new contribution to statewide power sector carbon dioxide emissions." Id. subd. 4(b). Accordingly, the Court determines that Plaintiffs have plausibly demonstrated that the NGEA may conflict with FERC's ability to exclusively regulate wholesale sales of electricity in interstate commerce.[6]

A fuller factual record is necessary to determine whether the FPA preempts certain provisions of the NGEA. Plaintiffs acknowledge that "whether or not the NGEA actually conflicts with the specific orders of FERC identified by Plaintiffs . . . or any other FERC

---

[6]    Defendants argue that the Court should not consider Plaintiffs' allegations that the NGEA regulates wholesale sales of electricity because these allegations were not explicitly pled in Plaintiffs' Amended Complaint. (Defs.' Reply Mem. of Law in Support of Mot. for Partial J. on the Pleadings, Doc. No. 18 ("Defs.' Reply Mem."), at pp. 3–4.) The Court notes that federal preemption analysis considers "the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." Medtronic, Inc. v. Lohr, 518 U.S. 470, 486 (1996) (citations and quotations omitted). Since the FPA clearly delegates to the federal government the power to exclusively regulate wholesale sales of electricity, the Court will analyze whether this portion of the FPA preempts the NGEA.

Orders cannot reasonably be determined on the pleadings alone." (Pls.' Mem. of Law in Opp'n to Defs.' Mot. for J. on the Pleadings, Doc. No. 17 (Pls.' Opp'n Mem.), p. 32.) Plaintiffs are also correct that "the degree to which the NGEA precludes or negatively impacts [MISO] from effectively planning for power supply on a regional basis . . . will likely require development of a fact record." (Id.)

It appears that, at a minimum, discovery is necessary on the following topics: (1) how coal generators in North Dakota and other states outside of Minnesota have complied with the NGEA since its inception; (2) whether it is possible to determine, once electricity is generated and introduced into the transmission grid, where that electricity travels; (3) whether the NGEA requires MISO to reconfigure the transmission grid to ensure that power from an electricity generator in another state, who does not purchase offsets or reduce carbon emissions, would not enter Minnesota; (4) whether the NGEA's prohibition related to entering into a new long-term power purchase agreement  interferes with FERC's authority to set wholesale rates and regulate agreements; (5) whether, how, and against whom the NGEA has been enforced since enactment; and (6) the NGEA's impact on RTOs' abilities to ensure non-discriminatory access to the transmission grid.

### D.    The CAA Preemption Claim

Defendants also move for judgment on the pleadings on Count II of Plaintiffs' Amended Complaint, which alleges that the CAA preempts certain NGEA provisions. For the reasons discussed below, the Court finds that Plaintiffs adequately plead CAA preemption such that this Court cannot, as a matter of law, enter judgment on Count II of Plaintiffs' Amended Complaint.

### 1.      The CAA: Its Structure and Purpose

The CAA was enacted in 1967 as the primary regulatory mechanism governing air emissions in the United States.  Its purpose is to "protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population."  42 U.S.C. § 7401(b)(1).  The Federal Government sets air quality standards for pollutants, and states have the primary role in determining how to meet them.  Exxon Mobil Corp. v. EPA, 217 F.3d 1246, 1255 (9th Cir. 2000).

The Federal Government regulates air pollutants from stationary sources.  The EPA identifies pollutants that cause or contribute to air pollution.  42 U.S.C. § 7409(a)(1).  The CAA was amended in 1970 to require the EPA to provide a uniform level of air quality across the country by setting national ambient air quality standards ("NAAQS").[7]  Id.; Her Majesty the Queen v. City of Detroit, 874 F.2d 332, 335 (6th Cir. 1989).  The EPA also designates "nonattainment areas" within states where the level of the pollutant exceeds NAAQS.  42 U.S.C. § 7407(d).

