## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

State of North Dakota, et al.,                    Civil File No. 11-3232  SRN/SER

        Plaintiffs,

v.                                        **DEFENDANTS' MEMORANDUM OF
                                          LAW IN SUPPORT OF MOTION FOR
Beverly Heydinger, Commissioner           SUMMARY JUDGMENT**
and Chair, Minnesota Public Utilities
Commission, et al.,

        Defendants.

## INTRODUCTION

In 2007, the Minnesota Legislature enacted the Next Generation Energy Act ("NGEA"). The NGEA provides for more renewable energy and more energy conservation. The portion of the NGEA at issue in this case provides for utilities in Minnesota to rely less on energy generated from power sources that emit carbon dioxide. The NGEA is a legitimate exercise of Minnesota's authority to even-handedly regulate the sources through which utilities obtain the power to provide electricity to Minnesota businesses and individuals. The NGEA does not run afoul of either the dormant Commerce Clause or the Supremacy Clause of the United States Constitution. As a result, summary judgment should be granted in favor of the State of Minnesota.

## UNDISPUTED FACTS

**I.** **MINNESOTA EXTENSIVELY REGULATES UTILITIES TO ENABLE MINNESOTA BUSINESSES AND INDIVIDUAL CONSUMERS TO HAVE ACCESS TO RELIABLE, STABLE, AND AFFORDABLE ENERGY.**

The cost, reliability, stability, and accessibility of power are important to both businesses and individual consumers.[1]   As a result, the regulation of utilities is one of the oldest and most extensive forms of state regulation of any industry.[2]   The Minnesota Public Utilities Commission ("PUC") regulates most aspects of public utilities, including the rates they may charge, (Minn. Stat. § 216B.16), the resources through which they plan to meet future demand, (Minn. Stat. § 216B.2422-.2424), their siting and routing of generation facilities over 50 megawatts and the necessity for such projects, (Minn. Stat. § 216B.243; Minn. Stat. Chapter 216E; Minn. Stat. Chapter 216F), their siting and routing of transmission lines in the state and the need for such projects, (Minn. Stat. § 216B.243; Minn. Stat. Chapter 216E), their siting and routing of pipelines and the need for such projects, (Minn. Stat. § 216B.216B.243; Minn. Stat. Chapter 216G), their property transfers, acquisitions, and other financial transactions, (Minn. Stat. § 216B.48-.51), their compliance with renewable energy mandates, (Minn. Stat. § 216B.1691), their compliance with energy conservation mandates, (Minn. Stat. § 216B.241), and virtually every aspect of their business operations, (Minn. Stat. § 216B.05).   This regulation is

---

[1] *See* Steven Ferrey, *Exit Strategy: State Legal Discretion to Environmentally Sculpt the Deregulating Electric Environment,* 26 Harv. Envtl. L. Rev. 109, 115-16 (2002).

[2] *See Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983).

designed to ensure that businesses and residential customers are provided adequate and reliable service at reasonable rates.  *See* Minn. Stat. § 216B.01.

II.     **BY ENACTING THE NGEA, MINNESOTA POLICYMAKERS PURSUED THE TWIN GOALS OF PLANNING FOR A STABLE ENERGY FUTURE AND PROMOTING CLEAN SOURCES OF ENERGY TO FOSTER PUBLIC AND ENVIRONMENTAL HEALTH.**

Consistent with the State's traditional and long-standing regulation of the utility industry, in December 2006, then-Minnesota Governor Tim Pawlenty announced his "Next Generation Energy Initiative" to promote more renewable energy, more energy conservation, and less carbon emissions for Minnesota.  Everson Aff., Ex. 1.[3]  Among other things, the Governor announced that, "Minnesota's electric utilities should prepare for the future by offsetting carbon emissions from new fossil-fuel generation sources" and stated that the Next Generation Energy Initiative "will be good for the environment, good for rural economies, good for national security, and good for consumers."  *Id.*  In his January 17, 2007, State of the State Address, the Governor asked the Minnesota Legislature "to consider my 'Next Generation Energy Plan,' add your own good ideas, and let's pass a comprehensive renewable energy plan as soon as possible."  Everson Aff., Ex. 2.[4]

---

[3] Press Release, Office of the Governor, Tim Palwenty, *Governor Pawlenty Introduces Next Generation Energy Initiative* (Dec. 12, 2006), available at http://www.leg.state.mn.us/docs/2010/other/101583/www.governor.state.mn.us/mediacenter/pressreleases/2006/PROD007863.html (last visited September 5, 2013).

[4] Governor Tim Pawlenty, State of the State Address, delivered before a joint session of the 85th Minn. Leg. (Jan. 17, 2007).

Thereafter, a number of bills were introduced in the Minnesota Legislature to implement these goals, components of which eventually merged into the final enacted law, called the Next Generation Energy Act.[5]  During hearings, the Legislature received testimony from scientists, industry, businesses, advocacy groups, and other stakeholders. Brown Aff., Exs. 1, 3-4.[6]

At the time of the NGEA's passage, 25 states had laws requiring electric utilities to generate a minimum amount of electricity from renewable energy sources.[7]  The federal government was also considering additional curbs on carbon emissions from electricity-producing coal plants.  Brown Aff., Ex. 1.[8]  Representative Maria Ruud, an author of the NGEA, stated that a primary purpose of the bill was to ensure that

---

[5] After the Governor announced his Next Generation Energy Initiative, at least three different bills were introduced in the Minnesota Legislature to implement all or part of the initiative.  *See* H.F. No. 375, 85th Minn. Leg. (2007); S.F. No. 145, 85th Minn. Leg. (2007); S.F. No. 192, 85th Minn. Leg. (2007).  After amending S.F. No. 145 to include several provisions that were originally part of H.F. No. 375, the Legislature enacted S.F. No. 145 as the NGEA.  85 Minn. H.J. 4809 (Apr. 27, 2007); 85 Minn. S.J. 5964 (May 20, 2007); 85 Minn. H.J. 7518 (May 20, 2007).

[6] *See, e.g.*, Hearing before the House Environment & Natural Resources Committee on March 1, 2007; Hearings before the Senate Energy, Utilities, Technology and Communication Committee on February 20, 2007 and February 22, 2007.

[7] *See* Joshua P. Fershee, *Changing Resources, Changing Market: The Impact of a National Revewable Portfolio Standard on the U.S. Energy Industry*, 29 Energy L.J. 49, 61-62 (2008).  Four additional states had enacted laws containing non-binding goals or incentives for using renewable energy sources.  *Id.* at 62.

[8] Hearing on H.F. No. 375 before the House Environment & Natural Resources Committee, March 1, 2007, at pages 45-46 of the transcript (testimony of John Knapp, Partners for Affordable Energy).

Minnesota prepared for national regulations that would increase the cost of carbon-emitting energy sources:

> The fact that we know federal regulations are eventually coming and that they will impose new costs on fossil fuels means that the choice before us is not between a world where carbon is regulated and one where it is not. The choice before us is between actively preparing for the carbon-constrained world we know is coming or just continuing to race down the path of business as usual, ignoring the changes ahead. Clearly it is far wiser for us to plan for these changes so we can both reduce the risk and maximize the opportunities for Minnesota, and that's what this bill is about.

*Id.*[9] Representative Ruud indicated that it was important to anticipate future carbon regulations because power-generating facilities are expensive to construct and have long life spans. *Id.* at 4 ("a coal plant lasts for decades").

The Legislature heard testimony about the economic risks of not planning for future carbon regulations. One scientist, for example, testified that by acting presently, the state would:

> …position your economies and your industries to do well in what is inevitably going to be the low carbon economy of the future. There is going to be federal action and increased international action. The question is when. But I think there are few people that would say, 10, 20 years from now we will not have constraints on emissions and prices associated with carbon pollution.

Brown Aff., Ex. 1.[10] The same expert testified that "the cost of carbon tremendously affects the cost of power from new coal plants" and that:

---

[9] *Id.*, at page 5 of the transcript (statement of Representative Maria Ruud).

[10] *Id.*, at pages 8-9 of the transcript (testimony of Dr. Alden Meyer, Union of Concerned Scientists).

> It's imprudent to build new big emission sources because as I said controls [on] carbon pollution are clearly coming down the pike. You don't want to create another generation of stranded investments like we experienced in the 1980s and '90s with nuclear power that have to be passed through to the rate payers in some way.

