UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| State of North Dakota, | ) | No.:  11-CV-3232 (SRN/SER) |
| Industrial Commission of North Dakota, | ) | |
| Lignite Energy Council, | ) | |
| Basin Electric Power Cooperative, | ) | |
| The North American Coal Corporation, | ) | |
| Great Northern Properties Limited | ) | |
| Partnership, Missouri Basin Municipal | ) | |
| Power Agency d/b/a Missouri River | ) | |
| Energy Services, Minnkota Power | ) | |
| Cooperative, Inc., | ) | |
| | ) | |
| Plaintiffs, | ) | **PLAINTIFFS' MEMORANDUM** |
| v. | ) | **OF LAW IN SUPPORT OF** |
| | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| Beverly Heydinger, Commissioner and | ) | |
| Chair, Minnesota Public Utilities | ) | |
| Commission, | ) | |
| David C. Boyd, Commissioner, | ) | |
| Minnesota Public Utilities Commission, | ) | |
| Nancy Lange, Commissioner and Vice | ) | |
| Chair, Minnesota Public Utilities | ) | |
| Commission, | ) | |
| J. Dennis O'Brien, Commissioner, | ) | |
| Minnesota Public Utilities Commission, | ) | |
| Betsy Wergin, Commissioner, Minnesota | ) | |
| Public Utilities Commission, and | ) | |
| Mike Rothman, Commissioner, | ) | |
| Minnesota Department of Commerce, | ) | |
| each in his or her official capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

## TABLE OF CONTENTS

Page No.

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ................................................................................................... 1

GENERAL BACKGROUND ................................................................................... 1

    A.    The Next Generation Energy Act ............................................................ 2

        1.    Minn. Stat. §216H.03 Explicitly And Intentionally Regulates Beyond Minnesota ........................................................................ 2

        2.    Minn. Stat. §216H.03 Does Not Provide Realistic Options For Compliance .............................................................................. 4

        3.    The Minnesota Legislature Repealed Minn. Stat. §216H.03. ............ 5

    B.    Minnesota has Imposed Minn. Stat. §216H.03 on the Regional Generation, Transmission, and Wholesale Delivery Systems. ..................... 6

    C.    Minn. Stat. §216H.03's Application to Plaintiffs ........................................ 10

        1.    Basin Electric ................................................................................ 11

        2.    Minnkota ...................................................................................... 12

        3.    MRES ........................................................................................... 13

        4.    North American Coal .................................................................... 13

        5.    Great Northern Properties .............................................................. 14

    D.    MPUC Dockets Reflect the Manner in Which Minn. Stat. §216H.03 Applies to Out-Of-State Actors and Actions. ............................................... 14

        1.    GRE Proceedings. ......................................................................... 14

        2.    Dairyland Proceedings. .................................................................. 16

        3.    Basin Electric Proceedings. ............................................................ 18

    E.    Minn. Stat. §216H.03's Application to Purchases from the MISO Market. ........................................................................................ 20

ARGUMENT...................................................................................................21

I.    MINN. STAT. §216H.03 VIOLATES THE DORMANT COMMERCE
      CLAUSE.................................................................................................24

      A.    Minn. Stat. §216H.03 Violates the Extraterritorial Doctrine of the
            Dormant Commerce Clause Because It Directly Regulates
            Commerce Occurring Entirely Outside of Minnesota. ...............................24

      B.    Minn. Stat. §216H.03 Violates the Dormant Commerce Clause
            Because It Discriminates Against Interstate Commerce. ...........................29

      C.    Minn. Stat. §216H.03 Is Invalid Because It Does Not Serve A Local
            Public Interest Nor Are Its Effects On Interstate Commerce
            Incidental. .................................................................................................32

            1.    Minn. Stat. §216H.03 Does Not Effectuate Or Advance A
                  Legitimate Local Purpose. ................................................................32

            2.    Minn. Stat. §216H.03's Effects On Interstate Commerce Are
                  Direct And Intentional, Rather Than Incidental..............................33

II.   MINN. STAT. §216H.03 IS ALSO UNCONSTITUTIONAL UNDER THE
      SUPREMACY CLAUSE. .....................................................................34

      A.    Minn. Stat. §216H.03 is Preempted by the FPA. .......................................36

      B.    Minn. Stat. §216H.03 is Preempted by the CAA. ......................................40

CONCLUSION ...............................................................................................46

# TABLE OF AUTHORITIES

Page No.

**Cases:**

*Alliance for Clean Coal v. Miller*,
    44 F.3d 591 (7th Cir. 1995) ................................................................... 30

*Alliant Energy Corp v. Bie*,
    330 F.3d 904 (7th Cir. 2003) ................................................................. 34

*Am. Elec. Power Co. v. Connecticut*,
    131 S.Ct. 2527 (2011) ............................................................. 40, 41, 43

*Am. Libraries Ass'n v. Pataki*,
    969 F.Supp. 160 (S.D.N.Y. 1997) ......................................................... 29

*Bacchus Imports, Ltd. v. Dias*,
    468 U.S. 263 (1984) .............................................................................. 30

*Bibb v. Navajo Freight Lines, Inc.*,
    359 U.S. 520 (1959) .............................................................................. 29

*BMW of N. Am. v. Gore*,
    517 U.S. 599 (1996) .............................................................................. 28

*Brown-Forman Distillers Corp. v. New York State Liquor Auth.*,
    476 U.S. 573 (1986) ................................................................. 24, 25, 26

*C&A Carbone, Inc. v. Town of Clarkstown, N.Y.*,
    511 U.S. 383 (1994) ........................................................................ 26, 29

*Clean Air Mkts. Grp. v. Pataki*,
    338 F.3d 82 (2d Cir. 2003) .................................................................... 42

*CSX Transp., Inc. v. Easterwood*,
    507 U.S. 658 (1993) .............................................................................. 35

*Edgar v. MITE Corp.*,
    457 U.S. 624 (1982) ........................................................................ 24, 28

*Fed. Power Comm'n v. S. Cal. Edison Co.,*
    376 U.S. 205 (1964) ...................................................................... 37, 39

*Healy v. The Beer Inst.,*
    491 U.S. 324 (1989) ................................................................ 25, 28, 30

*Ill. Natural Gas Co. v. Cent. Ill. Pub. Serv. Co.,*
    314 U.S. 498 (1942) ............................................................................ 38

*Int'l Paper Co. v. Ouellette,*
    479 U.S. 481 (1987) ................................................................ 42, 44, 45

*Jersey Cent. Power & Light Co. v. Fed. Power Comm'n,*
    319 U.S. 61 (1943) ............................................................................. 36

*Lead Indus. Ass'n, Inc. v. EPA,*
    647 F.2d 1130 (D.C. Cir. 1980) ......................................................... 43

*Maine v. Taylor,*
    477 U.S. 131 (1986) ...................................................................... 25, 33

*Maryland v. Louisiana,*
    451 U.S. 725 (1981) ............................................................................ 39

*Miss. Power & Light Co. v. Miss. ex rel. Moore ("MP&L"),*
    487 U.S. 354 (1988) ........................................................ 36, 37. 38, 40

*Nat'l Foreign Trade Council v. Natsios,*
    181 F.3d 38 (1st Cir. 1999) ................................................................. 27

*Nat'l Solid Waste Mgmt. Ass'n v. Meyer ("Meyer I"),*
    63 F.3d 652 (7th Cir. 1995) ....................................................... 24, 26, 27

*Nat'l Solid Waste Mgmt. Ass'n v. Meyer ("Meyer II"),*
    165 F.3d 1151 (7th Cir. 1999) ................................................... 26, 27, 28

*N. Natural Gas Co. v. Iowa Utils. Bd.,*
    377 F.3d 817 (8th Cir. 2004) .............................................................. 35

*N. States Power Co. v. MPUC,*
    344 N.W.2d 374 (Minn. 1984) ..................................................... 38, 40

*New England Power Co. v. N.H.,*
    455 U.S. 331 (1982) ................................................................ 36, 37

*N.C. ex rel. Cooper v. Tenn. Valley Auth.,*
    615 F.3d 291 (4th Cir. 2010) ............................................... 42

*Oregon Waste Sys. v. Dep't of Envtl. Quality,*
    511 U.S. 93 (1994) ................................................................ 29

*Pike v. Bruce Church, Inc.,*
    397 U.S. 137 (1970) ........................................................... 24, 32

*Pub. Utils. Comm'n of R.I. v. Attleboro Steam & Elec. Co.,*
    273 U.S. 83 (1927) ............................................................. 22, 36

*S. Pac. Co. v. Ariz. ex rel. Sullivan,*
    426 U.S. 794 (1976) ............................................................ 28

*S. Pac. Co. v. Ariz. ex rel. Sullivan*
    325 U.S. 761 (1945) ............................................................ 32

*S.D. Farm Bureau v. Hazeltine,*
    340 F.3d 583 (8th Cir. 2003) ............................................ 29

*United States v. Pub. Utils. Comm'n of Cal.,*
    345 U.S. 295 (1953) ............................................................ 36

*W. Lynn Creamery v. Healy,*
    512 U.S. 186 (1994) ............................................................ 30

## Statutes:

16 U.S.C. §824(a) ....................................................................... 36, 37
16 U.S.C. §824(b)(1) .................................................................. 36, 37

42 U.S.C. §7407(a) ..................................................................... 41
42 U.S.C. §7409(a)(1) ................................................................ 41
42 U.S.C. §7410(a)(1) ................................................................ 41
42 U.S.C. §7410(a)(1)-(a)(2) ..................................................... 41
42 U.S.C. §7410(a)(2)(D)(i) ....................................................... 41
42 U.S.C. §7410(k)(5) ................................................................ 42
42 U.S.C. §7411 ......................................................................... 42

42 U.S.C. §7420(a)(1)(B)(i) ........................................................................ 41
42 U.S.C. §7426(a)(1)(b) ............................................................................ 42
42 U.S.C. §7426(b) ..................................................................................... 42


