1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF MINNESOTA

3    ----------------------------------------------------------------

4    State of North Dakota,
     et al.,                              Case No. 11-cv-3232 (SRN/SER)
5
             Plaintiffs,

6
       vs.

7                                         St. Paul, Minnesota
     Beverly Heydinger, et al.,           Courtroom 7B
8                                         October 17, 2013
             Defendants,                  9:30 a.m.
9
     Minnesota Center for
10   Environmental Advocacy,
     et al.,
11
             Amici.

12   ----------------------------------------------------------------

13

14             BEFORE THE HONORABLE SUSAN RICHARD NELSON

15               UNITED STATES DISTRICT COURT JUDGE

16

17         HEARING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

18      [DOCS. 128 AND 135] AND DEFENDANTS' MOTION TO STRIKE

19             PLAINTIFFS' JURY DEMAND [DOC. 123]

20

21

22

23

24   Official Court Reporter:  Heather Schuetz, RMR, CRR, CCP
                               U.S. Courthouse, Ste. 146
25                             316 North Robert Street
                               St. Paul, Minnesota 55101

APPEARANCES

**For the Plaintiffs State of North Dakota and Industrial Commission of North Dakota:**

Thomas Boyd, Esq.                    Wayne K. Stenehjem, Esq.
Brent A. Lorentz, Esq.               North Dakota Attorney General
Winthrop & Weinstine, PA             600 E. Boulevard, 1st Floor
225 S. 6th St., Ste. 3500            Bismarck, ND  58505-0040
Minneapolis, MN 55402-4629


**For Plaintiffs Lignite Energy Council, Basin Electric Power Cooperative, North American Coal Corporation, Great Northern Properties Limited Partnership, Missouri River Basin Municipal Power Agency, and Minnkota Power Cooperative:**

Thomas Boyd, Esq.
Brent A. Lorentz, Esq.
(See address above)


**For the Defendants:**

Gary Cunningham, Esq.
Michael Everson, Esq.
Minnesota Attorney General's Office
445 Minnesota St., Ste. 1100
St. Paul, MN 55101-2128


**For the Movant Minnesota Center for Environmental Advocacy:**

Scott R. Strand, Esq.
Minnesota Center for Environmental Advocacy
26 E. Exchange St., Ste. 206
St. Paul, MN 55101-1667


**For the Movant Environmental Defense Fund:**

Scott R. Strand, Esq.
(See address above)

Sean H. Donahue, Esq.
Donahue & Goldberg, LLP
2000 L St. NW, Ste. 808
Washington, DC 20036

Heather A. Schuetz, RMR, CRR, CCP
(651) 848-1223
Heather_Schuetz@mnd.uscourts.gov

1                          APPEARANCES (Con't):

2    **For the Movant Sierra Club:**

3    Scott R. Strand, Esq.
     (See address above)
4
     Joanne Spalding, Esq.
5    Sierra Club
     85 Second St.
6    San Francisco, CA 94105

7
     **For the Movants National Rural Electric Cooperative Association**
8    **and American Public Power Association:**

9    John M. Baker, Esq.
     Greene Espel PLLP
10   222 S. 9th St., Ste. 2200
     Minneapolis, MN 55402
11

12
                            I N D E X:              Page:
13
Court's ruling re Movants........................... 5
14
     Argument by Mr. Boyd............................... 7
15
     Argument by Mr. Cunningham......................... 50
16
     Response by Mr. Boyd............................... 75
17
     Argument by Ms. Spalding........................... 79
18
     Argument by Mr. Donahue............................ 94
19
     Response by Mr. Boyd............................... 105
20
     Response by Mr. Cunningham......................... 110
21
     Response by Mr. Donahue............................ 114
22

23

24

25

```
1                    P R O C E E D I N G S

2                        IN OPEN COURT

3             THE COURT:  We are here this morning on the matter

4    of the State of North Dakota, et al. versus Beverly Heydinger,

5    Commissioner and Chair of the Minnesota Public Utilities

6    Commission, et al.  This is civil file number 11-3232.  Let's

7    begin by having the parties enter your appearance.  And if you

8    are here as an amicus, you may also enter an appearance.

9    We'll begin with the Plaintiffs, please.

10            MR. BOYD:  Morning, Your Honor.  Thomas Boyd here on

11   behalf of all of the Plaintiffs.

12            MR. LORENTZ:  Brent Lorentz, Your Honor, on behalf

13   of Plaintiffs.

14            MR. STENEHJEM:  And Wayne Stenehjem, Attorney

15   General of the State of North Dakota, on behalf of the State

16   of North Dakota.

17            THE COURT:  Welcome.

18            And the Defendants.

19            MR. CUNNINGHAM:  Morning, Your Honor.  My name is

20   Gary Cunningham.  I'm a member of the Minnesota Attorney

21   General's office, and I'm here representing the members of the

22   Public Utilities Commission and the Commissioner of the

23   Department of Commerce.  With me is Mark Everson, also from

24   the Attorney General's office.

25            MR. DONAHUE:  Good morning, Your Honor.  I'm Sean
```

1    Donahue and I'm here representing the Environmental Defense

2    Fund, *amicus*, and I'll be speaking for the group, along with

3    my co-counsel, Joanne Spalding, who will also be speaking for

4    *amicus* for the Defendants.

5            MR. STRAND:  And, Your Honor, Scott Strand for the

6    Minnesota Center for the Environmental Advocacy.

7            THE COURT:  Very good.

8            Anybody else present as *amicus* today?

9            MR. BAKER:  Your Honor, John Baker.  I'm counsel for

10   the American Public Power Association and the National REC

11   Association.  I'll note my appearance, but I don't have plans

12   to present argument pursuant to the letter that the Court

13   should have received yesterday.

14           THE COURT:  Thank you.

15           Anybody else?  Very good.  All right.

16           The Court recognizes Mr. Boyd's objection -- or

17   request for reconsideration, I guess, of the Court's order

18   with respect to permitting those who have made an appearance

19   as *amicus curiae* to argue.  I agree, Mr. Boyd, that the

20   request was made late.  My concern is two-fold.  My concern is

21   to make sure both sides feel that they have an equal

22   opportunity to be heard, and I can assure you that that will

23   happen.  This Court wants to get this right, so we could be

24   here a long time.  I'm going to keep you here until I'm

25   convinced that I've heard all of you out, so no one will feel

1    slighted by time.

2          I thought perhaps since none of the folks who filed

3    *amicus* briefs on behalf of the Plaintiffs plan to argue that

4    the way to approach this fairly would be to give you, Mr. Boyd

5    or anyone from your team, an opportunity to respond to the

6    arguments of the *amicus* who will be arguing on behalf of the

7    Defendants.  I think that will create fairness, which is my

8    goal.  But my other goal, of course, is I want to hear

9    everybody out here.  I really do want to get this right.  So,

10   I suppose technically I'm denying your motion for

11   reconsideration.  All right.

12          Now, because obviously the summary judgment motions

13   are interrelated, I think we will begin by having -- unless

14   you folks have a previous plan about how to approach this, my

15   thought was to have North Dakota go first.  But had you talked

16   about how to approach this?

17          MR. BOYD:  We had not, Your Honor.

18          THE COURT:  Okay.  I am going to assume that when

19   each side gets up, you're arguing both for your motion for

20   summary judgment and in opposition to the other side's motion

21   for summary judgment.  That makes most sense.

22          And we'll leave the question of the striking of the

23   Plaintiffs' demand for a jury trial to the end of the

24   proceeding; please don't let me forget that that motion is

25   there.  We will certainly entertain it.  As you can see, I

```
1   have some sort of a cold, but I will struggle through this

2   with you.

3          With that said, Mr. Boyd, are you prepared?

4          MR. BOYD:  I am, Your Honor.  Good morning again.

5   I'm Thomas Boyd.  I'm with the firm of Winthrop and Weinstine,

6   and in that capacity, I'm appearing on behalf of the private

7   Plaintiffs.  I'm also a Special Assistant Attorney General for

8   the State of North Dakota and, in that capacity, I'm appearing

9   on behalf of the state entities, the State of North Dakota and

10  the Industrial Commission.

11         Plaintiffs respectfully request the Court to hold

12  that Minnesota Statute 216H.03 is unconstitutional and to

13  enjoin Defendants and their successors in office from

14  enforcing this provision.  Minnesota passed this law in order

15  to advance its policy to eliminate coal-based power generation

16  sources.  This is not a traditional resource planning statute.

17  This is a resource elimination statute.  By its very nature,

18  the statute interferes with the interstate power market by

19  seeking to eliminate what has traditionally been the most

20  reliable and the least cost-generation source.  Its intended

21  effects and its actual effects go well beyond Minnesota's

22  borders.

23         The statute violates the Commerce Clause in

24  fundamental ways.  First, the statute applies

25  extraterritoriality to impose terms and regulate activities
```

1    and transactions that involve non-Minnesota entities and that

2    occur entirely outside of Minnesota.  It does so by imposing

3    prohibitions, onerous terms and conditions, and uncertain

4    expenses on the development of both new generation sources

5    outside of Minnesota and the contracting with existing

6    facilities outside of Minnesota through longterm power

7    purchase agreements.  Second, the statute is protectionist and

8    discriminatory on its face.  It inherently discriminates

9    against out-of-state interests by seeking to eliminate the use

10   of coal as a fuel source, a substance which Minnesota -- of

11   which Minnesota has none but upon which its neighbors'

12   economies rely heavily for reliable, low cost power.

13           It also facially discriminates against the

14   development of new and existing power generation sources

15   outside of the state of Minnesota, while imposing no such

16   burdens on generation sources located within the state.  And

17   that applies not only to new large energy facilities but also

18   existing facilities outside of the state.  The statute applies

19   to them and them alone without a similar burden on in-state

20   generation.  The statute's regulation of carbon dioxide

21   emissions from coal-based power generation sources also

22   violates the Clean Air Act.  The Supreme Court has recognized

23   that it's the federal government, not the individual states,

24   that has the authority to determine whether and to what extent

25   to regulate $CO_2$ emissions from power plants.

 1              Minnesota has improperly imposed its own regulatory

 2      regime upon its neighbors in the region wholly apart from

 3      anything the EPA may impose.  And finally the statute's means

 4      and methods for regulating power emissions also violates the

 5      Federal Power Act.  It's the federal government, not the

 6      individual states, that has the sole authority to regulate

 7      interstate transmission and the sale or wholesale of

 8      electricity that flows through interstate commerce.  And yet

 9      216H.03 seeks to regulate both transmission and wholesale

10      transactions.  Based on any or all of these grounds, section

11      216H.03 should be struck down as unconstitutional and

12      therefore invalid and unenforceable.

13              Before proceeding to the legal arguments, I'd like

14      to review some of the undisputed and unrebutted material facts

15      in the record.  I believe the record before the Court is

16      fairly simple and straightforward.  The Plaintiffs have

17      submitted the only substantive Declarations in the record.  In

18      particular, Plaintiffs have submitted Declarations from four

19      electrical engineers with extensive experience and knowledge

20      concerning the matters at issue in this case.  They have

21      actual practical experience with having to deal with this

22      statute.

23              We've also submitted an expert report from Randy

24      Porter, another electrical engineer who has extensive

25      experience and knowledge regarding the matters at issue in

1    this case.  He has actual practical experience with the

2    generation, transmission, and wholesale distribution of

3    electricity in this region, the region to which the statute

4    applies.

5            The Defendants have submitted no Declarations from

6    anyone with personal or direct knowledge regarding the

7    application of this statute or any other matters at issue.

8    The Defendants have submitted two expert reports, but they're

9    from an attorney and an economist.  These individuals have no

10   actual practical experience with MISO or the operation of

11   co-ops or other utilities within this region.  They offer

12   purely theoretical observations and opinions.  Given the

13   Defendants' challenge to Plaintiffs' standing to bring this

14   action, I would like to review some of the particular facts

15   relating to the Plaintiffs' -- the harm that the Plaintiffs

16   have suffered.  And in that regard, rather than covering all

17   the Plaintiffs, I'd like to focus in on three in particular:

18   Basin, Minnkota, and MRES --

19            THE COURT:  And I presume you will be addressing the

20   argument that there's no standing or there's no

21   injury-in-fact.

22            MR. BOYD:  I will be.

23            THE COURT:  Okay.

24            MR. BOYD:  I will discuss some of the evidence that

25   establishing injury-in-fact and/or the threat of injury, but

1    certainly it does include injury-in-fact that's being

2    sustained at this time.

3         And I would also underscore that the facts asserted

4    by these -- by these parties through their Declarants have

5    been unrebutted and unresponded to by the Defendants.  Each of

6    those entities, Basin, Minnkota, and MRES, are member owned.

7    They're each headquartered outside of Minnesota.  They each

8    have members in multiple states.  Those states include

9    Minnesota but also a number of other states.  In fact, Basin

10   has a nine-state membership region.

11        Each of these entities operates on the co-operative

12   model, meaning that their members have associated with these

13   out-of-state entities in order to benefit from a collective

14   portfolio of resources and to socialize the cost of obtaining

15   power that they require in order to serve their own members

16   or, in the case of municipalities, their citizens.  Each of

17   these entities have uniform, longterm power supply agreements

18   with their members.  I believe it's MRES that has membership

19   agreements going out to 2046, and they are not automatically

20   terminated at that point.  There's nothing in the contract

21   that allows it to be terminated earlier, so these are very,

22   very longterm agreements.

23        And these members each make these longterm

24   commitments and, again, in terms of pooling their resources

25   through the membership entity.  These contracts require Basin,

1    Minnkota, and MRES to supply their members with their

2    wholesale electricity requirements.  And these contracts

3    require Basin, Minnkota, and MRES to charge each of its

4    members the same common rate.  They cannot charge different

5    rates.  They have to charge the same common rate.  So, all of

6    the costs incurred with respect to the resource portfolio

7    compiled and administered by each of these entities is shared

8    equally by the various members in the various states.

9         Basin, Minnkota, and MRES are not regulated by the

10   MPUC.  They are self-regulated by their boards who are, in

11   turn, elected by their membership.  These governing boards,

12   not the MPUC, review and oversee the prudence of their

13   resource portfolio decisions.  Basin, Minnkota, and MRES

14   submit resource plans to the MPUC, but for advisory purposes

15   only.  I want to underscore the distinction there.  Unlike

16   public utilities which are required to submit their resource

17   plans for approval by the MPUC, Basin, Minnkota, and MRES

18   submit theirs to the MPUC; but the only authority, if you

19   could call it such, that the MPUC has is advisory.

20        Basin, Minnkota, and MRES all plan, assemble and

21   administer their portfolios to satisfy their obligations to

22   deliver wholesale power to their membership.  They, these

23   entities, are the entities that acquire the assets.  They,

24   these entities, are the parties who enter into the longterm

25   power purchase agreements.  It's they who have these

1    obligations and enter into these transactions, not their

2    individual members.  These resource -- the assets and the

3    resource portfolios that are the aggregate of the resources

4    are owned by Basin, MRES, and Minnkota, not their individual

5    members.  These resource portfolios are not segregated on a

6    member-by-member basis.

7         216H.03 has substantially harmed Basin, Minnkota,

8    and MRES by prohibiting and restricting their use of their

9    existing resources and preventing them from obtaining

10   additional resources to be able to provide their members with

11   low cost wholesale power.  The prohibitions and restrictions

12   imposed by engaging -- imposed on engaging in the transactions

13   that are statutorily prohibited by the statute impacts all of

14   Basin, MRES, and Minnkota's members.  Again, they are all

15   charged a common rate, they all experience the cost relating

16   to -- equally experience and bear the cost relating to the

17   portfolio and any regulation of that portfolio.

18        Now, to the Court's earlier inquiry, the record

19   contains several examples of harm that has been experienced by

20   these parties and harm that has been threatened by 216H.03.

21   The first I would note and one that has been focused on quite

22   a bit in our pleadings as well as in the briefing are the

23   issues relating to Basin's transfer of electricity from its

24   Dry Forks facility in Wyoming into the Eastern Interconnection

25   to serve its members in northwestern North Dakota.  Basin now

1   faces the prospect that it will have to establish offsets for

2   its use of the Dry Forks facility.  This is not something that

3   Basin has dreamt up or imagined.  This is something that has

4   been specifically addressed and focused on in one of the PUC

5   dockets.

6            Again, I know the Court has reviewed the briefs, so

7   you're probably tired of hearing about the Dry Forks

8   facility --

9            THE COURT:  No, no, it's okay --

10           MR. BOYD:  But it's a very important one, and it's

11  one that is in limbo at the moment.  The Department of

12  Commerce raised the issue, indicating that in their view they

13  believed that the statute would apply, even though the power

14  had been transferred to serve members in another area.  Their

15  view is Basin has one single resource portfolio to serve all

16  of its members, that the Eastern Interconnection flows to some

17  of those members in Minnesota, and therefore there may be a

18  violation that would trigger offsets.

19           THE COURT:  Now, you know in the briefing there's an

20  argument made that, first of all, that the Department of

21  Commerce is not the enforcing agency so that their opinions

22  don't constitute harm, I guess.  The other argument that's

23  made is that this Court should abstain until the PUC figures

24  this out.

25           MR. BOYD:  First of all, with regard to whether the

1    DOC is the enforcing entity, the statute makes it clear it is

2    one of the enforcing entities.  This was a PUC docket

3    proceeding, but subdivision 8 of 216H.03 specifically

4    authorizes the Department of Commerce to enforce the statute

5    and to report what it believes to be violations to the

6    Attorney General for action under statute 8.31.  So, the

7    statute itself identifies the Department of Commerce as one of

8    the -- or the Commissioner as one of the public parties who is

9    responsible for enforcing the statute.  That's why the

10   Commissioner of Commerce is in this case, because the statute

11   so imposes that responsibility on him.

12          Secondly, with regard to abstention, I want to

13   underscore that that is not something that has been requested

14   or suggested by any of the parties.