Within three years of a new or revised NAAQS, each state must submit a state implementation plan ("SIP") to the agency specifying proposed measures to comply with its NAAQS.  42 U.S.C. § 7410(a)(1); see Natural Res. Def. Council, Inc. v. EPA, 483 F.2d 690, 692 (8th Cir. 1973).  A "State may decide to impose different emissions limits on individual coal-burning power plants, natural gas-burning power plants, and other

---

[7]      "Ambient air has been defined by federal regulation to mean that portion of the atmosphere external to buildings to which the general public has access."  Union Elec. Co. v. EPA, 515 F.2d 206, 210 n.9 (8th Cir. 1975) (citing 36 Fed. Reg. 22384 (1971)).

sources of air pollution." <u>EME Homer City Generation v. EPA</u>, No. 11-1302, 2012 WL 3570721, at *3 (D.C. Cir. Aug. 21, 2012).  States must "include enforceable emissions limitations and other control measures, means, or techniques" to meet NAAQS.  42 U.S.C. § 7410(a)(2)(A).  Each SIP must sufficiently ensure that one state's sources do not interfere with another state's ability to meet its NAAQS.  42 U.S.C. § 7410(a)(2)(D)(i).  The EPA therefore evaluates each SIP to make sure that a state is not "exporting most of [its] emissions to other regions by strategically positioning sources along an arbitrary border line." <u>N.C. ex rel. Cooper v. TVA</u>, 615 F.3d 291, 300 (4th Cir. 2010); <u>see</u> 42 U.S.C. § 7410(a)(2)(E).  After EPA approval of a SIP, it has the force and effect of federal law and the EPA may enforce it in federal courts.  <u>Union Elec. Co.</u>, 515 F.2d at 211.

In the 1970s, the EPA identified six air pollutants or categories of air pollutants for NAAQS: sulfur dioxide, particulate matter, nitrogen dioxide, carbon monoxide, ozone, and lead.  40 C.F.R. §§ 50.4–50.17.  These are referred to as "criteria" pollutants.  Larry Parker & James E. McCarthy, Cong. Research Servs., Climate Change: Potential Regulation of Stationary Greenhouse Gas Sources Under the Clean Air Act 6 (2009).  Standards for criteria pollutants have been reviewed and modified since the 1970s, but no new criteria pollutants have been identified.  <u>Id.</u> at 6–7.

The CAA includes mechanisms for a state to seek EPA assistance when another state is interfering with its ability to meet its NAAQS.  The harmed state can request a "§ 110 SIP call," asking the EPA to require the offending state to amend its SIP to include additional control measures.  42 U.S.C. § 7410(k)(5); <u>Cooper</u>, 615 F.3d at 300.

A state can also file a "§ 126 petition," requesting that the EPA shut down or impose emission limitations on a source in another state that is contributing to nonattainment or maintenance problems in the petitioning state.  42 U.S.C. § 7426(b); Cooper, 615 F.3d at 300.  Section 126 of the CAA states that "[a]ny State . . . may petition the [EPA] for a finding that any major source or group of stationary sources emits or would emit any air pollutant in violation of [the NAAQS requirements or another provision of the CAA]."  Id. § 7426(b).

The CAA also limits a state's ability to construct or modify new emission sources. The CAA for example requires a state to provide "written notice to all nearby States" if interstate air pollution levels may be affected by the creation of a new emission source, id. § 7426(a)(1)(B), and a state can challenge the construction of a new emission source with the EPA.  See id. § 7426(b).

In addition to regulating air pollutants, the EPA sets performance standards for stationary sources of air pollution.  Id. § 7411.  The EPA lists categories of stationary sources that significantly contribute to air pollution, id. § 7411(b)(1)(A), and then proposes New Performance Standards ("NSPS") to regulate all new sources or sources undergoing major modifications within that category.  Id. § 7411(b)(1)(B); see also § 7411(a)(2).  New sources are subject to NSPS regardless of location or ambient air conditions.  See id.  NSPS for new sources must reflect emissions cuts achievable under "the best system of emission reduction" but may consider costs and other factors.  Id. § 7411(a)(1).  States may propose plans to implement and enforce NSPS for new sources after they have been established by the EPA.  Id. § 7411(c).