*Id.*[11] Another expert testified that: "[T]he states who are going to move first are going to enjoy an advantage and the advantage is preparing your economy for the inevitability of national policies" that reduce carbon dioxide emissions. *Id.*[12] Another expert testified about the need for the Legislature to move "forward into the new world of a carbon constrained economy." *Id.*[13] She further testified:

> [I]f the scientists and economists and utility CEOs around the country are right that in the near future we will have carbon regulation. That means that if we build new power plants in the near future we will have carbon regulation. That means that if we build new power plants that produce carbon, they will have a cost. And that cost is more likely to be borne by the ratepayers. By the citizens of Minnesota who pay for that power.

*Id.*

Others have expressed similar concerns. An August 2013 article from Bloomberg BusinessWeek states that with 29 states having renewable portfolio standards that require increased utilization of alternative energy sources, the costs of maintaining a centrally-based coal-reliant system will harshly impact consumers, especially the elderly and less

---

[11] *Id.*, at page 9 of the transcript.

[12] *Id.*, at page 56 of the transcript (statement of Michael Noble, Clean Energy Minnesota Coalition).

[13] Hearing on H.F. No. 375 before the House Finance and Policy Division, March 12, 2007, at page 5 of the transcript (statement of J. Drake Hamilton, Fresh Energy and Clean Energy Minnesota).

fortunate.  Everson Aff., Ex 3.[14]  Moreover, the President recently directed the Environmental Protection Agency (EPA) to promulgate regulations limiting carbon emission from coal power facilities.  Everson Aff., Ex. 4.[15]

Similar concerns were raised in the Minnesota Senate.  For example, Senator Ellen Anderson, a bill author, stated that:

> [I]t's only a matter of time and I think if you ask just about anybody who pays attention to these issues, they will agree that federal regulation of CO2 emissions is absolutely inevitable, it's just a matter not of if, but of when. And so it could be five or ten years away, and our concern is that if we wait, we will be disadvantaged because we will have the risk for our ratepayers of incurring tremendously higher costs if we go ahead and increase our greenhouse gas emissions between now and then.  So what this bill will do, as I said, is stop us where we are and allow us to be prepared for this new regime of carbon restrictions. . . . [I]f we act now it will prevent us from making some very costly mistakes in the next decade that our rate payers will be paying the price for, for decades after CO2 regulations become enacted across the country.

Brown Aff., Ex. 3.[16]

The Legislature also heard extensive testimony about the environmental reasons for promoting clean sources of energy.  Scientists testified that coal generates carbon dioxide, which traps heat in the atmosphere, resulting in higher temperatures.  Panknin

---

[14] Chris Martin, Mark Chediak, and Ken Wells, *This Guy Was Behind The Worst Merger Ever; Now He's Bringing Washington Together*, Bloomberg Businessweek 58-61 (Aug. 26, 2013).

[15] Presidential Memorandum on Power Sector Carbon Pollution Standards (June 25, 2013), available at: *http://www.whitehouse.gov/the-press-office/2013/06/25/presidential-memorandum-power-sector-carbon-pollution-standards* (last visited September 5, 2013).

[16] Hearing on S.F. 145 and S.F. 192 before the Senate Energy, Utilities, Technology and Communication Committee, 85th Minn. Leg., Feb. 20, 2007, at pages 16-17 of the transcript (statement of Senator Ellen Anderson).

Aff., Ex. 1.[17]   Scientists stated that the level of carbon in the atmosphere is higher than at any time in the prior 400,000 years and that temperatures in Minnesota had already increased by two-and-a-half degrees since 1900.  *Id.*[18]  Scientists testified that increased temperatures reduce water availability, causing more frequent droughts and decreased agricultural production.  *Id.*[19]  Legislators also heard about harm to Minnesota's tourism and timber industries, hunting, fishing, as well as the effects on Minnesota's ecosystem, infrastructure, and overall human health.  *Id.*[20]

The then-Deputy Commissioner of the Minnesota Department of Commerce testified that, "[I]t is in Minnesota's best interest to develop comprehensive, responsible, deliberate, deliberative, and enduring ways to reduce our greenhouse gas emissions."  Brown Aff., Ex. 1.[21]   Representatives from utilities and industry testified about the desirability of reducing such emissions.  Representatives from Otter Tail Power, Great

---

[17] J. Legis. Sess. on Climate Change, 85th Minn. Leg., Jan. 30, 2007, at pages 14-15 of the transcript (testimony of Dr. David Tillman, Professor of Ecology, University of Minnesota).

[18] *Id.*, at pages 16 and 23-24 of the transcript (testimony of Dr. David Tillman, Professor of Ecology, University of Minnesota and Dr. Lucinda Johnson, Associate Center Director at the Natural Resources Research Institute at the University of Minnesota – Duluth).

[19] *Id.*, at page 17 of the transcript (testimony of Dr. David Tillman, Professor of Ecology, University of Minnesota).

[20] *Id.*, at page 25 of the transcript (testimony of Dr. Lucinda Johnson, Associate Center Director at the Natural Resources Research Institute at the University of Minnesota – Duluth).

[21] Hearing on H.F. No. 375 before the House Committee on Environment & Natural Resources, March. 1, 2007, at page 22 of the transcript (testimony of Edward Garvey, Minnesota Department of Commerce).

River Energy, and Missouri River Energy Services (a plaintiff) all acknowledged the need to address climate change. Brown Aff. Exs. 1, 4.[22] A representative from the Center for Energy and Economic Development, which represents the coal industry, testified that climate change is a serious issue that policymakers must address, and a representative from the Minnesota Chamber of Commerce stated there is "urgency to move forward on the issue of climate change" because "we are at a tipping point with regard to this issue." Brown Aff., Exs. 1, 3.[23]

The Next Generation Energy Act was ultimately enacted with strong bipartisan support. The House of Representatives passed the NGEA by a vote of 125-9, and the Senate passed it by a vote of 59-5. 85 Minn. S.J. 5964 (May 20, 2007); 85 Minn. H.J. 7518 (May 20, 2007). Governor Pawlenty signed the Act into law on May 25, 2007. 85 Minn. H.J. 7588 (May 25, 2007).

---

[22] *Id.*, at pages 33 and 37-38 of the transcript (testimony of Loren Laugtug, Otter Tail Power, and Rick Lancaster, Great River Energy); Hearing on S.F. 192 Before the Senate Energy, Utilities, Technology, and Communications Committee, 85th Minn. Leg., Feb. 22, 2007, at page 10 of the transcript (statement of Deb Birgen, Missouri River Energy Services).

[23] Hearing on S.F. 145 and S.F. 192 Before the Senate Energy, Utilities, Technology, and Communication Committee, February 20, 2007, at page 37 of the transcript (statement of Scott Wiseman, Center for Energy and Economic Development); Hearing on H.F. 375 before the House Environment & Natural Resources Committee, March 1, 2007, at page 50 of the transcript (statement of Michael Robertson, Minnesota Chamber of Commerce).

III.    SECTION 216H.03 IS CONSISTENT WITH THE PUC'S LONGSTANDING REGULATION OF THE SOURCES OF ENERGY USED TO PROVIDE ELECTRICITY TO MINNESOTA BUSINESSES AND INDIVIDUAL CONSUMERS.

The portion of the NGEA at issue here, Minn. Stat. § 216H.03, subdivision 3, provides that unless preempted by federal law, and until Minnesota implements a comprehensive law for reducing statewide carbon-dioxide emissions, no person shall:

(1) construct within the state a new large energy facility[24] that would contribute to statewide power sector carbon dioxide emissions;

(2) import or commit to import from outside the state power from a new large energy facility that would contribute to statewide power sector carbon dioxide emissions; or

(3) enter into a new long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions.[25]

These prohibitions do not apply if the project proponent demonstrates to the PUC that it will offset any new contribution of carbon dioxide emissions with corresponding permanent and verifiable offsets in emissions.  Minn. Stat. § 216H.03, subd. 4.

Section 216H.03 was part of a comprehensive package of legislation designed to promote the reliability, stability, and accessibility of energy, and to protect Minnesotans' health, the environment and the state's natural resources.  Other provisions of the NGEA not at issue in this case establish goals for the reduction of carbon emissions (Minn. Stat. § 216H.02), establish as the state's energy policy the goal of achieving annual energy

---

[24]  A "new large energy facility" as defined in Minn. Stat. § 216H.03, subdivision 1, essentially means a new large coal plant.  No new coal plants have been approved and built in Minnesota since 1987.