Minn. Stat. §216H.01 .................................................................................... 2
Minn. Stat. §216H.01, subd. 2 .................................................................... 33
Minn. Stat. §216H.02 .................................................................................... 2
Minn. Stat. §216H.02, subd. 1 .............................................................. 33, 34
Minn. Stat. §216H.02, subd. 2 .................................................................... 33
Minn. Stat. §216H.03 ............................................................................. *passim*
Minn. Stat. §216H.03, subd. 1 .......................................................... 11, 20, 38
Minn. Stat. §216H.03, subd. 2 ................................................ 1, 3, 28, 31, 34
Minn. Stat. §216H.03, subd. 3 ............................................................. 3, 4, 46
Minn. Stat. §216H.03, subd. 3(1) .................................................................. 3
Minn. Stat. §216H.03, subd. 3(2) ......................................................... *passim*
Minn. Stat. §216H.03, subd. 3(3) ......................................................... *passim*
Minn. Stat. §216H.03, subd. 4 .................................................................... 31
Minn. Stat. §216H.03, subd. 4(a) ...................................................... 5, 26, 32
Minn. Stat. §216H.03, subd. 4(b) ............................................................ 5, 31
Minn. Stat. §216H.03, subd. 4(c) ............................................................ 5, 31
Minn. Stat. §216H.03, subds. 5-7 ..................................................... 4, 28, 30
Minn. Stat. §216H.03, subd. 7(1) ................................................................ 18
Minn. Stat. §216H.10, subd. 5 ................................................................ 2, 33

## INTRODUCTION

Plaintiffs State of North Dakota, Industrial Commission of North Dakota, the Lignite Energy Council, Basin Electric Power Cooperative ("Basin Electric"), The North American Coal Corporation ("North American Coal"), Great Northern Properties Limited Partnership ("Great Northern"), Missouri Basin Municipal Power Agency d/b/a Missouri River Energy Services ("MRES"), and Minnkota Power Cooperative ("Minnkota")(collectively, "Plaintiffs"), respectfully request the Court declare as a matter of law that Minn. Stat. §216H.03, subds. 3(2) and 3(3) violate the Commerce Clause and the Supremacy Clause of the United States Constitution, and enjoin Defendants Minnesota Public Utilities Commission ("MPUC") Commissioners Beverly Heydinger, David C. Boyd, Nancy Lange, J. Dennis O'Brien and Betsy Wergin, and Minnesota Department of Commerce ("MDOC") Commissioner Mike Rothman (collectively, "Defendants") from enforcing these unconstitutional prohibitions and restrictions.

## GENERAL BACKGROUND

The Next Generation Energy Act ("NGEA") purports to address "climate change" and *"global warming"* by imposing restrictions on greenhouse gas emissions that occur both "within the state" and "from the generation of electricity imported from *outside the state.*" Minn. Stat. §216H.03, subd. 2 (emphasis added). Without restriction or limitation, the NGEA broadly states that *"*no person shall...import or commit to import from outside the state power from a new large energy facility that would contribute to statewide power sector carbon dioxide emissions" or "enter into a new long-term power purchase agreement that would increase statewide power sector carbon dioxide

- 1 -

emissions." *Id.* §216H.03, subds. 3(2)&3(3).  It is difficult to imagine more direct affronts to the Dormant Commerce Clause than Minnesota's categorical proclamation that "no person shall...import" or "enter into agreements" to purchase power flowing through interstate commerce.

The NGEA's burdens on interstate commerce and out-of-state entities are not incidental.  Rather, these burdens and extraterritorial effects are the essential purpose of the statute.  Minnesota has willfully exceeded the bounds of permissible regulation by exporting its policy agenda and imposing regulation on a multi-state region, all in a misguided effort to reduce carbon emissions from electricity generated occurring outside Minnesota.  The NGEA violates the Commerce Clause and is preempted by both the Federal Power Act and the Clean Air Act.

### A.    The Next Generation Energy Act

#### 1.    Minn. Stat. §216H.03 Explicitly And Intentionally Regulates Beyond Minnesota.

Minnesota enacted the NGEA in 2007.  Minn. Stat. §§216H.01, *et seq.*  The NGEA's stated purpose is to address "climate change" and "global warming" through the regulation of "Greenhouse Gas Emissions" associated with electricity generation.  *See, e.g.*, Minn. Stat. §§216H.02 & 216H.10, subds. 5-6.  The statute does not identify any unique local interests it is intended to address.

Rather than confining its application to Minnesota's own borders, Minn. Stat. §216H.03 applies to all persons and geographic regions that could be construed to have

any connection whatsoever to electricity that might theoretically be consumed in Minnesota.

Specifically, "statewide power sector carbon dioxide emissions" is broadly defined to include "emissions of carbon dioxide from the generation of electricity within the state *and all emissions of carbon dioxide from the generation of electricity imported from outside the state* and consumed in Minnesota."  Minn. Stat. §216H.03, subd. 2 (emphasis added).  The NGEA further provides that "[e]missions of carbon dioxide associated with *transmission and distribution line losses* are included in this definition," suggesting that transactions involving the generation of power from out-of-state would "contribute" with greater emissions.  *Id.* (emphasis added).

The NGEA does not limit the application of Minn. Stat. §216H.03 to only those persons or entities who are actually located in Minnesota.  For example, the statute does not narrowly define and restrict the regulated parties to just Minnesota utilities that sell electricity directly to Minnesota consumers.  Instead, the statute broadly states—without any qualification or limitation whatsoever—that "*no person* shall" engage in the activities and transactions that are defined as increasing Minnesota's "statewide power sector carbon dioxide emissions."  *Id.* §216H.03, subd. 3(emphasis added).

Likewise, the NGEA is not solely limited to activities and transactions that occur within Minnesota's borders, such as the construction of a new large energy facility in the state that would contribute to statewide power sector carbon dioxide emissions.  *Id.* §216H.03, subd. 3(1).  Rather, the statute also provides that "*no person* shall":

(2) ***import or commit to import from outside the state power*** from a new large energy facility that would contribute to statewide power sector carbon dioxide emissions; or

(3) ***enter into a new long-term power purchase agreement*** that would increase statewide power sector carbon dioxide emissions. For purposes of this section, a long-term power purchase agreement means an agreement to purchase 50 megawatts of capacity or more for a term exceeding five years.

*Id.* §216H.03, subd. 3 (emphasis added). By definition, importing or committing to import from outside the state power from a new large energy facility are activities that necessarily occur on a regional basis and involve parties in different states; and entering into new long-term power purchase agreements frequently contemplate the generation and transmission of electricity from outside of Minnesota and commonly involve parties who are operating in different states.

Thus, as the language of the statute demonstrates, the NGEA explicitly and deliberately regulates electricity that is flowing through interstate commerce. Its effects on interstate commerce are not incidental, but are instead an intentional and critical feature of this statute. Indeed, the NGEA would not be able to achieve its obvious purpose, i.e., to reduce the carbon emissions that occur within a multi-state region, without interfering with interstate commerce.

## 2. Minn. Stat. §216H.03 Does Not Provide Realistic Options For Compliance.

The NGEA provides several exemptions for particular energy facilities that are either located or proposed to be located in Minnesota, or are owned by Minnesota-based entities. *Id.* §§216H.03, subds. 5,6,7. Otherwise, "persons" that violate the prohibitions of subd. 3(2) and 3(3) are obligated to establish "to the ***[Minnesota] Public Utilities***

- 4 -

*Commission's satisfaction* that it will *offset new contribution* to statewide power sector carbon dioxide emissions with a carbon dioxide reduction project" by either (1) reducing an existing facility's carbon dioxide emissions or (2) purchasing carbon dioxide allowances from a state operated carbon dioxide cap and trade system. *Id.* §§216H.03, subd. 4(a)&(b)(emphasis added). The statute provides for no other options or alternatives to satisfy the "offset" requirements.

Frankly, the first method for establishing "offsets" is no option at all, at least at this point in time, because it makes no sense to add one new resource only to have to eliminate a corresponding resource and thereby gain no additional capacity.

The second method for establishing "offsets" is likewise no option since neither Minnesota nor any other state in this region has yet established a carbon dioxide cap and trade system from which to purchase carbon allowances.

Even if either method were otherwise viable ways to establish the required "offsets," the NGEA states the MPUC "shall not find a proposed carbon dioxide reduction project...acceptably offsets a new contribution to statewide power sector carbon dioxide emissions unless the proposed offsets are *permanent, quantifiable, verifiable, enforceable, and would not have otherwise occurred."* *Id.* §216H.03, subd. 4(c)(emphasis added). These requirements make the already impossible task to establish "offsets" even more unrealistic.

### 3.    The Minnesota Legislature Repealed Minn. Stat. §216H.03.

In 2011, the Minnesota Legislature repealed Minn. Stat. §216H.03, recognizing it was improper to impose Minnesota's policies beyond its own borders. Unfortunately,

Governor Dayton chose to veto this repeal.  Consequently, Plaintiffs have had to cope with issues concerning the application and compliance with Minn. Stat. §216H.03 while, in the meantime, seeking relief from the statute through this lawsuit.

### B.     Minnesota has Imposed Minn. Stat. §216H.03 on the Regional Generation, Transmission, and Wholesale Delivery Systems.

Minn. Stat. §216H.03 applies to "persons" involved in the generation, transmission, and wholesale delivery systems that are interconnected throughout this regional, multi-state area.  Today's electricity industry exists within a complex and interconnected system, as contrasted to the monopolized and balkanized system of the past.  (Declaration of Thomas H. Boyd ("Boyd") Ex. A (Expert Report of Randall Porter, July 1, 2013 ("Porter") ¶¶6-40)  Federal laws and regulations have opened access to the transmission of electricity on a regional, interstate basis and have promoted the development of markets to ensure reliability and low-cost electricity.  (*Id.* ¶7)  Minnesota is now located within a regionally-regulated market which has developed over many years with the goal of enhancing competition and reliability for the benefit of consumers in a multi-state region.