15          THE COURT:  I understand, yeah.

16          MR. BOYD:  That has been suggested by the

17   environmental policy group and to my knowledge, at least in

18   the briefs, had not been embraced by the Defendants.  It

19   certainly is not embraced by the Plaintiffs.  We think that

20   that would be entirely inappropriate.  This case has been

21   pending for two years, and no one -- none of the parties --

22   have ever suggested abstention.  In fact, even the

23   environmental groups who sought to intervene quite some time

24   ago never brought up the idea of abstention until now in an

25   *amicus* brief.

```
 1              The parties and the Court have expended substantial
 2     resources in this case, and it's important for us to see it
 3     through to a final judgment.  There's nothing to be gained by
 4     requiring the parties to go through the protracted proceedings
 5     that the environmental groups themselves suggest we should go
 6     through, which would include PUC proceedings, Department of
 7     Commerce opinions, perhaps an Attorney General action, on to
 8     the District Court, on to the Court of Appeals, and then
 9     perhaps onto the Minnesota Supreme Court.  This is what the
10     environmental groups themselves suggest we do in -- under the
11     guise of abstention.  That's another way of perpetuating the
12     prohibitions in this unconstitutional statute.
13              And even if we were to exhaust all of those
14     requirements and spend all those years doing so, it's still
15     not likely that those proceedings would yield a definitive
16     determination, and we would likely end up right back here
17     before this Court.  This Court, of course, has the authority
18     to determine whether this statute is constitutional.  That's
19     exactly what the United States District Court does and should
20     do.  And that's what U.S. District Courts here and around the
21     country have done when these kinds of statutes have been
22     challenged.
23              Finally, all of the parties would benefit by a
24     decision from this Court.  Plaintiffs need a decision in order
25     to eliminate this purgatory of resource planning.  And the
```

1    Defendants themselves I think recognize they need a decision.

2    This issue has come up and will come up again in MPUC

3    dockets -- or proceedings.  And when it does come up, they

4    indicate to the parties that they can't address it, it's not

5    within their power to address the constitutional issues.  So,

6    that's not a meaningful avenue to pursue.  We would ask the

7    Court to decline the environmental group's invitation to

8    abstain.

9          With regard to the Basin situation, again I know

10   it's addressed at length in the briefs, but it is something

11   that is still an open issue.  And I believe -- certainly I

12   know that Basin wishes to get an order from this Court so it

13   can have a resolution and an understanding of what, if any,

14   obligations it would have.  It would like to have the statute

15   declared invalid to remove the threats of those required

16   offsets.  But I also believe the Defendants would like to have

17   this Court rule so as to address that issue.  That proceeding

18   has not gone anywhere, it's dormant, and we were not able to

19   reach any resolution through this litigation to determine that

20   there would be no threat of offset requirements on Basin.

21          So, we're asking this Court to address the

22   constitutionality and the validity of the statute to resolve

23   that existing harm that the -- that Basin incurs at this time.

24   And not only do they confront that problem with regard to the

25   use of their own resource, the Dry Forks facility, but they're

1    also currently and will in the future be prevented from

2    engaging either in the terms of longterm power purchase

3    agreements or power through MISO, power that's generated from

4    other new large energy facilities.  We've identified a number

5    of them in this region in Randy Porter's Affidavit.

6              Similarly, MRES and Minnkota are prevented from

7    purchasing interests or obtaining power from those new large

8    energy facilities to provide wholesale power to their members.

9    Basin, Minnkota, and MRES are all currently prevented from

10   entering into new longterm power purchase agreements with

11   generation facilities located outside of Minnesota.  And I'd

12   like to point the Court to specific pieces in the record or

13   documents in the record that reflect this.  First of all, with

14   regard to Basin, they recently went through a request for

15   proposals process seeking proposals and seeking to negotiate

16   longterm power purchase agreements.  Because the state law

17   prevents them from entering into longterm power purchase

18   agreements of five years or more for 50 megawatts or more,

19   they could not negotiate longer or bigger agreements in that

20   RFP.  And that's referred to in -- or that's described in

21   Mr. Raatz's Declaration, among other places, paragraph 25.

22             MRES has also stated in its Integrated Resource Plan

23   that the statute has expressly prevented it from entering into

24   these same kinds of longterm power purchase agreements, and an

25   excerpt reflecting that can be found in Mr. Wahle's

1    supplemental Declarations at Exhibit 1.  We didn't include the

2    entire resource plan because it's quite lengthy, but we

3    provided the cover pages and the particular excerpt.  And then

4    Minnkota -- and you can find this discussed in Mr. Tschepen's

5    Declaration.

6         Minnkota has acquired rights to surplus power assets

7    from one of the Young plants which is located in North Dakota.

8    This is an asset that belongs to Minnkota but can benefit all

9    of its members, its Minnesota members and its North Dakota

10   members, by generating revenue that, in turn, will reduce

11   their common rates.  And that's very important to their

12   members, particularly some of the members in northwestern

13   Minnesota who live in some of the poorest parts of the

14   country, and it includes Indian reservations and other areas

15   where it's not easy to pay the electric bills.  Being able to

16   maximize the value of this surplus power is very important to

17   Minnkota and its members.

18        But because of this statute and because the Young

19   facility is an out-of-state facility, that asset has been

20   devalued because power utilities in Minnesota will not

21   contract with Minnkota for longterm power purchase agreements

22   more than five years for more than 50 megawatts.  And

23   Mr. Tschepen discusses that in his -- he's talked to a number

24   of potential customers himself and they've said, "We can't do

25   it."  That's important because they can obtain a greater value

```
 1    from that power the longer term they can negotiate for that
 2    longterm agreement.  If they can get 10 years or 20 years,
 3    they're going to get a better and a higher price for that
 4    power.  And again, that will ensure, eventually to the benefit
 5    of all of their members, by reducing their common rate.  So,
 6    this surplus power asset has been devalued.  That's something
 7    that has already happened.  That's something that is an
 8    existing harm.
 9            Basin and MRES also participate in the MISO
10    system -- or the MISO energy markets, and this in turn imposes
11    a risk of incurring obligations to offset for CO2 emissions
12    associated with power they may obtain through the MISO energy
13    markets.  Mr. Porter has explained in his report that at any
14    given time the power that you would purchase from the MISO
15    market includes power that was generated by or from some of
16    these prohibited sources, whether it's a new large energy
17    facility from outside of Minnesota or power that was obtained
18    through a longterm power purchase agreement with an
19    out-of-state entity.
20            That power is part of the resource portfolio that
21    MRES and Basin supply to their members.  So, the use or the
22    purchase of power from MISO can trigger this statute.  Now,
23    one of the arguments that the Defendants have asserted and I
24    think the environmental groups have asserted is you can't know
25    for certain where that power is coming from.  As we know and I
```

1    think it's undisputed, MISO does not match sellers with

2    buyers; it just determines what would be the lowest price for

3    a particular day, clears the price, and dispatches the power.

4    Because coal is typically the most reliable and least

5    expensive, coal fuel is typically going to be part of that

6    power.  In fact, again, as Mr. Porter said, it's always going

7    to be in there.  So, what is Basin and MRES to do?  In the

8    Dairyland proceeding, which I know has also been the subject

9    of quite a bit of focus in the briefs, the MDOC established at

10   least in its arguments in that case that the statute applies

11   to purchases made from the MISO markets.  And the way the

12   statute applies is that you take a proportion of -- or you

13   conduct some kind of prorated calculus, but the basic essence

14   of the formula would be you look at what proportion of the

15   utilities portfolio includes prohibited sources and then you

16   look at what a portion of its load is supplied to Minnesota,

17   and you require an offset in that amount for those emissions.

18            Again, that's not something that the Plaintiffs have

19   dreamt up, it's not a figment of our imagination.  That's been

20   the discussion in and that was the articulated position of the

21   DOC in the Dairyland proceeding.  It was fortunate that

22   Dairyland was able to, as a matter of sheer luck, qualify for

23   one of the statutory exemptions.  Otherwise they would have to

24   struggle with coming up with some way to offset.  And since

25   I'm on the subject of offsets, another aspect of the record

1   that the Plaintiffs have developed is they have established

2   through undisputed evidence that there are no realistic or

3   available means to comply with these offset requirements.  So,

4   the transactions are prohibited, and there's no way to offset.

5           Now, the statute refers to two ways in which offsets

6   could be obtained, and these are offsets that have to be shown

7   to the PUC's satisfaction, whatever that may require.  But the

8   first way in which to offset would be to reduce an existing

9   facility's contribution to statewide power sector carbon

10  dioxide definitions.  This is not a meaningful or realistic

11  option today.  Mr. Porter has set forth in his Declaration

12  that carbon capture and sequestration technology, while it is

13  being developed and it is promising for the reduction of CO2

14  emissions, it's not currently commercially available.

15          In fact, that's one of the ironic things here is

16  that this statute impedes and interferes and prevents the

17  development of that technology.  Without access to that

18  technology, it's pointless from an economic standpoint to add

19  one resource for a certain volume of power only to be required

20  to then take off line the same or greater amount of potential

21  power out of your resource portfolio.  I don't know if I said

22  that very well, but it's basically a net nothing or a net

23  loss --

24          THE COURT:  Right, I understand.

25          MR. BOYD:  So, that first proposed way to offset is

1    not meaningful or realistic at all.  The second way to

2    purchase -- or the second way to offset is to purchase carbon

3    allowances from a state or group of states that has a carbon

4    dioxide cap-and-trade system in place.  This too is not

5    available.  It's undisputed that Minnesota has not created and

6    has not joined such a system.

7          The Defendants -- excuse me, the Plaintiffs,

8    Mr. Rutter and Mr. Raatz, as well as Mr. Porter, have

9    confirmed that these allowances are not available to Minnesota

10   utilities.  And, in fact, the Defendants do not rebut that.

11   Mr. Hempling, indeed, expressly stated he was not offering an

12   opinion on this, and Mr. Hempling is one of the experts.  He's

13   the lawyer that the Defendants have submitted a report from.

14   He stated he's not offering an opinion on this subject and he

15   was assuming that offsets are not available.

16          So, the undisputed evidence in the record is those

17   offsets are not available to the Plaintiffs, so there's no --

18   there's no way to offset.  And even if there was, the

19   paragraph that follows the description of those two ways to

20   offset indicates that the project proponent must establish

21   that the proposed offsets are permanent, quantifiable,

22   verifiable, enforceable, and would not have otherwise

23   occurred.  Each of those in and of themselves are difficult

24   standards to meet, but collectively they're essentially

25   insurmountable.  And I want to focus on the last requirement

1    there, that the offsets would not have otherwise occurred.

2           Had the GRE proceeding touched on that issue, they

3    were planning to use the Spiritwood facility in order to

4    generate coal-fueled power, and they explained to the PUC and

5    the DOC that the power from that station would have certain

6    technologies where they would be able to reduce or capture --

7    excuse me -- the CO2s -- I may be a little inarticulate in

8    terms of the technology, but basically the argument was they

9    would be able to provide this in a way that obtained offsets

10   in and of itself.  That was their plan.

11          And the environmental groups argued, well, that's

12   great, that's very laudable, but because that's part of your

13   plan, these offsets are going to occur anyway.  They don't

14   meet the standard of being offsets that would not have

15   otherwise occurred.  And if the EPA -- or if and when the EPA

16   promulgates its regulations and offsets are obtained as a

17   result of complying with those Federal Regulations --

18          THE COURT:  That won't count.

19          MR. BOYD:  -- that won't count.

20          THE COURT:  Yeah.

21          MR. BOYD:  Finally in terms of harms and injuries,

22   we've submitted supplemental Declarations from the individuals

23   from Basin, Minnkota, and MRES -- again, those are Mr. Raatz,

24   Mr. Tschepen, and Mr. Wahle -- they have established that the

25   proposed procedures for applying to the MPUC for approval of

1    transactions -- of the prohibited transactions or even ones

2    that are a close call -- and I think there's been some

3    suggestion we should again go through this process and see if

4    we can get approval for a transaction, but that's not a

5    meaningful alternative.

6          That's not the way business is done in compiling

7    these portfolios.  Seeking PUC approval would require the

8    disclosure of the confidential terms and conditions of the

9    proposed transaction.  These declarants have confirmed that's

10   a deal killer.  Conditioning the transaction on MPUC approval

11   or indemnification by the counter-party is also a deal killer.

12   Undergoing lengthy, protracted, and uncertain proceedings,

13   again a deal killer.  That's not my rhetoric, that's from

14   their supplemental Declarations.  It's not a meaningful

15   alternative.

16          So, in summary -- again focusing on Basin, Minnkota,

17   and MRES -- they have all established that they're being

18   harmed by the prohibitions imposed by the statute, and they

19   have no meaningful way to proceed with seeking offsets or

20   obtaining approval of the transactions in advance, and the

21   Defendants have not rebutted any of this evidence.  All of

22   that is not only intended to support our arguments on the law

23   but also I think clearly establishes that the parties have

24   standing to bring this case.  I focused in on Basin, Minnkota,

25   and MRES not because the other Plaintiffs do not have standing

1    but instead, as we've discussed in the earlier hearing on the

2    Defendants' motion for judgment on the pleadings, in the

3    Eighth Circuit the principle is standing for one is standing

4    for all.  So, there is more than adequate standing -- or more

5    than adequate evidence in the record to support -- or to find

6    that the parties have standing in this case.

7            If I may -- and I hope I'm not lumbering along too

8    slowly -- I would like to move onto the legal arguments.

9            THE COURT:  That's fine.  Sure.

10            MR. BOYD:  First of all, with regard to the Commerce

11    Clause, it's Plaintiffs' contention and I think it's quite

12    clear through the briefing that the statute, 216H.03, violates

13    the Commerce Clause in two basic ways.  First, it violates the

14    extraterritoriality doctrine by regulating parties' activities

15    and transactions wholly outside of Minnesota.  Second, it's

16    protectionist and discriminatory on its face because it

17    imposes burdens on out-of-state parties' interests and

18    activities without corresponding burdens on in-state parties,

19    interests or activities.

20            First, the extraterritoriality aspect.  We believe

21    the extraterritoriality scope of the statute is evidence by

22    its plain terms.  Subdivision 3(2) categorically prohibits

23    imports based on activities that occur entirely outside of

24    Minnesota.  Specifically, the statute says, quote, "No person

25    shall import or commit to import from outside the state power

1    from a new large energy facility."It's difficult to imagine
2    how a state law could begin with the words "No person shall
3    import or commit to import from outside the state" and not
4    violate the dormant Commerce Clause.
5            This is a statute that directly controls commerce
6    that occurs wholly outside the boundaries of the state.  All
7    of the regulated activities relating to the generation of the
8    regulated power from these out-of-state new large energy
9    facilities occurs entirely outside of Minnesota.  The
10   generation facility is located outside of the state, the
11   generation itself occurs outside the state, the emissions
12   associated with the generation occur entirely outside the
13   state.
14           The Court has already recognized that these terms --
15   or I should say the Court has observed in your earlier order,
16   your September 30, 2012, order, I think it was footnote 10,
17   that on its face these -- the plain language purports to
18   regulate these out-of-state activities based on the emissions
19   that are generated outside of the state --
20           THE COURT:  And isn't that the distinction with this
21   recent Ninth Circuit opinion?
22           MR. BOYD:  The out-of-state activities?
23           THE COURT:  Yes, because the Ninth Circuit opinion
24   really has to do with fuel emissions that occur in the state
25   of California that cause environmental damage in the state of

1    California, that cause economic damage in the state of

2    California and the like.

3            MR. BOYD:  That's absolutely right.  The ethanol

4    that the California law regulates may or may not originate

5    from out of state but it is something that can be traced to

6    the state.  And then when it's consumed in the state, that

7    consumption results in carbon dioxide emissions.  In the Ninth

8    Circuit, the -- and I -- as the Court has mentioned the case,

9    I'd like to go ahead and address some additional ways in which

10   I think it's inapplicable to this case.

11           THE COURT:  Sure.  Sure.

12           MR. BOYD:  First I would note that the Defendants

13   themselves I don't think even cited or relied on the case.

14   The environmental policy groups raised it and I think cited to

15   it once.  We disagree with a number of the analyses and views

16   of the Ninth Circuit.  But as the Court has already noted, the

17   key distinction is the nature of the statute that the Ninth

18   Circuit was looking at.  It's materially different from this

19   case, as is the regulator.

20           From the very outset of that opinion, the Ninth

21   Circuit focused on and underscored the fact that California is

22   different.  It's recognized in the Clean Air Act, it's been

23   recognized by Congress to have a certain stature, and it's

24   been carved out and can regulate outside of the Clean Air Act.

25   Minnesota has not been so exempted, so to the extent that

```
1    California has decided that they want to regulate the in-state

2    consumption of ethanol, which in and of itself results in

3    carbon dioxide emissions through this well-to-wheel approach,

4    that's, I think, the Ninth Circuit's view that California can

5    do that because California is unique.  Minnesota has not been

6    so exempted.

7            Second, the Ninth Circuit was analyzing a statute

8    that did not prohibit the sale or the supply of any particular

9    kind of fuel.  That's again another big distinction, material

10   distinction between that statute and 216H.03, which as I've

11   said is a resource elimination statute that categorically

12   prohibits transactions.  Even the California law doesn't

13   prohibit transactions.  It doesn't say, "You cannot engage in

14   the sale of certain ethanol."  This statute prohibits

15   transactions unless you can demonstrate offsets, which as the

16   record demonstrates, are not available.  So, it's a

17   prohibitive statute that completely eliminates the resource

18   option.

19           Third, California is regulating a good that can be

20   traced.  Ethanol is shipped through trucks and boats and can

21   be traced.  And if a supplier wants to ship it to California,

22   they have control over that.  If they don't want to send it to

23   California, they have control over that.  Electricity is

24   different.  It's injected into a regional grid.  Basin, MRES,

25   Minnkota, they can't put that electricity in a truck and make
```

1   sure it doesn't go to Minnesota.

2          And finally, the California fuel standards set forth

3   an elaborate formula and have established a cap-and-trade

4   system that enable market participants to calculate with

5   precision and in advance how they would plan to comply with

6   those requirements.  The out-of-state market participants are

7   not required to come to the California regulator and seek

8   permission or to go through a lengthy process, a PUC docket.