If emissions from existing sources are not controlled through NAAQS or hazardous pollution programs,[8] the EPA has authority under § 7411(d) to require states to set performance standards for them.  See Am. Elec. Power Co. v. Conn., 131 S. Ct. 2527, 2537 (2011).  Like the SIP process under § 7410 of the CAA, § 7411(d) requires states to submit a plan establishing a "standard of performance for any existing source for any air pollutant." 42 U.S.C. § 7411(d).  States may implement § 7411(d) standards, but the EPA retains approval power and the ability to regulate if a state fails to do so.  Id. § 7411(d)(2).  States must establish performance standards that are at least as stringent as the EPA guidelines.  40 C.F.R. § 60.24(c).

The CAA includes "multiple avenues for enforcement" of § 7411.  Am. Elec. Power, 131 S. Ct. at 2538.  The EPA may "delegate implementation and enforcement authority to the States . . . but the agency retains the power to inspect and monitor regulated sources, to impose administrative penalties for noncompliance, and to commence civil actions against polluters in federal court." Id. (citing 42 U.S.C. §§ 7411(c)(2), (d)(2), 7413, 7414).  Additionally, the CAA "imposes criminal penalties on any person who knowingly violates emissions standards" and provides for private enforcement in certain instances.  Id. (citations omitted).  If  the "EPA does not set emissions limits for a particular pollutant or source of pollution, States and private parties may petition for a rulemaking on the matter, and EPA's response will be reviewable in

---

[8]      CAA § 112 allows the EPA to create emission standards for "extraordinarily toxic" hazardous air pollutants.  Adamo Wrecking Co. v. United States, 434 U.S. 275, 296 (1978); see 42 U.S.C. § 7412.  Only three substances have been classified as "hazardous air pollutants" under § 112.  Id. (citation omitted).

federal court." Id. (citations omitted) (emphasis in original).

### 2.    Adequacy of Plaintiffs' Claim of CAA Preemption

Accepting the facts alleged in the Amended Complaint as true and granting all

reasonable inferences in favor of Plaintiffs, the Court determines that Plaintiffs have

adequately pled that the CAA preempts certain NGEA provisions.  Courts have denied a

defendant's motion to dismiss a CAA preemption claim where it is plausible that the state

law intrudes on the federal regulatory scheme. In Rocky Mountain Farmers Union v.

Goldstene, 719 F. Supp. 2d 1170, 1194 (E.D. Cal. 2010), the plaintiffs alleged that a

California law conflicted with the CAA's methods of regulating fuels that contribute to

global warming. After analyzing the plaintiffs' allegations, the court concluded that they

had satisfied their burden to plausibly show that the effects of the California law would

"frustrate . . . the full effectiveness of [the CAA]." Id. at 1195 (citation omitted); see also

In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., 175 F. Supp. 2d 593,

616 (S.D.N.Y. 2001).

Similarly, Plaintiffs in this case plausibly state that the NGEA's limitations on

emissions from power plants are an "interstate regulation of air pollution emissions" that

impede on "the exclusive authority and jurisdiction of the federal government."  (Pls.'

Opp'n Mem., at p. 33.)  Plaintiffs allege that the CAA's broad statutory framework

provides Minnesota with mechanisms to challenge interstate air pollution.  Minnesota

could request the EPA to determine whether a stationary source in another state may

prevent it from meeting its NAAQS.  42 U.S.C. §§ 7410, 7426.  Minnesota could also

inform the EPA if its air pollution levels may be impacted by new construction or

28

modification of an emission source in a nearby state.  Id. § 7426.  Moreover, even if the

CAA's existing mechanisms would be insufficient for Minnesota to achieve its goals

under the NGEA, Plaintiffs have plausibly shown that Minnesota could petition the EPA

to set carbon dioxide emission standards under CAA § 7411.[9]  It is thus plausible, as

Plaintiffs allege, that if "Minnesota has concerns and perceives problems with other

states' emissions, then its recourse is to express those concerns" under the mechanisms

that already exist in the CAA's broad statutory scheme.  (Pls.' Opp'n Mem., at p. 35.)

Case law also suggests that the CAA plausibly preempts certain NGEA provisions.