[25]  A long-term power purchase agreement is an agreement to purchase 50 megawatts of capacity or more for a term exceeding five years.  Minn. Stat. § 216H.03, subd. 3(3).

savings equal to 1.5% of annual energy sales through conservation (Minn. Stat. §
216B.2401), and require the Minnesota Pollution Control Agency to file a report every
two years identifying the level of carbon emissions reduction the state has achieved
(Minn. Stat. § 216H.07).

Most states require utilities to plan for how they will meet their customers' future
energy needs.[26]   The type of regulation contained in Section 216H.03, subd. 3 is
consistent with the State's longstanding regulation of the sources of power from which
utilities that operate in Minnesota meet the power needs of their Minnesota customers.
The Federal Energy Regulatory Commission (FERC), which is responsible for regulating
the interstate transmission of electricity, has acknowledged the authority of state utility
commissions to approve a utility's resource utilization plans.  FERC Order No. 888, 61
FR at 21626, n. 544 (May 10, 1996).

Since 1991, the State of Minnesota has required utilities that operate in Minnesota
to file with the PUC their "resource plans."  *See* Minn. Stat. § 216B.2422, subd. 2.  A
"resource plan" is a set of options that a utility could use to meet the future needs of its
customers, such as the construction of utility plants, the purchase of power generated by
other entities, and the implementation of customer energy conservation.  Minn. Stat.
§ 216B.2422, subd. 1(d).  The PUC considers whether the plans meet anticipated future
energy demands and are consistent with a number of statutory requirements.  *Id.* at
subd. 2.  One statutory requirement mandates that utilities generate or procure a certain

---

[26] *See* James M. Van Nostrand, *An Energy and Sustainability Roadmap for West Virginia*,
115 W. Va. L. Rev. 879, 886 (2013).

percentage of electricity using renewable energy sources. Minn. Stat. § 216B.1691, subd. 2a. The PUC may approve, reject, or modify a utility's resource plan consistent with the public interest. Minn. Stat. § 216B.2422, subd. 2. Thus, Section 216H.03 is complimentary to and consistent with the PUC's longstanding regulation of the manner in which utilities that serve Minnesotans secure the energy to do so.

## IV.   PLAINTIFFS' TESTIMONY FAILS TO SHOW DIRECT INJURY-IN-FACT FAIRLY TRACEABLE TO THE NGEA.

Raymond Wahle, the Director for Power Supply and Operations for Plaintiff Missouri River Energy Services in South Dakota, testified that this lawsuit is "a preemptive strike so that we understand and so the State of Minnesota understands how this statute would be applied." Everson Aff., Ex. 6, p. 66-67.[27] Chuck Kerr, President and CEO of Plaintiff Great Northern Properties (GNP) in Texas, does not contend that the NGEA directly regulates GNP. Everson Aff. Ex. 7, p. 29.[28] Indeed, Mr. Kerr is not aware of any instance in which a Minnesota authority has enforced the NGEA against an entity outside the boundaries of Minnesota. *Id.* at 33. According to Mr. Kerr, "[the NGEA] doesn't prohibit [Great Northern Properties] from developing its coal or leasing to a third party. But it impacts the desire of developers to use coal for power generation." *Id.* at 28-29. Potential customers of GNP's South Heart project (a proposed coal plant that remains in the planning stage, yet is prominent in Plaintiffs' Amended Complaint) have merely "intimated" that the NGEA is the reason they cannot enter into a contract or

---

[27] Rule 30(b)(6) Deposition of Raymond Wahle, August 21, 2013.

[28] Deposition of Chuck Kerr, August 14, 2013.

into business with South Heart. *Id*. at 69-70. There is currently no mine and no plant, just a proposal. *Id*. at 57-58. Indeed, there are no energy producing coal plants up and running on GNP properties. *Id*. at 107. Mr. Kerr acknowledges that "[r]ight now natural gas is a very cheap fuel. With the regulatory uncertainty revolving around the [United States Environmental Protection Agency], utilities have been reticent to develop coal properties until there's regulatory certainty." *Id*. 121-122.

Kenneth Rutter, Vice President of Marketing and Trading for Plaintiff Basin Electric in North Dakota, indicated Basin "has not changed our day-to-day operations at this point because of the pending – or because of the ongoing litigation with respect to [the NGEA]." Everson Aff., Ex. 8, at 86.[29] Alvin Tschepen, Vice President of Planning & System Operations for Plaintiff Minnkota Power, cannot point to any specific sale that a Minnkota customer cancelled due to the NGEA. Everson Aff., Ex. 9, at 92.[30] He speculates only that the NGEA "may impact the way that [Minnesota utilities] do business with Minnkota." *Id*.

### STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Withers v. Dick's Sporting Goods, Inc.*, 636 F.3d 958, 962 (8th Cir. 2011). On summary judgment, once the moving party makes its initial showing, "the nonmovant must respond by submitting

---

[29] Deposition of Kenneth Rutter, August 1, 2013.

[30] Deposition of Alvin Tschepen, Vol. 1, August 6, 2013

evidentiary materials that set out specific facts showing that there is a genuine issue."

*Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2011).

## ARGUMENT

**I.    PLAINTIFFS' CLAIMS ARE NOT RIPE FOR ADJUDICATION AND PLAINTIFFS LACK STANDING BECAUSE THEY CANNOT SHOW AN INJURY-IN-FACT TRACEABLE TO THE NGEA.**

Plaintiffs bear the burden of establishing both standing and ripeness. *See National Right to Life Political Action Comm. v. Connor*, 323 F.3d 684, 689 (8th Cir. 2003) (quoting *Renne v. Geary*, 501 U.S. 312, 316 (1991).  A claim is not ripe if the asserted harm depends upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Minn. Pub. Utils. Comm'n v. F.C.C.*, 483 F.3d 570, 582 (8th Cir. 2007) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998) (finding claim regarding sanctions was not ripe since "we have no idea whether or when such a sanction will be ordered")).  Similarly, a plaintiff lacks standing unless it can show an injury-in-fact that is: (1) "actual or imminent, not conjectural or hypothetical," and; (2) fairly traceable to the challenged action of the defendant. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Subjective fear of enforcement, without more, is insufficient to constitute an injury-in-fact. *See Morrison v. Board of Educ. of Boyd County*, 521 F.3d 602, 610 (6th Cir. 2008).  Standing and ripeness are lacking if a court must engage in "guesswork as to how independent decisionmakers will exercise their judgment." *Clapper v. Amnesty Intern. USA*, __ U.S. __, 133 S. Ct. 1138, 1150 (2013).  Where a claim is based on an unenforced statute, a plaintiff must show the existence of a concrete, imminent threat of

14

prosecution or enforcement.  *Ord v. District of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir.

2009) (citing *Babbitt v. United Farm Workers*, 442 U.S. 289, 298 (1979)).

Plaintiffs' claimed harm is premised on the theory that the NGEA has somehow

"chilled" or inhibited their business operations.  *See, e.g.,* (Doc. No. 9), Amend. Compl.

¶¶ 47, 52, 56, 76, 79; *see supra* pp. 12-14.  But a plaintiff cannot rely on a "chilling

effect" to support standing or ripeness unless a claim implicates First Amendment rights.

*See National Rifle Ass'n of America v. Magaw*, 132 F.3d 272, 294 (6th Cir. 1997).  A

plaintiff cannot establish injury based on a "speculative chain of possibilities."  *Clapper*,

133 S. Ct. at 1150.

Plaintiffs concede they are unaware of any long-term power purchase agreement

that would have materialized but for the NGEA.  Everson Aff., Ex. 5.[31]  Plaintiffs'

representatives acknowledge that they can still sell their product, but express concern that

the NGEA *might* lessen demand.  *Supra* at pp. 12-13.  Plaintiffs cannot meet their burden

of establishing standing and ripeness.  No harm asserted has matured sufficiently to

warrant judicial intervention.  Plaintiffs' claims, whether concerning Minnesota's alleged

enforcement of the NGEA or alleged lost sales, all hinge on speculation and contingent

future events.  Indeed, even if Plaintiffs could demonstrate lost sales, reduced demand or

a shift in market conditions resulting from a regulation is not a cognizable burden on

interstate commerce.  *Southern Waste Systems, LLC v. City of Delray Beach, Fla.,* 420

F.3d 1288, 1291 (11th Cir. 2005).  Plaintiffs fail to show any injury-in-fact fairly

---

[31] Pls.' Answers and Resp. to Defs.' First Set of Discov. Req. (Interrogs.), No. 4.

traceable to the NGEA.  On standing and ripeness grounds alone, the Court should grant Defendants' Motion for Summary Judgment.