Prior to the development of today's federal regulatory regime, vertically-integrated utilities were usually responsible for controlling the schedule and dispatch of power in discrete monopolistic areas known as "control areas."  (*Id.* ¶¶9-11)  They controlled what generators would operate and how electricity from those generators would be dispatched through the transmission lines in their control areas.  (*Id.* ¶11)  This control, combined with ownership of the transmission lines, stifled fair competition in the electricity market

because competitors could not meaningfully access the control areas and the transmission systems owned and operated by the vertically-integrated utilities. (*Id.*) It also discouraged the lowest cost available regional power from being used in the most efficient manner. (*Id.*)

Pursuant to federally-promulgated regulations, the scheduling and dispatch functions were eventually transferred from the individual utilities to Regional Transmission Organizations ("RTOs"). (*Id.* ¶12) RTOs are Federal Energy Regulatory Commission ("FERC") approved organizations through which utilities and other entities (including independent generators and power marketers) coordinate, control, and monitor the use of a defined multi-state portion of the transmission system. (*Id.* ¶18) RTOs provide non-discriminatory access to the transmission network, and must meet specific FERC regulations concerning transmission planning and expansion for their multi-state region, the use of energy markets to deal with energy supply and system congestion, and meeting the needs of power users and generation owners. (*Id.*) RTOs offer regional wholesale electric transmission services under one tariff. (*Id.*)

Although the utilities still own the transmission lines, the RTOs are now responsible for ensuring there is sufficient power to meet the customer demand from day-to-day and from hour-to-hour. (*Id.* ¶12) Additionally, the RTO generally dictates what power gets transmitted on the regionally-connected grid, and on what terms. (*Id.*) This has essentially done away with the independent "control areas" that had previously dominated the vertically-integrated marketplace. (*Id.* ¶17) Placing the "scheduling and

dispatch" function into the hands of a third-party resulted in a more open, transparent and competition-friendly system. (*Id.*)

FERC also facilitated the creation of non-profit organizations known as Independent System Operators ("ISO") that combine the transmission facilities of several transmission owners into a single transmission system to move energy over long distances at a single lower price, as opposed to the accumulation of separate charges imposed by each utility that may be located between the buyer and seller. (*Id.* ¶19) ISOs are designed to provide non-discriminatory service, and must be independent of both the transmission owners and the customers who use its system. (*Id.*) There are currently nine ISOs operating in North America, five of which are RTOs. (*Id.* ¶21) These ISOs manage the systems that serve two thirds of the customers in the United States, and over half the population of Canada. (*Id.*)

The Midcontinent Independent System Operator, Inc. ("MISO") was established in 1998 as an ISO and was approved as the Nation's first RTO by FERC in 2001. (*Id.* ¶22) It is an independent, member-based, non-profit organization. (*Id.* ¶24) Its members include over 30 transmission owners (including investor-owned utilities, public power utilities, independent power producers, and cooperatives) with more than $17-billion in transmission assets. (*Id.*)

MISO provides open-access transmission service and monitors the high voltage transmission system throughout the Midwest United States and Manitoba, Canada. (*Id.* ¶22) In addition, MISO operates one of the world's largest "real-time" energy markets. (*Id.*) MISO Markets include a Financial Transmission Rights Market, a Day-

Ahead Market, a Real-Time Market, and a market for operating reserves and regulation ("MISO Markets").  (*Id.* ¶29)  The vast majority of energy purchases and sales that occur within MISO's footprint occur through MISO's Markets.  (*Id.* ¶30)  MISO's goal and function is to ensure reliable and "least-cost delivered energy" is available to all consumers within the MISO footprint.  (*Id.* ¶22)

Generators that sell through the MISO Markets "bid in" their respective generation sources at a certain price per megawatt-hour.  (*Id.* ¶30)  MISO then compares the demand from distributors with the generation sources that are available, and determines the market price of the electricity at that particular point in time.  (*Id.*)  Moreover, consistent with its obligations to ensure the reliability of the grid, MISO controls which generation facilities will be operated and used to dispatch power to meet the total needs of the grid on an ongoing basis.  (*Id.*)  After the generators have bid their input into the grid, MISO tells them to run or not run.  (*Id.* ¶31)  In addition, should demand exceed what is initially expected, MISO—not the individual utilities—will decide which additional resources need to be operated.  (*Id.*)

Before the MISO Markets, self-generation and bilateral purchase agreements were the traditional methods through which distributors obtained energy.  (*Id.* ¶37)  In the traditional bilateral purchase agreements, a generator and distributor would enter into a contract where the distributor agreed to purchase a certain amount of energy from the generator at a certain rate.  (*Id.*)  The parties would then "schedule" the purchased energy through the grid to serve the distributor's needs.  (*Id.*)

There is no "contract path" for the MISO Markets. (*Id.* ¶40) MISO does not match buyers to sellers and, given the physical nature of electricity, the generation source of the buyer's electricity is unknown and irrelevant. (*Id.*) The electricity that is sold— whether coal, wind, nuclear, hydro—is not differentiated in the market; it is a commodity and is not differentiated on the basis of source. (*Id.*)

Rather than using purchase agreements to schedule the power directly between buyers and sellers, purchase agreements are generally used by the market participants to show they have access to a sufficiently-robust energy portfolio to supply all of their expected demand, or as financial hedges. (*Id.* ¶38) Once the participant has demonstrated it has sufficient resources, it then bids in all its available generation to the market and buys all its needed electricity out of the market, thereby ensuring it receives the lowest-cost electricity for its customers. (*Id.*) Whether the electricity the participant buys from the market is the same generation it bid into the market is completely unknown and cannot be determined. (*Id.*) The buyer does not know what type of electricity it is actually receiving, nor (prior to the NGEA) would it need to care. (*Id.* ¶40)

## C.    Minn. Stat. §216H.03's Application to Plaintiffs

Minn. Stat. §216H.03 is intended to control decisions that out-of-state entities make regarding generation sources that exist outside of the state and supply power on a regional basis. Plaintiffs comprise various entities having substantial interests in the flow of electricity through interstate commerce. These various interests are substantially harmed by the interference and burdens imposed by the NGEA.

### 1.    Basin Electric

The NGEA applies to regional generation and transmission cooperatives ("G&Ts") such as Plaintiff Basin Electric, a member-owned nonprofit cooperative association headquartered in Bismarck, North Dakota. (Declaration of David Raatz ("Raatz") ¶4)   Basin Electric is owned by 135 rural distribution coops located in Minnesota and eight other states located across the upper Midwest. (*Id.*)  Basin Electric's primary business is generating, acquiring and transmitting wholesale electric power to its member distribution co-ops. (*Id.*)  Basin Electric engages in comprehensive planning to provide reliable, low cost power on behalf of all Basin Electric's members and, like most co-ops, it charges all members a uniform rate. (*Id.* ¶¶4-6)

As detailed below, the MDOC has indicated that Basin Electric's transfer of power from its Dry Fork facility in Gillette, Wyoming to serve growing member load in northwest North Dakota triggers the NGEA because the Dry Fork station constitutes a "new large energy facility" under Minn. Stat. §216H.03, subds. 1&3(2). (*Id.* ¶¶20-24) This creates serious concerns for Basin about its future use of Dry Fork. (Raatz ¶23; Declaration of Ken Rutter ("Rutter") ¶¶10-12)  It also raises concerns about the possible development of future projects, including a second generation unit at the Dry Fork site in Wyoming, or a new facility in Selby, South Dakota, which would utilize new clean coal technologies. (Raatz ¶26)  Per the MDOC's interpretation, continued use of Dry Fork or the development of additional facilities would violate the NGEA even if these units were developed and used to serve only Basin Electric's members in northwest North Dakota

because some of Basin Electric's other members serve Minnesota load. (*Id.* ¶¶20-24&26)

Basin Electric's planning has also been impeded by the NGEA's prohibitions on entering into new long-term power purchase agreements that would result in any carbon dioxide emissions, *regardless* of whether those emissions are generated from a new large energy facility and *regardless* of whether those emissions occur as the result of generation from coal, natural gas, diesel, or biomass sources. Minn. Stat. §216H.03, subd. 3(3). (Raatz ¶25)

### 2.    Minnkota

Like Basin Electric, Plaintiff Minnkota is also a regional G&T. (Declaration of Alvin Tschepen ("Tschepen") ¶4) Minnkota is based in Grand Forks, North Dakota, and it is owned by distribution coops located in both North Dakota and Minnesota. (*Id.*) Minnkota provides comprehensive planning and acquisition of reliable, low cost power on behalf of all of its members at a uniform rate. (*Id.* ¶¶15-16) As a result, the prohibitions imposed by the NGEA impose the same kinds of hardships and difficulties on Minnkota as Basin Electric in terms of its planning and acquisition of reliable, low cost power on behalf of all of its members. (*Id.*)

Additionally, Minnkota has a substantial and growing volume of surplus capacity from the Milton R. Young unit 2 coal-fired plant in North Dakota, and Minnkota has already experienced a devaluation of that asset as a result of the NGEA. (*Id.* ¶¶11-14) Specifically, the value of this surplus capacity is far greater if Minnkota can offer it for sale through long-term power purchase agreements of 10 to 20 years. (*Id.* ¶13)

However, its natural customers, who are utilities serving load in Minnesota, are reluctant to enter into purchase agreements beyond 5 years because of the prohibitions imposed by Minn. Stat. §216H.03, subd. 3(3). (*Id.*)

### 3.    MRES

Plaintiff MRES is located in South Dakota and has a long-term contractual relationship with Western Minnesota Municipal Power Agency ("WMMPA") as well as other entities located throughout the region to provide wholesale power to more than 60 municipalities located in Minnesota and three other states at a common rate. (Declaration of Ray Wahle ("Wahle") ¶¶3&8)  MRES and WMMPA have regularly considered transactions that would involve purchasing new assets and/or entering into long-term power purchase agreements that involve the development of generation sources that would be considered new large energy facilities. (Wahle ¶¶20-25; Boyd Ex. B)  MRES did not end up closing on these transactions, which turns out to be fortunate given that at least two of these transactions would have triggered the application of the NGEA, based on MDOC's interpretation of the statute in the Dairyland proceedings described in greater detail below.

### 4.    North American Coal

Plaintiff North American Coal is one of the largest lignite coal producers in the United States. (Declaration of Carroll Dewing ("Dewing") ¶2)  It operates the Freedom Mine in Beulah, North Dakota, as well as the Falkirk Mine in Underwood, North Dakota. (*Id.* ¶¶2-3)  The NGEA adversely affects the marketing of power that would be made available as a regional resource through the development of the American Lignite Energy

coal-to-liquids plant, which would operate using lignite from North American Coal's mine in Falkirk, North Dakota, and would include 100 MW of power for export on a regional basis. (*Id.* ¶5)

### 5. Great Northern Properties

Plaintiff Great Northern Properties owns over 958,000 mineral acres under which lie in excess of 2-billion tons of developable and surface mineable lignite. (Declaration of Chuck Kerr ("Kerr") ¶2) A portion of these reserves are currently under development by an affiliate of Great Northern Properties for the generation of low carbon electricity using state-of-the-art low emission coal gasification technologies near South Heart, North Dakota. (*Id.* ¶4) The NGEA has interfered with the South Heart coal-gasification project, which would utilize lignite owned by Great Northern Properties, by essentially eliminating Minnesota as a potential market for the power that those projects could generate. (*Id.*)

### D. MPUC Dockets Reflect the Manner in Which Minn. Stat. §216H.03 Applies to Out-Of-State Actors and Actions

Both the MPUC and the MDOC have used MPUC proceedings for integrated resource plans as a forum for evaluating NGEA compliance. These proceedings illustrate the problems posed by the NGEA.