9          Minnesota statute provides for no such certainty.

10  There is no established or approved cap-and-trade market.  And

11  in fact the statute itself requires project proponents to come

12  before the MPUC to seek permission to try and demonstrate that

13  they can establish these offsets that are not available.  For

14  all of those many reasons, not the least of which the fact

15  that ethanol, when it's consumed, emits carbons, for all of

16  those reasons the statute that was addressed in the Ninth

17  Circuit decision, in the *Rocky Mountain* decision, is not

18  applicable to this case or this statute.

19         With regard to subdivision 3(2), again that's the

20  prohibition on importing power from new large energy

21  facilities, the contention that the power is to be

22  subsequently -- after it's generated is to be imported and

23  consumed in Minnesota does not justify regulating a

24  transaction that otherwise involves parties and generation

25  sources and activities that are wholly outside of the State of

1    Minnesota.  There's nothing about importing or consuming that

2    electricity that results in CO2 emissions.  The statute

3    focuses entirely on regulating emissions that occur outside

4    the state of Minnesota.

5            Subdivision 3(3) of the statute categorically

6    prohibits certain longterm power purchase agreements for power

7    generated outside the state of Minnesota.  Again, this statute

8    directly controls commerce occurring wholly outside the

9    boundaries of the state.  All of the regulated activities

10    relating to the generation associated with these new longterm

11    power purchase agreements occur outside of Minnesota.  The

12    generation is outside, the emissions are outside, all of the

13    activities that would trigger regulation occur outside of

14    Minnesota.

15            The contention that the power may be generated --

16    and I would -- we've made this distinction and I want to take

17    this opportunity to underscore it, we dwelled on it in our

18    reply brief that there are important distinctions between

19    capacity to generate power on the one hand and power.

20    Subdivision 3(2) which talks about importing power is dealing

21    with the concept of power that's been generated and is flowing

22    through the transmission system.subdivision 3(3)), which deals

23    with new longterm power purchase agreements deals with

24    capacity, and that's the capacity to generate power.

25            However, just because power may be generated from

1    the longterm power purchase agreement and may be consumed in

2    Minnesota does not justify regulating a transaction and a

3    generation activity that otherwise occurs entirely outside the

4    state of Minnesota.  Again, this statute focuses entirely on

5    regulating emissions that may occur, if at all, outside of the

6    state of Minnesota.  In our view, subdivisions 3(2) and 3(3)

7    are classic violations of the extraterritoriality doctrine.

8    They reflect Minnesota's disapproval with activities occurring

9    in other states and seek to regulate those out-of-state

10   activities.  That is unconstitutional.

11           The environmental groups and I think perhaps the

12   Defendants, as well, have argued that this extraterritoriality

13   doctrine does not apply in this case because the doctrine only

14   applies to price fixing statutes.  That's simply wrong.  I

15   recognize that the Ninth Circuit has ensconced that view in

16   the *Rocky Mountain* case and in another recent case, but that

17   is the Ninth Circuit's view.  That is not the view taken by

18   the United States Supreme Court.  The focus for that view has

19   been *Pharmaceutical Research and Manufacturers versus Walsh*, a

20   2003 decision, and it focuses on one paragraph of a very

21   lengthy decision.

22           That case involved whether a statute that addressed

23   pricing of prescription drugs violated the

24   extraterritoriality -- well, it addressed a number of issues,

25   but in this particular instance or this particular part of the

1  decision, the Court was addressing whether the statute

2  violated the extraterritoriality doctrine.  Again, the statute

3  at issue was a statute that dealt with pricing for

4  prescription drugs.  So, the argument was it was a price

5  control statute.

6          When Justice Stevens wrote that paragraph -- and

7  again this all revolves around one paragraph of a very lengthy

8  decision.  When Justice Stevens wrote that decision, he was

9  focusing within the framework of the argument that had been

10  made, and that is this is an unlawful price control statute.

11  And Justice Stevens said, "It's not a price control statute,

12  so we're not going to apply the doctrine."  He didn't say it

13  can never be applied to any other statutes, any non-price

14  control statutes.

15          And I would think that if the Supreme Court was

16  going to overrule its prior *juris prudence* on the

17  extraterritoriality doctrine, it would have done so expressly

18  and would not have left it for some divining from a paragraph

19  in a long opinion.

20          THE COURT:  And arguably this Seventh Circuit

21  opinion that you bring to the Court's attention, this *National*

22  *Solid Waste Management*, isn't the application of the

23  extraterritorial provision to a non-price fixing?

24          MR. BOYD:  Yes, it is.  The Seventh Circuit, the

25  *Meyer* case, does exactly that.  And more recently, the

1    *Pharmaceutical Versus Walsh* case was a 2003 case, more
2    recently -- in fact, in the last year -- the Sixth Circuit
3    applied the extraterritoriality doctrine to a bottle labeling
4    law out of Michigan.  And the Sixth Circuit said, "We're not
5    really sure whether or not this still makes sense to have an
6    extraterritoriality doctrine, but it does apply, it's still
7    the law."  And so they applied it to strike down that Michigan
8    law.  They applied the extraterritoriality doctrine to strike
9    down a Michigan law that was not a price control law.
10              And then one of the judges issued a concurrence
11   saying that we think that this is a decision that merits the
12   Supreme Court's attention, and we hope they take it.  The
13   Supreme Court denied cert.  The Eighth Circuit, as well as the
14   other circuits -- the Seventh Circuit, the Sixth Circuit,
15   several other circuits -- both before and after the
16   *Pharmaceutical Research Versus Walsh* case, have applied the
17   doctrine to statutes that are not price control or price
18   fixing statutes.  The second basic argument that the
19   Plaintiffs assert in terms of the way in which 216H.03
20   violates the Commerce Clause is on its plain language, it is
21   protectionist and discriminatory against out-of-state
22   interests, and it does not similarly impose burdens on
23   in-state interests.  The statute inherently discriminates
24   against out-of-state interests by seeking to eliminate the use
25   of coal as a fuel source.

1          This is a substance of which Minnesota has none, but

2    as I indicated at the outset, this is something that its

3    neighboring states rely upon heavily in their economies, not

4    only for revenue but for low cost and reliable

5    power.subdivision 3(2) applies solely to prohibit the

6    importation of power from new coal generation facilities

7    located outside the state of Minnesota.  The Defendants have

8    argued this is an even-handed regulation because the

9    subdivision right before that, subdivision 33(1), prohibits

10   the construction of new large energy facilities in Minnesota.

11   In fact, this is not evidence of evenhandedness.  As noted,

12   Minnesota has no coal.  In this day and age of RTOs, there is

13   no economic justification for incurring the cost to transport

14   coal here to generate power.  So, 3.1 is prohibiting something

15   that would never happen given the structure of the grid and

16   the electronic -- or the electric energy markets of today.

17          With the development of MISO and the integrated

18   markets, there's no longer any reason that anyone would build

19   a coal fuel plant in Minnesota because the generator can now

20   offer the power into the energy markets from any location and

21   forego the cost necessary to transport the coal to

22   Minnesota.subdivision 3(3) also facially discriminates against

23   out-of-state interests by applying solely to longterm power

24   purchase agreements with existing power sources located

25   outside the state of Minnesota while imposing no such burdens

1    on a longterm power purchase agreements with power sources

2    located within the state.  Subdivision 3(3) prohibits longterm

3    power purchase agreements that would increase the statewide

4    power sector carbon dioxide emissions.

5           The use of the word "increase" is unique to that

6    provision.  With regard to subdivision 3(2) which prohibits

7    importing from new large energy facilities, that applies if

8    that transaction would contribute to the statewide power

9    sector carbon dioxide emissions.  "Contribute" versus

10   "increase."So, the prohibited transaction under 3(2), large

11   new energy facilities will always trigger, it will always

12   contribute to the statewide power sector carbon dioxide

13   emissions; 3(3) will only be triggered if the transaction

14   increases the state power carbon sector dioxide emissions.  A

15   longterm energy contract with a generation source inside the

16   state of Minnesota will never trigger that provision; that's

17   because the emissions from that existing facility in Minnesota

18   is already counted as part of the statewide power sector

19   carbon dioxide emissions.

20          The statute and that definition, I believe, is in

21   subdivision 2 of section 216.03.  Subdivision 2 defines

22   "statewide power sector carbon dioxide emissions" as "the

23   total annual emissions of carbon dioxide from the generation

24   of electricity within the state, and all emissions of carbon

25   dioxide from the generation of electricity imported from

1    outside the state and consumed in Minnesota."  So, the

2    in-state -- the existing in-state facilities emissions are

3    already calculated as part of the total annual emissions of

4    carbon dioxide from the generation of electricity within the

5    state, contracting -- entering into a new longterm power

6    purchase agreement with that in-state entity will not increase

7    the power sector emissions because those emissions from that

8    facility are already counted, whereas -- well, I'll pause.  I

9    want to make sure I'm clear on that.  The only entities -- or

10   the only -- well, the only entities that have the potential of

11   increasing the power -- the public power sector carbon dioxide

12   emissions are out-of-state entities.

13          Again, this is not something that I dreamed up or is

14   a figment of the Plaintiffs' imagination, this is something

15   that has been addressed in the PUC dockets.  And as examples,

16   in my supplemental Declaration, the Boyd supplemental

17   Declaration, Exhibits Y and Z -- I believe it's Exhibits Y

18   and Z -- include an exchange between the Department of

19   Commerce and Basin dealing with a longterm power purchase

20   agreement with the Boswell facility, which is located in

21   Minnesota.  And the DOC questioned whether or not that would

22   trigger the statute.  And Basin responded saying it would not

23   trigger the statute because the emissions from Boswell are

24   already counted, so entering into -- whether it's Basin or

25   anybody else, entering into a longterm power purchase

1    agreement with that entity will not increase the statewide

2    public power -- or excuse me, the statewide power sector

3    carbon dioxide emissions.  And there has been no enforcement

4    action taken as a result of that longterm power purchase

5    agreement with the in-state facility, Boswell.

6           I'd like to respond briefly to some of the arguments

7    the Defendants have made in response to the Commerce Clause

8    challenges.  First, they've asserted that this statute is

9    merely an extension of Minnesota's traditional authority to

10   regulate.  That's simply not true.  Minnesota's traditional

11   authority to regulate has focused on Certificates of Need and

12   siting and construction and operation of power plants inside

13   of Minnesota.  And to some extent the siting and construction

14   of transmission equipment inside of Minnesota.  And they

15   also -- at least the PUC -- has a limited authority over

16   public utilities to determine the retail rates that those

17   utilities can charge to their consumers.  But the authority to

18   determine what retail rates public utilities can charge to

19   their consumers does not give them the authority to regulate

20   either transmission or wholesale transactions.

21          The PUC's authority to regulate rates that public

22   utilities can charge to their customers does not apply to

23   co-ops or municipalities.  Furthermore, it's based on a

24   prudence review, which is essentially a determination of what

25   costs can be passed through to the consumer.  It doesn't give

1    them control over the wholesale transaction.  The utilities

2    engage in the wholesale transaction, and then the PUC can

3    determine whether or not that was a prudent transaction and

4    whether or not the cost can be passed through.  But that is

5    not a regulation of the wholesale transaction.

6            This is not a resource planning statute.  Again,

7    it's a resource elimination statute.  This is a punitive

8    statute.  It punishes anyone who participants in these

9    prohibited transactions.  And lastly, this is not an extension

10   of the renewable portfolio standards.  The Plaintiffs do not

11   concede that renewable portfolio standard laws are

12   constitutional.  That's not the subject of this lawsuit, but

13   it bears noting that these statutes have been passed in other

14   states and are the subject of ongoing litigation.  That is an

15   open question, whether or not these are constitutional laws.

16           We would prefer to focus on the material differences

17   between this statute and the RPS statute.  Whereas the

18   renewable portfolio standard law is intended to promote

19   diversification and, in turn, promote reliability and obtain

20   lower cost power for the consumer, in contrast to that

21   objective of the renewable portfolio standard, 216H.03 is a

22   resource elimination statute.  It is anti-diversification.

23   And again, it's eliminating a resource that traditionally has

24   been the most reliable and least cost alternative, so it's

25   anti-diversification in order -- or not in order but that

1    would achieve higher cost and less reliability.  So, it's

2    entirely different in that respect from RPS.

3            RPS, renewable portfolio standards, statutes did do

4    not dictate what transactions a utility can engage in, whereas

5    216H.03 categorically prohibits and perpetuates that

6    prohibition of certain transactions.  And finally, renewable

7    portfolio standards do not require state approval for

8    particular transactions.  Again, 216H.03 requires project

9    proponents to come before the MPUC to obtain on approval of

10   the prohibited transactions.  Moving on -- and I'll try and be

11   more brief with regard to the preemption arguments.

12           Moving onto the Clean Air Act.  This statute is

13   preempted by the Clean Air Act.  216H.03 attempts to regulate,

14   quote, "emissions of carbon dioxide from the generation of

15   electricity within the state and all emissions of carbon

16   dioxide from the generation of electricity imported from

17   outside of the state and consumed in Minnesota."  That's a

18   direct quote from subdivision 2 of the statute, and that is a

19   direct violation of the Clean Air Act, that is because the EPA

20   has been assigned the responsibility of determining whether

21   and to what extent to which carbon dioxide emissions from

22   power plants should be regulated.

23           The Supreme Court has held in *American Electric*

24   *Power versus Connecticut* that carbon dioxide constitutes an

25   air pollutant under the Clean Air Act and that Congress has

```
1    delegated to the EPA -- not to Minnesota -- Congress has

2    delegated to the EPA the decision of whether and how to

3    regulate carbon dioxide emissions from power plants.  And in

4    fact, the EPA is in the midst of a process of promulgating

5    proposed regulations of carbon dioxide emissions associated

6    with coal generation of electricity.  Once a pollutant falls

7    within the EPA's regulatory framework, as with carbon dioxide,

8    any effort to regulate or preclude emissions of that pollutant

9    must proceed through the process created by Congress and the

10   EPA.

11            Relying on this principle, courts have rejected

12   federal common law nuisance claims.  In the *American Electric*

13   *Power* -- excuse me, I'll just make a statement here first

14   before giving you the authority.  Relying on these principles,

15   the courts -- the federal courts, the Supreme Court and the

16   Circuit Courts -- have rejected federal common law nuisance

17   claims, federal law -- or federal common law -- excuse me --

18   federal common law nuisance claims, state law common law

19   nuisance claims, and state statutes.  So, federal common law,

20   state common law -- and state law -- state statutes, the

21   Supreme Court has struck all of those down where those

22   statutes seek to circumvent or supplement the federal

23   regulatory scheme.  In this case, section 216H.03 apparently

24   seeks to supplement the federal regulatory regime.

25            Minnesota is barred from doing that.  Minnesota
```

```
 1    cannot create its own regime, whether it's intended to
 2    circumvent or supplement.  It's not for Minnesota or any other
 3    state to deviate from the longstanding structure by
 4    superimpose -- the longstanding federal regulatory structure
 5    by superimposing its own standards.  So, Minnesota is not
 6    authorized to regulate CO2 emissions from power plants.
 7    Independent of this, even if they somehow had the authority to
 8    regulate the emissions within Minnesota, Minn. Stat. § 216H.03
 9    goes beyond that and seeks to regulate all emissions of carbon
10    dioxide from the generation of electricity that is imported
11    from outside of the state.  They purport and seek to regulate
12    carbon dioxide emissions that occur outside of Minnesota --
13              THE COURT:  Let me interrupt you, and this is
14    getting you off track but it reminded me of another point.
15    Isn't that also an argument that can be made under the dormant
16    Commerce Clause analysis with respect to extraterritorial
17    application, that is that other states that attempt to
18    regulate carbon emissions, they could conflict and --
19              MR. BOYD:  That's right.
20              THE COURT:  -- and the balkanization theory, you
21    didn't mention it --
22              MR. BOYD:  It is, and that is certainly an argument
23    that the Plaintiffs assert, that this type of state-by-state
24    regulation of CO2 emissions will give rise to balkanization.
25    If this statute is permitted to stand, it would be my opinion
```

1    that it's quite likely that there would be balkanization

2    because allowing this statute to stand would give those other

3    states a blueprint, and they would know the framework of this

4    statute that they could pass in their own states.  And rather

5    than prohibiting emission sources -- excuse me -- generation

6    sources that emit carbon dioxide, they may decide to outlaw

7    nuclear power or biomass or any number of different

8    resource -- or generation sources.

9            So, there would be most certainly the concern of

10   balkanization --

11           THE COURT:  And I think it would be most vulnerable

12   in this offset cap-and-trade issue if everybody had a

13   different rule about it.

14           MR. BOYD:  That's exactly right.  And the way New

15   England has addressed this issue, for example, the states have

16   worked cooperatively.  There is not a state in New England

17   that has said, "Okay, we're going to take control of this,

18   we're going to pass a law and hoist it on everyone else."

19   They work cooperatively.  And that was something that

20   Minnesota seemed to be intending to do when Governor Pawlenty

21   signed on to the Midwest Greenhouse Gas Accord.  That was a

22   document that, I think, indicated that the states would work

23   cooperatively to develop cap-and-trade systems or other

24   regulations, not imposing their will on the other states but

25   working cooperatively as they've done in New England.

```
 1                That is not what this statute does.  And, again, if

 2      this statute is upheld, it's a blueprint and it gives the

 3      other states in this region the ability to pass their own law

 4      prohibiting their least favorite generation source in order to

 5      promote their most favored generation source.  And that will

 6      balkanize and will interfere with any potential for a

 7      cap-and-trade system.  As I indicated, the second argument on

 8      the Clean Air Act is that Minnesota does not have that

 9      authority to impose its will on other states.

10                In fact, the Clean Air Act and the EPA have

11      recognized that there may be instances where states may have

12      concerns about emissions that are occurring in other states,

13      and there are procedures that are established for that state

14      to Petition the EPA for relief.  And if the EPA ignores them

15      and ignores their Petition and their expression of concern

16      about emissions occurring in another state, the law allows

17      them to come to federal court to review the EPA to take

18      action.  That is The avenue.  That's the established avenue

19      and the exclusive avenue that states have if they have

20      concerns about emissions in other states.

21                Lastly, the Minnesota -- Minn. Stat. 216H.03 is

22      preempted by the Federal Power Act.  The Supreme Court stated

23      long ago in *Attleboro*, and Congress established in the Federal

24      Power Act that the federal government has exclusive authority

25      to regulate the transmission of electric energy that flows
```

1    through interstate commerce and the sale of energy at

2    wholesale that flows through interstate commerce.