(Id. at pp. 35–36.)  In American Electric Power, the Supreme Court determined that the

CAA preempted a federal common law nuisance claim that sought to require power plant

owners and operators to cap "carbon dioxide emissions" and "reduce them by a specified

percentage each year."  131 S. Ct. at 2534 (citations and quotations omitted).  The Court

held that the CAA "displace[s] any federal common law right to seek abatement of

carbon-dioxide emissions from fossil-fuel fired power plants" because Congress had

delegated such regulation to the EPA.  Id. at 2537.  Relying on § 7411, the Court found

plaintiffs' claim to be preempted because EPA procedures provided "the same relief the

_____

[9]      The EPA has commenced a rulemaking under § 7411 "to set limits on greenhouse gas emissions from new, modified, and existing fossil-fuel fired power plants."  Am. Elec. Co., 131 S. Ct. at 2533.  The agency recently issued a proposed rule setting emission limitations for carbon dioxide from new power plants.  Standards of Performance for Greenhouse Gas Emissions for New Stationary Sources: Electric Utility Generating Units, 77 Fed. Reg. 22392-01 (proposed Apr. 13, 2012) (to be codified at 40 C.F.R. pt. 60).  The plain language of the NGEA recognizes that once the EPA enacts a final rule on carbon dioxide emissions, the law may be preempted.  See Minn. Stat. 216H.03, subd. 3 (stating that NGEA applies "[u]nless preempted by federal law").

plaintiffs [sought] by invoking federal common law." <u>Id.</u> at 2538.

In <u>Cooper</u>, the CAA was also found to preempt a state law nuisance claim seeking emissions controls against coal-fired power plants because individual nuisance claims "threaten[] to scuttle" the CAA's comprehensive regulatory regime. 615 F.3d at 298, 303. Since Congress had "grant[ed] states an extensive role in the [CAA's] regulatory regime through the SIP and permitting process," the court stated that "field and conflict preemption principles caution at a minimum against according states a wholly different role and allowing state nuisance law to contradict joint federal-state rules so meticulously drafted." <u>Id.</u> at 303.

<u>American Electric Power</u> and <u>Cooper</u> support a finding that the CAA plausibly preempts the NGEA because, as in those cases, certain NGEA provisions evidence an attempt by Minnesota to redress external air quality interferences without following the CAA's regulatory scheme. <u>See</u> 42 U.S.C. §§ 7410, 7411, 7426.[10]   Minnesota thus could be "threaten[ing] to scuttle" the CAA's broad regulatory framework, <u>Cooper</u>, 615 F.3d at 298, especially since Congress has "delegated to the EPA the decision of whether and

---

[10]   Defendants argue that the NGEA does not seek to control carbon dioxide emissions at out-of-state power plants where power is produced. (Defs.' Reply Mem. at p. 2.) The plain language of the NGEA, however, belies Defendants' position. The NGEA accomplishes its goal of "reduc[ing] . . . greenhouse gas emissions," Minn. Stat. § 216H.02, in part by requiring companies to purchase allowances if it "import[s] or commit[s] to import [power] from outside the state" that increases statewide power sector carbon dioxide emissions. <u>Id.</u> § 216H.03, subds. 3–4. To the extent carbon dioxide emissions occur, they occur when energy is generated. (Pls' Suppl. Br. at p. 2; Defs.' Response to Pls. Suppl. Submission at p. 2 n.1). Because the carbon dioxide emissions occur in the state where energy is generated, the NGEA does seek to regulate carbon emissions occurring outside of Minnesota.

how to regulate carbon-dioxide emissions from power plants."  American Electric Power, 131 S. Ct. at 2538.

While Defendants dispute whether the CAA's regulatory mechanisms are so expansive as to create field or conflict preemption here, they have not shown that Plaintiffs' allegations are implausible on their face.  Accordingly, Defendants' 12(c) motion for judgment on the pleadings fails as to Plaintiffs' CAA preemption claim.