## II.    SECTION 216H.03 DOES NOT VIOLATE THE DORMANT COMMERCE CLAUSE.

The NGEA is a legitimate, non-discriminatory exercise of Minnesota's constitutional authority to promote the welfare of Minnesota residents by regulating utilities that supply power to Minnesota businesses and individuals.  The NGEA does not violate the dormant Commerce Clause.

Under the dormant Commerce Clause, states may not regulate in a manner intended to favor in-state economic interests at the expense of out-of-state actors.  *United Haulers Assoc., Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 334 (2007).  The dormant Commerce Clause does not, however, limit state authority to implement regulations that confer legitimate benefits and only incidentally burden interstate commerce, since states are primarily responsible for regulating to promote the public welfare.  *See Kassel v. Consolidated Freightways Corp. of Delaware*, 450 U.S. 662, 669 (1981) (recognizing that "there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it").  State action violates the dormant Commerce Clause only when it overtly discriminates against interstate commerce or burdens interstate commerce in a manner that "is clearly excessive in relation to the putative local benefits."  *Northwest Central Pipeline Corp. v. State Corp. Comm'n of Kansas,* 489 U.S. 493, 526 (1989) (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).  The NGEA does not run afoul of the dormant Commerce Clause.

16

**A.    Section 216H.03 Does Not Discriminate Against Non-Minnesota Entities.**

The threshold question in analyzing the dormant Commerce Clause is whether a challenged state law overtly discriminates against interstate commerce. *SDDS, Inc. v. South Dakota*, 47 F.3d 263, 267 (8th Cir. 1995). A state law overtly discriminates against interstate commerce when it plainly "accords differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Grand River Enterprises Six Nations, Ltd., v. Beebe*, 574 F.3d 929, 942 (8th Cir. 2009) (internal quotations omitted). A statute can overtly discriminate against interstate commerce in three ways: (1) on its face; (2) in purpose; or (3) in effect. *Granholm v. Heald*, 544 U.S. 460, 472 (2005). The NGEA does not overtly discriminate against interstate commerce under any analysis.

**1.    Section 216H.03 Does Not Facially Discriminate Against Interstate Commerce.**

Facial discrimination applies to statutory language that expressly differentiates between in-state and out-of-state economic interests in a manner that favors in-state interests. *See Oregon Waste Sys., Inc. v. Dep't. of Envtl. Quality of Oregon*, 511 U.S. 93, 99 (1994) (finding facial discrimination based on a statute that imposed higher disposal fees on solid waste originating out-of-state). The sole focus is whether the language of the statute treats in-state and out-of-state interests differently. *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 211 (2nd Cir. 2003).

Considered as a whole, section 216H.03, subdivision 3 does not discriminate against out-of-state actors in a manner that favors intrastate interests. *See West Lynn*

*Creamery, Inc. v. Healy*, 512 U.S. 186, 198 (1994) (finding it proper to analyze a regulatory structure as a whole, rather than considering isolated components of an overall regulatory framework). Subdivision 3, in a non-discriminatory fashion, regulates the resources public utilities may rely on to meet power demand in Minnesota. In other words, subdivision 3 regulates utilities that serve businesses and individuals in Minnesota and reduces their reliance on and financial support for power generation facilities that emit carbon dioxide, regardless of whether the facility is in-state (subdivision 3(1) and 3(3)) or out-of-state (subdivision 3(2) and 3(3)). Since Section 216H.03, subd. 3 restricts reliance on both in-state and out-of-state power from new coal plants it is not discriminatory.

No new large coal plant can be built in Minnesota pursuant to subdivision 3(1). Thus, no Minnesota utility can enter into a purchase agreement with a "new large energy facility" in Minnesota. "New large energy facilities" do exist outside of Minnesota. But pursuant to subdivision 3(2), a Minnesota utility may not rely on a purchase agreement with such a facility to meet its resource planning obligations. Similarly, subdivision 3(3) limits certain long-term power purchase agreements without regard to geographic location.

The exemptions to subdivision 3, found at Minn. Stat. § 216H.03, subd. 4-7, are also not facially discriminatory. Two of the exempted projects cited by Plaintiffs in their Amended Complaint at ¶¶ 68-69 are located outside Minnesota: one is in North Dakota, and the other was intended for South Dakota but never constructed. An additional exemption, not cited by Plaintiffs, also benefits out-of-state interests. Specifically,

section 216H.03, subd. 7(3) provides an exemption for "a new large energy facility or a power purchase agreement between a Minnesota utility and a new large energy facility *located outside Minnesota* that . . . is essential to ensure the long-term reliability of Minnesota's electric system[.]" (emphasis added).

### 2. Section 216H.03 Does Not Discriminate-in-Effect, And There Is No Inference Of A Discriminatory Purpose.

A statute is discriminatory-in-effect if it significantly favors local economic actors at the expense of out-of-state interests. *Hunt v. Washington Apple Adver. Comm'n*, 432 U.S. 333, 350-52 (1977). The primary focus is whether a state is pursuing discriminatory ends through artful drafting of facially neutral legislation. *West Lynn Creamery,* 512 U.S. at 201-02. A regulation is not discriminatory-in-effect unless the effect is substantial enough to justify an inference of discriminatory intent.[32] *See Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 618 (1981) (finding statute that imposed severance tax on coal non-discriminatory, even though 90% of the coal was exported and the tax burden fell primarily on out-of-state entities, because the tax applied evenly to all coal, regardless of its ultimate destination).

The NGEA does not discriminate-in-effect. The statute regulates reliance by utilities operating in Minnesota on power generation facilities that emit carbon dioxide,

---

[32] *See R&M Oil & Supply, Inc. v. Saunders*, 307 F.3d 731, 735 (8th Cir. 2002) (rejecting claim of discriminatory effect because the plaintiff failed to show how the law clearly placed out-of-state actors at a disadvantage vis-à-vis in-state actors); *National Paint & Coating Ass'n v. City of Chicago*, 45 F.3d 1124, 1131 (7th Cir. 1995) (stating that a law discriminates in effect "[w]hen the effect is powerful, acting as an embargo on interstate commerce without hindering intrastate sales").

without regard to whether the generation is in Minnesota, North Dakota, or elsewhere. Minnesota utilities may also rely on electricity generated from an emissions-producing facility, no matter its location, if they demonstrate to the PUC their plan to offset emissions. Minn. Stat. § 216H.03 subd. 4. In addition, coal-generated power may be utilized from new power facilities located outside Minnesota if the PUC determines it is essential to ensure the long-term reliability of Minnesota's electric system. Minn. Stat. § 216H.03 subd. 7(3). Minnesota utilities may continue to rely on North Dakota wind, natural gas, and other non-coal sources of energy.

Because there is no basis to find any discriminatory effect from Minn. Stat. § 216H.03, let alone a significant enough effect to justify an inference of discriminatory purpose, summary judgment is appropriate.

### 3.    Section 216H.03 is not an Extraterritorial Regulation.

Under the extraterritoriality doctrine, a state may not regulate in a manner that directly controls commerce occurring wholly outside of the state. *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 326 (1989).[33] A state may not, for example, enforce price-affirmation laws that require an out-of-state business to obtain regulatory approval before changing the price it charges out-of-state consumers for out-of-state transactions. *See Brown-*

---

[33] There is some question about the continuing validity of the extraterritoriality doctrine. After applying the doctrine in a recent case, a concurring opinion from the Sixth Circuit suggested that the extraterritoriality doctrine was outdated and should not apply in the context of the modern U.S. economy. *See American Beverage Ass'n v. Snyder*, 700 F.3d 796, 810-15 (6th Cir. 2012) (Sutton, J. concurring). The State of Michigan filed a Petition for a Writ of Certiorari. 2013 WL 1452895, No. 12-1221. Among the questions presented is whether the extraterritoriality doctrine should be abolished. *Id.* The Petition for Writ of Certiorari is scheduled for consideration on September 30, 2013.

*Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 582 (1986).  To constitute extraterritorial regulation, a law must reach beyond a state's borders and apply to transactions and entities that have absolutely no connection to a state.  *Id.*  The extraterritoriality doctrine does not, however, restrict a state's ability to regulate in-state activities, even if the regulation has extraterritorial effects.  *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 825 (3rd Cir. 1994).  The extraterritoriality doctrine also does not bar regulation of in-state conduct that effectively forces out-of-state entities to conform with state law or not enter the state's marketplace.  *See Cotto Waxo Co. v. Williams*, 46 F.3d 790, 794 (8th Cir. 1995); *National Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 110 (2nd Cir. 2001) (upholding statute because "[t]o the extent the statute may be said to 'require' labels on lamps sold outside Vermont, then, it is only because the manufacturers are unwilling to modify their production and distribution systems to differentiate between Vermont-bound and non-Vermont-bound lamps").