### 1. GRE Proceedings.

Great River Energy ("GRE") is a non-profit electrical G&T based in Minnesota. GRE is Minnesota's second largest electric utility based on generating capacity, and the fifth largest generation and transmission cooperative in the United States in terms of

assets.  GRE constructed Spiritwood Station in Jamestown, North Dakota, which has capacity to generate up to 99MW of electricity for the regional energy market.  (Boyd Ex. C)  Spiritwood is fueled by lignite and uses state-of-the-art technologies that make it one of the cleanest coal-based power plants in the world.  (*Id.*)

When GRE filed its 2008 Resource Plan with the MPUC, it mentioned Spiritwood Station in only four out of the more than 200 pages of its 2008 Resource Plan filing. (Boyd Ex. D at 2,15,19&52)  However, over the next three years, the MPUC proceedings regarding GRE's Resource Plan devolved into a referendum on the NGEA's applicability to Spiritwood.  (*See, e.g.*, Boyd Exs. E & F)  Several environmental organizations persuaded the MPUC to commence a contested case hearing on the issue.  (*Id.* Exs. G & H)  This occurred notwithstanding the fact that the Spiritwood Station is located *outside Minnesota*, and the generation of the electricity would occur entirely *outside Minnesota*.

In late 2010, the MPUC approved GRE's 2008 Resource Plan, but opened a new docket to consider Spiritwood's compliance with the NGEA.  (*Id.* Ex. H)  On this new docket, proposed energy imports from Spiritwood continued to meet objection from numerous environmental organizations.  (*Id.*)  Moreover, the environmental organizations argued that the MPUC should not allow GRE to claim as carbon offsets projects voluntarily undertaken to reduce carbon dioxide emissions, simply because GRE's projects were not directly undertaken to comply with NGEA offsetting requirements, as purportedly required by the NGEA's "would not have otherwise occurred" requirement for offsets.  (*Id.*)

The Spiritwood Station project was tied up in hearings before Minnesota's Office of Administrative Hearings until May 2011, when the Minnesota Legislature enacted an exemption to the NGEA for Spiritwood.  (Boyd Exs. I,J,K & L)

### 2. Dairyland Proceedings.

Dairyland Power Cooperative serves members in Minnesota, Wisconsin, Iowa, and Illinois.  Dairyland serves these members by using both traditional and renewable energy resources including coal, natural gas, water, landfill gas, wind, and animal waste resources.  Dairyland has a 30% ownership stake in the Weston-4 Coal-Fired Power Plant ("Weston-4") located in Wausau, Wisconsin.  (Boyd Ex. M)

Electricity from Dairyland's generation sources, including Weston-4, are transmitted through the MISO transmission system and dispatched by MISO.  Thus, Dairyland has no control over where the energy generated by Weston-4 will ultimately be consumed.  However, Dairyland has power plants substantially closer to Minnesota than Weston-4 and, due to the proximity of those power plants, and given that the majority of Dairyland's members are in Wisconsin and Weston-4 is located in central Wisconsin, it is unlikely that any significant amount of energy generated by Weston-4 would ever actually be imported into Minnesota.  Yet, because Dairyland has members in Minnesota, and because Dairyland has the Weston-4 resource available to serve its members in all states, the MDOC and various environmental groups took the position that the NGEA restricts Dairyland's ability to rely upon this resource to serve any of its members.  (Boyd Exs. N & O)

The MDOC pointed out that "the responsibility to comply with Minnesota Statutes does not fall to MISO; that is Dairyland's responsibility." (Boyd Ex. O at 27) Further, the MDOC claimed that unless it could qualify for an exemption, Dairyland must comply with the NGEA for the energy generated by Weston-4 even though the facility does not generate electricity intended for consumption by end-users in Minnesota. (*Id.*)

The MDOC began by observing that, "under the MISO energy market, Dairyland must bid in all of its load and all of its resources." (*Id.*) However, rather than recognizing the physical reality that the energy generated closest to the end-user is the energy most likely to be dispatched to and consumed by that end-user, the MDOC interprets the NGEA to apply based on the following syllogism: (a) "all of Dairyland's resources are available to meet the needs of all of Dairyland's load"; and (b) "all of Dairyland's generation resources are located in Wisconsin"; therefore, (c) "Dairyland clearly imports power from Wisconsin to meet the needs of its members in Minnesota." (*Id.* at 28)

The MDOC then rejected Dairyland's argument that no generation dispatched by MISO can be assigned to any utility specific load:

> It is true that electrons can and do travel in many different directions under different physical circumstances, such that it is impossible to determine which electrons from which generation units reached which end-use customers. Likewise, it is impossible to determine that no electrons from a generation unit reach a particular end-use customer, unless the generation resource and the end-use customer are completely disconnected from each other physically. However, within the MISO energy market, each utility's resources are offset against load so a utility's total supply of power is compared to the total demand for power. Any utility that does not have sufficient resources to meet the demand for power on its system must purchase more energy from the market to meet the needs of the load fully.

Thus, all of a utility's resources are matched to all of a utility's load, regardless of state boundaries.

(*Id.*)  Because all of Dairyland's "members will share in the benefits of any MISO energy sales," the MDOC concluded that "all [of Dairyland's] members will bear responsibility for any MISO purchases."  (*Id.*)

Thus, in the MDOC's view, since Weston-4 is included in Dairyland's generation resources, all of Dairyland's members—including those members located outside of Minnesota—would have to bear the costs imposed by the NGEA to establish satisfactory carbon offsets even though the energy generated by Weston-4 is not necessary to serve Minnesota consumers and is not, in fact, consumed in Minnesota.  (Boyd Ex. M)

After more than a year of proceedings relating to the applicability of §216H.03 to Weston-4, the MPUC ultimately concluded that Weston-4 was exempt under §216H.03 subd. 7(1).  (Boyd Exs. Q & R)  Had it not, Dairyland would have either needed to comply with the NGEA offset requirements, or stop using Weston-4 to serve any of its members, regardless of what state those members were located in, and regardless of the fact that Weston-4 energy is not likely to ever be consumed in Minnesota.

### 3.    Basin Electric Proceedings.

As noted, Basin Electric is a North Dakota nonprofit cooperative association whose core business is generating and transmitting wholesale bulk electric power to distributors, principally its 135-member rural electric systems located in Minnesota, North Dakota, Montana, Wyoming, Colorado, New Mexico, Nebraska, South Dakota and Iowa. (Raatz ¶4)

Recently, Basin Electric has experienced an increased load in northwestern North Dakota, which is attributable to the booming oil and gas exploration and development activities in that area. (*Id.* ¶20) To help serve this load, Basin Electric has been transferring up to 130MW of power from the Dry Fork Station, located in Wyoming, from the Western Interconnection into the Eastern Interconnection. (*Id.*)

These transfers have been necessary to serve Basin Electric's North Dakota customers; they have nothing to do with any increased electricity demand in Minnesota. (*Id.*) Nonetheless, out of an abundance of caution, Basin Electric provided the MPUC with a Notification of Changed Circumstances in connection with the MPUC proceedings on its Integrated Resource Plan. (Boyd Ex. S) In response, the MDOC recommended that the MPUC require Basin Electric to submit an analysis as to "whether the provision of power to MISO was a violation of Minnesota Statutes 216H.03." (Boyd. Ex. T)

Basin Electric provided the MPUC with further detail concerning how its Dry Fork plant has provided electricity to the Eastern Interconnection to serve its North Dakota customers and asserted that "Basin Electric believes that [it is] highly unlikely that the physical power generated in Wyoming ends up in Minnesota and thus, there would be no violation of Minnesota Statutes 216H.03." (*Id.* Ex. T) Despite this, the MPUC did not approve the transfers. Instead, the MPUC has since been silent on the issue and has not advised Basin Electric whether transmission of electricity generated by its Dry Fork station to the Eastern Interconnection does or does not violate the NGEA. (Raatz ¶23)

The positions that the MDOC and the MPUC have taken regarding the interpretation of the NGEA in the above integrated resource plan proceedings will presumably apply to the other utilities that are required to submit integrated resource plans in the future.

### E.    Minn. Stat. §216H.03's Application to Purchases from the MISO Market.

Virtually all distributors located in Minnesota purchase electricity from the MISO energy market on a daily- or even hourly-basis, either directly or through wholesalers. (Porter ¶41)  At any given time, the electricity being sold through the MISO energy market will likely include at least some electricity from one or several "new large energy facilities" as defined under Minn. Stat. §216H.03, subd. 1, that have gone into operation since January 1, 2007.  (*Id.*)  Defendants have confirmed that the NGEA's prohibitions and restrictions apply "to the sale and purchase of electricity purchased in the MISO energy market of power imports as expressly set forth in the statute."  (Boyd Ex. U, Resp. to RFA No. 33])

The integrated resource plans filed by utilities will typically reference to purchases from "The Market" as a common component of the resources that the utility has available to meet its service obligations.  (Porter ¶41))  Indeed, MISO member utilities who file these integrated resource plans purchase power from the MISO energy market every day, and the MISO energy market includes coal-generated electricity from non-exempted sources/resources (without any means of differentiating as to how the electricity was generated).  (*Id.*)  However, the NGEA prohibits such utilities from serving their

Minnesota loads with electricity generated from any non-exempted sources/resources, thus interfering with those utilities' ability to serve their Minnesota loads with purchases from MISO's Energy Markets.  (Boyd Exs. V, Resp. to RFA No. 33; O at 27-28)

Furthermore, it is important to note that most utilities that file integrated resource plans with the MPUC have interstate operations, meaning they each serve "load" both in Minnesota and outside of Minnesota ("Interstate Utilities").    As was seen in the Dairyland situation, the MDOC interprets the NGEA based on an analysis of the Interstate Utility's total portfolio of energy sources/resources available to serve its total load (as opposed to just the resources actually used to serve its Minnesota load).  (Boyd Ex. O at 27-28)  This has the effect of imposing the NGEA's prohibitions and restrictions where an Interstate Utility is serving any part of its total load with coal-generated electricity from any non-exempted sources/resources—regardless of whether that electricity is required solely to serve the Interstate Utility's out-of-state load and even though that electricity may have nothing to do with any change in the Minnesota load. Thus, under the MDOC's interpretation of Minn. Stat. §216H.03, the Interstate Utilities are prohibited from serving any part of their loads with any purchases from MISO's Energy Markets (because MISO's Energy Markets include coal-generated electricity from a non-exempted sources/resources) unless they comply with the carbon emission offset requirements to the MPUC's satisfaction.  (*Id.*)

### ARGUMENT

The NGEA's objective is to address global warming by reducing carbon emissions by imposing prohibitions and restrictions on the *generation* of electricity that takes place

in other states; the *transmission* of electricity that flows through interstate commerce; and the *sale at wholesale* of that electricity—all in violation of the Commerce Clause. The NGEA does this through Minn. Stat.§216H.03, which applies based on the manner in which the electricity is generated, rather than any characteristic of the electricity itself which, of course, cannot be distinguished based on how it is generated. Thus, the NGEA seeks to regulate based on activities over which Minnesota has no authority—such as out-of-state generation—rather than the nature or character of any electricity that is actually consumed in Minnesota.