3    Nonetheless, 216H.03 seeks to regulate transmission and

4    wholesale transactions.  First with regard to its regulation

5    of transmission, 216H.03 does so in a number of ways.

6    First -- and, again, I'm focusing on 216H.03, the first

7    subdivision, subdivision 1, expressly defines new large energy

8    facilities to include transmission lines.

9           Second, subdivision 2 specifically includes

10   transmission line losses as part of the definition of what

11   constitutes statewide power -- statewide power sector carbon

12   dioxide emissions.  It specifically includes transmission line

13   losses as part of that definition.  And third and most

14   importantly, subdivision 3(2) necessarily applies to the

15   transmission of power.  That's the prohibition on importing or

16   committing to import power from a new large energy facility

17   outside the state of Minnesota.  As we've discussed earlier

18   today, power is electricity that has been generated and is

19   flowing through interstate commerce.  The term "import" refers

20   to the transmission of that power.  That's what that term

21   means in the RTO world.

22          In the old days when participants would focus on

23   contract path, maybe "import" meant something else.  But

24   today, the word "import" means the transmission of that power

25   from that out of state source into Minnesota.  And 216H.03

1    imposes all of its prohibitions, terms, conditions, and

2    uncertain costs on those transmission activities.  The statute

3    also regulates the sale at wholesale of power that flows

4    through interstate commerce.  As we've discussed a number of

5    times this morning, subdivision 3(2) prohibits any person from

6    importing or committing to import from outside the state power

7    from a new large energy facility.

8           If and when Basin, Minnkota, and MRES engages in

9    those activities, they are engaged in wholesale transactions.

10   That's what they do.  They deal in wholesale power.  And when

11   they provide that power to their members, that's a wholesale

12   transaction.  When they acquire that power, that's a wholesale

13   transaction.  That's entirely wholesale, and Minnesota does

14   not have the authority to regulate those transactions.

15          Similarly, subdivision 3(3) also seeks to regulate

16   wholesale transactions by prohibiting any person from entering

17   into a new longterm power purchase agreement that would

18   increase the statewide power sector carbon dioxide emissions.

19   Again, Basin, Minnkota, and MRES, when they engage in those

20   activities, when they transact and enter into a new large

21   energy -- excuse me, a new longterm power purchase agreement,

22   that's a wholesale transaction that involves wholesale power.

23   And if and when that power is delivered by the source to the

24   member, that's a wholesale transaction; that is not a retail

25   transaction.  So, 216H.03 seeks to impose restrictions and add

1    cost to those purely wholesale transactions.

2            FERC is the only entity with the authority to

3    evaluate and control the implications of such transactions and

4    expenses on a regional and national basis.  216H.03 plainly

5    interferes with FERC's plenary authority to set wholesale

6    rates and regulate all agreements that might effect those

7    wholesale rates.  216H.03 does not constitute a state

8    regulation involving the sale at local retail rates.  Again,

9    Minnesota's traditional authority has been limited to the

10   siting and construction of power plants and transmission

11   agreements and retail prices that are charged to the consumer.

12           But as we've discussed, the retail -- the authority

13   that the PUC has to oversee those rates charged by public

14   utilities does not apply to co-ops, does not apply to munis.

15   It also is subject to the application of a prudency review.

16   It's not dictating wholesale transactions, it's not

17   interfering with wholesale transactions.  Utilities engage in

18   the transactions that they believe are likely to provide the

19   most reliable and least cost power.  And then the MPUC

20   determines whether or not that's the case and whether those

21   costs can be passed through as a retail -- in the form of the

22   retail rate.

23           That's entirely a retail transaction.  That does not

24   give the MPUC or Minnesota otherwise the authority to regulate

25   the wholesale transactions that MRES, Minnkota, and Basin are

1    engaged in.  There simply cannot be a dispute that the federal

2    government has exclusive jurisdiction over the terms and

3    conditions of wholesale transactions, and if states engage in

4    the process -- in a process that amounts to wholesale

5    ratemaking, they're exceeding their authority.

6              I'd like to finish just by citing to a couple of

7    very recent cases, one of which is in our brief.  The *PPL*

8    *Energyplus versus Nazarian* case from the District of Maryland

9    that was decided on September 30 of this year, and we've cited

10   to it.  In that case, the Court held that a generation order

11   issued by the Maryland PUC was a violation of the Federal

12   Power Act and struck it down as being preempted.

13             The Court in that case said, quote, "The Court does

14   not perceive, for purposes of field preemption, any meaningful

15   difference between state actions directed on the demand side

16   of the wholesale transaction and those directed to the supply

17   side of the wholesale energy market."  So, there's no merit to

18   the Defendants' argument and the environmental groups argument

19   that the State is entitled to regulate the purchase or the buy

20   side of a wholesale transaction.  The only, quote, "Regulation

21   that they're authorized to engage in involves public utilities

22   and relates to whether or not a cost incurred by that public

23   utility in a wholesale transaction can be passed on to the

24   retail consumer in the form of the rate."

25             The other case I would note similar to the *Maryland*

```
 1    case is a case from the District of New Jersey, and this was
 2    a -- this is a continuation or maybe a conclusion of a case
 3    that the Court had cited to in your September 30, 2012, order.
 4    It's in the proceeding of PPL Energyplus versus Solomon.  The
 5    Court had cited to the order in that case which had denied a
 6    motion to dismiss.  The Defendants had argued that the
 7    Plaintiffs had not established -- or stated a claim for
 8    preemption under the Federal Power Act.  The Court rejected
 9    that, the case went forward.  Last Friday the Court issued its
10    findings and held that, in fact, the Maryland statute -- or
11    excuse me the New Jersey statute does violate the Federal
12    Power Act --
13            THE COURT:  Do I have a copy of those findings?
14            MR. BOYD:  No, you do not.  That came down last
15    Friday.
16            THE COURT:  Okay.  Is it possible you could provide
17    that to the Court?
18            MR. BOYD:  Absolutely.
19            THE COURT:  Okay.
20            MR. BOYD:  Your Honor, I greatly appreciate your
21    time and patience in hearing me out this morning.  And we
22    would again ask the Court to grant Plaintiffs' motion for
23    summary judgment, to hold that this statute is
24    unconstitutional and cannot be enforced, and to deny the
25    Defendants' motion for summary judgment in all respects.
```

```
1                THE COURT:  Thank you, Mr. Boyd.

2                MR. BOYD:  Thank you.

3                THE COURT:  Mr. Cunningham, we're going to take a

4      brief break, allow the court reporter a moment and everybody

5      else a moment, so we will resume at 11:00 a.m.  Court is

6      briefly adjourned.

7                (Short break taken.)

8                THE COURT:  Mr. Cunningham.

9                MR. CUNNINGHAM:  May it please the Court, my name is

10     Gary Cunningham.  I'm an attorney with the Minnesota Attorney

11     General's office, and I represent the members of the Public

12     Utilities Commission and the Commissioner of the Department of

13     Commerce.

14               The question before the Court is the

15     constitutionality of a state statute.  You've heard a lot

16     about this statute.  It's a part of what is known as the Next

17     Generation Energy Act.  It was passed in 2007 by the State

18     legislature and signed into law by the Governor.  Among other

19     goals for the Next Generation Energy Act provides for the use

20     of more renewable energy and for more energy conservation.

21     The Next Generation Energy Act is essentially an act of good

22     citizenship on the part of Minnesota with respect to both the

23     needs of its citizens now and in the future and with respect

24     to the future as a whole.

25               With respect to the portion of the Next Generation
```

1    Energy Act that's at issue in this case -- this is this

2    216H.03 is a resource regulation statute -- it does deal with

3    a resource because it's used to generate energy in this

4    state --

5              THE COURT:  But it is unprecedented, and there is no

6    coal that generates electricity in this state, right?

7              MR. CUNNINGHAM:  Your Honor, if we're looking at the

8    Commerce Clause --

9              THE COURT:  No, I'm just looking at what you just

10   told me.  You said it regulates resources in this state.  It

11   regulates coal that generates electricity, and there is no

12   coal-generated electricity in this state.

13             MR. CUNNINGHAM:  No, there is coal-generated

14   electricity in this state.  There are coal plants in this

15   state.  The Boswell plant that Plaintiffs mentioned is in this

16   state.  It's a coal-burning state.  There are coal plants in

17   this state.  The statute forbids the construction of new coal

18   plants in this state --

19             THE COURT:  And, of course, we're not concerned

20   about the regulation of any activity in this state.  That's

21   fine.  The regulation of -- this state does have the power, I

22   think, to control emissions if they were to exist from

23   coal-generating plants in this state.  The question is whether

24   it has the power to regulate resources outside the state.

25             MR. CUNNINGHAM:  And it is not regulating resources

```
 1    outside of the state.  It is regulating the use of electricity

 2    in the state --

 3           THE COURT:  But, you see, what makes it different is

 4    this:  Electricity that comes to this state, to our consumers,

 5    is not harmful.  It's not like the fuel emissions in

 6    California or tainted food or flammable clothing.  We would

 7    have a local interest in regulating any product that is

 8    received by our consumers that is harmful.  Electricity is not

 9    harmful.  Nobody disputes that.

10           The only harm that occurs is at the point of

11    generation.  So, to the extent that this statute purports to

12    regulate out-of-state coal generation, it is regulating it

13    only out of state.  There is nothing harmful about that

14    electricity when it arrives in our consumers' homes.

15           MR. CUNNINGHAM:  Your Honor, I understand your

16    point, but that is a point questioning the wisdom of the

17    statute, not whether the statute is unconstitutional or not --

18           THE COURT:  No, I think it bears directly on the

19    extraterritorial argument.

20           MR. CUNNINGHAM:  Well, the legislature determined

21    that we did not want to rely on coal-generated electricity

22    because coal, as a resource, has two problems.  One of the

23    problems is its future is unknown.  If anything, the future of

24    coal is not good because the price of coal is going to go up

25    due to what is known in economics as "externalities."  So,
```

1    that is a legitimate basis to regulate a resource is whether

2    it's a stable source for future energy.

3        Another legitimate reason to regulate a resource is

4    the problems associated with that resource or the good things

5    associated with that resource.  For example, the Next

6    Generation Energy Act calls for the use of more renewable

7    energy.  That's not focusing on the electricity, that's

8    focusing on the source of the electricity.  And having more

9    renewable energy is good because fossil fuels are a limited

10    future resource --

11        THE COURT:  Nobody disputes that, and nobody

12    disputes that -- frankly, that we have a problem with -- in

13    this country with emissions from coal-generating plants that

14    we need to address.  The question here is not the

15    environmental issue.  That's pretty well-settled.  The

16    question is the power of the Minnesota legislature under the

17    Constitution and under the federal frameworks that directly

18    address these issues to superimpose itself on entities

19    entirely outside the state.

20        MR. CUNNINGHAM:  Excuse me, Your Honor.  Your Honor,

21    under the law that's been -- first of all, I want to point out

22    that my point about the resources, we can positively regulate

23    for resources and we can negatively regulate for resources

24    because resources, it is a legitimate concern that these

25    resources have different manifestations of future problems --

```
 1              THE COURT:  And you can do that in the state of

 2    Minnesota all you want.

 3              MR. CUNNINGHAM:  Okay.  So, if we say by -- invest

 4    in -- if, in a particular case, the Commission says there's a

 5    low cost resource, wind resource in North Dakota, it can say

 6    that's okay.  And that's what I want to address.  This -- if

 7    we look at -- you said it doesn't matter, it offends the

 8    Constitution because Minnesota doesn't have any coal.  Well,

 9    that means we couldn't be --

10              THE COURT:  No, I don't think that's what I said.

11              MR. CUNNINGHAM:  Okay.  I apologize.

12              THE COURT:  I said that this statute offends the

13    Constitution to the extent that it reaches entities in other

14    states and regulates them there.  The only harmful activity

15    that occurs, I think we can agree, is from the generation of

16    the coal.  That is -- that is where the harm occurs.  That's

17    where the emissions occur in this industry.  Right?

18              There is nothing harmful about the product that

19    arrives in Minnesota.  It's not a tainted food product, it's

20    not even a fuel emission.  There is nothing harmful to the

21    citizens of the state of Minnesota by consuming electricity

22    that was, in fact, generated in North Dakota by coal.

23              MR. CUNNINGHAM:  Well, you're right, Your Honor, and

24    we're not suggesting that there is anything.  What we're

25    saying is what the legislature determined the wisdom of this
```

1    is that we do not want —— we do not think it's in the public

2    interest to rely on a resource that produces problems.  It

3    produces two problems.  It produces emissions that aren't

4    limited to the area.  The atmosphere is a volatile place;

5    those emissions go beyond the borders.  They don't —— those

6    emissions don't recognize the borders between North Dakota and

7    Minnesota.

8              And second, that the resource itself is a risky

9    commodity.  That is a reasonable decision that the legislature

10   can make ——

11             THE COURT:  Those are interests of citizens

12   generally.  Okay?  Citizens around the country generally have

13   those interests.  There's nothing unique to Minnesota citizens

14   about that, and so —— let me finish, please ——

15             MR. CUNNINGHAM:  I'm sorry.

16             THE COURT:  And so that's why we do have federal

17   regulatory agencies focusing directly on those interests.

18   You're right that there is a concern.  I said that from the

19   outset.  I think it's clear that there's an environmental

20   concern, but that that is a concern whether it's air floating

21   between North Dakota and Minnesota and Wyoming or it's the

22   commodity concern that you raise.  That is not a local

23   interest unique to Minnesotans.  That is a common interest we

24   have in this country.

25             MR. CUNNINGHAM:  No Court has ever said that it has

```
1    to be unique.  For example, if Minnesota has a statute that is
2    concerned about disposing of milk cartons, that has been
3    upheld every other state -- it would apply to any other
4    locality.  It's whether it's an actual local concern, not
5    whether it's a unique local concern but whether it's an actual
6    local concern --
7              THE COURT:  But because disposing of milk cartons
8    might cause harm in this state, right?
9              MR. CUNNINGHAM:  I understand, but your point was
10   that it wasn't unique, and there's no requirement that it be
11   unique --
12             THE COURT:  I had two points.  One is that
13   electricity coming to the state is not harmful, that the harm
14   occurs at the point of generation, unlike the many interests,
15   local interests we have with respect to harmful products.
16             MR. CUNNINGHAM:  Your Honor, it's not just -- it's
17   not just the harm to the environment that's being analyzed
18   here, it's also the harm from entering into longterm contracts
19   for a risky commodity.  That's a --
20             THE COURT:  That's not a Minnesota unique harm.
21   That's my only point, is that's an issue we have with coal all
22   over this country.
23             MR. CUNNINGHAM:  I understand.  And what federalism
24   is based on is that states are laboratories of
25   experimentation, and my point is that the State has the right
```

```
 1    to deal with this --

 2              THE COURT:  Well, let's focus on that, then --

 3              MR. CUNNINGHAM:  Okay.

 4              THE COURT:  -- looking at the constitutionality of

 5    it.

 6              MR. CUNNINGHAM:  All right.  I would like to just

 7    put this in a context, and, believe me, I will not take an

 8    hour to get to the constitutionality --

 9              THE COURT:  You're welcome to take as long as

10    Mr. Boyd took.

11              MR. CUNNINGHAM:  I'm not going to.  The more

12    questions that are -- that you have that are unanswered about

13    the operation of this statute, the more this whole case is

14    premature.

15              The Public Utilities -- Mr. Boyd talked a lot about

16    regulatory matters, a lot about how his Plaintiffs -- his

17    clients -- do their utility business.  That is something that

18    they should bring before the Public Utilities Commission

19    because the Public Utilities Commission has the technical

20    analysts and structures to deal with those kind of things --

21              THE COURT:  Is this a primary jurisdiction argument

22    or an abstention argument?

23              MR. CUNNINGHAM:  Actually, it's a ripeness argument.

24    The whole point of ripeness when agencies are involved -- I'm

25    going to quote this, it's a long quote and I apologize --
```

```
 1              THE COURT:  Well, just read it slowly.

 2              MR. CUNNINGHAM:  I will.

 3              THE COURT:  Okay.

 4              MR. CUNNINGHAM:  "The basic rationale of the

 5   ripeness doctrine is to prevent Courts, to avoidance of

 6   premature adjudication, from entangling themselves in abstract

 7   disagreements over administrative policies, and also to

 8   protect the agencies from judicial interference until an

 9   administrative decision has been formalized and its effects

10   felt in a concrete way by the challenging parties."

11              THE COURT:  So you're saying to me because -- since

12   2007, which is now six years -- the Minnesota Public Utility

13   Commission -- which I can understand has had a challenging

14   time figuring out what on earth this statute means, and this

15   case is two years old -- that I should just wait for them to

16   figure that out, however long that takes?  I don't think so.

17   I have the power to look at the statute, on its face, and on

18   its face to determine whether it's constitutional.  And I have

19   the power to do that now.  I don't need to abstain to the

20   agency.

21              MR. CUNNINGHAM:  Your Honor, I was not disputing

22   your power.  I was saying that to the extent that you have

23   unanswered questions, my goal here is to answer all your

24   questions and make this as clear as possible --

25              THE COURT:  But isn't that part of the challenge
```

1    here?  I appreciate the struggle the State has had with this

2    statute is that many of the interpretations, for instance,

3    promoted in your briefing, are just that.  The language itself

4    is not, in fact, in the statute.  It's a difficult statute to

5    understand, frankly.