### E.      The Privileges and Immunities Claim

Count IV of Plaintiffs' Amended Complaint asserts that Minn. Stat. § 216H.03, subd. 3(2)–(3) violates the Privileges and Immunities Clause of the United States Constitution.  (Am. Compl, Doc. No. 9, ¶¶ 119–127.)[11]  North Dakota alleges that Minn. Stat. § 216H.03, subd. 3(2)–(3) reduces employment opportunities for North Dakotans in their state's lignite and coal-powered industries in violation of the Privileges and Immunities Clause.  (Id. ¶ 123.)

The Privileges and Immunities Clause of Article IV, Section 2, of the United States Constitution states, "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."  It was designed to "fuse into one Nation a collection of independent, sovereign States," Toomer v. Witsell, 334 U.S. 385, 395 (1948), and its purpose was "to place the citizens of each State upon the same footing

---

[11]      This claim is only brought by North Dakota parens patriae on behalf of its citizens' interest in employment opportunities.  (Am. Compl., Doc. No. 9, ¶¶ 120, 122.) The other Plaintiffs cannot assert this claim because corporations cannot invoke the Privileges and Immunities Clause.  W. & S. Life Ins. Co. v. State Bd. of Equalization of Cal., 451 U.S. 648, 656 (1981).

. . . so far as the advantages resulting from citizenship in those States are concerned."

Paul v. Va., 75 U.S. 168, 180 (1868).  The Supreme Court has explained "[t]he section, in

effect, prevents a state from discriminating against citizens of other states in favor of its

own."  Hague v. CIO, 307 U.S. 496, 511 (1939) (citations omitted).

 Whether differential treatment of out-of-state residents violates this Clause

involves a two-part inquiry: (1) whether the state's law discriminates against out-of-state

residents with regard to a privilege or immunity protected by the Clause, and (2) if so,

whether sufficient justification exists for the discrimination.  Minn. Ex rel. Hatch v.

Hoeven, 456 F.3d 826, 834 (8th Cir. 2006) (citing United Bldg. & Constr. Trades Council

of Camden Cnty. & Vicinity v. Mayor & Council of the City of Camden, 465 U.S. 208,

218, 221–23 (1984)).  If a law does not discriminate based on residence, no claim can be

sustained under the Privileges and Immunities Clause.  See United Bldg. & Constr.

Trades Council, 465 U.S. at 220 ("It is discrimination against out-of-state residents on

matters of fundamental concern which triggers the [Privileges and Immunities] Clause.");

see also, Yerger v. Mass. Tpk. Auth., 395 F. App'x 878, 885 (3d Cir. 2010) (stating that

no claim can be made under the Privileges and Immunities Clause if the challenged law

does not discriminate on the basis of residence); Kirkpatrick v. Shaw, 70 F.3d 100, 102–

03 (11th Cir. 1995) (holding that the plaintiff failed to state a claim under the Privileges

and Immunities Clause because the challenged law did not discriminate on the basis of

out-of-state residency); Giannini v. Real, 911 F.2d 354, 357 (9th Cir. 1990)

("Discrimination on the basis of out-of-state residency is a necessary element for a claim

under the Privileges and Immunities Clause.").

Plaintiffs' Privileges and Immunities claim fails because Minn. Stat. § 216H.03, subd. 3(2)–(3) does not discriminate against North Dakota residents in obtaining employment in Minnesota.  The cases relied on by North Dakota to support its claim under the Privileges and Immunities claim are inapposite.  Lee v. Minner, for example, involved an out-of-state journalist challenging the constitutionality of the Delaware Freedom of Information Act that provided, "[a]ll public records shall be open to inspection and copying by any citizens of the State."  458 F.3d 194, 195 (3d Cir. 2006) (emphasis added).  Similarly, Sugerman v. Dougall involved New York law which provided that only citizens of the United States were eligible for "competitive class" jobs in the New York civil service.  413 U.S. 634, 635 (1973).  Unlike the laws at issue in Lee and Sugarman, Minn. Stat. § 216H.03, subd. 3(2)–(3) does not restrict out-of-state residents in a manner that is different than Minnesota residents.  Accordingly, the Court grants Defendants' Motion for Judgment on the Pleadings as to Count IV of Plaintiffs' Amended Complaint.