The NGEA is not an extraterritorial regulation.  The NGEA regulates in-state entities and in-state activities.  Minnesota Statute § 216H.03, subd. 3 imposes no direct limitations on commerce occurring entirely outside of Minnesota.  There are no limitations placed on out-of-state generation of electricity that is sold to out-of-state consumers.  Out-of-state utilities can continue carbon-emitting generation of electricity without any limitations imposed by the NGEA.  Minn. Stat. § 216H.03, subdivision 3 only limits reliance on carbon-emitting power generation by in-state utilities that serve Minnesota individuals and businesses.  This is not extraterritorial regulation.

### B.    Section 216H.03 Is Constitutional Under The *Pike* Balancing Test.

A statute may also run afoul of the dormant Commerce Clause if it imposes burdens on interstate commerce that are "clearly excessive in relationship to the putative local benefits." *Hughes v. Oklahoma*, 441 U.S. 322, 331 (1979).  Because the dormant Commerce Clause is primarily designed to prevent overt discrimination, a plaintiff seeking to invalidate a statute under *Pike* must make a substantial showing.  *See Dep't of Revenue of Ky. v. Davis,* 553 U.S. 328, 337-38 (2008).

Mere effect on interstate commerce is insufficient to trigger review under *Pike*, since virtually all state regulation affects interstate commerce to some degree.  *See National Paint*, 45 F.3d at 1130.  Instead, for a statute "to run afoul of the *Pike* standard, the statute, at a minimum, must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce." *National Elec. Mfrs Ass'n v. Sorrell*, 272 F.3d 104, 109 (2nd Cir. 2001).  Cases from the Eighth Circuit consistently uphold statutes under *Pike* that confer legitimate local benefits, as long as the regulation does not treat interstate interests differently from similarly situated intrastate interests.  *See, e.g., Grand River Enter. Six Nations, Ltd. v. Beebe*, 574 F.3d 929, 942-43 (8th Cir. 2009) (requirement that tobacco companies make payments into escrow fund based on national sales did not violate *Pike* because it served a legitimate purpose and regulated without regard to the company's geographic origin).[34]

---

[34] *See also IESI AR Corp. v. Northwest Arkansas Reg'l Solid Waste Mgmt. Dist.*, 433 F.3d 600 (8th Cir. 2006) (upholding regulation under *Pike* requiring disposal of solid waste at a particular in-district landfill or at any out-of-state landfill because the rule did not discriminate against interstate commerce and served a legitimate purpose); *Hampton*

Section 216H.03 regulates the manner in which Minnesota utilities provide electricity used in Minnesota by Minnesota customers. The NGEA easily survives *Pike* balancing.

       **1.**      **Section 216H.03 Imposes No Cognizable Burden on Interstate Commerce.**

A plaintiff must prove that a regulation results in disparate treatment of in-state and out-state economic interests. This requires more than simply showing that a regulatory action happens to affect the interstate flow of goods and services. *National Paint*, 45 F.3d at 1130. Reduced demand or a shift in market conditions resulting from a regulation is not a cognizable burden on interstate commerce. *See Southern Waste Systems,* 420 F.3d at 1291. Similarly, there is no burden when a statute restricts or prohibits a particular product that in-state consumers will simply replace with another article of interstate commerce. *See Hampton Feedlot, Inc. v. Nixon*, 249 F.3d 814, 819 (8th Cir. 2001) (finding no undue burden from statute regulating price of Missouri livestock because "packers can just as easily purchase Nebraska or Kansas livestock for slaughter if they do not purchase Missouri livestock").

Without regard to geographic origin, Section 216H.03 restricts those utilities that serve Minnesota from building facilities or contracting to purchase power that increases statewide carbon-dioxide emissions. No preference is given to in-state interests. Mere lost profit or reduced demand is not a cognizable burden on interstate commerce. *See National Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1152 n.11 (9th Cir.

---

*Feedlot, Inc. v. Nixon*, 249 F.3d 814, 820-21 (8th Cir. 2001) (rejecting a *Pike* challenge to statute regulating price of livestock because plaintiffs failed to show the statute would have significant effect on out-of-state entities).

2012) (finding argument that loss of profit constitutes a burden on interstate commerce "has no merit" because "the dormant Commerce Clause does not protect a particular company's profits"). States have long regulated the power sources used by utilities to meet public demand. As noted above, half the states in the nation have renewable portfolio statutes that require a specified percentage or amount of electricity to come from renewable energy sources.[35]

The focus is not on whether a regulation reduces demand for a commodity, but on whether regulation places undue and disparate burdens on interstate commerce versus intrastate commerce. *See International Truck and Engine Corp. v. Bray*, 372 F.3d 717, 727-28 (5th Cir. 2004) (upholding statute because shifting of business from one supplier to another is not a burden on interstate commerce). Section 216H.03 imposes little or no burden on interstate commerce.

## 2. Section 216H.03 Confers Significant Local Benefits.

A primary consideration under *Pike* is the nature of the local benefits conferred by a statute. *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 473 (1981). In considering the local benefits, courts defer to legislative findings and judgments unless the facts "could not reasonably be conceived to be true by the governmental decisionmaker." *Clover Leaf Creamery Co.*, 499 U.S. at 463, n.7, 471 n.15; *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 312 (1st Cir. 2005) (stating that *Pike* focuses on

---

[35] *See* Elizabeth Burleson, *Climate Change and Natural Gas Dynamic Governance*, 63 Case W. Res. L. Rev. 1217, 1251 (2013).

putative local benefits and that "[i]t matters not whether these benefits actually come into

being at the end of the day").[36]

Local benefits related to public health, safety, or environmental concerns weigh

strongly in favor of upholding a statute under *Pike*. *General Motors Corp. v. Tracy*, 519

U.S. 278, 306-07 (1997) (recognizing that states may validly regulate utility markets

because the Commerce Clause was "never intended to cut the States off from legislating

on all subjects relating to the health, life, and safety of their citizens, though the

legislation might indirectly affect the commerce of the country"); *Pike*, 397 U.S. at 143.

This is particularly true when the regulation covers a subject matter traditionally

regulated by states. *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,

550 U.S. 330, 344 (2007).

The regulation of utilities is a traditional state activity entitled to significant

deference under *Pike*. *See Arkansas Elec. Co-op. Corp. v. Arkansas Pub. Serv. Comm'n*,

461 U.S. 375, 377 (1983) (noting that "the regulation of utilities is one of the most

important of the functions traditionally associated with the police power of the States").

Regulation of utilities is essential to the public welfare and provides important local

benefits. *See Panhandle Eastern Pipe Line Co. v. Michigan Pub. Serv. Comm'n*, 341

U.S. 329, 333 (1951).   Among other things, public utility regulation ensures that

---

[36] *See also Kassel*, 450 U.S. at 670 (stating that "the Court will not second-guess
legislative judgment about their importance in comparison with related burdens on
interstate commerce"); *United States v. Carolene Products Company*, 304 U.S. 144, 154
(1938) (stating that the inquiry into legislative facts supporting the exercise of federal
regulatory authority under the Commerce Clause was "restricted to the issue [of] whether
any state of facts either known or which could reasonably be assumed affords support for
it").

electricity purchased and consumed by local consumers is reliable, affordable, environmentally friendly, and consistent with the overall public interest. *See In re Request of Interstate Power Co.*, 574 N.W.2d 408, 413 (Minn. 1998) (noting that public utility commissions must balance needs of customers and utilities, as well as environmental concerns and general public interest). Courts give strong weight to putative local benefits conferred by statutes regulating utility resource planning and energy-capacity acquisition. *See Southern Union Co. v. Missouri Pub. Serv. Comm'n*, 289 F.3d 503, 509 (8th Cir. 2002) ("local public utility rate regulation is presumptively valid" and "the Supreme Court has rarely invoked *Pike* balancing to invalidate state regulation under the Commerce Clause").

The legislative history of the NGEA demonstrates multiple local benefits. Section 216H.03 provides economic and resource certainty to businesses and individuals who use power in Minnesota and encourages the use of clean energy in Minnesota.

### a. Section 216H.03 benefits Minnesota by ensuring that its long-term capacity to generate affordable and reliable electricity is not dependent on an energy source whose future is uncertain.