This Court has already observed that, "[b]ecause the carbon dioxide emissions occur in the state where energy is generated," the NGEA "seek[s] to regulate carbon emissions occurring outside of Minnesota." (Order, Doc. No. 32 at 30 n.10 ("Order")). Specifically, Minn. Stat. §216H.03 the NGEA prohibits and burdens transactions "that would contribute to statewide power sector carbon dioxide emissions"—regardless of where those transactions occur or who is party to those transactions—and requires that the "proponents" of those transactions must either incur the uncertain and impossible-to-calculate expense of a carbon dioxide reduction project that satisfies the MPUC (if indeed that is even a realistic possibility), or they must forego those transactions altogether. These prohibitions and restrictions clearly violate the Commerce Clause.

The NGEA also runs afoul of the Supremacy Clause. The United States Supreme Court established long ago that individual states cannot constitutionally regulate transactions involving electricity flowing through interstate commerce. *Pub. Utils. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 86&89-90 (1927).

Consequently, Congress enacted the federal laws that have evolved into today's version of the Federal Power Act ("FPA"). Those statutes, along with the regulations and orders promulgated by FERC, regulate the operation of the interstate transmission system—the "grid"—and promote the development of energy markets to maximize reliability of energy sources at competitive prices. The NGEA improperly superimposes prohibitions and restrictions on the federally-regulated regional transmission systems and the regional wholesale electricity markets by imposing terms and conditions on the transmission and sale at wholesale of electricity.

The Clean Air Act ("CAA") was enacted by Congress with the intention that the federal government work with individual states to regulate air quality and abate air pollution. However, nothing in the CAA expands an individual state's authority to regulate air quality and emissions beyond its own borders. On the contrary, recognizing that states are limited to regulating what actually occurs within its own borders, Congress provided statutory procedures under the CAA to enable states to petition for abatement of conditions generated in other states. Minnesota has unilaterally bypassed these federal procedures and far exceeded its authority by enacting the NGEA which, as this Court has already observed, "seek[s] to regulate carbon emissions occurring outside of Minnesota." (Order at 30 n.10)

For these reasons, Plaintiffs respectfully request the Court declare, as a matter of law, that Minnesota Statutes §216H.03, subds. 3(2) and 3(3) violate the Commerce Clause and the Supremacy Clause.

## I.    MINN. STAT. §216H.03 VIOLATES THE DORMANT COMMERCE CLAUSE.

The Dormant Commerce Clause's extraterritoriality doctrine "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982). Alternatively, the Supreme Court applies a two-tier approach to determine whether state regulation violates the Dormant Commerce Clause. *See Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 578-79 (1986). If a statute directly regulates or discriminates against interstate commerce, courts generally "str[ike] down the statute without further inquiry." *Nat'l Solid Waste Mgmt. Ass'n v. Meyer ("Meyer I")*, 63 F.3d 652, 657 (7th Cir. 1995)(citing *Brown-Forman*, 476 U.S. at 579). When the statute is neutral on its face and in practice, and only incidentally or indirectly affects interstate commerce, courts apply the so-called *Pike* test. *Id.* (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). Under the *Pike* test, a state law that burdens interstate commerce may be upheld only if it "regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental...unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142.

### A.    Minn. Stat. §216H.03 Violates the Extraterritorial Doctrine of the Dormant Commerce Clause Because It Directly Regulates Commerce Occurring Entirely Outside of Minnesota.

A state statute "that directly controls commerce occurring wholly outside the boundaries of a State...exceeds the inherent limits of the enacting State's authority and is

invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." *Healy v. The Beer Inst.,* 491 U.S. 324, 336 (1989). If a state law attempts to regulate beyond that state's jurisdiction and "control conduct beyond the boundary of the state," then the law is invalid *per se. Id.* at 336-37.

"The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Id.* (citing *Brown-Forman*, 476 U.S. at 579). The practical effect of a statute is evaluated "not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." *Id.* Here, the "practical effect" of the NGEA is clearly to control conduct occurring wholly outside Minnesota. (Order at 30 n.10) Indeed, that is the professed objective of the NGEA—to reduce carbon dioxide emissions regardless of whether they occur in Minnesota or elsewhere.

The NGEA does not prohibit goods that are themselves inherently-different or dangerous so as to pose a threat to Minnesota's citizens or environment. *Contra Maine v. Taylor*, 477 U.S. 131, 141-143&151-152 (1986). Indeed, there is no dispute that once generated, electricity is electricity and there is no difference in the electrons based on how they came into existence. (Boyd Ex. U, Resp. RFA No. 10) Thus, the NGEA's prohibitions based on whether the generation method contributes to Minnesota's "statewide power sector carbon emissions" is necessarily a restriction on how the goods were manufactured, not the quality or character of the goods themselves. Minnesota does not have authority to prohibit transactions involving goods that are generated out-of-state

solely because it does not approve of the method by which those goods are manufactured, while permitting transactions involving identical goods that were manufactured in a way that Minnesota does not find offensive. *See C&A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 393 (1994)("States and localities may not attach restrictions to exports or imports in order to control commerce in other States.").

The NGEA's "offset" exemption for electricity generated out-of-state, but nonetheless deemed to contribute to Minnesota's "statewide power sector carbon dioxide emissions," further illustrates the statute's violation of the "extraterritoriality doctrine." Electricity generated out-of-state in a manner that is deemed to contribute to "statewide power sector carbon dioxide emissions" can only be imported and consumed in Minnesota "if the project proponent demonstrates to the [MPUC's] satisfaction that it will offset the new contribution to statewide power sector carbon dioxide emissions with a carbon dioxide reduction project." Minn. Stat. §216H.03, subd. 4(a). Such regulation necessarily "forc[es] a merchant to seek regulatory approval in one State before undertaking a transaction in another," causing the NGEA to "directly regulate[] interstate commerce." *Brown-Forman*, 476 U.S. at 582.

The decisions in *National Solid Waste Management Ass'n v. Meyer* are directly on-point. 165 F.3d 1151 (7th Cir. 1999)("*Meyer II*"); 63 F.3d 652 (7th Cir. 1995)("*Meyer I*"). In those cases, the Seventh Circuit struck down two different versions of a Wisconsin statute that prohibited disposing of waste in Wisconsin unless the community where the waste was generated adopted recycling specifications approved by Wisconsin. *Meyer II*, 165 F.3d at 1152-54; *Meyer I*, 63 F.3d at 657-61. Wisconsin tried

to justify these statutes based on local environmental concerns arising from waste being disposed of within its borders (just as Defendants justify the NGEA by claiming the electricity in question is being "consumed" in Minnesota).  Despite this, the Wisconsin statutes were unconstitutional under the Dormant Commerce Clause for at least three independent reasons: (1) they "required municipalities outside Wisconsin's borders to enact ordinances favoring Wisconsin's system and thus had extraterritorial application"; (2) "the prospect of conflict (if other states required municipalities to enact different kinds of ordinances) invited balkanization"; and (3) "the law made interstate commerce in waste more costly than intrastate commerce in that commodity."  *Meyer II*, 165 F.3d at 1152 (citing *Meyer I*).[1]

Similarly, the NGEA requires facilities outside Minnesota's borders to comply with Minnesota law before electricity may be "imported" into Minnesota and/or parties may enter into long-term power purchase agreements associated with emission generating facilities.  Thus, Minn. Stat. §216H.03 clearly has extraterritorial application.  *See*

*Trade Council v. Natsios*, 181 F.3d 38, 61 (1st Cir. 1999)(striking down law that penalized state contract bidders based on out-of-state conduct).  The prospect of conflict if other states passed their own carbon emissions statutes invites balkanization.  *See*

---

[1] The first version of the statute also violated the Dormant Commerce Clause because it "applied to all waste originating in a jurisdiction whether or not it was bound for Wisconsin."  *Id.* at 1153.  The NGEA fails for this same reason because, due to the interconnection of electricity grids, any electricity generated by a facility connected to the same grid as Minnesota could conceivably reach Minnesota.  Thus the NGEA applies to all electricity generated in any facility connected to the same grid as Minnesota, regardless of whether the electricity ever actually reaches Minnesota.  (Boyd Ex. O  at 27-28)

*Healy*, 491 U.S. at 336 (noting that the Court must "consider[] how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation"). For example, North Dakota, Wisconsin, and South Dakota could pass conflicting carbon emissions statutes that make it impossible for facilities that supply those states to comply with all of them. In fact, this concern is heightened given the regional manner in which such facilities typically supply multiple jurisdictions. Finally, as in the *Meyer* cases, those proponents of electricity that would be generated outside of Minnesota will be more significantly burdened than those persons who promote in-state generation due to the carbon emissions offset requirements under the NGEA from which Minnesota entities have largely been exempted, Minn. Stat. §216H.03, subds. 5-7; and which inherently impose greater burdens on out-of-state generation sources by including the requirement to offset emissions for "transmission and distribution line losses." *Id.* §216H.03, subd. 2.