6              MR. CUNNINGHAM:  You're right, Your Honor.  And

7    that's -- the Public Utilities Commission has

8    quasi-legislative authority, and that's what sets this case

9    off from other cases.  And, in fact, in cases dealing with

10   public agencies -- and the *MPUC versus the FCC*, it's an Eighth

11   Circuit case, 483 F.3d 570 -- in that case, the FCC, in an

12   order, said, if we are -- said something to the effect that,

13   "If we are confronted with a particular fact situation, we are

14   inclined to rule in a particular way."  The Court said that

15   wasn't ripe.  Even when the agency indicated how it's going to

16   rule, the Court determined that that wasn't ripe.

17             The Public Utilities Commission has the authority

18   not only to determine, for example, who a "person" is in this

19   statute, they have the authority to determine what "import"

20   means and how you prove import.  They have the authority to

21   determine what "increase" means and how that's proven.  They

22   have the authority -- let's just take what Mr. Boyd was

23   talking about about Basin and Minnkota.  They're saying that

24   it's impossible for them to satisfy the statute, and I think

25   their goal is to have you -- is to have you determine that.

1          One of their -- one of the Plaintiffs' -- one of the

2   Plaintiffs' representatives in a deposition -- we refer to

3   this in our brief -- said this is a preemptive strike to have

4   the Court determine what the statute means so Minnesota will

5   be bound by it.  Those aren't his exact words, but that's

6   what's going on here:  They want the Court to determine that

7   it's impossible for Basin Electric to satisfy the statute.

8   But my point is that's something the Public Utilities

9   Commission could determine.  And if the Public Utilities

10  Commission determined that it was impossible for Basin

11  Electric to satisfy the statute, then there wouldn't be any

12  harm and we wouldn't have a case here.  That's the whole point

13  of why it's not ripe:  There might not be a case here.

14          THE COURT:  And, of course, the response to that is

15  that the Public Utilities Commission has had six years to do

16  that, they have not done it, there is no limit -- you're not

17  suggesting any limit in when they may do it.  And the process

18  of delay is in their self-interest because so long as they

19  delay, these folks can't function.

20          MR. CUNNINGHAM:  Your Honor, Basin Electric asked

21  for the Commission not to address the issue.  One of the

22  Plaintiffs said, "There's a lawsuit, so please don't address

23  this issue" --

24          THE COURT:  Because Minnesota Public Utilities

25  Commission can't determine the constitutionality of the

 1    statute --

 2              MR. CUNNINGHAM:  No, but they -- constitutional

 3    claims may be made, and constitutional claims are made.  And

 4    if the statute is applied to them in a manner that they deem

 5    institutional, they can file a separate legal case on that

 6    basis.  The reason that is important in this case is because a

 7    lot of the -- a lot of the harm, a lot of the

 8    extraterritoriality analysis is based on an absolutely false

 9    construction of this statute.  This statute is not about

10    tracking electrons.  When this --

11              THE COURT:  But you don't know what it is --

12              MR. CUNNINGHAM:  No, I do know what it is --

13              THE COURT:  Where in the statute does it say that --

14    well, go ahead.  It seems clear to me that the only regulated

15    activity that causes harm is the emission of $CO_2$ and the

16    generation of coal-generated electricity.  And when that

17    occurs in North Dakota or in Wyoming, then we have a problem.

18    Now, I don't see how you can construe the statute not to

19    pertain to that, which is, I think, what you're saying.

20              MR. CUNNINGHAM:  Well, what I'm trying to -- well,

21    let me give you an example.  Plaintiff has said that they are

22    obligated -- or they have wondered whether the importation --

23    the importation clause applies to transmitting energy across

24    the grid, across Minnesota, not consumed in Minnesota.

25              THE COURT:  But sometimes we don't know, do we?

```
 1              MR. CUNNINGHAM:  But the thing is, Your Honor, that
 2    supposes that we're measuring the electricity.  We're not.
 3    Proof of this will come in contracts, will come in ownership.
 4    That's how these cases will be litigated before the
 5    Commission.  And that's one of the problems that we're having
 6    here is it presupposes something that's not ever going to
 7    happen.  We're not ever going to be putting volt meters on
 8    every node and determining where the electricity goes.  That's
 9    not how the statute will be enforced.
10              It will be enforced based upon documents.  So, there
11    is no -- it doesn't have anything to do with creating a new
12    grid, it doesn't have anything to do when MISO dispatches of
13    electricity, it doesn't have anything to do with MISO
14    membership, it doesn't have to do with anything to do with
15    transmission of electricity through Minnesota.  These cases
16    are --
17              THE COURT:  The Department of Commerce has said
18    otherwise, haven't they?
19              MR. CUNNINGHAM:  No, the Department of Commerce has
20    not said otherwise --
21              THE COURT:  Well, then you heard Mr. Boyd quote the
22    Department of Commerce saying otherwise --
23              MR. CUNNINGHAM:  No, I think that -- when -- this
24    gets into minutia, but I'm afraid I have to try.  When --
25    let's say Basin Electric bids into MISO the capacity of
```

```
 1    coal-generated plants, along with its other plants; it has a
 2    business plan of offering a single rate that's based on a
 3    blended rate of all of its different generating facilities.
 4    That's its business plan; it's not a right.
 5            The Commerce Clause, if there's anything that's
 6    clear from the Exxon case, is the Commerce Clause does not
 7    protect participants, and it does not protect business plans.
 8    That's their business plan.  They could easily have a rate for
 9    Minnesota and a rate for Wisconsin.  They don't want to do
10    that.  It's not impossible.  But it's based on bidding their
11    capacities into MISO, and that's not tracking electrons.
12    That's not tracking electrons through the state.  They're
13    bidding that product into MISO for the purpose of satisfying
14    the capacity for Minnesota.
15            But my point is that analysis should be done by the
16    Public Utilities Commission --
17            THE COURT:  Why?  That's wholesale transactions,
18    isn't it?
19            MR. CUNNINGHAM:  No, Your Honor, that's resource
20    use.  That's what this is.  This is about resource use --
21            THE COURT:  No, you're talking about wholesale
22    contracts.  You're not talking about coal; you're talking
23    about wholesale contracts --
24            MR. CUNNINGHAM:  We're talking about contracts.  I
25    don't think they're determined whether wholesale or resale --
```

```
 1    I don't know -- but the point is we are not regulating prices.
 2    We're not doing that.  That's what FERC does.  And I'll just
 3    bring up right now this PPL case.  Let me read how the Court
 4    describes the issue in that case.  In essence -- I'm on Page 3
 5    of the opinion -- and I just want you to know that you don't
 6    have to write --
 7              THE COURT:  Is that the New Jersey or the Maryland
 8    opinion?
 9              MR. CUNNINGHAM:  This is the Maryland opinion, yes,
10    and you don't have to write anything near this long because
11    most of this is not relevant to this case.  But I do want you
12    to read what the issue was in that case:  "In essence, the
13    CFD," which is a contract for differences, "provided that,
14    regardless of the price set by the federally-regulated
15    wholesale market, the Maryland utilities would ensure that CBC
16    received a guaranteed price fixed by a contractual formula."
17              Our case is not about prices.  That's what FERC
18    regulates.  FERC regulates prices and the security of
19    transmission.  The NGA does not regulate either of those --
20              THE COURT:  So your position then is that Minnesota,
21    who has traditionally really regulated at the retail end, has
22    the power to regulate terms and conditions of wholesale
23    longterm power purchase agreements, purely wholesale, as to
24    resources.
25              MR. CUNNINGHAM:  We're not -- I apologize, Your
```

1    Honor.  Your phraseology, regulating the terms and conditions,

2    we're not regulating the terms and conditions.  We're

3    regulating the resource --

4              THE COURT:  That's a term and condition of that

5    contract, isn't?

6              MR. CUNNINGHAM:  No, we're saying you cannot use

7    that resource --

8              THE COURT:  That's a condition, isn't it?

9              MR. CUNNINGHAM:  I would say no.  I would say no,

10   that's not a term and condition of a contract.  You can't use

11   that resource.  When we're --

12             THE COURT:  Here's a contract between these two

13   entities and you're talking about terms and conditions and

14   rates and you say one of the conditions is you cannot use coal

15   as a resource --

16             MR. CUNNINGHAM:  That's in the statute.  That's not

17   a condition of the contract.  That's in the statute.

18             THE COURT:  No, but you're trying to regulate the

19   ability of wholesale -- folks in wholesale contracts and

20   requiring them in the context of a wholesale contract to

21   condition the contract on not using coal.

22             MR. CUNNINGHAM:  We are -- the state is regulating

23   persons that are subject to the PUC.  Part of the problem

24   was -- in this case is the context of how regulation occurs is

25   not fleshed out.  Counsel for Plaintiff has identified PUC

1  proceedings.  That's not it's going to be done.  It's going to

2  be done in Integrated Resource Plan proceedings.  So, for

3  example, on the other side, with our use of renewables, we are

4  saying, "You've got to use renewable sources."  So, in that

5  sense, we're saying, "You must use this type of source for a

6  certain percentage of your capacity."

7          That's our -- that's within our power, and certainly

8  that displaces other sources of energy.  So, in a sense, when

9  you make an affirmative statement that you must use a

10  resource, you are limiting the sale of the other resource.

11  It's a zero-sum game unless you take growth into account.

12  But, Your Honor, the -- this analysis, the Commerce Clause

13  analysis, let's say for extraterritoriality, the

14  extraterritoriality prong of the dormant Commerce Clause does

15  not prohibit affects that regulation -- in-state regulation,

16  as the Supreme Court has determined that many in-state

17  activities that are regulated has effects on out-of-state.

18          For example, let's take the *Cotto Waxo* case.  That

19  was a case in which Minnesota said you cannot use -- you

20  cannot sell cleaning products that have petroleum products in

21  it.  Now, certainly that had extraterritorial effects.  People

22  were buying those petroleum products from out of state --

23          THE COURT:  Because they had a harm in Minnesota,

24  right?  I get back to my original point.  Sure, Minnesota has

25  the power to say, "We don't want our citizens harmed by bad

```
 1    products."

 2            MR. CUNNINGHAM:  Yep.  And the -- and this Court is

 3    obligated to accept the determination of the Minnesota

 4    legislature on the legislative fact of the harm caused by

 5    emissions and the potential harm caused by unstable prices.

 6    The Supreme Court has said in many different guises that the

 7    wisdom of a state legislature is not the subject for debate --

 8            THE COURT:  No, and I agree that carbon emissions,

 9    generally speaking, in the atmosphere is a serious problem for

10    this country.  But again, the electricity that comes in this

11    state is not harmful to its citizens, but okay.

12            MR. CUNNINGHAM:  Your Honor, the Plaintiff is

13    able -- is obligated to show that there is a burden on

14    interstate commerce.  There is not a burden on interstate

15    commerce in this case.  The electricity will continue to flow,

16    there will still be water, electricity brought down from

17    Canada, there will still be wind electricity flowing from

18    North Dakota.  It does not -- it is not a burden on interstate

19    commerce.

20            That's the question is whether interstate commerce

21    is burdened, not whether Plaintiffs' business plans are

22    harmed, and they haven't shown how this burdens interstate

23    commerce.  They haven't shown how our statute will effect a

24    coal company -- a coal generator's ability to contract with an

25    entity in another state.  That's what the externality [sic]
```

1    cases are about.  They're not about whether decisions will be

2    effected in other states but whether it will be controlled,

3    whether conduct that has nothing to do with the state will be

4    controlled.

5          In the price cases, for example, the Court

6    determined that because the minimum price set in State A will

7    mean every other state has to accept that minimum price, there

8    is no corollary for this statute.  No corollary in this at

9    all.  No other state will be required to do anything, no

10   generating plant will be required to do anything.  They can

11   contract with whomever they want outside of Minnesota.  So,

12   the externality [sic] just isn't there.  Extraterritoriality,

13   I'm sorry.  It does not control what happens in other states.

14         It is also not discriminatory.  Your Honor mentioned

15   that we don't have coal.  Well, since we don't have coal, we

16   can't be discriminating in favor of our own coal.  And that's

17   what the Court -- that's what the Supreme Court determined in

18   the *Exxon* case, the *Exxon versus the Governor of Maryland*.  In

19   that case, there was a regulation, a prohibition on

20   out-of-state petroleum producers having retail stores.  And

21   they said, "Well, Maryland doesn't have any of its coal," and

22   the Court said, well, then by definition -- "Maryland doesn't

23   have any oil."

24         "Well, then by definition it can't be discriminating

25   in favor of its oil."

1          Same thing:  "By definition, we can't be
2     discriminating."  But if you look at the statute as a whole,
3     it's clear that this is about the use of coal.  It's not about
4     discriminating against interstate commerce.
5          THE COURT:  It is, as Mr. Boyd says, a resource
6     elimination statute.
7          MR. CUNNINGHAM:  Correct, it is.  And there's no law
8     that says in Minnesota can't make resource determinations.
9     They have the right to make affirmative resource
10    determinations, and they have the right to make negative
11    resource determinations because it doesn't -- this statute
12    does not violate the Commerce Clause.  As I say, it doesn't
13    have the extraterritoriality effect of the cases that have
14    prohibited state statutes.  If you look at the case -- at the
15    statute, it's obvious that its goal is against coal and not
16    against interstate interests.
17         As I said, electricity will continue to flow, and
18    other forms of electricity generated by North Dakota entities
19    will continue in interstate commerce.  In fact, the coal
20    industry continues in interstate commerce.  It's just
21    Minnesota said, "We don't want to be part of it anymore."With
22    respect to preemption -- oh, I want to make one more comment,
23    and that is the notion of potential conflict.  There is no --
24    Plaintiffs have concluded that there is, but they haven't
25    stated one state can determine that there's not going to be

1    renewables.  I don't see that happening, but there will be no

2    conflict.

3            There will be no multiplicity of standards.  There

4    is no showing that any state is bound by what Minnesota does.

5    And that was the problem with extraterritoriality.  It made

6    other states, actors conform.  This one does not --

7            THE COURT:  It could, though.  There could be

8    conflicts between the states.

9            MR. CUNNINGHAM:  Your Honor, I'd be happy to -- I've

10   thought about it, and I don't know what the conflict is.  It's

11   talking about -- we're only talking about electricity consumed

12   in Minnesota, and I assume another state would only be talking

13   about electricity consumed in that state.  So, I don't know

14   what the conflict is.  I've tried to think of what the

15   conflicts might be, but I don't know what they are.  And I

16   think that that's speculative.  And what I'm saying is if you

17   look at the statute, it does not control what happens outside

18   the state.

19           With respect to preemption, again we've got

20   Plaintiffs making conclusions and they use the word "plainly":

21   "Plainly it interferes with what FERC does."  Well, it's not

22   plain to me, and I don't see FERC here.  FERC regulates

23   wholesale prices, and it regulates the security of

24   transmission, transmission standards.  This --

25           THE COURT:  It regulates all the terms and

```
 1    conditions of transmission.  It's beyond prices.
 2              MR. CUNNINGHAM:  Okay.  Okay.  Yes.  And this
 3    statute does not.  This statute regulates a resource, not --
 4    otherwise all of our other -- all of our other resource
 5    statutes are infirm, and I don't think they are.  I think
 6    that's something that the State has -- the State has
 7    historically had authority to protect the health and --
 8    physical and economic health and security of its citizens.
 9    States -- courts recognize that states have traditional power
10    in utilities, and courts are loathe -- or "loathe" might be
11    too strong of word -- courts are sensitive to interference
12    with that.  And there's no doubt --
13              THE COURT:  Sure, siting and construction of power
14    plants, retail transmission, retail pricing, you're right.
15    That's where states traditionally have had exclusive
16    authority, but that's not what we're talking about here.
17    There's nothing here about siting and constructing of power
18    plants here, that at least is at issue, or retail pricing.
19              MR. CUNNINGHAM:  Your Honor, as I said, we -- the --
20    certainly the sensitivity towards the conservation of
21    resources is newer in regulation than the establishment of
22    local rates.  But it is a legitimate interest to have secure
23    resources for the provision of local service, and that's one
24    of the bases for this statute.
25              Plaintiffs have identified no way in which our
```

1    statute interferes with any FERC ability to regulate any of

2    the things that you said.  It doesn't establish prices, it

3    doesn't deal with terms and conditions.  I suppose we can

4    differ on whether a source is a -- whether a statutory

5    prohibition is a term and condition.  I would say it's part of

6    the statute.  But for the things that FERC normally regulates,

7    FERC specifically excludes resource planning, says states have

8    that authority.  So --

9             THE COURT:  It's the language actually local

10   resource planning?

11            MR. CUNNINGHAM:  And this is a local resource plan.

12   This is for electricity that will be consumed in Minnesota.

13            With respect to the Clean Air Act, the Clean Air Act

14   statute talks about standards.  The cases that Plaintiff has

15   identified -- and the cases that Your Honor identified in your

16   order on the dismissal motion -- pardon me -- those cases

17   dealt with the problems that would occur if courts get in the

18   business of establishing standards for pollutants.  The courts

19   say if you establish standards for pollutants, first of all

20   the courts aren't -- the courts aren't prepared in terms of

21   its resources to make the kind of economic and scientific

22   decisions with respect to standards.  And when I say

23   "standards," I mean parts per million, I mean, standards.

24            The courts don't have the proper mechanism for

25   making those decisions, and there would be the potential for

1    multiplicity.  There would be potential that a Court in Maine

2    would determine a standard, a Court in Vermont would determine

3    another standard.  And I'm saying parts per million.  Our

4    statute does not do anything like that.  There is no

5    possibility of multiplicity.  There's no possibility of -- you

6    don't have to make any scientific decisions about this.

7    Plaintiffs are asking you to make regulatory decisions about

8    this statute.  I ask you that that is specifically what you

9    should not do is make regulatory decisions.  I believe that is

10   something that is not ripe yet.  The Court doesn't have to

11   make any standards.  The statute doesn't establish any

12   standards, parts per million.  The reasons why preemption

13   is -- exists is not offended by this statute.