> **E.**     **The Due Process Clause Claim**

In Count VI of Plaintiffs' Amended Complaint, Plaintiffs allege a due process violation resulting from the fact that their "property interests in the productive use of coal and other resources that are utilized and/or consumed in the creation and operation of facilities [in North Dakota are]. . . subject to the strictures of the NGEA."  (Am. Compl., Doc. No. 9, ¶ 137.)  Specifically, Plaintiffs argue that the Minnesota Constitution provides that "[t]he legislature shall pass no local or special law . . . granting to any private corporation, association, or individual any special or exclusive privilege,

immunity or franchise." (Id.) (quoting Minn. Const. art. XII, § 1.)  Plaintiffs claim that

the NGEA "grant[s] special privileges and immunities to several private corporations

with Minnesota-based interests by exempting them from the requirements of Minn. Stat.

§ 216H.03, subd. 3," (id. ¶ 139), which violates the Minnesota Constitution's prohibition

of special legislation resulting in "a defect in the legislative process, denying Plaintiffs

due process of law."  (Id. ¶ 140.)

The Fourteenth Amendment prohibits state action that deprives "any person of

life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  The

possession of a protected life, liberty, or property interest is a condition precedent to the

government's obligation to provide due process of law.  Movers Warehouse, Inc. v. City

of Little Can., 71 F.3d 716, 718 (8th Cir.1995).  Procedural due process requires that

procedures provided by the state in effecting deprivation of liberty or property are

adequate in light of the affected interest.  Keating v. Neb. Pub. Power Dist., 660 F.3d

1014, 1017 (8th Cir. 2011).  Courts examine procedural due process in two steps: (1)

first, whether there exists a liberty or property interest, which has been interfered with by

the state; and if so, (2) whether sufficient procedural safeguards are employed to assure

the deprivation of that interest is not arbitrary.  Id.  Thus, in assessing a procedural due

process claim, "[u]nless there has been a deprivation [of a protected liberty or property

interest] by state action, the question of what process is required . . . is irrelevant, for the

constitutional right to 'due process' is simply not implicated."  Iota Xi Chapter of Sigma

Chi Fraternity v. Patterson, 566 F.3d 138, 146 (4th Cir. 2009) (citation omitted and

ellipsis in original).

Courts find the existence of a property interest when "'a person clearly . . . [has] more than an abstract need or desire' and 'more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it.'"  Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748, 756 (2005) (quoting Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972)).  Property interests are "'not created by the Constitution.  Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'"  Id. (quoting Paul v. Davis, 424 U.S. 693, 709 (1976)).  Protected property interests can be created by state law, Roth, 408 U.S. at 577, but federal constitutional law determines whether the interest created by state law rises to the level of a protected property interest.  Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 9 (1978).  A property interest is not limited to ownership of tangible property but includes those interests that "a person has already acquired in specific benefits."  Roth, 408 U.S. at 576.  The Supreme Court has found property interests in a number of state-conferred benefits and services, including welfare benefits, disability benefits, public education, utility services, professional licenses, and government employment.  Town of Castle Rock, Colo., 545 U.S. at 789–790.

In order to state a claim for a procedural due process violation, Plaintiffs must show that they have been deprived of a constitutionally protected property interest.  They argue that they have a property interest in "the productive use of coal and other resources."  (Am. Compl., Doc. No. 9, ¶ 137.)  The first issue then is whether they have a legitimate claim of entitlement to these resources.  See, e.g., Davenport v. Univ. of Ark. Bd. of Trustees, 553 F.3d 1110, 1114 (8th Cir. 2009) (holding that the plaintiff does not

have a legitimate property interest in a promotion); see also Ezekwo v. NYC Health & Hosps. Corp., 940 F.2d 775, 782 (2d Cir.1991) ("A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit.") (citation omitted); Nishitani v. United States, 42 Fed. Cl. 733, 739 (Fed. Cl.1999) (claimed interest in a six-week training course did not rise to the level of a property interest for purposes of a due process analysis).