Energy is a vital necessity and major cost for both Minnesota businesses and individual consumers. Like other states, Minnesota extensively regulates the utilities industry to ensure that businesses and individuals have access to stable, reliable, and affordable energy sources to operate their businesses and power their homes. *See, e.g.,* Minn. Stat. 216B.01, *et seq.* Testimony before the Minnesota Legislature makes clear that one of the Legislature's goals in enacting the Next Generation Energy Act in 2007

26

was to ensure that Minnesota anticipates and plans for changes in the marketplace that will impact the cost, stability, and reliability of coal as an energy source in coming years.

For example, Representative Ruud, a bill author, stated on March 1, 2007 that, "[T]he choice before us is not between a world where carbon is regulated and one where it is not. The choice before us is between actively preparing for the carbon-constrained world we know is coming or just continuing to race down the path as business as usual….Clearly it is far wiser for us to plan for these changes so we can both reduce the risk and maximize the opportunities for Minnesota." Brown Aff., Ex. 1.[37] Similarly, Senator Anderson, another bill author, stated on February 20, 2007, "[I]f we act now it will prevent us from making some very costly mistakes in the next decade that our ratepayers will be paying the price for, for decades after CO2 regulations become enacted across the country." Brown Aff., Ex. 3.[38] Legislative testimony further stated that "controls on carbon pollution are clearly coming down the pike. You don't want to create another generation of stranded investments…that have to be passed through to the ratepayers in some way." Brown Aff., Ex. 1.[39] *See also supra* pp. 2 - 9.

---

[37] Hearing on H.F. No. 375 before the House Committee on Environment & Natural Resources, March. 1, 2007, at page 5 of the transcript (statement of Representative Maria Ruud).

[38] Hearing on S.F. 145 and S.F. 192 before the Senate Energy, Utilities, Technology and Communication Committee, 85th Minn. Leg., Feb. 20, 2007, at page 17 of the transcript (statement of Senator Ellen Anderson).

[39] Hearing on H.F. No. 375 before the House Committee on Environment & Natural Resources, March. 1, 2007, at page 9 of the transcript (statement of Dr. Alden Meyer, Union of Concerned Scientists).

These are legitimate concerns for state policymakers. At the time the NGEA was passed, 25 states had already adopted renewable energy standards mandating that a certain percentage of their energy come from renewable sources of energy.[40] Earlier this year, the President directed the EPA to promulgate regulations regarding carbon emissions from coal power facilities. Everson Aff., Ex. 4.[41] Similarly, a recent article in Bloomberg BusinessWeek noted that the country's push for alternative energy will likely leave coal-based utilities with stranded costs that disproportionately affect elderly and disadvantaged retail consumers. Everson. Aff., Ex. 3.[42]

The State's legitimate interest in ensuring stable, reliable, and affordable utility services for Minnesota businesses and individual consumers by planning and preparing for the changing future of coal-based energy is a legitimate local interest that readily satisfies the *Pike* balancing test.

---

[40] *See* Joshua P. Fershee, *Changing Resources, Changing Market: The Impact of a National Review Portfolio Standard on the U.S. Energy Industry*, 29 Energy L.J. 49, 61-62 (2008).

[41] Presidential Memorandum on Power Sector Carbon Pollution Standards (June 25, 2013), available at: *http:/www.whitehouse.gov/the-press-office/2013/06/25/presidential-memorandum-power-sector-carbon-pollution-standards* (last visited September 5, 2013).

[42] Chris Martin, Mark Chediak, and Ken Wells, *This Guy Was Behind The Worst Merger Ever; Now He's Bringing Washington Together*, Bloomberg Businessweek 58-61 (Aug 26, 2013).

### b. Section 216H.03 benefits Minnesota by promoting the use of clean energy to foster public and environmental health.

Testimony before the Minnesota Legislature makes clear that another legislative goal in enacting the NGEA was to promote the increased use of clean sources of energy to benefit public health and the environment.  See *supra* pp. 7 - 9.

The Legislature heard extensive testimony about the desirability and immediate need for reducing greenhouse gas emissions.  The United States Supreme Court has held that "[t]he harms associated with climate change are serious and well recognized."  *Cf. Massachusetts v. E.P.A.*, 549 U.S. 497, 521 (2007).  The former Deputy Commissioner of the Minnesota Department of Commerce testified that, "[I]t is in Minnesota's best interest to develop comprehensive, responsible, deliberate, deliberative, and enduring ways to reduce our greenhouse gas emissions.  *See supra* p. 8.  Other experts testified about the impact of climate change on hunting, fishing, tourism, and agriculture.  *See supra* p. 7-9.

The State has a legitimate interest in promoting the use of clean energy and bettering the environment, and these legitimate local interests readily satisfy the *Pike* balancing test.

## III.   THE NGEA IS NOT PREEMPTED BY FEDERAL LAW.

Under the Supremacy Clause to the United States Constitution, state laws that conflict with federal law are "without effect."  *Altria Group, Inc. v. Good*, 555 U.S. 70, 75 (2008).  In the absence of an express preemption clause, a plaintiff must demonstrate either: (1) field preemption – *e.g.*, that a federal law regulates a subject matter in such a

comprehensive fashion as to clearly indicate that Congress intended to occupy the entire legislative field; or (2) conflict preemption – *e.g.*, that there is an actual conflict between state and federal law. *Id.* at 75.

A state is preempted from regulating "in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona v. United States*, __ U.S. __, 132 S. Ct. 2492, 2501 (2012). To prevail on a field preemption claim, a plaintiff must show that federal law regulates in such a pervasive manner that Congress plainly intended to leave no room for states to supplement it. *Id.* In areas of traditional state regulation, there is a strong presumption "that a federal statute has not supplanted state law unless Congress has made such an intention 'clear and manifest.'" *Bates v. Dow Agrosciences LLC.*, 544 U.S. 431, 449 (2005) (citations omitted).

To establish conflict preemption, a plaintiff must show that: (1) compliance with both federal and state regulations is a physical impossibility; or (2) the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 132 S. Ct. at 2501. Conflict preemption requires more than the existence of a hypothetical or potential conflict; instead, there must be a clear and actual conflict between state and federal law. *Rice v. Norman Williams Co.*, 548 U.S. 654, 659 (1982); *Dalton v. Little Rock Family Planning Servs.*, 516 U.S. 474, 476 (1996). As with field preemption, courts considering a conflict preemption claim presume that "the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." *Arizona,* 132 S. Ct. at 2501.

For the reasons set forth below, the NGEA is not preempted by either the Federal Power Act or the federal Clean Air Act.

### A.    The NGEA Is Not Preempted By The Federal Power Act.

Section 216H.03 is a lawful exercise of the Minnesota Legislature's traditional authority to regulate the resources through which utilities provide power to Minnesota businesses and households.  The NGEA does not regulate wholesale electricity rates or the interstate transmission of electricity.  As a result, the NGEA is not preempted by the Federal Power Act (FPA).

### 1.    The NGEA Is Not Preempted by the Federal Power Act by Virtue of Field Preemption.

To establish field preemption, Plaintiffs must demonstrate that through the FPA, Congress so comprehensively regulated the field of utility resource planning that it plainly intended to preempt state regulation.   Because regulation of electric generation sources and utilities is a traditional state concern, there is a strong presumption against preemption.  *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 205 (1983); *Southern Union Co.*, 289 F.3d at 508-09.  The NGEA does not regulate the same field as the FPA and accordingly is not preempted.

The FPA grants authority to the Federal Energy Regulatory Commission (FERC) to regulate the "transmission of electricity in interstate commerce" and the "wholesale" sale of electricity.   16 U.S.C. §§ 824(a),(b)(1).  The "transmission" of electricity refers to the delivery of electricity from a generation facility to the local distribution system.  *See* 16 U.S.C. § 824(b)(1) (differentiating between generation, transmission and local

distribution); *PPL Corp. v. C.I.R.*, 135 T.C. 176, 178 (U.S. Tax Ct. 2010) (stating that "[t]ransmission is the process of moving high voltage electricity from power plants to distribution substations"); *United States Energy Information Administration Glossary*, http://205.254.135.7/tools/glossary/ (follow link to the definition of "transmission") (last visited September 5, 2013). Regulation of transmission involves the terms and conditions of transmitting electricity that has already been generated, not the type of resources used to generate the electricity. *See, e.g.*, FERC Order No. 888, 61 FR 21540, 21541 (May 10, 1996) (setting forth terms and conditions of non-discriminatory access to transmission lines).