"No state has the authority to tell other polities what laws they must enact or how affairs must be conducted outside its borders." *Meyer II,* 165 F.3d at 1153; *see also, e.g., BMW of N. Am. v. Gore*, 517 U.S. 599 (1996)(invalidating Alabama statute that prohibited selling repainted cars without disclosing that car had been repainted because repainting could have occurred in a different state); *Healy*, 491 U.S. 324 (invalidating Connecticut statute that required shippers to affirm that prices in Connecticut were not higher than prices in bordering states); *Edgar,* 457 U.S. 624 (invalidating Illinois anti-corporate takeover statute that could have stifled transactions that occurred wholly outside the state); *S. Pac. Co. v. Ariz. ex rel. Sullivan*, 426 U.S. 794 (1976)(invalidating

Arizona statute that attempted to limit length of trains within the state); *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520 (1959)(invalidating Illinois statute that required certain type of mudguards on semis because other states allowed different mudguards and one state actually required a different type of mudguard); *Am. Libraries Ass'n v. Pataki*, 969 F.Supp. 160 (S.D.N.Y. 1997)(invalidating New York statute that attempted to regulate the Internet).  The NGEA likewise seeks to unconstitutionally impose requirements on the generation of electricity that occurs entirely outside Minnesota's borders.

    **B.**    **Minn. Stat. §216H.03 Violates the Dormant Commerce Clause Because It Discriminates Against Interstate Commerce.**

The NGEA further violates the Dormant Commerce Clause because, while purporting to regulate electricity evenhandedly, the NGEA regulates out-of-state coal interests and disproportionately favors in-state interests with exemptions.  States may not "discriminate against an article of commerce by reason of its origin or destination out of State."  *C&A Carbone,* 511 U.S. at 390.  In this context "'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."  *Oregon Waste Sys. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994).  "If a restriction on commerce is discriminatory, it is virtually per se invalid."  *Id.*

A law or regulatory scheme can discriminate against out-of-state interests in three ways: (1) purposefully; (2) facially, or (3) in practical effect.  *S.D. Farm Bureau v. Hazeltine*, 340 F.3d 583, 593 (8th Cir. 2003).  The NGEA discriminates against out-of-state interests in all three ways.

On its face, the NGEA clearly and expressly discriminates against electricity generated by coal. Minnesota does not produce any coal used to generate electricity. (Boyd Ex. U, Resp. to RFA No. 5) Thus, the adverse effects of the NGEA are felt solely by owners of coal reserves, coal suppliers, and coal producers in other states, such as North American Coal and Great Northern Properties, that provide coal for electricity generation. The NGEA's purpose will not be achieved without adversely affecting the demand and use of out-of-state coal to generate electricity. *See Alliance for Clean Coal v. Miller*, 44 F.3d 591, 595-96 (7th Cir. 1995)(Illinois statute that discriminated against use of low-sulfur coal that could be supplied only from outside Illinois violated Commerce Clause).[2]

Furthermore, the NGEA favors in-state interests in the form of exemptions, all of which were enacted to exempt projects either located in Minnesota or owned by Minnesota-based entities. Minn. Stat. §216H.03, subds. 5-7. The United States Supreme Court has held on numerous occasions that using exemptions to favor in-state interests constitutes the very economic in-state favoritism that the Dormant Commerce Clause prohibits. *See Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 265-67 (1984)(holding that statute imposing tax on liquor, but exempting liquor made from products indigenous to that state, violated Commerce Clause); *see also W. Lynn Creamery v. Healy*, 512 U.S.

---

[2] The Illinois statute held unconstitutional in *Alliance for Clean Coal* discriminated against use of low sulfur coal in the generation of electricity within the state by making it a less viable option for Illinois generating plants. *Id.* at 596. The Illinois statute was basically doing what the NGEA seeks to do—discriminating against goods that are part of interstate commerce in order to control the type of material used to generate electricity.

186, 190-91&198 (1994)(state law that charged fee on all milk sold in the state and redistributed those fees to in-state milk producers was unconstitutional because it effectively exempted local producers at the expense of out-of-state producers)(citing *Bacchus* and the "other cases of this kind" which are "legion").

In contrast to those in-state interests favored by the statutory exemptions, non-exempt parties must face the uncertain challenges of demonstrating they will offset carbon emissions to the MPUC. Minn. Stat. §216H.03, subd. 4. Yet the availability of such relief is questionable, to say the least. First, the potential to qualify for these offset requirements is illusory, since they require either "reducing an existing facility's contribution to statewide power sector carbon dioxide emissions"—which would presumably require the party to own or acquire such an existing facility—or "purchasing carbon dioxide allowances from a state or group of states that has a carbon dioxide cap and trade system in place that produces verifiable emissions reductions"—if and when such systems ever come to exist. *Id.* §216H.03, subd. 4(b). (Porter ¶42) Second, parties seeking to demonstrate such carbon offsets cannot satisfy the requirements through reductions they had already planned to accomplish because the MPUC "shall not find that a proposed carbon dioxide reduction project…acceptably offsets a new contribution to statewide power sector carbon dioxide emissions unless the proposed offsets…*would not have otherwise occurred.*" *Id.* §216H.03, subd. 4(c)(emphasis added). Third, the offset requirements are by definition more burdensome on out-of-state generation sources because the emissions that must be "offset" include emissions from "transmission and distribution line losses." Minn. Stat. §216H.03, subd. 2. Finally, whether a party has

- 31 -

sufficiently demonstrated these offset requirements is subject to the amorphous, subjective standard of the MPUC Commissioners' "satisfaction." *Id.* §216H.03, subd. 4(a). Thus, the "offset" requirements further discriminate against out-of-state generation sources.

### C. Minn. Stat. §216H.03 Is Invalid Because It Does Not Serve A Local Public Interest Nor Are Its Effects On Interstate Commerce Incidental.

To be eligible for consideration under the *Pike* test, a statute that affects interstate commerce must: (1) regulate evenhandedly (2) to effectuate a legitimate local public interest, and (3) have only incidental effects on interstate commerce. 397 U.S. at 142. As previously discussed, the NGEA does not regulate evenhandedly. Additionally, it does not effectuate a legitimate local interest. Finally, the effects on interstate commerce are anything but incidental. For these reasons, the statute is invalid and the Court need not reach the *Pike* balancing test.

### 1. Minn. Stat. §216H.03 Does Not Effectuate Or Advance A Legitimate Local Purpose.

When a "matter[] of local concern is local in character and effect, and its impact on the national commerce does not seriously interfere with its operation, and the consequent incentive to deal with them nationally is slight, such regulation has been generally held to be within state authority." *S. Pac. Co. v. Ariz. ex rel. Sullivan,* 325 U.S. 761, 767 (1945) (citations omitted). "But ever since *Gibbons v. Ogden,* 9 Wheat. 1, the states have not been deemed to have authority to impede substantially the free flow of commerce from state to state, or to regulate those phases of the national commerce

which, because of the need of national uniformity, demand that their regulation, if any, be prescribed by a single authority." *Id.* (citations omitted).

By its very terms, the NGEA imposes Minnesota's policy judgments regarding "climate change" and "global warming," rather than addressing a unique local situation or a particular statewide problem. The absence of a unique local purpose for the NGEA is facially confirmed by the statute itself. The Minnesota Legislature's stated purpose for enacting the NGEA was to reduce "greenhouse gas emissions" which it viewed as causally related to "climate change" and "global warming." *See, e.g.*, Minn. Stat. §§216H.01, subd. 2, 216H.02, subds. 1&2, & 216H.10, subd. 5. Thus, the NGEA was not enacted to promote a "local purpose," but instead it was enacted to address global climate issues. *Contra Maine v. Taylor*, 477 U.S. at 141-143&151-152. Further, Defendants have confirmed that prior to and since the NGEA's enactment, the State has made no effort to determine any local benefits that could be associated with Minn. Stat. §216H.03. (Boyd Ex. U, Resps. to RFA Nos. 17-26)

### 2. Minn. Stat. §216H.03's Effects On Interstate Commerce Are Direct And Intentional, Rather Than Incidental.

The NGEA's effects on interstate commerce are not "incidental." Far from it. The very purpose of Minn. Stat. §216H.03 is to prevent carbon dioxide emissions associated with electricity that is generated in other states and transmitted and sold in interstate commerce. The NGEA must necessarily regulate these out-of-state activities to achieve its goal of preventing any contribution to the "statewide power sector carbon

dioxide emissions" which expressly include emissions associated with the generation of electricity "outside the state." Minn. Stat. §216H.03, subd. 2.

Defendants' contention that the statute is narrowly focused on local consumption of electricity by end-users is belied by the stated goals of the statute, which focus on reducing carbon emissions that occur in the generation of electricity rather than reducing the retail consumption of electricity in Minnesota. Minn. Stat. §216H.02, subd. 1. As the Court has recognized, "[t]o the extent carbon dioxide emissions occur, *they occur when energy is generated.*" (Order, p.30 n.10 (emphasis added)) Once an item of commerce has been produced, Minnesota "may not prevent it from crossing state lines...no matter where it originates." *Alliant Energy Corp v. Bie*, 330 F.3d 904, 914 (7th Cir. 2003). This "is true of all items of commerce." *Id.* Thus, the NGEA deliberately and intentionally burdens interstate commerce by prohibiting and regulating electricity flowing through interstate commerce based on how the electricity was generated, rather than based on the manner in which electricity is consumed in Minnesota.

In short, the very purpose of Minn. Stat. §216H.03 is to control decisions that are made outside of Minnesota by persons and entities located elsewhere regarding the generation that takes place and emissions that occur in other states.

## II.  MINN. STAT. §216H.03 IS ALSO UNCONSTITUTIONAL UNDER THE SUPREMACY CLAUSE.

A separate, but closely-related, basis for holding the NGEA unconstitutional arises under the Supremacy Clause. Because individual state regulations such as the NGEA are not constitutionally permissible under the Commerce Clause, federal regulation is

necessary to deal with issues relating to the interstate transmission and the wholesale sale of electricity, as well as the emissions that result from electricity generation. Unsurprisingly, Congress has enacted laws to specifically deal with these issues in the form of the FPA and the CAA. The NGEA is preempted by these laws.