14           Words are just the skins of ideas.  Our statute does

15   not offend any of the ideas underscoring preemption, and

16   therefore preemption shouldn't be applied.  Courts are warned

17   that there's a presumption for -- there's a presumption for

18   the validity of state statutes and certainly in a case where

19   even the Clean Air Act recognizes that states have a role.

20   And you say, well, they have a role with respect to their own

21   atmosphere.

22           And again I say that the atmosphere doesn't stop at

23   the end of the -- at the borders of the state, but since we're

24   not --

25           THE COURT:  But the Clean Air Act addresses that

```
 1    directly.  It says that if this state is concerned that the
 2    bad atmosphere from North Dakota, if you will, is coming over
 3    into Minnesota, there's a procedure to go to the EPA and make
 4    that complaint.  Right?
 5              MR. CUNNINGHAM:  If we were wanting to -- you're
 6    right, Your Honor, and if we were wanting to establish
 7    standards, that would be a criticism.  But this statute does
 8    not establish standards.  It does not establish parts per
 9    million.  There is no potential for multiplicity or conflict
10    in this statute, and that was the basis for the Courts'
11    decisions that have been cited.
12              It doesn't have any requirements for a -- the
13    hallmark of the things that would be preempted would be the
14    establishment of standards, requirements for emission
15    suppression technology, reporting requirements, excessive --
16    penalties.  None of these are in this statute.  None of those
17    hallmarks that would trigger preemption are in this statute.
18    None of the hallmarks that would trigger preemption under
19    FERC.  We don't do anything about prices or standards of
20    transmission in this statute.
21              Your Honor, I'd be happy -- more than happy to
22    answer any of your questions about how this statute works,
23    what its intentions are and why it's a good idea, and why
24    Minnesota is a good citizen for wanting to do this.
25              THE COURT:  I hope you understand that this Court
```

1    completely agrees that we have an environmental issue.  But

2    this Court's focus, necessary focus on this case is the

3    constitutionally of the statute.

4            MR. CUNNINGHAM:  Right, and that's good.  It is not

5    on how the statute -- whether the statute is a wise one, it is

6    not on we don't know exactly how the statute is going to

7    operate with respect to exceptions.  That is not what this

8    case is about.  This case is about whether it burdens

9    interstate commerce and whether its actual operation is

10   preempted by other federal laws.

11           THE COURT:  Thank you.

12           MR. CUNNINGHAM:  Thank you.

13           THE COURT:  You bet.

14           Mr. Boyd, why don't I give you a chance to respond

15   to that, and then we'll hear from the environmental groups.

16           MR. BOYD:  Thank you, Your Honor.  I'll try to be

17   very specific.

18           First of all, I wanted to just clarify something

19   that I meant to emphasize in an earlier -- in my earlier

20   presentation.  I promise I won't go through that whole process

21   here, that whole presentation again, but I was making the

22   point that subdivision 3(3) prohibits new longterm power

23   purchase agreements with existing sources outside of

24   Minnesota.  I had been focusing on coal-fueled sources; but as

25   the Court is aware from our briefs, the statute, in fact, in

1    its plain terms, prohibits longterm power purchase agreements

2    with existing out-of-state facilities that generate any CO2

3    emissions.  So, that prohibits longterm power purchase

4    agreements not only where there is CO2 emissions from coal but

5    also CO2 emissions from natural gas, some forms of biomass,

6    and diesel.

7         It doesn't change the point I was making about the

8    statute being a statute -- or a generation-source elimination

9    statute.  It eliminates -- seeks to eliminate coal fuel

10   sources, but it's even broader in its discrimination on

11   out-of-state interests by prohibiting longterm power purchase

12   agreements with other forms of generation existing outside of

13   Minnesota.  And again, that prohibition on such new longterm

14   power purchase agreements does not apply to any existing

15   facility in Minnesota.  So, it prohibits out-of-state or

16   longterm power purchase agreements with out-of-state

17   facilities that are fueled by coal, natural gas, biomass, and

18   diesel without any corresponding burden on in-state

19   facilities.

20        In response to some of the arguments Mr. Cunningham

21   had made, first of all, he -- he described or he quoted the

22   concept that states are laboratories for inventive kinds of

23   legislation that the federal government has learned from.

24   Well, in fact, the Clean Air Act has made it very clear that

25   that application does not apply to the context of regulating

1    what are deemed to be air pollutants.  And in this case, the

2    Clean Air Act makes it very clear that, with the exception of

3    California which is carved out of that statute, the other 49

4    states, including Minnesota, is not supposed to and is not

5    allowed to be a laboratory of legislation.  That's very clear

6    under the Clean Air Act.

7            Mr. Cunningham indicated that the MPUC has a

8    quasi-legislative function.  That may be true in some

9    circumstances, but that function does not apply where the

10   language of a statute is clear and plain on its face.  And it

11   does not have the authority to declare or not declare statutes

12   to be unconstitutional, where the statute is plain and clear

13   on its face.  Where it says, for example, "no person shall

14   engage" in these prohibited transactions, that's plain on its

15   face.  The PUC cannot change that and rewrite it.

16           The legislature could have said "no public utility,"

17   as defined in the Minnesota statutes, "shall engage" in this

18   transaction.  Instead it said "no person shall."  It was

19   unqualified, it was categorical, it says what it says.  It's

20   very plain on its face.  It applies to any person who

21   participates in those activities, and the PUC does not have

22   quasi-legislative authority to change that.

23           Mr. Cunningham said this statute's application will

24   be based on documents.  Those documents that he is referring

25   to are wholesale transactional documents.  That underscores

1   the points we've been making.  The statute imposes terms and

2   conditions on wholesale transactional activities, and he's

3   confirmed that by saying that is what they would look to.  He

4   indicated that the statute doesn't impose any terms or

5   conditions.  In fact, that's exactly what it does.  It says

6   this transaction, this wholesale transaction, is prohibited

7   unless you can come to the PUC and satisfy them that you can

8   establish offsets pursuant to the statute.

9           That's a condition:  You cannot engage in this

10  transaction unless you offset.  That's as clear of a condition

11  as anything could be.  That condition is imposed on wholesale

12  transactions, and the Supreme Court and Congress has said

13  that's an area that's exclusively reserved for the federal

14  government.  Mr. Cunningham indicated that we have not

15  explained how the statute burdens interstate commerce.  I

16  think I began this morning by saying exactly how it burdens

17  interstate commerce.

18          It burdens it by seeking to eliminate a generation

19  source.  It burdens interstate commerce by being a generation

20  elimination statute, which Mr. Cunningham confirmed.  This is

21  a generation elimination statute.  We're operating in a

22  regional marketplace.  The statute seeks to eliminate this

23  generation source from the market.  That burdens the

24  interstate market.

25          And then lastly, Mr. Cunningham indicated that this

```
 1    statute is not preempted by the Clean Air Act because it
 2    doesn't establish standards.  I would respectfully agree.
 3    Again, it establishes standards very clearly.  In fact, it
 4    imposes the ultimate standard.  Rather than dealing with some
 5    level of parts per million, the statute says the standard will
 6    be zero.  That is a standard.  That may be a very heavy-handed
 7    standard, not as precise or scientific as parts per million,
 8    but that is a standard.  And that is the ultimate standard.
 9    The statute imposes a zero tolerance standard -- or --
10    standard, and provides no way around it.  The offsets, as
11    we've established, are not available.
12            I believe that's all I have in response to
13    Defendants' arguments.  Thank you.
14            THE COURT:  Thank you.
15            Mr. Strand.
16            MR. STRAND:  May it please the Court, my name is
17    Scott Strand with the Minnesota Center for Environmental
18    Advocacy.  We would like to start with Ms. Spalding who will
19    address the bulk of the issues in the case.  Mr. Donahue will
20    then follow and particularly focus on the dormant Commerce
21    Clause issues.
22            THE COURT:  Very good.
23            MR. STRAND:  All right.  Thank you.
24            THE COURT:  Ms. Spalding.
25            MS. SPALDING:  Good morning, Your Honor.  My name is
```

```
 1   Joanne Spalding, I'm with the Sierra Club here on behalf of

 2   environmental amici.  Thank you so much for allowing us to

 3   present arguments this morning and --

 4            THE COURT:  I'm just going to need you to speak up

 5   just a little bit.  That comes down, if you can --

 6            MS. SPALDING:  Oh.

 7            THE COURT:  There you go.

 8            MS. SPALDING:  Great.  I just wanted to thank you

 9   very much for allowing us to present arguments this morning in

10   this case.  We appreciate the opportunity.

11            I will be discussing the jurisdiction and preemption

12   issues.  My co-counsel, Sean Donahue, will address dormant

13   Commerce Clause issues.  And since Your Honor seems to be very

14   interested in the dormant commerce clause, I will try to leave

15   plenty of time for him to discuss those.

16            So, the Next Generation Energy Act is well within

17   Minnesota's authority to regulate utilities.  Plaintiffs

18   mischaracterize the prohibitions in section 216H.03 to sweep

19   well beyond the language of the statute.  They make

20   unwarranted assumptions about how the statute would apply even

21   though the Minnesota PUC, which is charged with implementing

22   it, has never interpreted it or applied it in the manner they

23   suggest.  In the context of this facial challenge, such a

24   sweeping interpretation is inappropriate.  Unless and until

25   Minnesota applies a statute in the broad manner that
```

1   Plaintiffs suggest, it must be upheld if any possible reading
2   is constitutional.
3          Plaintiffs rely on their overly broad reading of the
4   statute to attempt to show that they are injured, but they
5   have not been harmed by any requirement of the statute.  And
6   the future harm they allege is purely speculative.  They,
7   therefore, lack standing.  Their challenge is also premature.
8   It is not only unripe as Minnesota has argued, but it assumes
9   that the Minnesota PUC will construe the statute broadly
10  without ever asking the PUC to interpret key terms.  Indeed,
11  Basin Electric explicitly asked the PUC not to decide how key
12  provisions could be interpreted until after this litigation
13  concludes.  But this Court should not endeavor to interpret
14  these --
15         THE COURT REPORTER:  Ms. Spalding, I need you to
16  slow down.
17         MS. SPALDING:  I'm sorry.  I'm trying to let my
18  co-counsel --
19         THE COURT:  No, no, don't worry.  Everyone will have
20  enough time.
21         MS. SPALDING:  All right.  I will slow down then.
22         If the Court decides to reach the constitutional
23  questions that the Plaintiffs have raised, it should have no
24  trouble finding that the statute is constitutional --
25         THE COURT:  So, let me just step back a minute.

1    Your argument is a ripeness argument, not an abstention --

2              MS. SPALDING:  No, we are arguing an abstention, I

3    was just agreeing that ripeness would also apply.

4              THE COURT:  Okay.

5              MS. SPALDING:  But I won't go into that since

6    Minnesota has already done that.

7              In terms of whether or not the statute is

8    constitutional, states routinely tell utilities what kind of

9    generation they can purchase.  That happens all over the

10   country.  Minnesota may constitutionally choose to purchase

11   and use electricity with as low of $CO_2$ emissions it can

12   acquire, as several other states have already done, including

13   Washington, Oregon, and California.  And each of those has

14   comparable statutes governing power purchase agreements.  The

15   citizens of Minnesota may constitutionally make that choice

16   through legislative action, and the NGEA does not regulate

17   beyond Minnesota's border or beyond Minnesota's constitutional

18   authority.

19             With regard to standing as a preliminary matter,

20   Plaintiffs have not demonstrated standing because they claim

21   to be injured by the NGEA provisions related to out-of-state

22   new large energy facilities, which is subdivision 2, as well

23   as the provisions related to longterm power purchase

24   agreements, subdivision 3.  But the PUC has never adopted the

25   overbroad interpretations that Plaintiffs find offensive, and

Heather A. Schuetz, RMR, CRR, CCP
(651) 848-1223
Heather_Schuetz@mnd.uscourts.gov

1    it is clear from the history of the PUC proceedings and this

2    litigation that the PUC is highly unlikely to do so.

3            The Plaintiffs' allegations of possible future harm

4    do not demonstrate concrete, actual, or imminent injury.  And

5    their efforts to determine whether or not an ambiguous statute

6    applies are not cognizable injury.  And additionally,

7    Plaintiffs must establish standing with regard to each claim.

8    With regard to the new power plant provisions, they have said

9    that they originally said that they would not be able to sell

10   power into Minnesota from plants they plan to build.  We

11   offered extensive evidence showing that those plants would not

12   be built, and Plaintiffs have not rebutted that evidence.

13           So, with regard to subdivision 2, they are -- their

14   claims are mostly related to whether or not power would enter

15   Minnesota from some of the plants that are subject to

16   subdivision 2, the new large energy facilities, that are out

17   of state.  And the example that they've used is with Basin

18   Electric's uncertainty about whether the sales from the Dry

19   Fork plant into MISO would qualify for that, but uncertainty

20   does not create standing.  Basin has been selling that power

21   for several years now with no action from the PUC.  This issue

22   is pending before the PUC, and Basin has asked the PUC not to

23   decide it.  And Defendants have now confirmed that the statute

24   does not apply to Minnesota purchases from MISO.

25           And with regard to the PPA provision, subdivision 3,

1    Plaintiffs claim injury from that because their concern about,

2    for example, MRES says it can no longer consider longterm

3    power purchase agreements that might increase statewide power

4    sector carbon dioxide emissions.

5            And Basin has said that it was unable to enter into

6    longterm power purchase agreements that were offered in

7    response to a recent request for proposals.  Plaintiffs'

8    concerns are not well-founded.  They themselves are not sure

9    whether the PPAs would or would not implicate the Next

10   Generation Energy Act.  If, for example, you look at the Raatz

11   Declaration on paragraph 25, it says these PPAs appear to be

12   prohibited; it is unclear how one might determine if a

13   particular import or transaction actually increases statewide

14   power sector carbon dioxide emissions.

15           So, this is not -- this is the classic case where

16   the PUC should decide this issue.  It's not that they are not

17   able to enter these transactions.  They haven't determined

18   whether they can enter those transactions.  And no one knows

19   for sure what "increase" means because no one has asked the

20   PUC to define that, and it's not defined in the statute, and

21   the PUC has therefore not defined it.

22           If the Plaintiffs have been injured by this

23   provision, it is because they have chosen to interpret

24   "increase" even though they admit they don't know what it

25   means.  This is a self-inflicted injury.  Uncertainty is not

1    enough to create standing.  If mere uncertainty over a statute

2    were enough to create standing, then everyone automatically

3    would be able to challenge statutes, and federal courts would

4    be in the business of issuing advisory opinions.  If the Court

5    decides that the Plaintiffs do have standing, it should

6    nevertheless abstain from deciding the Plaintiffs' claim.

7            Under *Railroad Commission of Texas versus Pullman*,

8    which the Court can raise *sua sponte* regardless of whether the

9    parties raise it, each of the provisions that the Plaintiffs

10   challenge involve unsettled issues of state law.  And once

11   those are decided by the PUC, that would resolve Plaintiffs'

12   constitutional concerns or at least substantially modify the

13   constitutional question.  Subdivision 2, for instance, the

14   unsettled question is whether MISO transactions are included

15   in the prohibition.  Plaintiffs now say that this provision is

16   unambiguous and the only way to construe it is it applies to

17   MISO transactions.

18           But they also cite the Dairyland proceeding in

19   which -- in that case, Dairyland, another utility, took the

20   position advocating the opposite conclusion.  That's clearly a

21   possible interpretation of the statute.  And the Defendants

22   now have confirmed that it does not apply to MISO

23   transactions.  There is a state avenue to get this issue

24   resolved, but Basin expressly asked the PUC to refrain from

25   deciding it pending the outcome of this case, which is

```
 1    backwards --
 2              THE COURT:  But I'm confused, didn't the Department
 3    of Commerce say it did apply to purchases from MISO markets?
 4              MS. SPALDING:  No.  The Department of Commerce,
 5    appearing as an advocate in that proceeding, submitted
 6    testimony -- or submitted argument about how it could apply,
 7    but the PUC is the deciding entity.  Anything that's -- that
 8    is --
 9              THE COURT:  Not under this statute.  The Department
10    of Commerce could, despite what the PUC says, go to the
11    Attorney General and say there's been a violation of the
12    statute.
13              MS. SPALDING:  The power to refer cases to the
14    Attorney General is not the power to interpret the statute.
15    The power to interpret the statute lies with the PUC.  And in
16    the PUC proceedings, the Department of Commerce is a party to
17    those proceedings.  It's advising, but that's not the ultimate
18    decision maker.  And so the appropriate process is for the PUC
19    to make that determination.  But that -- and it was in the
20    process of doing that when Basin said, "Please don't decide
21    this because we're litigating it."
22              And I just want to get to a couple of the other
23    unsettled questions -- unsettled and unclear areas, but one is
24    this whole question of "increase" and what does that mean.
25    The PUC has not decided that.  And there are lots of things --
```

1    ways that "increase" could make a huge difference.  If

2    "increase" means from the 2007 baseline, for instance, there

3    could be all sorts of power purchase agreements that the

4    Plaintiffs could enter that would not increase statewide power

5    sector carbon dioxide emissions because those emissions have

6    gone down.  We don't know what the baseline is, so we don't

7    know what "increase" means and whether any of their contracts

8    would, in fact, cause such an increase because the PUC has not

9    decided that.  So, that is -- if they have that concern, there

10   is a process by which they could get a decision from the PUC.

11          And the same is true with "offsets."  There's no

12   indication that they've asked the PUC for guidance on that,

13   and the statutory language clearly allows for a much broader

14   range of offsets than the Plaintiffs presume.  For example,

15   they say that adding additional resources requires eliminating

16   corresponding resources without gaining additional capacity,

17   but that assumes that all resources have the same CO2

18   emissions.  Coal plants can be operated more efficiently and

19   reduce their emissions in that way and increase capacity.  The

20   same is true with natural gas plants.  Wind, of course, has no

21   CO2 emissions, so the question is --

22          THE COURT:  Is this the CO2 capture technology that

23   doesn't commercially exist?