The cases Plaintiffs rely on in support of their due process claim involved legitimate property interests conferred by state law. See Richardson v. Town of Eastover, 922 F.2d 1152, 1156–58 (4th Cir. 1991) (determining that the plaintiff has a property interest in a license to operate a club based on a town ordinance); Rea v. Matteucci, 121 F.3d 483, 484–85 (9th Cir. 1997) (holding the plaintiff had a property interest in her continued employment pursuant to a Nevada statute); Gattis v. Gravett, 806 F.2d 778, 779–80 (8th Cir. 1986) (finding that state law created a property interest in continued employment). Here, however, Plaintiffs have failed to identify any existing rules, understandings, or state law, which confers on them a property interest in "coal" or "natural resources." In the absence of such law, the Court finds that at this stage of the proceedings, Plaintiffs have not established a property interest that entitles them to constitutional protection. Accordingly, the Court grants Defendants' Motion for Judgment on the Pleadings on Count VI of Plaintiffs' Amended Complaint.[12]

---

[12] The Court, however, dismisses Plaintiffs' claim without prejudice in the event Plaintiffs can identify a legitimate property interest to sustain a due process claim.

**F.      Whether the Minnesota Attorney General is a Proper Defendant**

Defendants also move to dismiss Minnesota Attorney General Lori Swanson as a

defendant in this action.  The Eleventh Amendment establishes a general prohibition of

suits in federal court by a citizen of a state against his state or an officer or agency of that

state.  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984).  There are,

however, exceptions to this rule and a suit against a state official may go forward in the

limited circumstances identified by the Supreme Court in Ex Parte Young.  209 U.S. 123,

156–57 (1908).  Under the Ex Parte Young doctrine, a federal court may issue injunctive

relief against a state officer to prevent ongoing violations of federal law, on the rationale

that such a suit is not a suit against the state for purposes of the Eleventh Amendment.

209 U.S. at 159–60.

The Ex Parte Young exception is directed at "officers of the state [who] are

clothed with some duty in regard to the enforcement of the laws of the state, and who

threaten and are about to commence proceedings . . . to enforce against parties affected

[by] an unconstitutional act."  Id. at 155–56 (emphasis added);  see also Advanced Auto

Transp., Inc. v. Pawlenty, No. 10-cv-159, 2010 WL 2265159, at *3 (D. Minn. June 2,

2010) (noting that the exception only applies against officials who (1) have some

connection with the enforcement and (2) have threatened or are about to commence

proceedings enforcing a law alleged to be unconstitutional).  Plaintiffs include Attorney

General Swanson as a defendant for all claims based on the language in Minn. Stat.

§ 216H.03, subd. 8.  (Am. Compl., Doc. No. 9, ¶ 20.)  That provision authorizes the

Attorney General to take legal action to enforce Minn. Stat. § 216H.03 if the MPUC or

the MDOC "determines that any person is violating or about to violate this section."

Minn. Stat. § 216H.03, subd. 8.  Minn. Stat. § 216H.03, subd. 8 also provides that "[t]his

section may be enforced by the attorney general on the same basis as a law listed in

section 8.31, subdivision 1, except that the remedies provided by section 8.31,

subdivision 3a, do not apply to a violation of this section."  Minn. Stat. § 8.31, subd. 1

provides "[t]he attorney general shall investigate violations of the law of this state

respecting unfair, discriminatory, and other unlawful practices in business, commerce, or

trade . . . and assist in the enforcement of those laws."

Plaintiffs argue that Minn. Stat. § 216H.03, subd. 8, provides the Attorney General

unconditional authority to enforce the statute and she therefore falls within the Ex Parte

Young exception.  (Pls.' Opp'n Mem. at p. 45–46.)  Plaintiffs also argue that there is no

requirement that they must allege that the attorney general has threated litigation to retain

her as a party to this action.  (Id. at p. 46.)  Defendants respond that Minn. Stat.

§ 216H.03, subd. 8, does not provide a basis to sue the Attorney General because § 8.31

only concerns the Attorney General's authority to enforce state statutes generally.  (Defs.'