In contrast, Section 216H.03, subd. 3 regulates the generation sources relied on by Minnesota utilities to serve Minnesota businesses and individuals. Nothing in Section 216H.03 regulates the actual transmission of electricity, *i.e.*, the *process* of moving the electricity. The NGEA is a resource planning statute that is plainly within the State's legal authority. *See, e.g.*, FERC Order No. 888, 61 FR at 21626, n. 544 (May 10, 1996) (noting that the states retain authority over resource planning and buy-side decisions). Transmission of electricity from any "new large energy facility" remains fully subject to federally regulated transmission rates, terms, and conditions.

Because transmission lines do not emit carbon dioxide, they are not implicated in the implementation of Section 216H.03. Plaintiffs' erroneous assertion that the NGEA regulates transmission lines relies *solely* on a cross-reference in the definition of "new large energy facility" in Section 216H.03, subdivision 1, to the definition of "large energy facility" in Section 216B.2421, subdivision 2(1), which includes the phrase of

32

"transmission lines directly associated with the plant." *Id.* Reading Section 216H.03 as a whole, however, it is clear that the reference to transmission lines in Section 216B.2421 is irrelevant for purposes of the substantive requirements of Section 216H.03. *See Dunham v. Portfolio Recovery Assocs., LLC*, 663 F.3d 997, 1001 (8th Cir. 2011) (stating that courts "examine the text of the statute as a whole by considering its context, object, and policy") (internal citations omitted); *State v. Randolph*, 800 N.W.2d 150, 154 (Minn. 2011) (providing that a "statute is read as a whole and each section is interpreted in light of surrounding sections") (internal citations omitted).

Plaintiffs' convoluted interpretation of Section 216H.03 should be rejected. *See* Minn. Stat. § 645.17 (2010) (providing that Minnesota laws are to be interpreted to avoid "a result that is absurd, impossible of execution, or unreasonable"); *Gershman v. American Cas. Co.*, 251 F.3d 1159, 1162 (8th Cir. 2001) (recognizing that in interpreting a state statute, federal courts are bound by the state's rules of statutory construction). The NGEA does not regulate the transmission or wholesale sale of electricity. It is a resource planning statute that regulates the energy sources that Minnesota utilities may rely on to meet Minnesota ratepayer demand. This type of utility regulatory statute is well within the traditional powers of the states. As a result, it is not subject to field preemption by the FPA.

### 2. The NGEA Is Not Preempted by the Federal Power Act by Virtue of Conflict Preemption.

The NGEA is also not preempted by the FPA by virtue of conflict preemption. Conflict preemption involves state laws that conflict with federal law because: (1)

33

"compliance with both federal and state regulations is a physical impossibility"; or (2) the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 132 S. Ct. at 2501. The NGEA does not directly conflict with the FPA or interfere with any of the FPA's objectives or purposes. Section 216H.03 does not apply to the transmission of electricity, nor does it prohibit "large energy facilities" from selling their product to others via the transmission grid. The statute does not conflict with any specific provision of the FPA, and it does nothing to interfere with FERC's authority to regulate the transmission or wholesale sale of electricity.

Plaintiffs "are not presently contending that there are any NGEA provisions that make it impossible for a regulated entity to comply with any specific FERC Order." Everson Aff., Ex. 5.[43]    Indeed, Section 216H.03 falls within the states' traditional authority to regulate resource planning and retail sales of electricity. *See* FERC Order 888, 61 FR 21540, 21626, n.544 (May 10, 1996) (recognizing that the states retain authority over integrated resource planning).

The NGEA has no more potential for conflict than the resource regulation of any number of states. For example, a 2006 California law prohibits retail utilities in California from entering into "long-term financial commitment[s]" for "baseload generation" unless that generation source meets a "greenhouse gas emissions performance standard established by the [California public utilities] commission." Cal.

---

[43] Pls.' Answers and Resp. to Defs.' First Discov. Req. (Interrogs.), No. 2.

Pub. Util. Code § 8341 (West 1994 & Supp. 2012). The California law applies to both commitments with in-state and out-of-state generation sources. *Id.* In addition, over half the states in the country have renewable portfolio standards that require utilities to generate or procure a certain amount of renewable energy for their retail electricity sales or, alternatively, to obtain renewable energy credits.[44] Section 216H.03 is a similar exercise of the states' traditional and continuing authority. The NGEA does not conflict with the FPA and is not preempted.

**B.    The NGEA Is Not Preempted By The Clean Air Act.**

Minnesota Statute § 216H.03, subd. 3 does not establish or enforce any emissions standards; rather, it limits Minnesota utilities' reliance on generation sources that emit carbon dioxide. Section 216H.03 reduces emissions not by telling any facility to emit less, but by directing Minnesota utilities to rely less on carbon dioxide producing sources when providing energy to Minnesota homes and businesses. Such directives are not preempted by the Clean Air Act (CAA). Even if the NGEA were deemed to regulate carbon dioxide emissions, the CAA does not preempt state laws regulating carbon dioxide emissions within the state.

---

[44] *See Database of State Incentives for Renewable and Efficiency*, United States Department of Energy, http://www.dsireusa.org/summarytables/rrpre.cfm (table showing states with RPSs, including links to applicable state statutes), http://www.dsireusa.org/glossary (definition of "Renewable Portfolio Standards" under "Rules, Regulations, and Policies") (last visited September 5, 2013); Minn. Stat. § 216B.1691, subd. 2a (2010) (setting forth Minnesota's RPS) (enacted in 2007 Minn. Laws ch. 3).

> **1.     The NGEA Does Not Regulate Air Emissions And Is Not Subject To Field Preemption.**

Field preemption applies only to state laws that regulate "in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 132 S. Ct. at 2501. A strong presumption against preemption applies to state regulation of air pollution, an area of traditional state authority. *Bates*, 544 U.S. at 449.

Section 216H.03 does not establish, impose, implement, or enforce emissions standards. It contains no direct limits on emissions, nor does it authorize the Minnesota PUC to establish such limits. It does not impose any requirements on any utility with respect to emissions standards, and it contains no punitive provisions for non-compliance with actual emissions standards. Instead, the NGEA is a resource planning statute that regulates the generation sources upon which Minnesota utilities may rely when powering Minnesota homes and businesses.

Plaintiffs erroneously suggest that Section 216H.03's offset provision "regulates" power generation facilities outside of Minnesota. But the offset provisions in section 216H.03, subd. 4 apply to the "project proponent," *e.g.*, the *Minnesota utility* that wants to build a plant in Minnesota or rely on a power generation facility that emits carbon dioxide. The plain language of Section 216H.03 demonstrates that the offset provision places no requirements on out-of-state generation facilities to acquire offsets.

Nothing in the CAA suggests Congressional intent to preempt state regulation of utility resource planning. The NGEA is a valid exercise of state authority over resource planning by local utilities and is not preempted by the CAA.

> **2.    Even If The NGEA Were Deemed to Regulate Emissions, Field Preemption Does Not Apply Because States Retain Ample Authority Under The CAA To Regulate Emissions.**

Congress has not occupied the field of air pollution regulation in such a manner as to preempt all state regulation of emissions. The CAA provides for a mix of federal and state authority to regulate the emission of air pollutants. *EME Homer City Generation L.P. v. E.P.A.,* 696 F.3d 7, 12 (D.C. Cir. 2012), *cert. granted in part,* 81 U.S.L.W. 3567, 81 U.S.L.W. 3696, 81 U.S.L.W. 3702 (U.S. June 24, 2013 (Nos. 12-1182 and 1183)). Under the CAA, the Environmental Protection Agency (EPA) is responsible to set air quality standards, referred to as national ambient air quality standards, for certain common pollutants. *Exxon Mobil Corp. v. EPA,* 217 F.3d 1246, 1255 (9th Cir. 2000). While the EPA sets air quality standards, states are responsible for developing implementation plans to meet these standards. *EME Homer*, 696 F.3d at 12. In developing an implementation plan, states may determine the emission limits and standards they will use to meet the EPA's national ambient air quality standards. *Id.* Carbon dioxide, however, is not among the pollutants subject to regulation under the CAA's national ambient air quality standards. *Coalition for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 131 (D.C. Cir. 2012).

A second provision authorizes the EPA to set emissions standards for stationary sources of air pollution. 42 U.S.C. § 7411. In general, states are responsible for

implementing stationary source standards, although the EPA retains regulatory authority if states fail to properly enforce the standards. *Jensen Family Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d 934, 938 (9th Cir. 2011). The EPA has not established stationary source emission standards for carbon dioxide.