Under the Supremacy Clause, state law is preempted when it conflicts with or frustrates federal law. *N. Natural Gas Co. v. Iowa Utils. Bd.,* 377 F.3d 817, 820-21 (8th Cir. 2004)(citing *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658 (1993)). There are generally three ways that a state law can be preempted under the Supremacy Clause. First, state law is preempted where Congress has expressly stated it intends to prohibit state regulation in an area. *Id.* Second, Congress may implicitly preempt state regulation of an area through occupation of a field. *Id.* A field is occupied when the federal regulatory scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Id.* And third, even if Congress has not completely precluded the ability of states to regulate in a field, state regulations are preempted to the extent they conflict with federal law. *Id.* Such a conflict will be found "when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Id.*(internal quotes omitted).

Minn. Stat. §216H.03 is invalid under both field preemption and conflict preemption. Congress has demonstrated its intent to regulate the fields of interstate electricity transmission and the wholesale sales of electricity through the FPA. Congress has also demonstrated an intent to regulate the field of air pollution emissions through the

CAA.  Even if Congress did not fully regulate these fields through these Acts, the NGEA stands as an obstacle to the accomplishment of the full purposes and objectives of Congress as set forth in these statutes.  For these reasons, as well as others, Minn. Stat. §216H.03 is preempted by the FPA and the CAA.

### A.    Minn. Stat. §216H.03 is Preempted by the FPA.

The Court is already familiar with the history and development of the FPA, which is set forth in its September 30, 2012 Order.  The FPA arose as a "direct result" of the Supreme Court's holding in *Public Utilities Commission of Rhode Island v. Attleboro Steam & Elec. Co.,* 273 U.S. 83, 89 (1927), that states could not regulate rates for electricity sold into other states because it would be "a direct burden on interstate commerce."  (Order at 13)  Congress passed the FPA to fill the gap and establish exclusive federal jurisdiction over the interstate sale of electricity.  (*Id.* (citing *New England Power Co. v. N.H.,* 455 U.S. 331, 340 (1982) and *Jersey Cent. Power & Light Co. v. Fed. Power Comm'n,* 319 U.S. 61, 68 n.7 (1943)).

Under the FPA, the United States expressly and exclusively regulates the transmission of electric energy in interstate commerce and the sale of such energy at wholesale.  16 U.S.C. §§824(a), 824(b)(1); *see United States v. Pub. Util. Comm'n of Cal.*, 345 U.S. 295, 299-300 (1953); *Miss. Power & Light Co. v. Miss. ex rel. Moore,* 487 U.S. 354, 371 (1988)("MP&L").  In *Federal Power Commission v. Southern California Edison Co.*, the Supreme Court recognized that in passing the FPA, "Congress meant to draw a *bright line easily ascertained between state and federal jurisdiction...*by making FPC jurisdiction *plenary* and extending it to *all wholesale sales in interstate commerce*

except those which Congress has made explicitly subject to regulation by the States." 376 U.S. 205, 215-16 (1964)(emphasis added).

This bright line plainly was intended to extend, and does in fact extend, to "agreements that affect wholesale rates"—like wholesale power purchase agreements. *See MP&L,* 487 U.S. at 374. Congress expressly decreed that the exclusive authority under the FPA be exercised through FERC and tasked FERC—not the individual states—with ensuring that entire regions have access to efficient, cost-effective, and reliable energy. FERC has "*exclusive* authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce, without regard to the source of production." *New England Power Co.*, 455 U.S. at 340 (emphasis added). Accordingly, as the Court previously noted, "FERC is responsible for the economic regulation of the electric utility industry, including financial transactions, wholesale rate regulation, transactions involving transmission of retail electricity, and ensuring adequate and reliable service." (Order p.14)

Ultimately, under the FPA, the only area left for state regulation is "sale at local retail rates to ultimate consumers" and any other exceptions which Congress explicitly made subject to regulation by the states. *Fed. Power Comm'n,* 376 U.S. at 214, 216 (quoting *Ill. Natural Gas Co. v. Cent. Ill. Pub. Serv. Co.,* 314 U.S. 498, 504 (1942). Thus, while leaving for the states the authority over facilities used to generate electricity within their borders and for furnishing retail service, Congress clearly, expressly, and conclusively evidenced its intent to occupy the field of interstate electrical power transmission and sale at wholesale. *See* 16 U.S.C. §§824(a)&(b)(1).

In the face of the FPA's and FERC's exclusive authority and expansive regulation over interstate transmission and sales at wholesale, the NGEA attempts to regulate interstate transmission and sales by expressly prohibiting utilities in Minnesota from, *inter alia*, "import[ing] or commit[ing] to import from outside the state power from a new large energy facility that would contribute to statewide power sector carbon dioxide emissions," unless the project proponent offsets the emissions with burdensome and expensive carbon offset measures. Minn. Stat. §216H.03.[3] Frankly, it is difficult to imagine a more direct violation of the federal government's exclusive jurisdiction over interstate transmission and sales of electrical energy than the NGEA's explicit prohibition on interstate power importation.

The NGEA effectively functions as a tax on electricity imports which necessarily increase the cost of wholesale electricity. In the case of the MISO market, these increased costs would necessarily be borne by the entire regional market which includes thirteen states other than Minnesota. Thus, the NGEA plainly interferes with FERC's "plenary" authority to set wholesale rates and regulate all agreements which might affect wholesale rates. *See MP&L,* 487 U.S. at 374. *See also N. States Power Co. v. MPUC,* 344 N.W.2d 374, 377 (Minn. 1984)(State utilities commissions "have no regulatory power over wholesale interstate transactions.").

---

[3] The NGEA also imposes prohibitions and restrictions on the transmission of electricity generated in other states that flows through interstate commerce by specifically providing that "[e]missions of carbon dioxide associated with transmission and distribution line losses are included in [the NGEA's] definitions" of "statewide power sector carbon dioxide emissions." Minn. Stat. §216H.03, subd. 1; (Porter ¶42)

In *Maryland v. Louisiana,* 451 U.S. 725 (1981), a Natural Gas Act case,[4] the Supreme Court specifically considered whether a state could lawfully tax imports. Unsurprisingly, the Court held that such an import tax was preempted. There, Louisiana had passed a First-Use Tax of seven cents per thousand cubic feet of natural gas imported into Louisiana which was not previously subjected to taxation in another State or the United States. *Id.* at 731. The purpose of the tax was to "reimburse the people of Louisiana for damages to the State's waterbottoms barrier island, and coastal areas resulting from the introduction of natural gas into Louisiana from areas not subject to state taxes as well as to compensate for the costs incurred by the State in protecting those resources." *Id.* at 732. After noting that "[t]he Gas Act was intended to provide the Federal Power Commission, now FERC, with authority to regulate the wholesale pricing of natural gas in the flow of interstate commerce from wellhead to delivery to consumers," the Supreme Court struck down the statute. *Id.* at 748. The Court held the First-Use Tax was a "substantial usurpation of the authority of FERC" because it improperly interfered with FERC's allocation of processing costs for the shipments of natural gas. *Id.* at 749.

Similarly, the NGEA usurps FERC's authority by imposing restrictions and conditions upon the interstate transmission and sale of electricity at wholesale. Simply

---

[4] The Supreme Court has specifically held that decisions relating to the Natural Gas Act ("NGA") are instructive to the FPA analysis because the NGA and the FPA grew from the same judicial history and both were passed for similar purposes. *See Fed. Power Comm'n,* 376 U.S. at 211. NGA case law clearly sets forth the principle, equally applicable to the FPA, that state regulations requiring particular action or inaction in relation to interstate transmission and wholesale sales are unconstitutional.

stated, if there is going to be a prohibition or expense charged on interstate electricity transmissions based on carbon emissions, such a prohibition or expense would need to be imposed, or at the very least approved, by FERC. FERC is the only entity with the authority to evaluate and control the implications of such prohibitions and expenses on a regional and national basis, as part of FERC's plenary authority over wholesale rates and agreements. *See MP&L,* 487 U.S. at 374; *N. States Power Co.,* 344 N.W.2d at 377. To hold otherwise would allow individual states to interfere and frustrate the efforts of FERC. Accordingly, the NGEA is preempted by the FPA.

### B.      Minn. Stat. §216H.03 is Preempted by the CAA.

The NGEA's extraterritorial regulation on emissions is preempted by the CAA. The Supreme Court has held that carbon dioxide constitutes an air pollutant under the CAA and that "Congress has delegated to the EPA the decision of whether and how to regulate carbon-dioxide emissions from power plants." *Am. Elec. Power Co. v. Connecticut,* 131 S.Ct. 2527, 2537 (2011). The CAA provides a comprehensive and time tested regulatory framework which allows for the effective and well-reasoned regulation of carbon dioxide which crosses state borders. This regime provides opportunities for the EPA to receive and consider significant input from industry participants, states, and environmental groups to ensure that emissions regulations properly weigh not only the desire to protect environmental considerations, but also the impact that the regulations will have on the reliability and efficiency of the electrical industry in general (which is an issue affecting residents of all states on the interconnected grid, not just Minnesota). Minnesota passed the emissions requirements of NGEA wholly outside the framework

provided by the CAA.  Were other states to follow suit and pass their own separate emission standards, the centralized and cooperative framework provided by the CAA would be completely undone and we would be left with a mélange of unique and, most likely, conflicting state regulations which would do more harm than good.

This result plainly was not intended by Congress for numerous reasons.  First, it is well-settled that the federal government—through the CAA—regulates air pollutants from a stationary source.  (Order, p.24 (citing 42 U.S.C. §7409(a)(1)))  Carbon dioxide constitutes an air pollutant under the CAA and "Congress has delegated to the EPA the decision of whether and how to regulate carbon-dioxide emissions from power plants." *Am. Elec. Power Co.,* 131 S.Ct. at 2537.  Second, the federal government—through the EPA—is regulating carbon dioxide emissions from power plants through its Prevention of Significant Deterioration of Air Quality ("PSD") program which provides for the maintenance of national ambient air quality standards.  Through the PSD program contained in the CAA, Congress provided states with the authority to implement the emissions standards and limitations set by the EPA.[5]  *See* 42 U.S.C. §7410(a)(1).  Third, although the EPA delegates some authority to the states for regulating emissions, that authority does not extend beyond a state's own border and is, in all instances, subject to review and approval by the EPA.  (Order, p.24-25 (citing 42 U.S.C. §§7410(a)(1)-(a)(2))), p.26 (citing 42 U.S.C. §7411).  And fourth, the EPA provides a framework that

---

[5]  It is important to note that state regulations are uniformly limited to regulating emissions sources within their own state.  *See, e.g.,* 42 U.S.C. §§7407(a), 7410(a)(1), (a)(2)(D)(i); 7420(a)(1)(B)(i).

allows states to bring complaints and petitions to the EPA regarding another state's emissions.    (Order, pp.25-26 (citing 42 U.S.C. §§7410(k)(5), 7411, 7426(a)(1)(b), 7426(b)))

Thus, the only remaining question is whether Minnesota can enact a statute whose stated purpose is to regulate carbon dioxide emissions occurring outside of Minnesota when (1) the federal government has already exercised its authority to regulate carbon dioxide and created an expansive framework for this regulation, and (2) the statute passed by Minnesota is entirely outside the framework created by the federal government.