24          MS. SPALDING:  No.  Coal plants can reduce their

25   emissions -- I don't want to get into the technical side of

```
1    it -- but by the -- any -- from -- like maybe 5 to 9 percent
2    efficiency improvements just by tuning up their plants or
3    reconstructing parts of it.  There are ways that coal plants
4    can reduce their emissions, so there are -- so that's just
5    within coal plants.  And then, of course, there are resources
6    that are lower carbon resources.  So, you don't have to
7    necessarily eliminate one source in order to add another.
8            And in the absence of a cap-and-trade system is --
9    the PUC could also determine what the applicability -- or the
10   ability to rely on other states' cap-and-trade systems.  But
11   even without that, the first offset opportunity exists.  So,
12   the bottom line is that the statute is ambiguous, the
13   Plaintiffs have a resource because there's a state avenue to
14   resolve those ambiguities; and that would, in turn, resolve or
15   at least substantially modify their federal claims.  And so
16   the environmental amici believe that the Court should abstain
17   to give Minnesota the chance to interpret the statute in a
18   manner that avoids these constitutional concerns.
19           Now, Plaintiffs have also said they would be harmed
20   if they were not able to present those claims to the federal
21   court until the PUC and Minnesota courts interpret it.
22   However, the PUC proceedings, you know, as I said, they cut
23   that off before they got a decision on at least one issue.  In
24   addition, state and federal courts have concurrent
25   jurisdiction to decide constitutional issues, so it doesn't
```

1    necessarily have to go all the way through the state Supreme

2    Court and then come back here.  So, again, their only harm in

3    this case is uncertainty, which is not -- is really no harm at

4    all.

5           So, on -- I'm now going to turn to Clean Air Act

6    preemption.  The Next Generation Energy Act and this provision

7    does not regulate out-of-state carbon dioxide emissions, it

8    simply minimizes Minnesota's reliance on high $CO_2$-emitting

9    sources of electricity.  Choosing not to purchase a product

10   whose production results in environmental harm is entirely

11   different from regulating the production of that product.  The

12   State does not in any way prevent out-of-state coal plants

13   from being -- from producing electricity.  It doesn't require

14   out-of-state generators to reduce their emissions in any way.

15   Those plants can continue to sell their power to any other

16   state.

17          Plaintiffs cite the definition of "statewide power

18   sector carbon dioxide emissions" as requiring reductions, but

19   that is just measuring emissions for the purposes of

20   determining what "increase" means.  It has nothing to do with

21   controlling emissions or preventing emissions.  The Clean Air

22   Act has nothing to say about what -- about choices that a

23   state can make about what available generation resources can

24   be used to provide power in that state.  Even if the Clean Air

25   Act were relevant, the Plaintiffs fundamentally

1    mischaracterize its scope.  In fact, California is not so very

2    special.  Every state can adopt regulations that are more

3    stringent than federal law allows.

4            And so there's no question that states can be

5    laboratories in the clean -- in the air pollution control

6    context.  Plaintiffs rely on the provisions related to

7    pollutants for which there is a National Ambient Air Quality

8    Standard.  Most -- and we've discussed this in our brief.

9    Nearly every provision they cite relates to a pollutant that

10   has a National Ambient Air Quality Standard.  There are only

11   six of those.  CO2 is not one such pollutant.  So, the

12   provisions of Section 126, for instance, that Your Honor was

13   discussing before about asking EPA to reduce emissions from a

14   neighboring state do not apply.  They are not available

15   because it is not a pollutant for which a National Ambient Air

16   Quality Standard exists.

17           It is also untrue, actually, that air pollution

18   regulation in a state must be adopted under the auspices of

19   the Clean Air Act.  Nothing in the Act requires that.  Cases

20   on which the Plaintiffs rely invalidated state laws because

21   they conflict with or interfere with Clean Air Act

22   requirements, not because they are outside the scope of the

23   act.

24           Plaintiffs also mischaracterize the Supreme Court's

25   decision in *AEP versus Connecticut*.  They rely entirely on one

1    sentence, which is this:  "The critical point is that Congress

2    delegated to EPA the decision whether and how to regulate

3    carbon dioxide emissions from power plants."  This was a

4    decision that was made in the context of whether or not

5    federal common law exists.  Federal common law is rarely -- is

6    rarely created by the federal courts.  It's an interstitial

7    type of law that federal courts only create in the complete

8    absence of any other law on the subject.

9           And, in fact, courts will turn first to state law if

10   there's no federal law before they create federal common law

11   in many situations.  So, it's really not -- it's very

12   different from the plenary authority that states have to

13   regulate air pollution.  State law can only be limited by

14   clear -- clear intent of Congress to eliminate the State's

15   authority.  Now, one of the things that --

16          THE COURT:  The State can control -- the State has

17   authority over air pollution in the state --

18          MS. SPALDING:  That's correct.

19          THE COURT:  -- but that's not what we're talking

20   about here.

21          MS. SPALDING:  Right.  And that's why it's a little

22   bit -- it's a little bit odd to be talking about this Clean

23   Air Act preemption at all because it doesn't control pollution

24   outside of the state.  Those plants can emit however much

25   pollution they want to emit that complies with the laws in

1    that state.  And the EPA, which is charged with implementing

2    the Clean Air Act, of course, agrees that states have this

3    authority.  So, in the -- what -- the federal court -- what

4    the Supreme Court did in *AEP versus Connecticut* was it said

5    the EPA has this authority under Section 111 of the Clean Air

6    Act, which is the new source performance standards.

7            And, in fact, EPA is in the process of adopting new

8    source performance standards for power plants.  And that's all

9    true.  Now, EPA issued its proposed rule on September 20th,

10   and if you look at that rule you will see that EPA actually

11   cites -- it says -- I'm actually going to read this because --

12           THE COURT:  Slowly, slowly.

13           MS. SPALDING:  "Several states have also recently

14   established emission performance standards or other measures

15   to limit emissions of GHG from new EGU that are comparable to

16   this proposal in this rule making."  EPA then goes on to cite

17   the 9-state Regional Greenhouse Gas Initiative which caps CO2

18   emissions from all fossil fuel powered planned in those

19   states.  California's SB1368, and that's the law that the

20   NGEA, this part of the NGEA, was modeled on and that limits

21   power purchases to plants generating less than 1100 pounds of

22   CO2 per megawatt hour and that governs power purchase

23   agreements.  Laws to that same effect exist in Oregon and

24   Washington state; and New York has a statute limiting CO2

25   emissions; California's AB32.  All of these are cited in the

1    EPA's New Source Performance Standard rule making.

2              EPA also includes the list of state RPS programs,

3    renewable portfolio standard programs, noting that currently

4    30 states and the District of Columbia have enforceable RPS or

5    other mandatory renewable capacity policies, and seven states

6    have voluntary goals.  So, the entity that's charged with

7    implementing the Clean Air Act and interpreting it under

8    federal law has -- is, in fact, looking to these state

9    laboratories of -- to determine -- to -- and basically using

10   them as examples of ways in which states are, on their own,

11   reducing $CO_2$ emissions.  And some of those statutes that EPA

12   cites are -- do apply to power purchase agreements of power

13   from other states into the state, like the Washington, Oregon,

14   and California statutes.

15             With regard to Federal Power Act preemption, I'm

16   just going to say briefly that this -- Plaintiffs' preemption

17   argument again depends on accepting their overly broad

18   interpretation of the statute.  And there are alternative

19   interpretations of the statute -- one of which is in the

20   Declaration of Scott Hempling, it's the Defendants'

21   Declaration and expert report -- that is a viable

22   interpretation of the statute.  It is one that the Defendants

23   have adopted.  And it is very clear that it does not -- that

24   it is dealing with the areas that the State has traditional

25   authority to regulate.

```
 1            And I wanted to say one thing about that, as well.
 2   The fact that the -- that Minnesota has not previously
 3   regulated municipal and co-ops -- munis and co-ops, which is
 4   what these Plaintiffs are -- is just because it hasn't
 5   extensively regulated them doesn't mean that it doesn't have
 6   the authority to do so.  This is a question of what is
 7   traditionally within the State's authority is -- the State can
 8   limit itself.  That doesn't mean it loses that authority.  And
 9   again, more than 30 states, including Minnesota, have RPS
10   programs.  By definition, those limit the sale of fossil fuel
11   power, and the FERC has not found any infirmity with those.
12            And if Your Honor has any questions on those
13   jurisdictional and preemption issues, I'd be happy to respond,
14   and otherwise my co-counsel will address the dormant Commerce.
15   Clause.
16            THE COURT:  Thank you.
17            MS. SPALDING:   Thank you.
18            MR. DONAHUE:  Good afternoon, Your Honor.
19            THE COURT:  Yes, I guess we're in the afternoon.
20            MR. DONAHUE:  Yes.  Sean Donahue, I represent the
21   Environmental Defense Fund, and I'm speaking on behalf of the
22   whole group of environmental intervenors.
23            I want to talk about the dormant Commerce Clause, in
24   particular the theory of extraterritoriality that is being
25   urged in this case, which has absolutely no support in the
```

1    doctrine, would be a radical and highly problematic departure

2    that would, if taken seriously, condemn the laws of more than

3    half the states of the country, including these laws that are

4    extremely close to this one and enacted throughout the West

5    Coast.

6              The extraterritoriality doctrine is very narrow, and

7    it's articulated by the Supreme Court and the Court of Appeals

8    cases.  And we acknowledge Courts of Appeals have applied it,

9    but it's always about states that try to regulate transactions

10   to which they have no connection so that in *Healy*, the state

11   is trying to regulate transactions between sellers of alcohol

12   and purchasers in another state and say you can't charge lower

13   than you posted in your home state.  The *Cotto Waxo* case, the

14   Eighth Circuit articulated this very clearly and said what

15   Minnesota is trying to do in this ban on the importation or

16   use of this product has a connection to the state.  It is not

17   telling a manufacturer that it may not transact with a citizen

18   of a different state.  That's not what's happening here.

19   That's the limited --

20             THE COURT:  But we have this unique situation with

21   electricity, don't we, and we can't be certain whether the

22   electricity is coming into Minnesota or not coming into

23   Minnesota.  And so, in fact, there may be an impact of this

24   statute on the transmission of electricity that never comes

25   into Minnesota.

1           MR. DONAHUE:  Well, those are a different category.

2   I want to distinguish between two different types of theories

3   of extraterritoriality.  The rigid one that basically says,

4   "Well, the transmissions is occurring in another state,

5   therefore the harm is occurring there, therefore the state

6   can't regulate it," that's wrong.  What the state is

7   regulating is the transaction in the Minnesota market, just as

8   the LCFS in California was regulating only California

9   transactions.  I'll get to in a moment why the

10  extraterritoriality question in the *Rocky Mountain* case is

11  just like the one we have here.

12          It was really heavily briefed in that case.  The

13  Court considered it very closely and found there was

14  absolutely no support for this idea that, well, if the

15  products are physically identical when they cross the border,

16  the state may not regulate it.  The extraterritoriality

17  doctrine is narrower than that, and it doesn't apply.

18          Plaintiffs do say that, in fact, this law will

19  operate to apply -- like the Basin claim that there will be a

20  seller in one non-Minnesota state trying to reach a buyer in

21  another and Minnesota's law will reach out and regulate and

22  interfere with that.  That is a cognizable claim under the

23  extraterritoriality.  That is the paradigm.  The problem with

24  it is there is not any reason to think, certainly for a

25  federal court, to strike down a state law that the law will be

1    applied that way.

2            But what I'm very concerned about is the broader

3    theory that because states do this all the time throughout the

4    country, they tell utilities within their borders what kind of

5    generation they may purchase, and that necessarily means

6    whether it is purchased in state or out of state.  Consider --

7    what the Plaintiffs here are very ambitiously asking this

8    Court to rule is to give coal an immunity from state

9    regulation so that if a state wants to say, "We want to use

10   renewable generation utilities," you must -- as many RPSs say,

11   "you must supply some percentage of your power that you supply

12   to your customers must be renewable."  They would say, "Well,

13   if the renewable generation occurs out of state, that's

14   out-of-state activity."  That's -- you can't look at that

15   under dormant Commerce Clause doctrine.  The electrons are

16   fungible and identical.  That theory just can't be right.

17           And, of course, the doctrine -- there is a massive

18   nexus between Minnesota, at least the paradigm case, not the

19   parade-of-horrible cases involving two other states.  The

20   Court can decide if those are plausible and if it's

21   appropriate to make that determination.  But the paradigm case

22   where Minnesota is saying you are entering into a longterm

23   contract to provide power to customers that's going to be

24   consumed in Minnesota, that is the nexus, that is ample, that

25   is exactly what the Court in the *LCFS* case.  I want to quickly

1    note that the extraterritoriality issue, that was exactly the

2    same because the Court suggested that maybe the fact that the

3    fuel was burned in California distinguishes that case.

4         But what California found was that different forms

5    of ethanol actually have the same tailpipe emissions but may

6    have very, very different actual consequences for global

7    warming because some of them, considering their whole life

8    cycle of how they're produced, have very high emissions and

9    some very low.  So, if ethanol is produced using high

10   emissions generation in an inefficient way, it will have

11   higher life cycle emissions than ethanol that is produced more

12   efficiently.  And the Court said it is permissible for

13   California to assign deferential regulatory treatment to those

14   two physically identical products based on the life cycle

15   emissions where --

16        THE COURT:  Because they are coming into California

17   and harming its citizens.  It starts the opinion by saying,

18   "This has harmed our environment and it has harmed our

19   business" --

20        MR. DONAHUE:  In exactly the same way that would be

21   the case here --

22        THE COURT:  No harm here --

23        MR. DONAHUE:  The emissions in California are the

24   same.  They're burning fuel, and --

25        THE COURT:  In California.

1              MR. DONAHUE:  Right, but the California regulation

2      takes into account life cycle emissions that happen in Iowa

3      and in Brazil, and that was the whole controversy.  And

4      that's -- and the Court looked at it and said that there is a

5      nexus to California because it only regulates fuel sales in

6      our market but considering the full carbon impact of the use

7      of that fungible and identical fuel is permissible, there's

8      nothing on extraterritoriality --

9              THE COURT:  But what is the nexus when there is no

10     harm in the state?  This is all about Minnesota reaching out

11     and saying --

12             MR. DONAHUE:  This is about saying every state that

13     engages in integrated resource planning does, when it favors

14     some forms of generation.  Minnesota -- there's no basis to

15     tell Minnesota that it may not rationally conclude that

16     Minnesota demands should not be subsidizing a form of power

17     that is harmful to Minnesota and to the planet and that may,

18     given federal regulatory developments and other factors, may

19     prove unstable in the long run.  It's the financial support.

20     That's -- and the Court's harm prong to extraterritoriality

21     doesn't have a support in the cases.

22             The cases say --

23             THE COURT:  It's the nexus.  It's the nexus --

24             MR. DONAHUE:  Yeah, and the nexus is very clear --

25             THE COURT:  But typically it's the nexus to harm in

1    the state, a local interest in the state --

2          MR. DONAHUE:  But there is a -- as all of these

3    states, all the RPS states -- California, Washington, and

4    Oregon -- that have enacted similar provisions for longterm

5    contracts have concluded that providing support for high

6    emissions forms of energy is a cognizable interest, is a

7    serious interest.  There is not -- if this were a statute

8    about trying to regulate carbon emissions in another state,

9    there would be emissions standards that would say no North

10   Dakota power plant may emit more than X tons per year.  That's

11   not what it is.  This is no Minnesota utility that may

12   purchase certain forms of power that we deem to be

13   environmentally and economically and otherwise problematic.

14         That is a power that, I would submit, is established

15   and clear that FERC has repeatedly recognized that the EPA, as

16   Counsel noted, has recognized.  FERC says states have the

17   authority to dictate the generation and resources from which

18   utilities may procure electric energy.  This goes on, and the

19   reason it's not -- and it has to be -- I would point out it's

20   been commented that some RPSs -- and, Your Honor, I think

21   raised Judge Posner's decision or dicta in the *Illinois*

22   *Commerce Commission* case --

23         THE COURT:  I think it was Easterbrook, and so I

24   think Posner would take great offense --

25         MR. DONAHUE:  Is it?  You may be right.  I think it

1   was --

2          THE COURT:  Or maybe it might have been a different

3   Seventh Circuit case --

4          MR. DONAHUE:  Both of them were my professors and

5   were very beloved, but Judge Posner sometimes speaks freely

6   about things in the course of reaching a decision.

7          But the issue there was one that has been raised

8   about many RPSs which is a decision that favored in-state

9   generation, in-state renewable projects.  That's

10  discrimination, arguably, and that's problematic.  But the

11  requirement to use clean power wherever it's generated is not

12  discriminatory, and the idea of using the dormant Commerce

13  Clause to strike that down because if the generation is out of

14  state, then you're prescribing how a generation out of state

15  may occur would completely override the State's ability to do

16  resource planning in this area.  And it's something states are

17  doing and nobody has -- I mean, this is a -- you know, well

18  argued and impressive argument, but it's really, really out

19  there.

20         And the general version, the specific version that

21  says you're really regulating transactions between two

22  different non-Minnesota states, I fully agree that is a claim

23  that fits within the doctrine.  And the question is:  Is it a

24  real concern about this statute?  And for reasons both of my

25  co-counsel have said, we think it's speculative and not --

```
 1    but, you know, I -- my real concern is the broader theory that
 2    the only relevant harm is one in another state, there's no
 3    nexus to Minnesota, because I think that's really wrong under
 4    the cases; really problematic for energy policy.  That's
 5    really become quite well-rooted; and that, you know, federal
 6    agencies, if they believe it's problematic, have ample
 7    authority to step in.  And they haven't.
 8            So, again, I mean, I think if you look at cases like
 9    Healy, Cotto Waxo, there just isn't -- and the Ninth Circuit,
10    again, looked at this in a massively briefed case with tons of
11    amici and parties and so forth and said it could find no
12    authority for this principle that was urged in that case, that
13    regulating sales -- regulating contractual relationships with
14    California sales into California is tantamount to trying to
15    regulate activity in another state.  And the Court said
16    there's no support in the extraterritoriality cases, there's
17    nothing in the California regulatory regime, just as there
18    isn't in Minnesota's that purports to regulate transactions
19    between two out-of-state parties.  And the fact that the
20    power -- the resources we're talking about here are being used
21    in Minnesota's market is a very robust and traditionally
22    recognized nexus that's more than enough to oust the doctrine.
23            I haven't addressed discrimination.  I think it's
24    implausible to say that this is a protectionist statute, that
25    it's protecting some local industry.  I think it's a good
```

1    faith, you know, resource planning and environmental statute.