Reply Mem. at pp. 15–16.)  Moreover, Defendants claim that, even if the Attorney

General has unconditional authority to enforce Minn. Stat. § 216H.03, Plaintiffs still have

failed to show the Attorney General is threatening to enforce the challenged statute to

make her a proper defendant.  (Id.)  Defendants thus contend that Attorney General

Swanson is not a proper defendant under the Ex Parte Young exceptions.

The "[g]eneral authority to enforce the laws of the state is not sufficient to make

government officials the proper parties to litigation challenging the law."  Minn. Citizens

Concerned for Life, Inc. v. Swanson, No. 10-cv-2938, 2011 WL 797462, at *3 (D. Minn. Mar. 1, 2011); Advanced Auto Transp., Inc. v. Pawlenty, No. 10-cv-159, 2010 WL 2265159, at *3 (D. Minn. June 2, 2010) (citations omitted); see also Children's Healthcare is a Legal Duty, Inc. v. Deters, 92 F.3d 1412, 1416 (6th Cir.1996); 1st Westco Corp. v. Sch. Dist. of Phila., 6 F.3d 108, 113 (3rd Cir.1993); Okpalobi v. Foster, 244 F.3d 405, 416 (5th Cir. 2001); Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 331 (4th Cir. 2001).  The mere fact that the Attorney General has a duty to prosecute all actions in which the state is interested is not enough to make her a proper defendant in an action. Shell Oil Co. v. Noel, 608 F.2d 208, 211 (1st Cir. 1979).

In Reproductive Health Services v. Nixon, the Eighth Circuit acknowledged that statutory authority allowing the Missouri Attorney General to aid prosecutors when so directed by the Governor and to sign indictments when directed to do so by the trial court made the attorney general "a potentially proper party for injunctive relief."  428 F.3d 1139, 1145 (8th Cir. 2005) (emphasis added).  The Court determined that the district court had erred by issuing an injunction against the Attorney General because she had not been directed to enforce the statute.  Id.  The Eighth Circuit explained, "extending the grant of preliminary injunctive relief to this defendant in his official capacity looks very much like the impermissible grant of federal court relief against the State of Missouri." Id.

Here, Attorney General Swanson is immune from this suit under the Eleventh Amendment.  Plaintiffs do not allege that Attorney General Swanson has threatened a suit or is about to commence proceedings against them or anyone else under Minn. Stat.

§ 216H.03.  (<u>Cf.</u> Am. Compl., Doc. No. 9); (Answer, Doc. No. 10, ¶¶ 18–19)

(affirmatively asserting that neither the MPUC nor the MDOC has ever "made a referral

to the Attorney General pursuant to Minn. Stat. § 216H.03, subdivision 8.")  Just like in

<u>Reproductive Health</u>, Attorney General Swanson is not a proper party because there is no

evidence that those delegated authority to enforce the statute, the MPUC or MDOC, have

requested the Attorney General to enforce the statute.  Nor do Plaintiffs provide evidence

that the Attorney General has threatened to enforce Minn. Stat. § 216H.03.  As such, the

Court grants Defendants' Motion for Judgment on the Pleadings as to Attorney General

Swanson.

### III.    ORDER

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1. Defendants' Motion for Partial Judgment on the Pleadings (Doc. No. 11)  is

   **GRANTED IN PART and DENIED IN PART**;

2. Defendants' Motion for Judgment on the Pleadings as to Counts III and V is

   **DENIED**;

3. Defendants' Motion for Judgment on the Pleadings as to Count II is **DENIED**;

4. Defendants' Motion for Judgment on the Pleadings as to Count IV is **GRANTED**;

5. Defendants' Motion for Judgment on the Pleadings as to Count VI is **GRANTED**

   without prejudice; and

6. Defendants' Motion for Judgment on the Pleadings as to Minnesota Attorney

   General Lori Swanson is **GRANTED**.

Dated: September 30, 2012                    s/Susan Richard Nelson
                                             SUSAN RICHARD NELSON
                                             United States District Judge