Further, the CAA expressly preserves the role of states in regulating air emissions. Congress specifically preserved the states' and local governments' "primary responsibility for air pollution prevention." *See* Section 116 of the Clean Air Act, 42 U.S.C. § 7416. Section 116, which is entitled "Retention of State Authority," provides, in relevant part:

> *nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution*; except that if an emission standard or limitation is in effect under an applicable implementation plan or under section 7411 or section 7412 of this title, such State or political subdivision may not adopt or enforce any emission standard or limitation which is less stringent than the standard or limitation under such plan or section.

42 U.S.C. § 7416 (emphasis added).

The plain language of Section 116 broadly and expressly preserves state authority to adopt "*any* standard or limitation respecting emissions of air pollutants" and "*any* requirement respecting control or abatement of air pollution." *Id.* (emphasis added). The only limits on state authority apply to certain state regulations regarding new motor vehicles, fuel and fuel additives, and aircraft. *Id.*; 42 U.S.C. § 7543 (relating to motor vehicles); 42 U.S.C. § 7545(c)(4) (relating to fuel and fuel additives); 42 U.S.C. § 7573 (relating to aircraft). The inclusion of the savings clause in Section 116 precludes a

finding of field preemption.  *See California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 281 (1987) (finding no field preemption based on Congress' inclusion of savings clauses); *Lockwood v. Conagra Foods, Inc.*, 597 F. Supp.2d 1028, 1032 (N.D. Cal. 2009) (recognizing that the presence of a savings clause is fundamentally incompatible with a claim of field preemption).

Congress' intent to preserve state authority to regulate air pollution prevention is also expressed in Section 101 of the CAA.  This section, entitled "Congressional Findings and Declaration of Purpose," provides that "States and local governments" have primary responsibility for "air pollution prevention . . . and air pollution control at its source."  42 U.S.C. § 7401(a)(3).  Taken together, Sections 101 and 116 unequivocally demonstrate that Congress intended to allow for state abatement of air pollution.

Courts have acknowledged that Congress expressly preserved state authority to abate air pollution.  As the United States Supreme Court has stated, the CAA made "the States and the Federal Government partners in the struggle against air pollution." *General Motors Corp. v. United States*, 496 U.S. 530, 532 (1990).  The "text of the Clean Air Act, in a number of different sections, explicitly protects the authority of the states to regulate air pollution."  *Exxon Mobil Corp.*, 217 F.3d at 1254.  In *Jensen Family Farms v. Monterey Bay Unified Air Pollution Control Dist.*, the court upheld a California regional air district regulation that set emissions limits for stationary diesel engines within the region.  644 F.3d at 938, 941-42.  The court found the California regional air regulation was not preempted because Section 116 preserves state and local authority to limit air

emissions from stationary sources. *Id.* Therefore, the NGEA is not subject to field preemption by the CAA.

In its Memorandum Opinion and Order issued September 30, 2013, the Court identified two cases for denying the State's Motion to dismiss the claim that the CAA preempts the NGEA. In *American Electric Power Co., Inc. v. Conn.*, ___ U.S. ___, 131 S.Ct. 2527 (2011), the Supreme Court held that the CAA displaced a federal common law nuisance claim because, when Congress has legislated in a particular area, the need for federal courts to engage in the "unusual exercise of law-making . . . disappears." *Id.* at 2537. The Court did not address preemption and explicitly noted that "[l]egislative displacement of federal common law does not require the same sort of evidence of a clear and manifest congressional purpose demanded for preemption of state law." *Id.* (internal citations omitted).

The Court in *American Electric* held that the CAA displaced the federal common law right to seek abatement of carbon dioxide emission from fossil-fuel powered plants. *Id.* Beyond the fact that the Court did not address preemption, the important distinction between *American Electric Power* and the instant case is that the remedy sought by the *American Electric Power* plaintiffs would actually set and enforce emission standards for power plants. The NGEA does not. The *American Electric Power* plaintiffs' common law nuisance claim sought as a remedy that owners and operators would cap carbon dioxide emissions and reduce the carbon emission by a specific percentage each year. *Id.* at 2534. The Court observed that such a remedy would require federal district court

judges to make scientific judgments for which they are ill-equipped and could lead to a chaotic multiplicity of results. *Id.* at 2539-2540.

The NGEA has none of the effects that led the *American Electric* Court to determine that the CAA displaced a federal common law nuisance claim. The NGEA does not set or enforce emissions standards. It does not require permitting an out-of-state electric generation plant, nor does it impose carbon dioxide emission standards on electric generation facilities outside of Minnesota. Additionally, it does not impose any requirement upon operators of coal-fired power plants to monitor, reduce, or control emissions. The NGEA simply does not establish emissions standards for any North Dakota plant, even if the plant is a "new" large energy facility.

In *North Carolina, ex rel. Cooper v. J.V.A.*, 615 F.3d 291 (4th Cir. 2010), the Fourth Circuit Court of Appeals held that the CAA preempted a state-law public nuisance lawsuit that resulted in a court order imposing specific emission caps and emission control technologies. *Id.* at 296. The *Cooper* court stated:

> If allowed to stand, the injunction would encourage courts to use vague public nuisance standards to scuttle the nation's carefully created system for accommodating the need for energy production and the need for clean air. The result would be a balkanization of clean air regulations and a confused patchwork of standards, to the detriment of industry and the environment alike. Moreover, the injunction improperly applied home state law extraterritorially, in direct contradiction to the Supreme Court's decision in *International Paper Co. v. Ouellette,* 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987).

*Id.* The implementation of the NGEA has no such potential, as described above. The NGEA does not prescribe or lead to emissions standards or control technologies. Instead,

the NGEA is a resource planning statute that regulates the manner in which Minnesota utilities supply energy to Minnesota customers.

In sum, Congress has not occupied the field of air pollution regulation, but rather only established and enforced national ambient air quality emission standards for pollutants, *not including carbon dioxide*.  The CAA plainly preserved a state's authority to regulate carbon dioxide emissions within its borders.  Therefore, the NGEA is not subject to field preemption by the CAA.

### 3.    The NGEA Does Not Conflict With The CAA.

Plaintiffs' conflict preemption claim also fails.  The NGEA does not conflict with any provision of the CAA because the NGEA does not regulate emissions in North Dakota or elsewhere.  Plaintiffs "are not presently contending that there are any NGEA provisions that make it impossible for a regulated entity to comply with any Clean Air Act provision."  Everson Aff., Ex. 5.[45]  Even if the NGEA were deemed to regulate emissions in Minnesota, Congress expressly preserved state authority to regulate air pollution and control air emissions from stationary electric generating facilities.  *See* 42 U.S.C. § 7416.[46]  Thus, any regulation of Minnesota's "statewide power sector carbon dioxide emissions" falls squarely within the authority retained by the States under the

---

[45] Pls.' Answers and Resp. to Defs.' First Discov. Req. (Interrogs.), No. 1.

[46] Plaintiffs' citation to the Supreme Court's decision in *Massachusetts v. EPA*, 549 U.S. at 528-530 is misplaced.  *See* Amend. Compl. ¶ 102.  While the Court concluded that carbon dioxide is an "air pollutant" within the meaning of the CAA, 529 U.S. at 528-530, it did not conclude that the federal government has exclusive authority to regulate carbon dioxide pollution.  *Id.*  Indeed, the *Massachusetts* case did not address preemption.  The *Massachusetts* case does not support Plaintiffs' conflict preemption claim.

42

CAA. No provision of the CAA conflicts with the resource planning goals of the NGEA.

Therefore, there is no conflict preemption.

## CONCLUSION

For all of the reasons discussed above, Defendants respectfully request the Court

to grant their Motion for Summary Judgment and dismiss Plaintiffs' Amended Complaint

in its entirety.


Dated:   September 5, 2013                    Respectfully submitted,

                                             OFFICE OF THE ATTORNEY GENERAL
                                             State of Minnesota


                                             s/Kevin P. Curry
                                             KEVIN P. CURRY
                                             Assistant Attorney General
                                             Atty. Reg. No. 0285067
                                             kevin.curry@ag.state.mn.us

                                             LISA A. CRUM
                                             Assistant Attorney General
                                             Atty. Reg. No. 0302600
                                             lisa.crum@ag.state.mn.us

                                             MICHAEL EVERSON
                                             Assistant Attorney General
                                             Atty. Reg. No. 0388310
                                             Michael.everson@ag.state.mn.us

                                             445 Minnesota Street, Suite 1100
                                             St. Paul, Minnesota 55101-2128
                                             (651) 757-1362 (Voice)
                                             (651) 296-1410 (TTY)

                                             ATTORNEYS FOR DEFENDANTS