The answer is plainly, "No."  As the Fourth Circuit held, "[w]here Congress has chosen to grant states an extensive role in the CAA's regulatory regime through [state implementation plans] and permitting process, field and conflict preemption principles caution at a minimum against according states a wholly different role."  *N.C. ex rel. Cooper v. Tenn. Valley Auth.,* 615 F.3d 291, 303 (4th Cir. 2010).  Moreover, states have long been precluded from attempting to regulate emissions that occur in other states.  *See Clean Air Mkts. Grp. v. Pataki,* 338 F.3d 82, 87 (2d Cir. 2003); *see also Int'l Paper Co. v. Ouellette,* 479 U.S. 481, 496 (1987)(application of an affected state's laws to an out-of-state water pollution source preempted by the Clean Water Act).

Once a "pollutant" falls within the EPA's regulatory framework, any efforts to regulate or preclude emissions of that pollutant must proceed through the process created by Congress and the EPA.  Otherwise, the effort is an improper intrusion on the federal regulatory scheme.  Relying on this principle, courts have rejected federal common law nuisance claims, state law nuisance claims, and state statutes.  *See infra pp.46-47.*  Where

- 42 -

the CAA regulates the pollutant and source at issue (as it does here), states cannot by statute or common law replace comprehensive federal emissions regulations with a contrasting state perspective. *Cooper,* 615 F.3d at 304.

Congress recognized that emissions issues, and the associated regulation of emissions, requires a high degree of specialized knowledge in chemistry, medicine, meteorology, biology, engineering, and other relevant fields that the EPA is expected to possess, and "Congress…entrusted the Agency with the responsibility for making these scientific and other judgments, and we must respect both Congress' decision and the Agency's ability to rely on the expertise that it develops." *Cooper,* 615 F.3d at 304-05 (quoting *Lead Indus. Ass'n, Inc. v. EPA,* 647 F.2d 1130, 1146 (D.C. Cir. 1980)). Congress *did not* entrust the states with the authority to supplant or second guess the regulatory regime developed by Congress and the EPA, nor did it grant the states the power to individually regulate emissions outside the CAA framework.

There is an utter absence of case law upholding regulations passed outside the framework of the CAA. As this Court noted, if states have problems with the current regulations for carbon dioxide emissions originating in a neighboring state, the remedy is through the CAA, including the provisions regarding the "§110 SIP call" and the "§126 petition" procedures, or through a subsequent federal action challenging the EPA if it refuses to act. (Order, pp.25-26) *See also Am. Elec. Power Co.,* 131 S.Ct. at 2539.

Minnesota cannot go its own way and ignore the carefully-enacted federal regulatory procedures by imposing its own judgment about how power plant carbon dioxide emissions should be regulated. Allowing states to do so would effectively scuttle

the CAA's framework and result in a grab-bag of state regulations passed without regard to federal-state cooperation. *See Ouellette,* 479 U.S. at 494 ("A state law is [] preempted if it interferes with *the methods* by which the federal statute was designed to reach [its] goal.")(emphasis added). Utilities commonly serve members located in multiple states. Further, to the extent the utilities are MISO members, the electricity that they supply to the grid is potentially imported into any of the thirteen different states located in the MISO footprint. If every state passed its own prohibitions and requirements to regulate carbon dioxide emissions associated with electricity crossing state lines (outside the process provided by the CAA), there would be regulatory chaos and the cost of electricity would skyrocket.

In *Ouelette*, the Supreme Court specifically addressed such chaos in the context of the Clean Water Act:

> The Clean Water Act carefully defines the role of both the source and affected States, and specifically provides for a process whereby their interests will be considered and balanced by the source state and the EPA. This delineation of authority represents Congress' considered judgment as to the best method of serving the public interest and reconciling the often competing concerns of those affected by the pollution. It would be extraordinary for Congress, after devising an elaborate permit system that sets clear standards, to tolerate common-law suits that have potential to undermine this regulatory structure.

*Ouellette,* 479 U.S. at 497. Its holding is equally applicable to the CAA and state statutory law.

In *American Electric Power,* the Supreme Court held that the CAA displaced federal common law nuisance claims asserted by several states against carbon emitters were "displaced" by the CAA. 131 S.Ct. at 2532, 2537. Although the Supreme Court

was analyzing displacement, as opposed to preemption, its analysis of the CAA is instructive and relevant here.   After summarizing the procedures and avenues for enforcement found in the CAA (much like the Court did here in its September 30, 2012 Order), the Supreme Court held that there was "no room for a parallel track" of law regulating carbon emissions outside the framework of the CAA.  *Id.* at 2538.  Critical to the holding was the Supreme Court's recognition that "Congress delegated to EPA *the decision whether and how* to regulate carbon-dioxide emissions from power plants…." *Id.* at 2538-39 (emphasis added).   It is not for the federal courts—through federal common law—or for the states—through regulations passed outside the framework of the CAA—to upset the EPA's decisions regarding whether and how to regulate such emissions.

In *Cooper,* the Fourth Circuit held that state law tort claims relating to emissions passing from Alabama and Tennessee into North Carolina were preempted by the CAA. The Fourth Circuit relied heavily on *Ouellette* and previewed many of the important points that would later be made by the Supreme Court in *American Electric Power.*  The *Cooper* court noted the importance of specialized knowledge possessed by the EPA, and the need to weigh and consider various inputs and factors in the rulemaking process, including the "varied practical perspectives of industry and environmental groups."  615 F.3d at 304-05.

In *Pataki,* the Second Circuit held that a New York statute which assessed an "air pollution mitigation offset" upon any New York utility that transferred its SO2 allowances to an upwind state violated the Supremacy Clause.  338 F.3d at 89.  The court

- 45 -

noted that the CAA and related EPA regulations provided the method for regulating SO2 emissions from power plants, and New York's statute unconstitutionally interfered with this method. *Id.* at 87. So too here. The EPA has the authority to decide how it wishes to regulate carbon dioxide emissions from power plants, and Minnesota's statute does not comport with this method.

Congress has created a regulatory structure and has vested the EPA with the authority to consider the relevant scientific evidence and applicable policy interests. It is not for Minnesota—or any other state—to derail this longstanding structure by superimposing its own standards.

## CONCLUSION

Plaintiffs respectfully request the Court to declare and adjudicate that Minn. Stat. §216H.03, subd. 3, is unconstitutional, and therefore invalid and unenforceable, because, *inter alia*, it prohibits any person from importing or committing to import power from "a new large energy facility that would contribute to statewide power sector carbon dioxide emissions," *id.* subd. 3(2), and it prohibits any person from "enter[ing] into a new long-term power purchase agreement that would increase statewide power sector carbon dioxide emissions" *id.* subd. 3(3); and an order enjoining Defendants and their successors in office from enforcing Minn. Stat. §216H.03, subds. 3(2) and 3(3).

Dated:  September 5, 2013

s/Thomas H. Boyd
Wayne Stenehjem
     Attorney General
     of North Dakota
     Pro Hac Vice
John A. Knapp
    Special Assistant Attorney General
    Minnesota Bar No. 56789
Thomas H. Boyd
    Special Assistant Attorney General
    Minnesota Bar No. 200517
Brent A. Lorentz
    Special Assistant Attorney General
    Minnesota Bar No. 386865
Derek R. Allen
    Special Assistant Attorney General
    Minnesota Bar No. 0392065
Suite 3500
225 South Sixth Street
Minneapolis, MN 55402-4629
612-604-6400

*Counsel of Record for Plaintiffs State of North Dakota and Industrial Commission of North Dakota.*

WINTHROP & WEINSTINE, P.A.

s/Thomas H. Boyd
John A. Knapp
    Minnesota Bar No. 56789
Thomas H. Boyd
    Minnesota Bar No. 200517
Brent A. Lorentz
    Minnesota Bar No. 386865
Derek R. Allen
    Special Assistant Attorney General

Minnesota Bar No. 0392065
Suite 3500
225 South Sixth Street
Minneapolis, MN 55402-4629
612-604-6400

*Counsel of Record for Plaintiffs Lignite Energy Council, Basin Electric Power Cooperative, The North American Coal Corporation, Great Northern Properties Limited Partnership, Missouri Basin Municipal Power Agency d/b/a Missouri River Energy Services, Minnkota Power Cooperative, Inc.*

Claire M. Olson
Casey Jacobson
Basin Electric Power Cooperative
Office of General Counsel
1717 East Interstate Avenue
Bismarck, ND 58503-0564
Phone:  (701) 557-5317

*Attorneys for Basin Electric Power Cooperative*

John Neumann
The North American Coal Corporation
5340 Legacy Drive, Building 1
Suite 300
Plano, TX 75024
Phone:  (972) 448-5400

*Attorneys for The North American Coal*
*Corporation*

Sandi Tabor
Lignite Energy Council
1016 East Owens Avenue
PO Box 2277
Bismarck, ND 58502
Phone:  (701) 258-7117

*Attorney for The Lignite Energy Council*

William Taylor
Woods, Fuller, Shultz and Smith
300 S. Phillips Ave., Suite 300
P.O. Box 5027
Sioux Falls, SD 57117-5027
Phone:  (605) 336-3890

*Attorneys for Missouri Basin Municipal*
*Power Agency d/b/a Missouri River*
*Energy Services*

David Sogard
Minnkota Power Cooperative, Inc.
P.O. Box 13200
Grand Forks, ND 58208-3200
Phone:  (701) 795-4210

*Attorney for Minnkota Power*
*Cooperative, Inc.*

Wyatt Hogan
Great Northern Properties L.P.
601 Jefferson Street
Suite 3600
Houston, TX 77002
Phone:  (713) 751-7500

*Attorney for Great Northern Properties
Limited Partnership*

8272951v4