2    I think the arguments, you know, the *Exxon* case where the only

3    affected parties were outside of Maryland, the *Cotto Waxo*

4    case, also the fact that the parties that may be most burdened

5    are out of state is not discrimination if there is some

6    legitimate basis other than origin for the distinction and the

7    fact that coal generation produces a lot more emissions than

8    other forms of generation is a basis that's legitimate and has

9    been adopted in many, many other jurisdictions.

10           So, unless the Court has any questions about that,

11   I'm really eager to engage about extraterritoriality because I

12   believe that it's a point on which the Court would not get it

13   right if it followed some of the lines of argument that are

14   being offered here.  And I'm happy to discuss it more, but I'm

15   also aware that we've been here a long time and happy to stand

16   down, as well.

17           THE COURT:  Well, you've done a marvelous job.  Let

18   me ask you about these other statutes in Washington, Oregon,

19   and California.  If I were to match them up with the Minnesota

20   statute, which I will do, would they be precisely the same, or

21   does Mr. Boyd make a point about the over-breadth of the

22   Minnesota statute, particularly the phrase "no person shall"?

23           MR. DONAHUE:  Right, I'm sure they wouldn't be the

24   same --

25           THE COURT:  They would be the same?

```
 1                MR. DONAHUE:  They would not be the same.  There are

 2      going to be differences --

 3                THE COURT:  Meaningful differences?

 4                MR. DONAHUE:  And my co-counsel is going to know the

 5      statute better than I do.  I know the California one, the

 6      structure is similar:  Longterm contracts, doesn't matter

 7      where the generation is and, you know -- and the goal is

 8      reducing reliance on high emissions sources.  So, that's --

 9      the -- so I would say if we're talking about a broad version

10      and a narrow version of the extraterritoriality, this

11      fundamental idea that you can't, even in doing resource

12      planning, take into account the type of generation, if it

13      occurs in another state, which is really radical, that idea is

14      clearly rejected in the Pacific Coast statutes and in all the

15      RPS statutes that more than half the states have adopted.

16                These other arguments that parts of the language --

17      parts of the statute are very problematic and unclear and we

18      don't know how they apply and they may apply in ways that are

19      really burdensome or troubling, I'm sure there will be

20      significant differences.  And I don't think we're claiming

21      that, for example, you know, PUC constructions of those

22      statutes would necessarily carry over to fill gaps in how this

23      statute is applied.  It's the basic structure.

24                THE COURT:  And has the constitutionality of those

25      statutes been challenged?
```

1          MR. DONAHUE:  The -- I think in California there was

2     some talk of challenging -- no.  There's not been a court

3     challenge, no.  And the RPS, there have been court challenges.

4     There was -- but they have -- the ones that have gotten any

5     purchase so far have been about these provisions that favored

6     in-state.  And, you know, that's -- there's some tension

7     between the extraterritoriality theory that says the state

8     line is sacrosanct, the State can't take into account the type

9     of generation if it occurs out of state.  Well, if the State,

10    in a national -- or at least regional electricity market, if

11    the State can't take into account the type of generation that

12    occurs if it occurs out of state, the State can't effectively

13    take into account the type of generation anywhere because

14    electricity is fungible and imports -- apparently their view

15    is that coal-generated power sort of has an immunity from

16    state regulation.

17          And I'm sure the State could try to regulate --

18    directly regulate emissions, but there's effectively nothing

19    they could do about procurement, which is just a very

20    different animal from regulation, as we've tried to urge --

21    from emissions regulation.

22          THE COURT:  Thank you very much.

23          MR. DONAHUE:  Thank you.

24          THE COURT:  Mr. Boyd.

25          MR. BOYD:  Thank you, Your Honor.  I'll try and be

1    brief and very focused.

2              THE COURT:  It's been suggested that you are urging

3    a radical -- I have to say Mr. Boyd doesn't typically do that

4    but --

5              MR. BOYD:  It would be very out of character.

6              THE COURT:  Yeah, it would be out of character.

7              MR. BOYD:  I do not believe that we are proposing

8    anything radical.  I think if there was something radical, it

9    was the terms of the legislation that Minnesota enacted in

10   2007.  I've been intrigued by the way in which the statute has

11   been alternatively referred to as a run-of-the-mill resource

12   planning statute on the one hand, but then other times

13   referred to as the "product of creativity from the State

14   legislative process."  I imagine that it's more of the latter.

15             The Minnesota legislature trying to be creative,

16   trying to achieve whatever its objective was.  And as I've

17   stated and I believe is clear, the objective was to eliminate

18   coal as a resource in this country and certainly in this

19   regional area.  But what they were doing was something that

20   was novel, it was beyond what they had done before.  The fact

21   that there may be some states on the Pacific Coast that may

22   have had similar ideas or objectives does not mean this law is

23   constitutional.  As Counsel indicated, those laws have not

24   been challenged.  I think there was a reference to a

25   California law in the briefs, but these other state statutes

1    were not referred to.  There's been discussion about the

2    resource planning statutes that have been enacted around the

3    country; those are the subject of ongoing litigation.  It

4    cannot be suggested to this Court that you can just assume

5    that those are appropriate resource planning statutes, that

6    it's a foregone conclusion.  But again, as I've said earlier,

7    we're not attacking the RPS in this case.  216H.03 is

8    materially different from the RPS statutes.  It's different

9    because it's eliminating a resource.

10            RPS statutes, resource planning statutes, they may

11    encourage diversification, diversifying capacity.  That

12    doesn't mean that coal goes away.  Coal provides reliable

13    power.  Wind is available when the wind blows; it's not

14    reliable.  So, adding wind to capacity doesn't eliminate coal.

15    This statute, its purpose on its face is to eliminate coal as

16    a resource in this market.

17            Going back to some of the points that were made at

18    the beginning of the *amici's* presentation, I wanted to make

19    sure that the Court was aware of what's in and what's not in

20    the record.  Counsel was suggesting that, in fact, perhaps it

21    is possible to satisfy the PUC on these offset requirements

22    and then went on and talked about certain technologies and so

23    forth.  That's not in the record.  The Defendants have not

24    provided any rebuttal to the Plaintiffs' concrete evidence

25    establishing that the offsets are not available.  And

1   Mr. Hempling, who was referred to by the *amici*, in fact

2   acknowledged that he was not asserting that the offsets were

3   available.  He was assuming they were not available.

4        The Plaintiffs' Declarations establish that they've

5   experienced harm and continue to experience harm as a result

6   of this statute.  It prevents them from engaging in

7   transactions relating to their resource portfolio for all of

8   their members.  Plaintiffs have established the 216H.03 offset

9   requirements are not available, and Plaintiffs have

10   established -- and this too is unrebutted -- that attempting

11   to seek advance approval of any transaction that is otherwise

12   prohibited is effectively a prohibition.

13        Mr. Raatz, Mr. Wahle, and Mr. Tschepen have all

14   submitted supplemental Declarations explaining in detail how

15   that is not feasible.  For the *amici* to come in, people who

16   are not in this business, and postulate without any record

17   support, sure, these businesses can go in and ask the PUC or

18   try and convince the DOC that this transaction is okay.  That

19   is not evidence, that's not record [sic], and that's not

20   plausible.  The people who know about how this business runs,

21   how this energy market operates are Mr. Tschepen, Mr. Wahle,

22   and Mr. Raatz, and they've all submitted unrebutted

23   Declarations explaining why that's not feasible.

24        Counsel also indicated that this statute doesn't

25   apply to the MISO energy market purchases.  In fact, the

1  Department of Commerce stated that it did, and it does in the

2  Dairyland proceedings.  And you've heard people describe

3  that -- the MDOC's statements in the Dairyland proceedings are

4  in the record and available to the Court.  And I think we even

5  have a big block quote in our brief setting forth exactly what

6  the DOC said.  The Defendants in their discovery responses

7  also admitted that the statute applies to MISO transactions,

8  and that too is in the record.

9          Counsel referred to one of the Defendants' experts,

10  Scott Hempling, as providing an interpretation of the statute.

11  He purports to surmise how he thinks it might work.  Frankly,

12  it's an effort to salvage what he hopes to salvage out of this

13  statute, but it's essentially a -- an impression that he has

14  as to how this -- the legislature might achieve its goal.

15  It's not based on the plain language.  And, frankly, I don't

16  know that the Defendants have adopted Mr. Hempling's

17  interpretation.  I know that sounds strange since Mr. Hempling

18  is the Defendants' expert, but they've been very clear to say

19  they don't take a position on what this statute means.

20          With regard to the department -- or excuse me, the

21  dormant Commerce Clause, I think the argument was that this

22  statute is limited in its application to only regulating

23  Minnesota co-ops, which I think was intended to mean

24  load-serving entities located in Minnesota actually serving

25  retail customers, so, for example, the co-op in Olivia,

```
1    Minnesota.  In fact, as the Court has noted, the statute says
2    "no person shall."  So, this isn't a statute that's just
3    limited to prohibiting a coop in Olivia, Minnesota from
4    entering into a longterm power purchase agreement with a
5    facility in South Dakota.  It says "no person shall," and it
6    applies to Basin in Bismarck, Minnkota in Grand Forks, and
7    MRES in Sioux Falls.
8            That's the breadth of this statute, and to argue
9    that that kind of extraterritorial regulation is somehow
10   radical is, frankly, implausible.  And to argue that declaring
11   this statute to be unconstitutional will bring the demise to
12   all resource planning statutes is likewise implausible.  Those
13   statutes encourage diversity.  This statute encourages and
14   requires the absolute elimination of a resource.  And those
15   resources are located outside of the state and, if eliminated,
16   would be eliminated with respect to the entire regional
17   market.  That is unconstitutional.
18           That's all I have, Your Honor.  Thank you.
19           THE COURT:  Any response either by the State or by
20   the amici?
21           Yes, Mr. Cunningham.
22           MR. CUNNINGHAM:  Thank you, Your Honor.  I'll try to
23   be brief and to the point.
24           I'll start off with the last things that were said,
25   which is we, the members of the PUC and the Department of
```

1    Commerce, did not identify how the statute works with respect

2    to their Plaintiffs.  Well, that's true.  The Department is a

3    litigant in front of the PUC.  The PUC is a decision maker.

4    How are they going to get together and litigate the Public

5    Utilities' case against -- or with the Plaintiffs?  That's a

6    fundamental problem in this case.

7            THE COURT:  Except that the statute again identifies

8    the Department of Commerce, and the Department of Commerce

9    hasn't expressed a view on the breadth of the statute.  And

10   there's nothing to preclude them from going to your office and

11   saying, "Enforce our view."

12           MR. CUNNINGHAM:  But that doesn't mean that the

13   Public Utilities Commission has adopted that view in this

14   case, nor does it mean that a Court would adopt that view --

15           THE COURT:  No, but it doesn't preclude that --

16           MR. CUNNINGHAM:  No, it doesn't.  But could I

17   just -- I will also address this whole MISO thing.  Nobody has

18   said that simply because energy will be dispatched by MISO,

19   that alone triggers the NGEA.  Nobody has said that.  The fact

20   that it applies to capacity bid into MISO, yes, it does apply

21   to that, or it could.  It could apply to that.

22           THE COURT:  There you go.

23           MR. CUNNINGHAM:  But that's all -- that's -- when

24   the capacity is bid into MISO, that's the entity saying, "We

25   are using coal plants to serve Minnesota ratepayers" --

1          THE COURT:  Maybe, maybe not.

2          MR. CUNNINGHAM:  No, it's true.  They bid into MISO

3    the capacity necessary to serve their customers.  That's what

4    we're talking about.  They're bidding into MISO the capacity

5    to serve their customers in Minnesota.

6          THE COURT:  I understand that.

7          MR. CUNNINGHAM:  And if they bid in a coal plant to

8    serve their Minnesota customers, that could trigger a -- the

9    application of the statute --

10         THE COURT:  But MISO, as I understand it, doesn't

11   correlate purchaser and seller.  So --

12         MR. CUNNINGHAM:  No, it's the fact that they're --

13   it's the fact that they are contracting for that and bidding

14   it in.  That's the proof.  That's the proof under the statute.

15   If it ever is applied, that's the proof.  That will be how it

16   was done, not whether electricity that MISO was transmitting

17   came from a particular plant, because that cannot be tracked.

18   But the Public Utilities Commission in the first place has the

19   technical expertise to sort these things out, but you can't

20   just glibly say that it applied to electricity in MISO or it

21   doesn't.  MISO transmits electricity.  It's bid into it

22   through contracts.

23         THE COURT:  And you're telling me that this statute,

24   in the State's view, applies to out-of-state entities' bidding

25   capacity into MISO.

```
 1              MR. CUNNINGHAM:  Bidding capacity to serve their
 2     Minnesota ratepayers, yes.
 3              THE COURT:  My understanding is you can't do that --
 4              MR. CUNNINGHAM:  Oh, yeah, you can.
 5              THE COURT:  It's bidding a capacity to serve the
 6     region --
 7              MR. CUNNINGHAM:  No, no, they're submitting capacity
 8     to serve their customers.  That's what they're doing.
 9              Mr. Boyd said that he talked about burden on
10     interstate commerce.  Well, he didn't.  He talked about
11     problems that his own Plaintiffs have.  That's not a burden on
12     interstate commerce.  Interstate commerce is indifferent to
13     the participants and their business plans.  He was talking
14     about standing.  I understand, but it's not the same as the
15     burden on interstate commerce.
16              Let's talk about this subpart 3 very briefly.  If
17     you look at subpart 3, the one about "There shall not be
18     longterm contracts," it's not limited by its terms to just
19     out-of-state.  And Mr. Boyd said, "Well, if you're in-state
20     and the plant is already in existence, there will never be an
21     increase."  Same thing applies to an out-of-state.  If it's
22     in -- if it's in production, there will be no increase.
23              If it's a new plant, well, the Minnesota state law
24     says you can't have a new plant, so it is symmetrical with
25     respect to in-state.  In fact, Plaintiffs have never
```

```
 1    identified any power plant that is treated differently
 2    inside -- from those inside Minnesota or owned by Minnesota
 3    interests or those outside.  In order to show that
 4    discrimination, they've got to show one that's similarly
 5    situated treated differently.
 6              Finally, Counsel glibly said that we have
 7    established a standard and the standard is zero.  No.  Power
 8    plants who use coal, wherever they are, are free to do
 9    whatever they have -- whatever they want without any emissions
10    controls.
11              Thank you.
12              THE COURT:  Thank you.
13              Yes, Mr. Donahue.
14              MR. DONAHUE:  Thank you.  I will leap at the
15    opportunity, but I didn't mean to suggest Mr. Boyd was
16    radical.  I --
17              THE COURT:  I know.  He was mostly teasing you --
18              MR. DONAHUE:  He is an effective advocate.  I meant
19    to suggest that the argument is radical --
20              THE COURT:  And I appreciated that.
21              MR. DONAHUE:  I'll just address one of his points in
22    response to ours, trying to distinguish the RPS.  I don't
23    think he's distinguished; he's explained how -- the broad
24    theory of extraterritoriality that any consideration of
25    generation, if it occurs out of state, constitutes regulating
```

```
 1    that generation and is impermissible.  He hasn't distinguished

 2    the RPS because the extraterritoriality doctrine is very

 3    strong medicine.  It's not a matter of degrees if something is

 4    extraterritorial or not.  There's no balancing.  It's per se

 5    invalid.

 6              And so the fact that an RPS -- and, of course, some

 7    RPSs, like California is I think 30 percent.  It's quite

 8    robust and it will mean using less coal and using less natural

 9    gas ultimately.  So, it does have -- you can't increase the

10    percentage of RPS without decreasing other, you know, fossil

11    fuels.  And there's no problem distinction of how you save

12    those if you adopt their strong version of

13    extraterritoriality.

14              The argument that this statute is about trying to

15    eliminate coal, eliminate reliance on coal, I first want to

16    say, you know, where is the constitutional principle, where is

17    the federal statute that forbids a state from enacting a

18    policy that it wants to eliminate reliance on any particular

19    fuel?  There isn't one, I would submit.  At best, that

20    argument is an argument about burden on interstate commerce.

21    It would be analyzed under *Pike*.  It would be -- it would face

22    a heavy burden because the Court basically has, you know --

23    *Pike* balancing gives a lot of deference to the policy interest

24    and the fact that particular firms may be adversely affected

25    doesn't equate to unconstitutionality.
```

```
1              And then I would just close again with pointing to
2    the LCFS decision because I think the extraterritoriality
3    issue was really fully vetted and briefed there, and I think
4    it's directly applicable here.
5              THE COURT:  Thank you.
6              MR. DONAHUE:  Thank you.
7              THE COURT:  Have I heard everyone out?  Is there
8    anyone else who wishes to be heard?  Very good.
9              Well, very well briefed, fascinating issue.  Very
10   well argued.  The Court will take it under advisement.  Court
11   is adjourned.
12             Oh, you know what, we have -- I knew I was going to
13   forget this motion.  Would anybody have any objection to my
14   considering it on the papers?  It's pretty straightforward
15   and --
16             MR. BOYD:  That's fine with us, Your Honor.
17             MR. CUNNINGHAM:  Agreed.
18             THE COURT:  Okay.  Thank you.  Court is adjourned.
19             (WHEREUPON, the matter was adjourned.)
20
21                        *     *     *     *
22
23
24
25
```

1                              CERTIFICATE

2

3         I, Heather A. Schuetz, certify that the foregoing is

4    a correct transcript from the record of the proceedings in the

5    above-entitled matter.

6

7

                 Certified by: s/ Heather A. Schuetz_____

8                               Heather A. Schuetz, RMR, CRR, CCP
                                Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25